Rene L. Valladares
Federal Public Defender
Nevada State Bar No. 11479
*Jonathan M. Kirshbaum
Assistant Federal Public Defender
New York State Bar No. 2857100
411 E. Bonneville Ave., Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
Jonathan_Kirshbaum@fd.org


*Attorney for Petitioner Shawn Glover, Jr.

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| Shawn Glover, Jr., | |
| Petitioner, | Case No. 3:22-cv-00207-LRH-CSD |
| v. | **First Amended Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254** |
| Warden Reubart, *et al.*, | |
| Respondents. | |

The State holds Shawn Glover, Jr., in violation of the United States Constitution. He asks that this Court grant his petition for a writ of habeas corpus and order the State to release him from his unconstitutional confinement pursuant to the judgment entered October 15, 2018.

## PROCEDURAL HISTORY

**A.    State Court Proceedings**

**1.    Trial and Direct Appeal**

On February 4, 2016, an indictment was issued charging Shawn Glover, Jr., with open murder with use of a deadly weapon, assault with a deadly weapon, ownership or possession of firearm by prohibited person, and discharge of a firearm from or within a structure of vehicle. (02/04/2016 Indictment.)

A five-day jury trial occurred between July 31, 2018, and August 3, 2018. The jury found Glover guilty of murder in the first degree with use of a deadly weapon. The jury also convicted him on the three remaining counts in the indictment. (08/03/2018 Verdict.) On October 10, 2018, Glover was sentenced to life without the possibility of parole on the murder count with a consecutive term of 4 to 15 years on the weapon enhancement. (10/15/2018 Judgment of Conviction.) The remaining sentences were ordered to run concurrently to each other and to the sentence on the murder. (*Id.*) The judgment of conviction was entered on October 15, 2018. (*Id.*)

Glover timely appealed. He raised the following three claims on direct appeal:

I.    There was insufficient evidence presented at trial to overcome the presumption of innocence and thereby to sustain the convictions against Shawn Glover.

II.    Mr. Glover was denied his constitutionally guaranteed right to a fair trial when the state attempted to shift the burden of proof to him.

III.    Mr. Glover was denied his constitutionally guaranteed right to a fair trial when the court allowed the state to solicit from Miranda Sutton and Akira Veasley improper character evidence.

(04/17/2019 OB in Case No. 77425.)

On October 24, 2019, the Nevada Supreme Court issued its order of affirmance. (10/24/2019 Order of Affirmance.) Remittitur issued on November 18, 2019. (11/18/2019 Remittitur.)

2

**B.      State Post-Conviction Proceedings**

On March 5, 2020, Glover moved for the withdrawal of his trial attorney and for the appointment of counsel to represent him in his postconviction proceedings. (03/05/2020 Motion.) On April 30, 2020, the court granted the motion and appointed counsel to represent Glover on his post-conviction petition. (04/30/2020 Minute Order.)

On September 14, 2020, appointed counsel filed a Petition for Writ of Habeas Corpus (Post-Conviction). (09/14/2020 Petition.) He raised two grounds for relief:

1.    Trial counsel provided ineffective assistance to the petitioner by failing to object to testimonial hearsay introduced in violation of *Crawford v. Washington*.

2.    Trial counsel provided ineffective assistance to the petitioner by possessing a conflict of interest resulting from the public defender's office previous representation of Fleming in a criminal case.

(09/14/2020 Petition.) The court issued a notice of nonconforming document, indicating that the petition initiated a new civil action, but had been made up of multiple documents submitted together. (09/17/2020 Notice.) The State moved to strike the petition due to this notice. (11/13/2020 Response.) On January 4, 2021, Glover filed an amended petition, which was identical to the original petition, except for the cover page. (01/4/2021 Amended Petition; 01/08/2021 Hearing Tr. at 4.)

On February 25, 2021, the state district court issued a findings of fact, conclusions of law and order denying the petition. (02/25/2021 FOFCOLO.) Glover timely appealed and raised the following two claims:

1. The District Court Erred By Not Finding Trial Counsel Provided Ineffective Assistance To Glover By Failing To Object To Testimonial Hearsay Introduced In Violation Of *Crawford v. Washington*. The District Court Further Erred By Failing To Grant An Evidentiary Hearing Regarding This Claim

3

> 2. The District Court Erred By Failing To Find Trial Counsel Provided Ineffective Assistance To Glover By Possessing A Conflict Of Interest Resulting From The Public Defender's Office Previously Representing Fleming In A Criminal Case. The District Court Further Erred By Failing To Grant An Evidentiary Hearing Regarding This Claim

(9/23/2021 OB in No. 82700.) On February 3, 2022, the Nevada Court of Appeals issued an Order of Affirmance. (02/03/2022 Order of Affirmance.)

## C. Federal Court Proceedings

On May 6, 2022, this Court filed Glover's 28 U.S.C. § 2254 petition. (ECF No. 1-1.) On July 26, 2022, this Court granted Glover's request for the appointment of counsel and appointed the Federal Public Defender to represent Glover. (ECF No. 12.) On August 25, 2022, Assistant Federal Public Defender Jonathan Kirshbaum appeared as counsel. (ECF No. 14.)

## STATEMENT REGARDING 28 U.S.C. § 2254(D)

With respect to each ground for relief in this petition, Glover alleges any rulings from the Nevada appellate courts denying him relief on the merits are (or would be) (1) contrary to, and/or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and/or (2) are (or would be) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Glover also asserts for the purposes of further review that the standard of review in 28 U.S.C. § 2254(d) violates the U.S. Constitution, specifically the Suspension Clause (Article One, Section Nine, clause two); fundamental principles of separation of powers (Articles One, Two, Three); the ban on cruel and unusual punishments (Amendments Eight and Fourteen); and the guarantee of due process (Amendments Five and Fourteen). *But see Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007) (rejecting some of these arguments).

1

2                              GROUNDS FOR RELIEF

3    **Ground One:**          **Glover's Right to Due Process under the Fifth and**
4                             **Fourteenth Amendments to the United States**
                              **Constitution Was Violated Because the Evidence Was**
5                             **Legally Insufficient to Support the Convictions.**

6           **Statement of Exhaustion**: This claim was raised, and decided, on direct
7    appeal. (04/17/2019 OB in Case No. 77425; 10/24/2019 Order of Affirmance.)

8           A defendant's right to due process is violated if a conviction is not supported
9    by legally sufficient evidence.

10          **A.    Factual Background**

11          In December 2015, Patrick Fleming, his wife Miranda Sutton, their 21-year-
12   old daughter Akira Veasley, and their 12-year-old twins, moved into a townhouse in
13   North Las Vegas with their goddaughter Angela. (08/01/2018 Trial Transcript ("Trial
14   Tr.") at 42-44, 91.) Shortly after that, around Christmas Eve, Shawn Glover moved
15   into the townhouse. Glover and Angela have a daughter in common. (*Id.* at 45-46.)

16          Sutton and Veasley testified at trial that, on the morning of January 1, 2016,
17   Glover shot and killed Fleming. However, in their initial statements to the police
18   given on the day of the shooting, neither Sutton nor Veasley stated that Glover had
19   committed the shooting. Rather Sutton indicated that she did not know who shot
20   Fleming and Veasley indicated the shooter was a man named Hatch, who had come
21   over to the house to buy marijuana from Fleming.

22          In contrast to their initial statements to the police, Sutton and Veasley testified
23   at trial that on the morning January 1, 2016, Glover shot Fleming after a
24   confrontation between them in the townhouse. The incident began when Fleming had
25   returned from taking Angela to work. (08/01/2018 Trial Tr. at 46-48.) Fleming got
26   into an argument with Veasley over her behavior the night before. (08/01/2018 Trial

27

                                          5

1    Tr. at 46-48, 92.) The argument was loud and took place in the downstairs garage.

2    Sutton was present in the garage during the argument. (*Id.*)

3        According to Sutton, at some point during the argument, Glover came

4    downstairs with the phone and told Sutton that Angela was on the phone and wanted

5    to speak to her. (*Id.* at 49-50.) After Miranda told Angela that everything was okay,

6    Glover went back upstairs. (*Id.*) Later, as the argument in the garage was winding

7    down, Glover returned to the garage. Sutton testified that Glover asked her to come

8    upstairs with him, which she did. She claimed that Glover asked her if she wanted

9    him to handle the situation. She told him that everything was fine and not to worry.

10   (*Id.*)

11       Sutton testified that shortly after Fleming and Veasley had come back upstairs

12   Fleming confronted Glover about wanting to talk to his wife. (*Id.* at 52.) Glover

13   indicated he was concerned because of the heated argument in the garage. (*Id.*)

14   According to Sutton, when Fleming attempted to touch Glover on his shoulder, Glover

15   pulled away "like man, get off me, you're too close to me." (*Id.*) Fleming then looked

16   at Glover and said "do we have a problem, do we need to talk?" Fleming suggested he

17   and Glover go downstairs to talk. (*Id.*)

18       Sutton told Fleming that he did not need to talk to Glover, but Fleming pushed

19   Sutton to the side and walked downstairs. (*Id.*) Glover followed Fleming down the

20   stairs. Sutton then went towards Angela's bedroom when she heard three gunshots.

21   (*Id.* at 53-54.) Sutton and Veasley ran to the landing at the top of the stairs and saw

22   Fleming lying on the floor and Glover standing over him holding a gun. (*Id.* at 53-54,

23   96.) Sutton testified that Glover pointed the gun at her and said something to the

24   effect of "don't tell on me." Sutton later testified that Glover threatened her, saying

25   "if you and your kids want to live, you'll shut the fuck up." (*Id.* at 54.) Glover left and

26   Veasley called 911. (*Id.* at 55-56.)

27

On cross examination, both Sutton and Veasley acknowledged that they told the police a different story immediately after the shooting. Sutton admitted that, in the 911 call, she originally told the police that she did not know who had shot her husband. (*Id.* at 68.) Sutton struggled to provide a coherent explanation for why she told a different story to the police. Her explanations varied: "I was afraid, so I initially liked to the police"; "I really don't – don't even remember that part"; "I'm not sure if I lied to them"; "I believe I said that"; "I might have said that"; "I don't know." (*Id.* at 68-79.) She also was unable to answer simple and direct questions on cross examination, particularly with respect to questions about her original statement to the police. (*Id.*)

For her part, Veasley admitted on cross examination that she initially told the police that someone named Hatch, who had come over to buy marijuana from Fleming, had shot Fleming. She also indicated that Hatch had been waiting upstairs during the argument, but at some point had come downstairs to talk to Sutton. She further stated that Fleming was upset about Hatch sticking his nose into family business. (*Id.* at 103-05.)

## B.    Argument

Glover's right to due process was violated because his murder conviction was based on legally insufficient evidence. The State presented no physical evidence tying Glover to the crime. There was no fingerprint evidence that linked Glover to the crime. There was no DNA evidence collected from inside the townhouse or from any of the ballistics evidence, like the .40 caliber shells found at the crime scene.

Instead, the case against Glover relied solely on the testimony from Sutton and Veasley. However, their testimony was fundamentally flawed. These two witnesses told a completely different story at trial than the one they told to the police immediately after the shooting. In contrast to her trial testimony implicating Glover, Sutton stated in the 911 call when she was still under the stress of the incident that

she did not know who had shot Fleming. She could not credibly explain why, in a moment devoid of reflection, she told the 911 operator that she did not know who had shot Fleming. She provided various reasons for her inconsistency: she was afraid, she did not remember, she did know, she was not sure what she said. She repeatedly refused to give answers to simple and direct questions. Her inconsistency in her accounts of what happened rendered her testimony entirely untrustworthy.

The same can be said about Veasley. She told multiple versions of what happened that day. While she pointed the finger at Glover at trial, she told the police a man named Hatch shot Fleming. Hatch was a customer of Fleming and was at the house to buy marijuana. Although Veasely later stated Hatch was Glover, her description of Hatch as a customer over to buy marijuana was a different person than Glover, who was living in the house at the time. This core inconsistency in her story severely undermines the credibility of her testimony.

Because the only evidence against Glover cannot be considered reliable, the convictions were not based on legally sufficient evidence. Glover's right to due process was violated. The writ should be granted, the judgment of conviction vacated, and the charges dismissed.

**Ground Two:** **Glover's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution was violated based upon prosecutorial misconduct when the prosecutor attempted to shift the burden of proof unto Glover.**

**Statement of Exhaustion**: This claim was raised, and decided, on direct appeal. (04/17/2019 OB in Case No. 77425; 10/24/2019 Order of Affirmance.)

Prosecutorial misconduct in closing argument can violate a defendant's constitutional rights if the comments so infect the trial with unfairness as to make the resulting conviction a denial of due process.

In closing argument, defense counsel argued that the prosecution had not proven beyond a reasonable doubt that Glover was the one who committed the crime. (08/03/2018 Trial Tr. at 26.) He pointed out that there was no physical evidence connecting Glover to the crime. (*Id*. at 32-34.) He argued that the only evidence against Glover were the unreliable and "suspect" testimony from Sutton and Veasley. (*Id*. at 33-34.) He argued there was no corroboration for their testimony. (*Id*.) He also pointed out there was no real evidence establishing intent or motive. (*Id*. at 36.)

In rebuttal, the prosecutor then attempted to shift the burden of proof on to the defense. First, the prosecutor stated, "And I'm waiting for Mr. Bashor to answer the question, well where was his client?" (08/03/2018 at 37-38.) Counsel's objection was sustained and the court asked counsel to rephrase the comment. (*Id*. at 38.) The prosecutor then stated, "He [defense counsel] said – Mr. Bashor said, as he was making his comment about this Defendant, is the Defendant was not even there. Where is the evidence about that?" (*Id*.) The jury was never told to disregard this comment.

The prosecutor's misconduct in closing violated Glover's right to due process. The State's question to the jury—"Where is the evidence about that?"—clearly shifted the burden of proof from the State to the defendant. The question told the jurors that in order for them to consider the defense's argument challenging the State's evidence against him, the defense needed to present to them some evidence. This comment violated a fundamental notion of our criminal justice system—the State has the burden to prove the defendant guilty beyond a reasonable doubt. When the prosecutor tells the jury, through argument, that the defense needs to produce evidence, the prosecutor shifts the burden upon the defendant in violation of due process under the Fifth and Fourteenth Amendments. Critically, this comment was not responsive to any argument from the defense. The defense limited its argument exclusively to the

prosecution's failure to prove its case beyond a reasonable doubt. There was no justification for this comment. Yet, the jury was not told to disregard it.

Accordingly, when the prosecution shifted the burden of proof onto Glover, Glover's right to due process was violated. The writ should be granted, the judgment of conviction should be vacated, and a new trial should be ordered.

**Ground Three:** **Glover was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution when trial counsel failed to object to testimonial hearsay**

**Statement of Exhaustion**: This claim was raised, and decided, in the state post-conviction appeal. (9/23/2021 OB in No. 82700; 02/03/2022 Order of Affirmance.)

A defendant is entitled to the effective assistance of counsel. To establish a claim that an attorney provided constitutional ineffective representation, a defendant must establish that his attorney's performance was deficient, in that counsel's performance fell fellow an objective standard of reasonableness, and this deficient performance caused him prejudice, in that but for counsel's deficient performance, there is a reasonable probability the outcome of the proceedings would have been different.

A.    **Factual Background**

Prior to trial, Dr. Timothy Dutra—a medical doctor employed by the Clark County Coroner Medical Examiner—performed an autopsy on the victim, Patrick Fleming. Dr. Dutra produced an autopsy report that contained his findings and conclusions regarding the cause and manner of death. At trial, the State called Dr. Jennifer Corneal, rather than Dr. Dutra, to present information contained in the autopsy report, as well as information contained in an investigative file presumably produced by the Clark County Coroner's Office.

10

At trial, Dr. Corneal testified that Dr. Dutra performed the autopsy of Fleming. (08/01/2018 Trial Tr. at 121.). Dr. Corneal had merely reviewed the autopsy report and investigative files, including photographs, as it related to the autopsy performed on Fleming on January 2, 2016. (*Id.*)

Dr. Corneal testified that Fleming was shot in the back of his head on the left side. (*Id.* at 123.) The entrance wound was located in the back of Fleming's head. (*Id.* at 123-24.) The trajectory of the projectile was left to right, and downward.(*Id.* at 126.) The projectile passed through Fleming's brain, which transected his brain stem and immediately incapacitated him. (*Id.* at 127.) Dr. Corneal testified that she did not observe any soot or stippling that would indicate the gun was fired at close range. (*Id.* at 128.) She further testified she could not determine the range at which the gun was fired possibly due to Fleming's thick hair, which may have absorbed the soot—the gray material deposited around the wound edges—and/or the stippling—the unburnt gun powder that strikes the skin during a shooting at close range. (*Id.*)

Patrick was also shot in his inner, right upper arm, and in the right groin area. (*Id.* at 129-30.) The trajectory of the projectile in the groin area was right to left, front to back and downward. (*Id.* at 131.) Dr. Corneal testified that the gunshot wound to the head was the cause of Patrick's death, and the manner of death was homicide. (*Id.*)

Counsel did not object to Dr. Corneal's testimony under the Confrontation Clause.

**B.    Argument**

Counsel was ineffective for failing to object to the admission of testimonial hearsay. Evidence of Fleming's autopsy, including all of the testimonial conclusions in the autopsy report, was admitted at trial, even though the export who performed the autopsy, Dr. Dutra, did not testify. Dr. Dutra's findings and conclusions were clearly testimonial as the information in the report would have led an objective

witness to reasonably believe that the statements would be available to be used at a later trial. The report contained, among other things, Dr. Dutra's opinion as to the cause and manner of death in a homicide case. This evidence was clearly incriminating as it was used to support the State's theory about the manner in which the shooting occurred. Because it was testimonial, Glover had the right to question Dr. Dutra about his work if the State intended to use it against him.

Although the State was allowed to present the evidence to the jury, Glover was not provided the opportunity to question Dr. Dutra about his methodology, competence as an expert, and other factors relevant to the weight and admissibility of the testimony concerning the autopsy provided through Dr. Corneal. The Supreme Court has made clear that an expert witness must be subject to confrontation. *See Commonwealth v. Melendez-Diaz*, 557 U.S. 305 (2009); *see also Bullcoming v. New Mexico*, 564 U.S. 647, 664 (2011). However, rather being given the opportunity to confront Dr. Dutra, the medical examiner who performed the autopsy and authored the autopsy report, Dr. Dutra's findings were presented through Dr. Corneal. But Dr. Corneal did not conduct an independent evaluation. Rather, her testimony was based solely upon her review of Dr. Dutra's work. She testified she reviewed the autopsy report authored by Dr. Dutra and an investigative file—presumably produced by the coroner's office—that included photographs taken during the autopsy. Dr. Corneal never indicated that her testimony was based upon her own conclusions and opinions after an independent evaluation of the evidence. As such, the record suggests that Dr. Corneal acted as a surrogate for the findings and opinions contained in Dr. Dutra's autopsy report.

Counsel was ineffective for failing to object to Dr. Corneal's testimony on this ground. There was no feasible strategic reason for trial counsel's failure to object to the admission of testimonial hearsay through Dr. Corneal.

Glover was prejudiced by counsel's failure to object to this testimony. There was a reasonable probability that such an objection would have led to the testimony being excluded. This exclusion would have resulted in the omission of a critical element of the homicide charge—cause and manner of death—which would like probably led at least one juror to find reasonable doubt.

Accordingly, Glover's right to the effective assistance of counsel was violated. The writ should be granted, the judgment of conviction vacated, and a new trial ordered.

**Ground Four:** **Glover was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution because the public defender's office possessed a conflict of interest due to its prior representation of the victim in a criminal case**

**Statement of Exhaustion**: This claim was raised, and decided, in the state post-conviction appeal. (9/23/2021 OB in No. 82700; 02/03/2022 Order of Affirmance.)

A defendant has the right to the effective assistance of counsel free of any conflicts of interest. If a defendant can establish that his attorney harbored an actual conflict of interest and the conflict adversely affected his attorney's performance, prejudice is presumed.

Glover was represented by an attorney with the Clark County Public Defender's Office. However, trial counsel failed to disclose the Public Defender's former representation of the victim, Patrick Fleming, in two criminal cases. The Public Defender represented Fleming in Las Vegas Justice Court case number 01M20858X. In that case the court convicted Fleming of Battery Domestic Violence following a bench trial. (01/04/2021 Amended State Petition, Ex. B.) The Public Defender also represented Fleming in Las Vegas Justice Court in case number

1   10F15357X, where Fleming pleaded Nolo Contendre to a charge of Disorderly
2   Conduct. (*Id.*)

3        Glover was deprived of his right to the effective assistance of counsel based on
4   the conflict of interest due to his counsel's prior representation of the victim. The
5   Public Defender's Office represented Glover on a case in which he was convicted of
6   battery domestic violence. That crime generally includes acts that are considered
7   violent in nature towards someone who had a familial or romantic relationship with
8   Fleming.[1] There is reason to believe that, because Glover was connected to Fleming's
9   family through Angela, he would have been aware of this prior behavior. That
10  information may have been used to support a self-defense claim during Glover's trial.
11  Such a defense would have been bolstered by trial testimony revealing: (1) Fleming
12  initiated a confrontation with Glover following a heated confrontation with Sutton
13  and Veasley; (2) Fleming pushed Sutton to the side when she attempted to deescalate
14  the confrontation between Fleming and Glover; and (3) Fleming was in physical
15  possession of a firearm at the time of his death. (08/01/2018 Trial Tr. at 52; 08/02/2018
16  at 15.) However, the Public Defender's Office would have had an ethical obligation to
17  refrain from using any information from the prior case to assist Glover establish a
18  self-defense argument. Thus, there was a significant risk that the representation of
19  Fleming materially affected trial counsel's ability to represent Glover. As such, an
20  actual conflict of interest existed.

21       Accordingly, Glover's right to the effective assistance was violated. The writ
22  should be granted, the judgment vacated, and a new trial ordered.

23
24
25
26       [1] Under NRS 200.481(1)(a) a "battery" means any willful and unlawful use of
    force or violence upon the person of another. A battery domestic violence occurs when
27  a battery is committed against someone who has a familial or romantic relationship
    with the defendant. NRS 33.018.

**Ground Five:**     **Glover was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitutional when his attorney failed to impeach a critical witness with her inconsistent prior statement in which she told detectives a different story about the shooting than the one she gave in her trial testimony**

**Statement of Exhaustion**: This claim has not been presented to the state court.

A defendant is entitled to the effective assistance of counsel. To establish a claim that an attorney provided constitutional ineffective representation, a defendant must establish that his attorney's performance was deficient, in that counsel's performance fell fellow an objective standard of reasonableness, and this deficient performance caused him prejudice, in that but for counsel's deficient performance, there is a reasonable probability the outcome of the proceedings would have been different.

### A.    Factual Background

In December 2015, Patrick Fleming, his wife Miranda Sutton, their 21-year-old daughter Akira Veasley, and their 12-year-old twins, moved into a townhouse in North Las Vegas with their goddaughter Angela. (08/01/2018 Trial Transcript ("Trial Tr.") at 42-44, 91.) Shortly after that, around Christmas Eve, Shawn Glover moved into the townhouse. Glover and Angela have a daughter in common. (*Id.* at 45-46.)

Sutton and Veasley testified at trial that, on the morning of January 1, 2016, Glover shot and killed Fleming. However, in their initial statements to the police given on the day of the shooting, neither Sutton nor Veasley stated that Glover had committed the shooting. Rather Sutton indicated that she did not know who shot Fleming and Veasley indicated the shooter was a man named Hatch, who had come over to the house to buy marijuana from Fleming.

In contrast to their initial statements to the police, Sutton and Veasley testified at trial that on the morning January 1, 2016, Glover shot Fleming after a confrontation between them in the townhouse. The incident began when Fleming had returned from taking Angela to work. (08/01/2018 Trial Tr. at 46-48.) Fleming got into an argument with Veasley over her behavior the night before. (08/01/2018 Trial Tr. at 46-48, 92.) The argument was loud and took place in the downstairs garage. Sutton was present in the garage during the argument. (*Id.*)

According to Sutton, at some point during the argument, Glover came downstairs with the phone and told Sutton that Angela was on the phone and wanted to speak to her. (*Id.* at 49-50.) After Miranda told Angela that everything was okay, Glover went back upstairs. (*Id.*) Later, as the argument in the garage was winding down, Glover returned to the garage. Sutton testified that Glover asked her to come upstairs with him, which she did. She claimed that Glover asked her if she wanted him to handle the situation. She told him that everything was fine and not to worry. (*Id.*)

Sutton testified that shortly after Fleming and Veasley had come back upstairs Fleming confronted Glover about wanting to talk to his wife. (*Id.* at 52.) Glover indicated he was concerned because of the heated argument in the garage. (*Id.*) According to Sutton, when Fleming attempted to touch Glover on his shoulder, Glover pulled away "like man, get off me, you're too close to me." (*Id.*) Fleming then looked at Glover and said "do we have a problem, do we need to talk?" Fleming suggested he and Glover go downstairs to talk. (*Id.*)

Sutton told Fleming that he did not need to talk to Glover, but Fleming pushed Sutton to the side and walked downstairs. (*Id.*) Glover followed Fleming down the stairs. Sutton then went towards Angela's bedroom when she heard three gunshots. (*Id.* at 53-54.) Sutton and Veasley ran to the landing at the top of the stairs and saw Fleming lying on the floor and Glover standing over him holding a gun. (*Id.* at 53-54,

16

96.) Sutton testified that Glover pointed the gun at her and said something to the effect of "don't tell on me." Sutton later testified that Glover threatened her, saying "if you and your kids want to live, you'll shut the fuck up." (*Id.* at 54.) Glover left and Veasley called 911. (*Id.* at 55-56.)

On cross examination, defense counsel attempted to impeach Sutton with her prior inconsistent statements. Sutton admitted that, in the 911 call, she stated that her husband had answered the door and he had been shot. (08/01/2018 Trial Tr. at 68.) She acknowledged that someone was supposed to come over, but she did not know who it was. (*Id.*) She further admitted that she told the 911 operator that she did not know who had shot her husband. (*Id.*) She believed that she also told the 911 operator that she had been threatened. (*Id.*)

However, defense counsel failed to impeach Sutton with her statements to the detectives on the day of the shooting. Sutton acknowledged that the detectives had a recording device and they wanted to record the conversation. (08/01/2018 Trial Tr. at 69.) She could not remember if it had been recorded. (*Id.*)

Counsel then sought to question her about the substance of her prior statement to the detectives. However, counsel failed to actually impeach her with the statement. Counsel began by asking her whether she informed the detectives that Fleming was looking for a re-up. (08/01/2018 Trial Tr. at 70-71.) In response, Sutton became evasive. At first, she changed the subject and began discussing other aspects of her prior statement. Counsel asked her again and Sutton replied, "I may have said that." (*Id.* at 71.) Rather than impeach her with the actual language of the statement, counsel asked her, "Would looking at your statement to the police on September 1st refresh your recollection?"[2] Sutton said no. Counsel asked why. Sutton said that she

---

[2] It is not clear why counsel said September 1. There was no statement from September 1. The statement he was referencing was clearly January 1, 2016.

did not sign a written statement or write a statement because she was in fear. She explained that she asked the officers to stay and protect them, but they would not. (*Id.*)

Counsel continued to frame the impeachment question as whether Sutton "recalled" telling the detective her inconsistent statements. Counsel asked, "**You don't recall** telling the detectives that the deal didn't go through, I know this morning he kept saying he had to recop or get some weed?" (*Id.* (emphasis added).) Sutton, once again, redirected her answer away from the question and stated that she believed she and her kids were in danger. (*Id.*) Defense counsel followed up by attempting to get her to confirm she had said this. Sutton refused to do that. After her refusal, counsel then asked whether she recalled making the statement. Sutton said no. (*Id.* at 71-72.) Counsel again asked whether she recalled saying it. Sutton answered that she could have said it, but she was "not sure what I said after that. I was distraught, I was still shaking, and I was still asking for services that they could not provide. So I'm not exactly sure. I didn't even want to give out his name because I was so scared." (*Id.* at 72.) Counsel then asked, "Okay. Maybe because it's a lie, right?" The prosecutor's objection to the question as argumentative was sustained. (*Id.*)

Counsel then asked, "Do you recall telling the detectives that your husband had to make a run, and it was something to do with weed, and he kept talking about it the night before?" Sutton responded, "You keep asking me these questions, but I'm not familiar with them. I'm not exactly sure what I told them." (*Id.* at 73.) Once again, Sutton stated that the police refused to protect her and her family. (*Id.*) Counsel moved on to other subjects.

After questioning her about the argument between Fleming and Veasley occurred, counsel asked Sutton, "Okay. So, that part of your statement to the police

on January 1 you have a perfect recollection of, right?" Sutton responded that she was not sure. (*Id.* at 75.)

Counsel returned to the January 1 statement to the police and asked her, "In your statement to police on January 1st, you indicated to them that you didn't get a good look at the suspect, is that correct?" Sutton replied, "I'm not exactly sure." (*Id.* at 76.) Sutton explained that she was afraid when the officers would not stay with them. (*Id.*) Counsel asked, "And, again, there'd be no point to show you the transcript?" Sutton answered, "No." (*Id.*)

Counsel then asked whether she remembered telling the police that her memory was off since her last surgery. Sutton said, "No. I told them that I had a lot of things going on since my last surgery, but my memory wasn't off that—not to know what had had happened to my husband." (*Id.* at 76.) Counsel followed up, "And that's why you told the police you didn't know who shot your husband on January 1st?" Sutton denied that. She said, "I told the police that when they told me that they could not stay there with me and my kids in the house. . . ." (*Id.*) Counsel then asked her whether she recalled telling the officers she couldn't describe the individual because her memory was kind of off since my last surgery." Sutton, once again, changed the subject and said what she could remember about what happened. (*Id.* at 77.)

Later, counsel asked whether she recalled stating that the individual came in through the front door on January 1. Sutton said she wasn't sure. She added, "[T]hat's my whole point to you. I'm not exactly sure what I said to the officers January 1st, because I was scared and alone with my husband still laying down there and my kids in a room somewhere that I don't even know about." (*Id.* at 78.)

After asking Sutton whether she lied to the police, Sutton said she was not sure if she lied to them since she did not write out a statement. Counsel then asked her whether she had any recollection of the police recording a statement. Sutton said,

"No, not today because I never signed anything that day." She added, once again, she was scared. (*Id.* at 79.)

On redirect, the prosecutor asked Sutton whether, when she spoke to the detectives on January 1, she believed that Glover had committed other acts of violence at the time she spoke to the police. Sutton said yes, she knew about his history. (*Id.* at 89.) Afterwards, the court instructed the jury that this testimony could be considered by the jury solely for the purpose of explaining the state of mind of the witness at the time she made her statement to police on January 1, 2016. (*Id.* at 89-90.)

Counsel never sought to admit into evidence Sutton's prior inconsistent statements to the police detectives.

For her part, Veasley admitted on cross examination that she initially told the police that someone named Hatch, who had come over to buy marijuana from Fleming, had shot Fleming. She also indicated that Hatch had been waiting upstairs during the argument, but at some point had come downstairs to talk to Sutton. She further stated that Fleming was upset about Hatch sticking his nose into family business. (*Id.* at 103-05.)

## B. Argument

Counsel was ineffective for failing to impeach Sutton with her prior inconsistent statement to the police. Glover's main defense at trial was that the State's most important witnesses against Glover told an entirely different story at trial than the one they told the police on the day of the shooting. Sutton's prior inconsistent statement to the police was a central component of that defense. However, counsel utterly failed to impeach Sutton with the statement. There is a basic way that a witness can be impeached through the use of a prior inconsistent statement. The attorney confirms the witness's current testimony. The attorney then confirms that the witness made a prior statement. The final step is to then ask the

witness about the specific language in the prior inconsistent statement. If the witness refuses to acknowledge the content of the statement, then the attorney can seek to admit the statement. *See* NRS 51.035 (prior inconsistent statements are not hearsay).

Counsel simply failed to do that here. Most importantly, counsel failed to get the prior inconsistent statement into evidence. Counsel's approach was misguided from the start. When counsel first began questioning Sutton about her prior inconsistent statement, he did not make clear the exact contents of her prior statement. He paraphrased it and spoke about it in broad terms. However, counsel had the right to use the exact language of the statement in his question. Counsel could have gone so far *as simply reading the transcript of the statement*.

But the more prejudicial mistake was his inadequate and misguided response to Sutton's answers. Sutton refused to confirm the contents of her prior statement. Instead, she kept repeating that she did not remember. In response, counsel had the right to admit the prior statement into evidence. Rather than pursue this important step, counsel instead focused on whether Sutton remembered her prior statement. But her memory of the statement was irrelevant for this type of impeachment. So long as the parties had the opportunity to question her about the statement, which clearly occurred, counsel was allowed to admit the prior inconsistent statement into evidence. *See* NRS 51.035. He did not need to waste time, and cede control of the questioning over to Sutton, by inquiring into her memory of the statement. He just needed to admit the prior inconsistent statements. Based on Sutton's refusal to answer his questions about the contents of her statement to the police, the jury was simply not allowed to consider what Sutton had previously said to the detectives.

At bottom, the goal of this type of impeachment was to get the exact contents of the prior inconsistent statement into evidence so that the jury could use it to assess Sutton's credibility. That was either through Sutton admitting that she said the statements or, if she refused to acknowledge those statements, to then admit them

into evidence. Counsel did not do that here. This was a critical mistake. There was no strategic justification for this error.

This deficient performance prejudiced Glover. Sutton's prior inconsistent statements to the police were the central component of the defense. Sutton's testimony, even more than Veasley's, was critically important to the prosecution's case. She provided the details about the entire incident, including Glover's alleged motivation for the shooting. Attacking her credibility was fundamental to the defense. Counsel's inability to properly impeach her with the prior inconsistent statements in which she told an entirely different story about what occurred, resulted in the jury being unable to consider the substance of the prior statement. There can be no doubt that there is a reasonable probability that, but for counsel's error, the outcome of the proceedings would have been different.

Accordingly, Glover's right to the effective assistance of counsel was violated. The writ should be granted, the judgment of conviction vacated, and a new trial ordered.

## Prayer For Relief

Accordingly, Shawn Glover, Jr., respectfully requests that this Court:

1.      Issue a writ of habeas corpus to have Glover brought before the Court so that he may be discharged from his unconstitutional confinement;

2.      Conduct an evidentiary hearing at which proof may be offered concerning the allegations in this amended petition and any defenses that may be raised by respondents; and

3.      Grant such other and further relief as, in the interests of justice, may be appropriate.

Dated August 1, 2023.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Jonathan M. Kirshbaum*
Jonathan M. Kirshbaum
Assistant Federal Public Defender

23

1

### DECLARATION UNDER PENALTY OF PERJURY

2    I declare under penalty of perjury under the laws of the United States of

3 America and the State of Nevada that the facts alleged in this petition are true and

4 correct to the best of counsel's knowledge, information, and belief.

5    Dated August 1, 2023.

6                                          Respectfully submitted,

7

8                                          Rene L. Valladares
                                           Federal Public Defender
9

10                                         */s/ Jonathan M. Kirshbaum*

11                                         Jonathan M. Kirshbaum
                                           Assistant Federal Public Defender
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27