# EXHIBIT  45

# EXHIBIT  45

Electronically Filed
12/31/2018 10:22 AM
Steven D. Grierson
CLERK OF THE COURT

RTRAN

DISTRICT COURT

CLARK COUNTY, NEVADA

|  |  |
|---|---|
| STATE OF NEVADA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| SHAWN GLOVER, aka SHAWN LYNN | ) |
| GLOVER, JR., | ) |
| | ) |
| Defendant. | ) |

CASE NO. C-16-312448-1

DEPT. IX

BEFORE THE HONORABLE JENNIFER P. TOGLIATTI, DISTRICT COURT JUDGE

WEDNESDAY, AUGUST 1, 2018

**RECORDER'S TRANSCRIPT OF JURY TRIAL - DAY 3**

APPEARANCES:

| | |
|---|---|
| For Plaintiff: | DAVID STANTON, ESQ. |
| | WILLIAM FLINN, ESQ. |
| | |
| For Defendant: | ROBERT E. O'BRIEN, ESQ. |
| | RYAN J. BASHOR, ESQ. |

RECORDED BY YVETTE G. SISON, COURT RECORDER

# INDEX

Testimony ............................................................. 26


<u>WITNESSES FOR THE PLAINTIFF:</u>

Miranda Sutton

    Direct Examination by Mr. Flinn ................................... 26

Akira Veasley
    Direct Examination by Mr. Flinn ................................... 31

Miranda Sutton

    Direct Examination by Mr. Flinn ................................... 41
    Cross-Examination by Mr. Bashor ................................. 64
    Redirect Examination by Mr. Flinn ............................... 87

Akira Veasley

    Direct Examination by Mr. Flinn ................................... 90
    Cross-Examination by Mr. Bashor ................................. 97
    Redirect Examination by Mr. Flinn ............................. 108

Melvin A. Givens, III

    Direct Examination by Mr. Stanton ............................. 115

Dr. Jennifer Corneal

    Direct Examination by Mr. Stanton ............................. 118
    Cross-Examination by Mr. Bashor ............................... 131

Renee Harder

    Direct Examination by Mr. Stanton ............................. 134
    Cross-Examination by Mr. O'Brien ............................. 148
    Redirect Examination by Mr. Flinn ............................. 167

1

INDEX OF EXHIBITS

2

3

4

FOR THE PLAINTIFF:                    MARKED        RECEIVED

5

4, 5, 6, 7, 10, 11 .............................................................58

36 to 48 ...........................................................................121

1 to 35 .............................................................................137

6

7

8

9

10

FOR THE DEFENDANT:                    MARKED        RECEIVED

11

A to K ..............................................................................152

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Las Vegas, Nevada, Tuesday, August 1, 2018

[ Case called at 9:07 a.m.]

[Outside the presence of the Jury]

THE COURT:  Okay.  So, this is the time set for the continued trial on State vs. Shawn Glover, C-3124481.  Counsel, could you state your appearance before we bring in the jury?

MR. STANTON:  David Stanton and William Flinn on behalf of the State.

MR. BASHOR:  Ryan Bashor and Robert O'Brien on behalf of Mr. Glover who's present and dressed appropriately.

THE COURT:  All right.  Is there anything outside the presence of the jury before you do your opening statements, and then I'll -- or I don't know if you're going to do an opening statement, but if you choose to do an opening statement, then I would take maybe a short rest.  How long are they going to be?

MR. STANTON:  I would imagine mine's about a half an hour --

THE COURT:  Okay.

MR. STANTON:  -- 35 minutes.

THE COURT:  What about you?

MR. O'BRIEN:  Probably around 20 minutes, Your Honor.

THE COURT:  So, then we could just take a quick break and perhaps calls your first witnesses and do the little mini hearing that I suggested.

MR. STANTON:  Yes.

1    THE COURT:  And then we'll go from there.  There was something I

2    said -- you walked out yesterday.  I think the phrase I used was flew out of here

3    like Batman.  You were like phoom (phonetic).

4    MR. STANTON:  Yeah.

5    THE COURT:  And I had an after thought --

6    MR. STANTON:  The kids.

7    THE COURT:  -- that I wanted to tell you, and I mentioned it to the

8    defense to tell you, which was --

9    MR. STANTON:  They did.

10   THE COURT:  -- I made -- okay, I made that ruling yesterday and on

11   -- I turned around, and you were gone.  So, I told the defense to tell you if

12   there was a pivot, the likes of which we discussed yesterday, then I would

13   revisit the ruling that I had made.  And I know I haven't made a specific

14   detailed ruling on the -- you know, there's what I may allow after we hear from

15   the two witnesses, but I just wanted to tell you that because I didn't tell you

16   that before you left.

17   MR. STANTON:  I appreciate it.

18   THE COURT:  Thank you.

19   MR. STANTON:  And Counsel did inform me.

20   THE COURT:  Thank you.

21   MR. O'BRIEN:  And then obviously after that, before we bring the

22   jury back in, we'll refine my poorly worded limiting instruction?

23   THE COURT:  Your what?

24   MR. O'BRIEN:  We'll refine the --

25   THE COURT:  Oh, yeah.  Yeah.

1          MR. O'BRIEN:  Okay.

2          THE COURT:  Can I have whatever you're looking at?

3          MR. O'BRIEN:  Sure.  I emailed it to --

4          THE COURT:  So, I can look at it while you're doing your opening?

5          MR. STANTON:  I actually thought it was pretty good.

6          MR. O'BRIEN:  Well, thanks.

7          MR. STANTON:  The hybrid Tavares [phonetic] I think is what it's

8   now going to be called.

9          THE COURT:  We're going to call it the Togliatti.

10          MR. STANTON:  The Tog.

11          THE COURT:  The Tog.

12                              [Pause]

13          THE COURT:  Do you have a problem on line 4 with saying instead

14   of  these beliefs, either  the witnesses' beliefs or any beliefs by the witnesses?

15          MR. O'BRIEN:  Not at all.  That's fine.

16          THE COURT:  You see, I'm just being really specific.

17          MR. O'BRIEN:  I appreciate it.  I told you it was poorly worded.

18          THE COURT:  Can you send this to --

19          MR. O'BRIEN:  I did.  To Diane.

20          THE COURT:  Oh.  Is she here today?

21          THE CLERK:  She'll be in later.

22          MR. O'BRIEN:  I can --

23          THE COURT:  She'll be in later.

24          MR. O'BRIEN:  I have it on my phone Dropbox, I believe.  I can

25   email it to anybody.

1          THE COURT:  Can you email it to my --

2          THE LAW CLERK:  Just email it to me.

3          THE COURT:  -- Nick Lasso, my law clerk, please?  All right.  So, I'm

4   going to make -- I don't know.  I'll propose some changes.  I just --

5          MR. O'BRIEN:  Great, Your Honor.  Thank you.

6          THE COURT:  -- want to sit with it for a minute.

7          MR. O'BRIEN:  Sure.

8          THE COURT:  Okay.  Anything else before you do your opening

9   statements?

10          MR. STANTON:  Not on behalf of the State.

11          MR. BASHOR:  Not on behalf of the Defense, Your Honor.

12          THE COURT:  And you're doing the opening statement?

13          MR. O'BRIEN:  Yes, Your Honor.

14          THE COURT:  Do you all have the technology that you need?

15          MR. STANTON:  I am hooked up and test run it, so I'm good.

16          MR. O'BRIEN:  Good over here.

17          THE COURT:  Okay.  Do you have a hard copy of any PowerPoints

18   you're using?

19          MR. STANTON:  I do.  And I can deliver that.  There are some

20   notes, but I'll bring over a clean copy.

21          THE COURT:  Okay.  So, if you could do that after the lunch hour,

22   I'd appreciate it.

23          MR. STANTON:  Sure.

24          THE COURT:  Do you --

25          MR. O'BRIEN:  And no PowerPoint here, Your Honor.

1    THE COURT:  Okay.  All right.  So, at this time --

2    THE CLERK:  (Indiscernible).

3    THE COURT:  Sure.  If he could bring them in.

4    THE MARSHAL:  All rise for the jury.  The jurors are all present,

5    ma'am.

6    [In the presence of the jury]

7    THE COURT:  Counsel, will you stipulate to the presence of the

8    jury?

9    MR. STANTON:  Yes, Your Honor.

10    MR. BASHOR:  Yes, Your Honor.

11    THE COURT:  Okay.  Ladies and gentlemen, unless any of you have

12    any questions this morning about the process, we're going to begin the trial.

13    We'll hear the opening statements.  Then I'll take a recess -- a morning recess

14    for you to take a restroom break, stretch your legs.  And then we're kind of

15    going into, you know, your participation mode and more of an observation

16    mode except for at the end of each witness I will ask you if you have any

17    questions you wish the Court to ask the witness as I told you about yesterday.

18    Okay.

19    So, does anybody have any questions before we start about the

20    process?  All right.  There being no questions, at this time, State, opening

21    statement.

22    MR. STANTON:  Thank you, Your Honor.  Madam Recorder, can I

23    have -- thank you.

24    [OPENING STATEMENT BY THE STATE]

25    Ladies and gentlemen, this case begins factually in the time of the

1   murder itself, which is January 1st, 2016. And this is the location where

2   Patrick Fleming was murdered. In this home during this day are four adults.

3   There are some minor children, but the four adults inside the home are

4   Miranda Sutton. She is Patrick Fleming's, the victim in this case, wife. Also

5   present in the home is Akira Veasley. She is the stepdaughter to Mr. Fleming

6   and the daughter to Ms. Sutton. She's in her early twenties. There is Patrick

7   Fleming, as I just mentioned. And there's the Defendant.

8           In this case, you will hear that on January 1st, the beginning of a

9   series of dominoes that falls leading up to Mr. Fleming's murder is an

10  argument -- a verbal argument between Mr. Fleming and his stepdaughter.

11  You'll hear briefly about the nature of that argument, that Mr. Fleming was

12  upset about his stepdaughter seeing another young man under circumstances

13  that he and Akira did not agree.

14          During that verbal argument, you'll hear from Miranda Sutton and

15  from Akira that Ms. Sutton intervenes on her daughter's behalf on the side of

16  the argument -- the verbal argument. You will also hear, and I ask, as I'm sure

17  you will, to pay special attention to the facts as they describe it about the

18  Defendant's behavior as this argument is ongoing in the home.

19          You will hear that the Defendant gets involved in the argument,

20  and he gets involved in a couple of different ways. And you'll hear that from

21  Ms. Sutton and Ms. Veasley about how that occurs, and when that occurs, and

22  with whom.

23          Suffice it to say, that just prior to the critical events and the murder

24  itself, there is a time where the Defendant speaks to Ms. Sutton alone. And the

25  victim, Mr. Fleming, sees that, and he's not happy about it. And so, he and the

1    Defendant are engaged in now a verbal argument about the Defendant's

2    ongoing interjection into a family dispute that he has no standing to.  Once

3    again, this is from Mr. Fleming's perspective.

4              And right at a critical moment, you will see several photographs in

5    this case of a portion of that interior of the home.  So, if you go back and recall

6    in the first photograph, there's a garage door open.  And at the back of that

7    garage doors, there's a door that leads into the home itself.  And immediately

8    upon entering that door is a stairwell up into the general residence where the

9    rooms, the kitchen, and everything else is located.

10             So, after this final confrontation occurs, you will hear that the

11   Defendant makes some comments to Miranda prior to them being seen

12   coming out of the bedroom or from a room.  She will describe to you what the

13   Defendant tells her and the words that she remembers him uttering to her

14   about what he is willing to do and get involved in in this case.

15             Then, ladies and gentlemen, there is a discussion between the

16   Defendant and Mr. Fleming about going outside of the home to talk this out.

17   And what happens is that Ms. Sutton and Ms. Veasley are at the top of the

18   stairs.  They're observing the argument and what's occurring.  And then

19   there's the interjection of let's go outside.

20             And to go outside, Mr. Fleming makes a fatal error.  And what he

21   does, ladies and gentlemen, is he walks down the stairs first with the

22   Defendant behind him.  Ms. Veasley and Ms. Sutton who -- have known the

23   Defendant for a period of time, he is a friend or an acquaintance of Mr.

24   Fleming, and Ms. Sutton and Ms. Veasley know him and have seen him

25   repeatedly in the past.

1    So, Mr. Fleming walks down the stairwell.  You can see the width

2  and the length of the stairwell in the photos and you're about to see that in a

3  photo that I'm going to show you.  Behind him, as I mentioned, Mr. Glover

4  was walking.  Unbeknownst to anybody, Mr. Glover is armed.  He's armed

5  with a .40 caliber semi-automatic handgun.

6    Ms. Sutton and Ms. Veasley will tell you that after they see them

7  walking down the stairs after that discussion, they turn their attention to what

8  they're going to do next.  And almost immediately, they hear three gunshots

9  ring out.  They run to the stairs -- the top of the stairs and they look down the

10  stairs and this is what they see.  That is Mr. Fleming.  He is dead.  He's been

11  murdered.

12    You're going to hear testimony about his wounds that are critical

13  in this case.  And, ladies and gentlemen, the door that you see down there is

14  the door that I mentioned earlier.  One is the exit to the garage and to outside.

15  And as I mentioned to you, there's wounds to Mr. Fleming.  Mr. Fleming, you

16  will hear from a witness I believe today -- this afternoon, a doctor, -- a

17  specialized doctor.  Her name is Jennifer Corneal.

18    She is a physician, and she deals as a medical examiner at the

19  coroner's office with a medical procedure called an autopsy.  And she's

20  dealing with a subspecialization called pathology and forensic pathology.  It's,

21  as she will describe to you, the study of injuries, the cause and manner of

22  death and the injuries that cause death.  You will hear from her some very

23  specific aspects of the wounds to Mr. Fleming because while Mr. Fleming will

24  not be here to testify, the wounds and evidence on his body is telling,

25  compelling evidence to tell you how he was killed and by whom.

First of all, Dr. Corneal will tell you that he died from multiple gunshot wounds, one in particular.  And I'll get to that in just a moment.  She will describe the locations of the wounds.  And, ladies and gentlemen, you will hear that Mr. Fleming was shot in three areas of his body, generally his leg, his torso, and the fatal gunshot wound, a massive injury, a headshot with a .40 caliber semi-automatic handgun.

She will also talk about the directionality.  And by that, in an autopsy, the observations both externally to show, in a gunshot wound, what wound is the entrance and whether or not there is a corresponding exit.  In this case, Mr. Fleming suffered three gunshot wounds.  Two were what's called penetrating gunshot wounds, meaning that the bullet went in but did not exit.  Those bullets or fragments thereof were removed as evidence during the autopsy procedure.  And one wound was what's referred to as a perforated gunshot wound with a recognized entrance and a recognized exit.  And you will hear Dr. Corneal, and through photographs of those injuries, describe how she can determine what are entrance and what are exit gunshot wounds.

But in addition to that examination, there is an internal examination.  And in the internal examination, it is noted and marked about what damage is done internally.  And you will hear that.  And you will also hear the directionality, the directionality of how that bullet passed through Mr. Fleming.  And that is important, ladies and gentlemen, because it absolutely corroborates Ms. Veasley and Ms. Sutton about what they observed just before the gunshots.  And that is the Defendant, Mr. Glover, following right behind Mr. Fleming as he's walking down the stairs because you will see, in especially the head wound, the trajectory is downward.

1

2          In addition, you will hear the doctor testify about in her medical

3   opinion which of these gunshot wounds are lethal and those that are not,

4   independently of one another.  And certainly, when you hear the testimony

5   regarding the head wound, you will hear testimony from Dr. Corneal that that

    is an instantaneously incapacitating wound and a fatal wound.

6          In addition, ladies and gentlemen, you're going to see that there is

7   a shot from behind multiple -- that there are two bullets recovered from both

8   Mr. Fleming's head as well as his arm, that there is from the crime scene

9   evidence of one round that strikes ultimately directly under Mr. Fleming's

10  body.  And so, let me show you that.

11         So, what you're looking at here is the close-up at the bottom of the

12  stairs.  Mr. Fleming has now been taken from the scene.  The carpet in the left-

13  hand photograph has been pulled back.  You will see closer photographs of a

14  bullet hole in that carpeting.  And in the center is the tile with distinct marks

15  showing a bullet impact at that site.  And what that means from a homicide

16  detective's perspective as to how Mr. Fleming is positioned, the number of

17  wounds, and the exiting of wounds, that tells you where Mr. Fleming was

18  when that shot entered and exited his body.

19         Immediately adjacent to Mr. Fleming's body at the bottom of the

20  stairs are two expended cartridge cases.  They're both .40 caliber.  They are

21  semi-automatic rounds.  And you will hear from the primary homicide

22  detective in this case, Detective Wilson, that as of today or her testimony

23  tomorrow, there's been no weapon recovered by their investigation associated

24  with those two and ultimately three rounds.

25         You will also hear testimony that when they examined the scene,

1  once again, which include Mr. Fleming's body, right at his waist band is a gun.

2  Mr. Fleming was carrying a semi-automatic handgun on his person as you see

3  it there, not withdrawn, but literally that's the condition at the scene.  And,

4  ladies and gentlemen, you're going to hear evidence in this case about that

5  weapon because as you can imagine, this weapon is part of a crime scene.

6  And you're going to hear from a crime scene analyst and from the detective

7  about the condition of this weapon and how a weapon like this is handled and

8  processed at the scene.

9          You're going to hear that it is photographed both in its natural

10  condition as you see here, but that after the scene is processed, and you see in

11  that photograph the yellow, what we call, evidence tents, with the numbers on

12  them, have a very specific purpose and design, that they are to mark evidence

13  in a crime scene and that they have a corollary cognition to the crime scene

14  diagram.

15          So, there's a crime scene diagram that will be introduced as

16  evidence in this case.  And certain items of evidence are denoted in the index

17  by a number, and those numbers on the index correspond to the evidence

18  tents that you see actually at the crime scene.

19          So, what you see here at the scene in the photographs and in all

20  the photographs that will be admitted, you will see numbers.  It will tell you,

21  number one, that the scene has been processed, and it's towards the end of

22  the process, but, also, that it will tell you, and you can use as reference when

23  you look at the crime scene diagram where those items are located and a

24  reminder what each one of those items are.

25          So, in this particular case, that weapon was discovered and as you

1    will hear from the crime scene analyst, after it is collected physically as

2    evidence, it is examined by crime scene investigators in a methodical

3    patterned way.  And one of the things that they do in the methodical manner is

4    that they photograph it, and they note the condition of the weapon as they find

5    it.

6            So, what you see here are two photographs in that progression of

7    processing the weapon Mr. Fleming had.  And there's two very important

8    things about it.  Number one, it's in the condition on his body as you see on

9    the left.  Number two, ladies and gentlemen, it's a 9 millimeter.  It's a 9

10   millimeter semi-automatic handgun.  And on the right, you will see the

11   depiction of it now in a what's referred to as a render-safe condition.  The slide

12   is ejected and locked back.  And you will hear testimony that it had

13   ammunition in the magazine which is on the far-right upper portion, that's in

14   the handle portion of the semi-automatic handgun.

15           So, it had ammunition in it, but it had no round in the barrel of the

16   weapon.  And, thus, this weapon is -- has ammunition, but it's not ready to

17   fire.  So, anybody that pulled the trigger, as you will hear from witnesses, this

18   weapon would not have fired.  It physically has to be loaded by sliding back

19   the handle that you see in the condition it is, and the handle has to come

20   forward to then load the weapon.

21           So, ladies and gentlemen, the facts of this case as I've just outlined

22   is that there is a three-shot close -- or at least relatively close range firing once

23   into the head, into the body, and into the central area of the pelvic region,

24   actually the leg.  And those wounds are fatal to Mr. Fleming.  And as I

25   mentioned to you in the last part of this story and what the evidence will show

1    you, is that Ms. Sutton and Ms. Veasley are staring down the stairs at a scene

2    that they know -- is becoming real to them.  That from Ms. Sutton's

3    perspective, her husband is lying dying on the floor.  And Ms. Veasley

4    observes her stepdad in the same condition.

5            But Ms. Sutton will tell you that when she's staring down the

6    stairwell and what leads to Count 2 of this case, the assault with a deadly

7    weapon, because as she's staring down and absorbing what she's seen, after

8    she heard the gunshots, went to the stairwell and looked down, at the bottom

9    of that stairwell is Shawn Glover.  And what does Mr. Glover do?  He points

10   the gun at Ms. Sutton, and he utters these words:  If you and your kids don't

11   want to -- or want to make it, shut the fuck up.  And then he flees from the

12   home.

13           Ladies and gentlemen, at the end of this case, Mr. Flinn and myself

14   are going to ask you to find the Defendant guilty of first-degree murder with

15   the use of a deadly weapon, assault with a deadly weapon, and discharging a

16   firearm in a structure.  And that is going to be based upon the evidence in this

17   case.  Thank you.

18           THE COURT:  All right.  At this time does the Defense wish -- does

19   the Defense wish to make an opening statement?

20           MR. O'BRIEN:  Yes, Your Honor.  If we can just clear the screen.

21           [OPENING STATEMENT BY THE DEFENSE]

22           MR. O'BRIEN:  Shawn Glover did not kill Patrick Fleming and yet he

23   was put in handcuffs, arrested, and charged with a crime he -- crimes he did

24   not commit.  Now, he sits at a table with Mr. Bashor and is forced to defend

25   himself against a crime he didn't commit.  This is exactly why there's a

presumption of innocence in this country.

Now, the question for you in this case is going to be does the prosecution have enough evidence to show that Shawn Glover committed these crimes beyond a reasonable doubt. The judge has already told you, as the jury, you are the people in this trial who find the facts. You'll sit through the evidence, you'll sit through the testimony. And at the end, you'll weigh out who is credible, what to rely on, and to evaluate whether the prosecution has met its burden of proving that Shawn Glover committed these crimes beyond a reasonable doubt.

Now, in order to try to figure out what happened, you might look to physical evidence. But in this trial, you will hear that there are no fingerprints, no DNA, no gunshot residue, no video surveillance, none of those things to tie Shawn Glover to these crimes. What you will be relying on is the testimony of Ms. Veasley and Ms. Sutton. They're the two adults who were at the property at the time, as the prosecution said. The problem is going to be that they gave three versions of what happened that day to police.

On New Year's Day when Ms. Sutton is at the bottom of the stairs, she calls 911. And the version she tells the police is that she doesn't know who shot her husband. Someone knocked on the door, shot her husband. She didn't see anything. She doesn't know anything.

A couple of hours later the police arrive or a couple of hours later into the investigation, police talk to Ms. Veasley. And she says, actually the suspect is a man named Hatch, my father deals marijuana. Patrick Fleming deals marijuana. And Hatch is a customer of my father's. He was sitting on the couch for a while. I was having an argument with my dad down in the

1    garage.  And then Hatch talked to my mom, Miranda, for a minute, and then he

2    ultimately shot Patrick.  She'll explain Miranda doesn't know this person.  She

3    -- Ms. Sutton has never met this person, and Akira does not know this person

4    either.  Ms. Veasley does not know this person.

5        She'll explain to police at that time that when Ms. Sutton and her

6    hear three gunshots, they run over to the stairwell to look down.  And what

7    they see is the body of Patrick Fleming.  He is dying, or he is dead due to

8    multiple gunshot wounds.  Ms. Veasley tells the police she sees no one else.

9    The suspect must have run out the door, but she does know that Patrick

10   Fleming's Dodge Durango was missing.  They keep the keys on the counter.

11   They always keep them on the counter, and the keys aren't there, and the

12   Dodge Durango's gone.

13       The same day, New Year's Day 2016, the police interview Miranda

14   Sutton.  They want to find out what she saw, what she knows.  She explains to

15   police at that time, I think there was a guy here.  He's a customer of my

16   husband's.  He's a customer of Patrick Fleming's.  He was sitting on the couch.

17   My daughter, Akira Veasley, and my husband were arguing down in the

18   garage.  I went down to check on what happened with them.

19       I don't really know this guy.  I've seen him maybe one time before

20   at a previous house that we had.  And she'll explain to police that she does not

21   know information about who this person is.  But if they give her until 6:00 p.m.

22   that night, she will come back and give them the name of the person who shot

23   her husband.

24       The very next day, January 2nd, Akira Veasley and Miranda Sutton

25   will tell police we lied yesterday.  It was Shawn Glover who shot Patrick

1  Fleming.  We were scared because he threatened us.  With these three

2  versions of what happened on January 1st, 2016, and you trying to sort

3  through what is true and what is not, you would usually want to rely on some

4  type of evidence beyond the statements, but you will not have that here.  You

5  will not have the fingerprints of the man who ran out the door of the

6  townhome from the door.  You will not see evidence about fingerprints on the

7  door of the Dodge Durango or inside the Dodge Durango that the suspect

8  stole.

9          You will not hear if there's any DNA evidence tying Mr. Glover to

10  that townhome.  You will not hear that there's any DNA evidence tying Mr.

11  Glover to the Dodge Durango.  You will not see any video surveillance of the

12  suspect running out of the townhome into a townhome community, a gated

13  townhome community.  You will not hear about gunshot residue testing on

14  Mr. Glover or anyone else.

15          At the end of this trial, you'll be left with the word of these two

16  women to determine is there enough evidence to find a man guilty of murder.

17  And at the conclusion of this trial, we are going to say we are going to ask you

18  to find Shawn Glover not guilty of these crimes because there's simply not

19  enough evidence.  Thank you.

20          THE COURT:  Okay.  Ladies and gentlemen, we're going to take a

21  brief recess for you to use the restroom and us to address a couple of matters.

22  During this recess, you're admonished not to talk or converse among

23  yourselves or with anyone else on any subject connected with this trial.

24  You're not to read, watch, or listen to any report of or commentary on the trial

25  by any person connected with this case or any medium of information,

1  including without limitation, newspaper, television, the Internet, or radio.

2  You're not to form or express any opinion on any subject connected with this

3  trial until the case is finally submitted to you.

4        Oh, I don't know exactly how long it'll be, but I appreciate your

5  patience, and we'll bring you back in when we're ready.  Please follow my

6  Marshal.

7        THE MARSHAL:  All rise.  The jurors are exiting.

8        [Outside the presence of the jury.]

9        THE COURT:  Counsel?

10        [Sidebar begins at 9:43 a.m.]

11        THE COURT:  Just a suggestion, it's your instructions.  I'll read

12  them any way you want me to read them.  Just a suggestion.  Here's your

13  original to compare and contrast.  This is the original.  Oh, you have that,

14  right?

15        UNIDENTIFIED ATTORNEY:  Yes.  Right.

16        THE COURT:  Okay.  So that just has --

17        UNIDENTIFIED ATTORNEY:  This is the --

18        THE COURT:  -- that's just a couple -- a little nuanced --

19        MR. O'BRIEN:  Okay.

20        THE COURT:  -- changes.

21        MR. STANTON:  Judge, how do you want to do this?  Do you want

22  it one at a time or both together?

23        THE COURT:  Yeah.

24        MR. STANTON:  One at a time?

25        THE COURT:  You mean those ladies?

1          MR. STANTON:  Yes.

2          THE COURT:  One at a time.  I wanted to hear exactly what they

3     were going to say about the gang membership, specifically.  If you could like

4     run through that real quick before I go and say -- also, I want it made very

5     clear, and I'll say this on the record, that this was what they heard, not who

6     they heard it from or anything else, but that's what they heard.  I mean I'll

7     assume they didn't watch anybody -- they didn't watch him shoot somebody

8     other than allegedly, you know -- didn't see him in a gang or --

9          MR. STANTON:  They heard it from him.

10         MR. BASHOR:  He's told them, and he sat there showing them

11    videos of these are my homies in New York and stuff doing, you know, this

12    and that with their guns.

13         THE COURT:  It's still --

14         MR. BASHOR:  And they know he couldn't have killed somebody

15    because he just got out of prison for --

16         THE COURT:  It's still --

17         MR. BASHOR:  -- manslaughter.

18         THE COURT:  It's still a hearing.  Sorry.

19         MR. STANTON:  From a reliable source.

20         THE COURT:  No elaboration, just hearing.  I heard.

21         MR. STANTON:  And he's the father of her grandchildren.  It's not

22    like they're strangers.  That's the scenario.

23         THE COURT:  Well, that would explain why we hang out with

24    people who we think more than other people.  Okay.  Well, that makes more

25    sense to me.  None of that made any sense.  I have no pride of ownership or

1    authorship.

2              MR. O'BRIEN:  I like it.

3              THE COURT:  I don't care.

4              MR. O'BRIEN:  I'm fine.  This is fine.

5              THE COURT:  I'm just throwing it out there.

6              MR. O'BRIEN:  This is -- actually, the wording especially at the end

7    is better, so.

8              THE COURT:  Okay.  You need to say, if believed.  That's what I --

9    you know, because you need to put out there that it's subject to belief.

10             MR. O'BRIEN:  Right.

11             MR. STANTON:  Fine.

12             THE COURT:  Okay.  So --

13             MR. BASHOR:  And then you're requesting?

14             MR. STANTON:  Yes.

15             MR. BASHOR:  Okay.

16             THE COURT:  My other question is this.  You're entitled to have it

17   read as each witness says their thing, I think.  Also, at the -- if you want to --

18   me to give it in the actual instructions at the end.

19             MR. O'BRIEN:  Uh-huh.

20             THE COURT:  I might change that first sentence to say, ladies and

21   gentlemen, because --

22             MR. O'BRIEN:  Right.

23             THE COURT:  -- that's at the end.

24             MR. O'BRIEN:  No, and I -- yeah, and there might be a -- there's an

25   instruction that's a little less specific, too, that's usually given at the end.  It

1    references this mort specific instruction.

2            THE COURT:  Okay.  So, whatever you want to do for the end, let

3    me know.

4            MR. O'BRIEN:  Okay.

5            THE COURT:  Because right now this doesn't say, you know,

6    instruction blank.

7            MR. O'BRIEN:  No, it does not.  Absolutely not.

8            THE COURT:  This is just what I'll do right now.

9            MR. O'BRIEN:  I appreciate that.

10           THE COURT:  And then give me in your -- I'm just going to read it.

11   I don't think you need to file it --

12           MR. O'BRIEN:  That's fine, Judge.  And --

13           THE COURT:  -- unless you want to.

14           MR. O'BRIEN:  No.

15           THE COURT:  Okay.  So, let's hear from the witnesses first.

16                 [Sidebar ends at 9:46 a.m.]

17              [Outside the presence of the jury.]

18           THE COURT:  Okay.  So, there's a limited instruction or a

19   cautionary instruction that has been proposed by the defense.  Oh, I'm sorry.

20   He's not here.  One moment.  I can wait.  He's using the restroom?

21           MR. O'BRIEN:  No, he's not.

22           MR. BASHOR:  No, he's going to get the witnesses.

23           THE COURT:  I meant the Defendant.

24           MR. BASHOR:  Okay.  Sorry.

25           THE COURT:  I can wait if he has to use the restroom.

1    UNIDENTIFIED MALE:  Oh, no.  He's --

2    THE CLERK:  We just had him in there.

3    THE COURT:  Okay.  So, we're back on the record.  We had a brief

4    bench conference so that I could give the defense a slightly amended version

5    of a cautionary instruction, which I think is, you know, better.  Nothing

6    personal to you.  I think yours is great.  I just think this is better, but I have no

7    pride of authorship, and I told you if you don't want to use it, don't use it.

8    And --

9    MR. O'BRIEN:  I would like to use it.

10    THE COURT:  And you would like to use it?

11    MR. O'BRIEN:  Yes.

12    THE COURT:  So, I'll read it into the record:  Now I'm going to

13    caution the ladies and gentlemen of the jury that the testimony that the

14    witness believed the Defendant was gang-affiliated and/or had a history of

15    violence against persons is being offered and may only be considered by you

16    solely for the purpose of explaining the state of mind of the witness at the time

17    she made her statement to police on January 1st, 2016.  The testimony, if

18    believed, was not to be -- excuse me -- is not to be considered as substantive

19    evidence that the Defendant is in fact gang-affiliated, and/or has a history of

20    violence against persons, or that he is a person of bad character.

21    So, what I think I didn't mention yesterday, but I will when the

22    witnesses come in here, is that I'm allowing -- aware of a history of violence

23    against persons and general, vague gang affiliation potentially depending on

24    what I hear with the understanding that the witness can say she heard it.  She

25    can't say she heard it from the Defendant.  She can't say anything else.  Let's

1   just keep it contained.  And I will give you some latitude to lead the witness so

2   that there is no -- while I know the district attorney's position, the State, is that

3   the source of information that she has that would give her this state of mind

4   was, fill in the blank.

5            MR. STANTON:  From the Defendant.

6            THE COURT:  And unless you want me to allow such a thing?

7            MR. O'BRIEN:  No.

8            THE COURT:  I didn't think so.  I think it's enough to show her state

9   of mind, and why she might change her story over time to show that he -- that

10  she believed he was -- had been violent against people in the past, that he was

11  a gang member, and that's what she heard and believed, and that's it.

12           So, if we could bring --

13           MR. STANTON:  Judge, is it proper for us within your ruling to ask

14  the witness that they heard it, and they believed it to be true?  That they

15  personally believed it to be true?

16           THE COURT:   Yes.  That's kind of the point.

17           MR. STANTON:  I think so, too.

18           MR. FLINN:  And I did, in speaking with them, advise them because

19  I've obviously been talking to them about -- that there's going to be limitations,

20  but that the purpose of this is that the Court would advise them --

21           MR. STANTON:  What those limitations are --

22           THE COURT:  I will advise them.

23           MR. FLINN:  -- so they're prepared for that.

24           THE COURT:  I will advise them.

25           MR. STANTON:  Miranda Sutton, Your Honor.

1      THE COURT:  So, the record should reflect we've been outside the

2  presence of the jury since they've been excused.  And we're calling in the first

3  witness.

4      THE MARSHAL:  Follow me, please.

5      THE COURT:  Ma'am, if you could approach the witness stand.

6  Once you're there and you're ready, if you could face my clerk.  Raise your

7  right hand and be sworn.

8          MIRANDA SUTTON, PLAINTIFF'S WITNESS, SWORN

9      THE MARSHAL:  Please be seated.

10      THE COURT:  Okay.  I'm sorry about this.  One second.  We're

11  outside the presence of the jury right now.  The district attorney is going to ask

12  you some questions.  The defense counsel may also ask you some questions.

13  And then we're going to talk about your testimony before the jury.  Regardless

14  of what is asked of you in front of the jury, we're not going to discuss this little

15  hearing right here in front of the jury.  We might say things like, you said

16  before, or you've said in the past, but we're not going -- you know, your

17  answer shouldn't be, yeah, in the little mini hearing five minutes ago, right,

18  because this is off -- outside of their consideration.

19      THE WITNESS:  Okay.

20      THE COURT:  Okay.

21                    <u>DIRECT EXAMINATION</u>

22  BY MR. FLINN:

23      Q     So, Ms. Sutton, you've testified in this case before, correct?  You

24  remember that?

25      A     Yes.

1      Q    And you testified about giving statements about what happened

2  on January 1st, 2016 to police, correct?

3      A    Yes.

4      Q    And I know that on the day of the murder of your husband, you

5  told police one version of what happened that day, correct?

6      A    Yes.

7      Q    Yes.  And then on the next day, January 2nd, you and your family

8  reached out to police and you told them a different version or a more detailed

9  version of what happened the previous day, and that included who shot your

10  husband?

11      A    Correct.

12      Q    What I'd like for you to tell the Court, because you previously

13  testified that you -- the second statement was truthful and that the first version

14  was not because you were afraid --

15      A    Exactly.

16      Q    -- is that correct?

17      A    Yes.

18      Q    So, what I'd like, if you could tell the Court, please, the reasons,

19  whatever they may be, however many or how few there are, that you were

20  afraid at that particular time that you gave the statement and what about it

21  made you change your mind the following day?

22      A    During the interview, I felt intimidated because once I asked the

23  officers if they could stay there with us, because I was in fear of my life, they

24  told me, no, they could not.  There was not enough police officers to stay.  All I

25  could see was my husband on the ground.  That's all I could see.  I was in fear

1    of my life.  I had already been threatened.  And I was not okay until my family

2    came in.

3        Q       Did you also previously explain, and I believe in that second

4    statement to police, that there were things that in addition to having just been

5    threatened the day before by the Defendant, that you knew about him that

6    made you believe those threats to be true; is that correct?

7        A       Yes.

8        Q       Could you explain what - what those are to the Judge, please?

9        A       I know that he has a violent past, that my husband is laying on the

10   floor, that he had just been murdered, and that I had been threatened.  And I

11   still had my kids and myself inside of the apartment there in the townhouse.

12   And my biggest fear was getting out alive.

13       Q       You, in that second statement to police also talked to them about

14   the Defendant, his family and friends, and, for example, videos he had shown

15   you, things of that nature, correct?

16       A       Yes.

17       Q       What were you talking about when you explained that to the

18   detectives?

19       A       The nature of -- I know who he is.

20       Q       What do you mean by that, who he is?

21       A       That he was an active gang member.  That -- you know, that he

22   was sitting there watching the videos that morning of different instances that

23   had happened the night before, New Year's Eve.  The simple fact that my

24   husband was laying on the floor was the biggest part of everything.

25               MR. FLINN:  No more questions, Your Honor.

1      THE COURT:  So, when you say I know he had a violent past, you

2  know that how; all the possible ways you know that?

3      THE WITNESS:  Because I knew that he had been in prison before.

4  I knew that --

5      THE COURT:  I mean how did you know that?

6      THE WITNESS:  From my daughter --

7      THE COURT:  Okay.

8      THE WITNESS:  -- Angela.

9      THE COURT:  So, someone told you?

10      THE WITNESS:  Yes.  She had told me that -- of his past that

11  he -- you know, I knew that myself, that he had been in prison

12  before, but I thought that everything was okay.

13      THE COURT:  So, what you knew about the Defendant's past you

14  either knew from the Defendant or your daughter?

15      THE WITNESS:  I knew from the Defendant, his self, because I

16  knew that he had gotten out of prison.  I knew that him and my daughter had

17  dated before when they were in high school.  And I knew that she told me that

18  he had went to prison, you know, when he disappeared for a long period of

19  time.  I knew that he had just murdered my husband, and he was laying on the

20  floor and that's all I could really see.

21      THE COURT:  Do you have any questions for the witness on this

22  specific topic?

23      MR. FLINN:  No.

24      THE COURT:  Okay.  So, because --

25      MR. BASHOR:  Your Honor, I would like to be heard --

-29-

1    THE COURT:  Yes.  Do you want to --

2    MR. BASHOR:  -- outside the presence of the witness.

3    THE COURT:  Can you step out just for one second in the hallway --

4  I mean in the little room there?

5    THE MARSHALL:  Follow me, please.

6                    [Outside the presence of the witness]

7    MR. BASHOR:  I guess, Judge, you know, yesterday it was

8  proffered that --

9    THE COURT:  Why don't we hear from both of them and then you

10  can argue?

11    MR. BASHOR:  Okay.

12    THE COURT:  Because otherwise we're going to -- we're going to

13  have --

14    MR. BASHOR:  That makes sense, Your Honor.

15    THE COURT:  Does that make sense?

16    MR. BASHOR:  Yes, it does.

17    THE COURT:  Okay.  Let's call the other witness in.

18    MR. FLINN:  It's Akira Veasley.

19    THE MARSHAL:  Akira Veasley.  Follow me, please.  Watch your

20  step.

21    THE COURT:  If you could face my Clerk, raise you right hand and

22  be sworn.

23              AKIRA VEASLEY, STATE'S WITNESS, SWORN

24    THE CLERK:  Please be seated.

25    THE COURT:  Okay.  Before the District Attorney and possibly the

1   Defense Attorney or myself ask you any questions, we're doing this hearing

2   outside the presence of the jury.  And later when you testify before the jury,

3   we're not going to reference this hearing.  They're not even going to know

4   what happened.

5           THE WITNESS:  Okay.

6           THE COURT:  And so, if you say something today in this hearing

7   and one of the attorneys asks you about it, they may say something like you

8   testified before or you testified in the past, such and such.

9           THE WITNESS:  Okay.

10          THE COURT:  It would be helpful if you didn't say oh, you mean in

11  the little mini hearing when no jury was here?  Do you see what I'm getting at?

12          THE WITNESS:  Uh-huh.

13          THE COURT:  Is that a yes?

14          THE WITNESS:  Yeah.

15          THE COURT:  Okay.  So, at this time, State, if you want to ask

16  questions about our narrowed topic for the purpose of this hearing?

17          MR. FLINN:  Thank you, Your Honor.

18                         DIRECT EXAMINATION

19  BY MR. FLINN:

20      Q      So, Ms. Veasley, I'm just going to ask you a few questions about

21  statements you gave to police on January 1st, 2016 and January 2nd, 2016,

22  okay?

23      A      Okay.

24      Q      And so, January 1st, was the day your stepdad, Patrick Fleming, of

25  course, was killed in the home, right?

1    A    Yes.

2    Q    So, that day you told police that the man that shot your dad was

3    somebody by the name of Hatch, right?

4    A    Yes.

5    Q    The following day you and your mom, Miranda Sutton, went to the

6    police and told them what you explained was the truth and that it was actually

7    Shawn Glover, correct?

8    A    Correct.

9    Q    Now, what I want you to tell the Court is the reasons that you have

10   for telling one thing on the 1st, and then telling something else on the 2nd.

11   So, what about the events that day, what you know about Shawn Glover, and

12   anything else that was in your head made you do that course action?

13   A    I was just scared.  After the events that happened, I didn't know

14   what to do.  I just never been in that predicament before.  And just the events

15   that happened that day I was scared.  I looked in my mom's eyes, and she just

16   looked at me, and I was scared.  I didn't know what else to do.

17   Q    What, in particular, made you scared?

18   A    Shawn, the way -- you know, what happened right there, you

19   know.  Just everything that happened that day made me scared, you know.

20   The prior things before made me scared.

21   Q    What prior things?

22   A    As far as like behavior, you know, the way he acted towards

23   people, the things that were happening that day, the event that happened.

24   And, again, I was just scared.  I didn't know what else to do.  I didn't know

25   what I should do being in this predicament.

1  Q  Did -- you testified about when your dad was shot --

2  A  Yes.

3  Q  -- and that you heard the Defendant make threats to you and your

4 mom, correct?

5  A  Correct.

6  Q  Did you have reasons, based on your knowledge of Shawn, and

7 anything you knew about him, and his relationship with your family, did you

8 have any reason that you thought he was serious about that threat?

9  A  Yeah, just due to the threats and what happened in the past, what

10 he had stated that day, you know, as far as if -- if you, you know, do this, I'm

11 going to do that.  So, that did make me scared.  It made me, you know, feel in

12 fear of my life, so I didn't know what else I should do.  I -- I didn't know.

13  Q  Were -- at the -- were you aware at that time about Shawn Glover's

14 past and having been in prison?

15  A  Yes.

16  Q  How were you -- how did you know about that?

17  A  Just through people, you know, he say, she say.  As far as social

18 media, as far as things I looked up, as far as things, you know, what has been

19 said.  Again, with those prior events I was in fear.

20  Q  Did you know or believe you knew why he had been in prison?

21  A  Yeah.  For -- for I think it was, if I'm not mistaken, a murder.  I'm

22 not sure.

23  Q  And --

24    THE COURT:  What prior events are you talking about?  Are you

25 talking about that or something else?

1      THE WITNESS:  No.  The events that happened that day.

2      THE COURT:  Okay.

3      THE WITNESS:  As far as him, you know, doing what he did, as far

4  as what was said that day, as far as me being scared, as far as me, you know,

5  knowing that the kids were in the house and, you know, trying to defend them,

6  as well.

7  BY MR. FLINN:

8      Q      Now, this house was your sister, Angela's, right?

9      A      Correct.

10     Q      And Angela and Shawn Glover had a relationship, right?

11     A      Correct.

12     Q      Did Angela talk to you about Shawn Glover and things that went

13  on with them?

14     A      No, she did not.

15     Q      She left that out?

16     A      She didn't really mention like the full extent, but she did mention

17  that, you know, that they did have arguments, that they did have their own

18  problems, as well.

19     Q      So, when the -- when you said that you knew that the Defendant

20  had been in prison, you believed it was for a murder, are you talking

21  about -- you're not talking about what happened that day, right; you're talking

22  about a murder from before, and he was in prison and then released for that?

23     A      That's correct.

24     Q      Were you familiar with the Defendant's gang affiliations?

25     A      I was not, but I was aware of it, but I -- I didn't know.

1    Q    You were made aware by somebody else?

2    A    Yes, that's correct.

3    Q    But you didn't have, like, firsthand knowledge of it?

4    A    Through Facebook.  That was the only thing, but other than that,

5  no.

6    Q    How so through Facebook?

7    A    Because we were Facebook friends, so I can see everything that

8  was being posted.

9    Q    So, did he post things that you interpreted as related to gang

10  activity?

11    A    Yes.

12    Q    And his affiliations with gang -- with a gang?

13    A    Yes.

14    Q    When you made the decision to tell -- to leave Shawn Glover's

15  name out of your statement to police on January 1st, and you used the name

16  Hatch, were any of these things, other than just I know you've already talked

17  about the obvious events that day --

18    A    Uh-huh.

19    Q    -- the shooting of your dad and the threats, did any of these things

20  factor into whether or not you believed Shawn Glover was serious about those

21  threats?

22    A    Yeah.  I felt that he was serious about the threats.  I didn't doubt

23  him at all.

24    Q    Did you have -- that day, the following day, did you have concerns

25  about your own safety?

1      A      Yeah.  That night -- the following night after I was receiving

2   random friend requests, after, you know, certain threats were made, I was in

3   danger and scared for my life, so I did feel that way.  I -- I felt like I was in

4   danger, and I was -- I was scared.

5              THE COURT:  I'm sorry, could you repeat, random friend requests

6   and then you said something else, something about threats; is that what you

7   said?

8              THE WITNESS:  Yeah.  Yes.  I -- I'm not completely sure, but I heard

9   that there was a threat about me and my mom if we told, we were going to be

10  killed next or something to that stipulation.

11             MR. FLINN:  No other questions, Your Honor.

12             MR. BASHOR:  No questions.

13             THE COURT:  Okay.  Could you step outside for a second, please?

14             THE WITNESS:  Yes.

15             THE COURT:  I'd appreciate it.

16             THE BAILIFF:  Watch your step, follow me.

17                        [Outside the presence of the witness]

18             THE COURT:  Well, before I hear from you, I would -- do you have

19  your -- can you give me your proposed instructions, please, the ones I just

20  gave you?

21             MR. BASHOR:  Yes.

22             THE COURT:  Could you approach?  Okay.  Can you approach

23  again?  I'm sure Mr. Stanton appreciates you getting his paper for him.  This is

24  what you're arguing about?

25             MR. BASHOR:  Yes, Your Honor.  I think you read my mind.

THE COURT:  Okay.  So, based upon the testimony of the witnesses, balancing -- all the balancing in the world, I appreciate that there's some evidence of knowledge of gang affiliation, but the gist of this is that these women both believed he went to prison before for some kind of death of another, at the hands of another, and the mother -- I mean the wife of the decedent testified that she knew he had a violent past.  And so, that's where I'm going to leave it.  I'm going to allow the District Attorney to talk about the witness' beliefs of the history of violence, but I'm going to exclude gang affiliation because it's not really the impetus of this.  It's mostly a deceased relative, a very serious threat, and a history of violence.

MR. BASHOR:  And, Your Honor, just in case an appellate tribunal were to think that I've acquiesced, obviously, our objections from yesterday as to any of this I would renew.  You've ruled, but I don't want someone to say --

THE COURT:  Well, that's fine.

MR. BASHOR:  -- well, he was okay with the instruction later on.

THE COURT:  No, I know.  The record should reflect that you've objected to any history of violence or any testimony about any history of violence.  And, honestly, you know, the problem I have is I don't know what those videos -- you know, once I open the door a little bit, I don't know what it's all about, and we could have a collateral trial on how that message of violence was communicated to these witnesses.  And I don't want to get -- I don't want to get into it that far.  I will tell you, though, depending on what questions you ask, if you open the door to how they knew this information --

MR. BASHOR: Yeah, I'm not --

THE COURT:  -- the fact that the Defendant is the one they know it

1  from is, you know -- I'm not going to thought to exclude it if you ask.

2       MR. BASHOR:  I'm going to put a deadbolt on that door, Judge.

3       THE COURT:  All right.  Just checking.  Okay.  So, what I'm inclined

4  to do now is bring in the witnesses, tell them about the Court's ruling.  I would

5  -- on one hand I want to encourage leading.  On the other -- you know, just to

6  confine them.  On the other hand, which one of you is examining these

7  witnesses in front of the jury?  Because if it's you, you're going to have to

8  change your style a little bit.  Leading is to keep the deadbolt on what I've

9  allowed, not to spoon feed the witness your words.

10       MR. FLINN:  No, I understand.

11       THE COURT:  So, like I just heard some of those leading questions.

12  So, do you understand what I'm getting at?

13       MR. FLINN:  I do, Your Honor.

14       THE COURT:  Okay.

15       MR. FLINN:  I was trying to direct them just to get through the

16  short hearing versus what I would ask in front of a jury.

17       THE COURT:  Okay.

18       MR. FLINN:  Based on all of their conversations with us previously.

19       THE COURT:  Okay.  I understand.  I'm just saying I don't know

20  what you're going to do.

21       MR. FLINN:  No, I understand.

22       THE COURT:  I'm just trying to give you a head's up --

23       MR. FLINN:  No, I understand.

24       THE COURT:  -- that if there's an objection to leading questions like

25  that, I'm going to sustain them.  Okay.  So, could you bring in the ladies,

1  please?

2  [In the presence of the witnesses]

3  THE COURT:  Okay.  If you could just stand right there by the

4  District Attorneys.  Okay.  So, here's the thing.  You're both going to testify in

5  this trial.  I know testifying can be very stressful.  And I've made a few rulings

6  based upon arguments of the attorneys and some testimony that you gave

7  here today.  And the rulings relate to what the District Attorneys can have you

8  say on the witness stand, okay?

9  And so, what I'm going to do is I'm going to give them some

10  latitude to ask you specific questions when it gets to the area of Mr. Glover's

11  history, meaning they'll ask you questions like then what happened, then what

12  happened; open-ended questions.  When we get to things that you know about

13  his history, they're going to be very specific, because I'm not allowing you to

14  testify about his gang membership, okay?  What I'm allowing you to testify

15  about is that you have a belief about his violent past.  You can't say murder,

16  you can't say prison; violent past.  That's what I heard from both of you here

17  today.  It's a more general phrase for the prison case, okay?

18  So please don't reference prison.  The District Attorney's not going

19  to ask you about prison.  Please don't reference the gang membership.  The

20  District Attorney's not going to ask you about the gang membership.  And then

21  if, you know, the Defense were to ask you, I'll cross that bridge when I come to

22  it, okay?

23  And so, when they're getting to the point of what you know about

24  Mr. Glover, they're really just talking about did you understand -- you know,

25  had you heard he had a violent past?  We're not going to talk about videos or

1  things that he said or told you, just did you hear that he had a violent past and,

2  you know, whatever you believed about him having a violent past as far as I

3  believed he was violent, you can say that, but no gang membership, okay?

4  Okay. Any questions?

5         And here's the thing. If I - I'm going to be listening really carefully.

6  So, if I interrupt you, if I say oh, excuse me, just stop and the District Attorney

7  will re-guide you. I know it's awkward and I'm sorry. Okay?

8         UNIDENTIFIED FEMALE: Okay.

9         THE COURT: Okay. Thank you very much. Anything else?

10        MR. BASHOR: Not from the Defense, Your Honor.

11        MR. FLINN: Nothing.

12        THE COURT: Okay. I'm going to look to you, Mr. Bashor or

13  whoever's witness this is.

14        MR. BASHOR: It will be me, Your Honor.

15        THE COURT: To when you want me to read this? You know, look

16  at me because there's a time usually before, or in the middle, or during or at

17  the -- you know, I'll be looking for you to, you know, right after she says it.

18        MR. BASHOR: Right.

19        THE COURT: If you could just give me the --

20        MR. BASHOR: Okay.

21        THE COURT: -- you know, some kind of sign --

22        MR. BASHOR: All right.

23        THE COURT: -- when you'd like that done.

24        MR. BASHOR: You know, the --

25        THE COURT: Yeah. Not the sign of the cross or the sign for a

1  strike, but.

2          MR. BASHOR:  Okay.

3          THE COURT:  All right.  Perfect.  Anything else?

4          MR. FLINN:  No, Your Honor.

5          THE COURT:  Okay.

6                          [Pause]

7          THE MARSHAL:  All rise.  The jury is entering.  The jury is all

8  present, Your Honor.

9                   [In the presence of the jury.]

10         THE COURT:  Counsel, will you stipulate to the presence of the

11  jury?

12         MR. FLINN:  Yes, Your Honor.

13         MR. BASHOR:  Yes, Your Honor.

14         THE COURT:  All right.  At this time, State, call your first witness.

15         MR. FLINN:  The State calls Miranda Sutton, Your Honor.

16         THE MARSHAL:  Follow me, please.

17         THE COURT:  Ma'am, if you could face my Clerk, raise your right

18  hand, and be sworn.

19              MIRANDA SUTTON, STATE'S WITNESS, SWORN

20         THE MARSHAL:  Please be seated.  State and spell your name for

21  the record.

22         THE WITNESS:  Miranda Sutton, M-I-R-A-N-D-A S-U-T-T-O-N.

23         THE COURT:  State, when you're ready.

24         MR. FLINN:  Thank you, Your Honor.  Can I kind of drag this back a

25  little bit --

1          THE COURT:  Sure.

2          MR. FLINN:  -- so I'm out of the way?

3                         DIRECT EXAMINATION

4     BY MR. FLINN:

5          Q     Good morning, Ms. Sutton.

6          A     Good morning.

7          Q     Is it all right if I call you Miranda?

8          A     Yes.

9          Q     Miranda, I want to talk to you about January 1st, 2016, specifically,

10    okay?

11         A     Okay.

12         Q     At that time, back then on January 1st, a little over two years ago,

13    where were you living?

14         A     With my daughter at 38 -- it was ██████████ -- ████████

15    ██████.  I remember that.

16         Q     Okay.  You're not sure of the number, but ██████████████

17         A     Right.

18         Q     And when -- and that's in North Las Vegas?

19         A     Yes.

20         Q     City of North Las Vegas, correct?

21         A     Yes.

22         Q     Here in the county.  You said you lived with your daughter; who is

23    that?

24         A     Angela.  It was my goddaughter, Angela.

25         Q     Your goddaughter, Angela.  The house itself, what I want you to do

1   is explain to the jury how the house is situated; does that make sense?  So --

2        A     It's a townhouse.

3        Q     It's a townhouse.  Is there another unit attached to it?

4        A     Yes, with a townhouse.

5        Q     Okay.  So, where the townhouse, is the -- how are the living

6   arrangements?  Are there multiple levels?  What are the basics of that?

7        A     It's a two-story level.  When you come in, you have the entrance

8   and a garage on the lower floor.  You go up a flight of stairs, which is -- you'll

9   see in the pictures how the stairs go.  And you're up in the second part of the

10  townhouse.

11       Q     So, let me just backtrack a little bit.  So, on the ground floor -- I'm

12  on the ground floor and you said there's a garage?

13       A     Yes.

14       Q     And there's also a front door?

15       A     Yes.

16       Q     If I go in through the front door, where am I standing?

17       A     On the landing.  There's a landing right there in front of the front

18  door.

19       Q     Right in front of the door  you said a landing.  And by landing I

20  assume you mean the bottom of a stairway?

21       A     Yes.

22       Q     Are there any other doors in that landing?

23       A     There's a front door and there's a garage door.

24       Q     So, a door that leads outside and a door that leads into a garage?

25       A     Right.

1    Q     And then so if you're standing there, the only places you could go

2  at that point are out the front door, out to the garage, or up the stairs?

3    A     Up the stairs, right.

4    Q     Okay.  So, if you start to go up the stairs, what do you see or where

5  do you go in the house?

6    A     You go right into the dining room from the steps.  And right off

7  from there is the kitchen.  And then you had Angela's room right in front of the

8  kitchen almost and the boys room was off to the side.

9    Q     Now, I'm going to ask you a little bit more about who the people

10  are that you're talking about.

11    A     Okay.

12    Q     So, if you walk up the stairs, you're in the dining room.  There's a

13  living room straight through--

14    A     Right.

15    Q     -- do I have that right?

16    A     Right.

17    Q     The boys' room, and you said Angela's room?

18    A     Yes.

19    Q     Are too?

20    A     Angela's room --  if I'm standing here and this is the front door,

21  Angela's room was off over here, and the boys room is off over here to the

22  right-hand side.  Right here you have the dining room going into the living

23  room.

24    Q     If you could, I know you said this is Angela's house, your

25  goddaughter.  Would you please tell the jury who all was living in this

1    particular townhouse at that time?

2          A      Yes.  When we first got there it was my daughter, Angela, and her

3    three kids.  Then my husband, myself.  My daughter was just -- Akira, which

4    was 21 came, and we had twins that's 12 years old, they also came.

5          Q      So, there are four -- if I counted correctly, four adults living in the

6    house and then some small children?

7          A      Yes.  It was --

8          Q      Younger children.

9          A      -- Angela's house that was there and myself and my husband,

10   Patrick, came and Akira was there.

11         Q      Okay.  Were there any other adults at that time?

12         A      Not when we first got there.

13         Q      When did you first get there?

14         A      We had been there almost a week prior to.

15         Q      So, about a week before January 1st, 2016?

16         A      Yes.

17         Q      So, during that period from when you first got there to January 1st,

18   did anyone else come and stay at that house?

19         A      Shawn -- Shawn came and stayed there.

20         Q      When you say Shawn, did you know a last name for Shawn?

21         A      Shawn Glover.

22         Q      The person you described known to you as Shawn Glover, is that

23   person present in the courtroom today?

24         A      Yes.

25         Q      Could you please tell the Court where that person is sitting and just

1    identify some clothing he's wearing?

2        A     Right there with the green tie on.

3               MR. FLINN:  May the record reflect she identified the Defendant?

4               THE COURT:  The record shall so reflect.

5    BY MR. FLINN:

6        Q     So, the Defendant came during that week and was staying at the

7    house?

8        A     Yes.

9        Q     How so?  I mean who does he know at the house that he would

10   come and stay there?

11       A     Angela.  He has a daughter by her, also.

12       Q     So, he has a child in common with Angela?

13       A     Yes.

14       Q     And so, during that week he came to live at the house, as well?

15       A     Yes.

16       Q     So, as of January 1st there's a total of five adults that are now

17   living in the house and then there's the children?

18       A     Right.

19       Q     Okay.  Starting with in the morning of January 1st, 2016, of course,

20   who was home in the morning?

21       A     We had all gotten up that morning from the New Year's Eve.  And

22   Angela had to be to work at 10:00.  Patrick took Angela to work that morning.

23   And I think he went by his job after that to grab his check.

24       Q     So, Patrick you said took Angela to work.  I assume he drove?

25       A     Yes.

1    Q    So, he drove Angela.  Approximately at the time how old was

2  Angela?  If you know.

3    A    Thirty something.

4    Q    Thirty something.  Fair enough.  So, he took her to work.  And did

5  he use his own vehicle or was there some other vehicle there?

6    A    Yes, he used his own vehicle.  He had just taken both of them to

7  work the day before.

8    Q    So, he took her to work on the morning of the 1st?

9    A    Uh-huh.

10    Q    And you thought maybe he stopped by his job to pick up a check?

11    A    Right.

12    Q    Did there come a point that morning where he arrived back at the

13  house?

14    A    Yes.

15    Q    What happened when Patrick came back to the house?

16    A    When Patrick came back to the house, he came in and he was

17  discussing something about the night before when my daughter was -- had

18  went out.  And he said that he was going to look at something on his phone

19  and went to go check out his phone, or what the video was, or whatever.  And

20  he said that he wanted to talk to Akira, my 21-year-old.  And they went

21  downstairs to talk, and I went with them.  And it was a lot of arguing and a lot

22  of discussion down there about her being -- of her age and her being a

23  responsible 21-year-old at the time.  And --

24    Q    Let me stop you for just a second.  So, you said Patrick came back

25  and you said with your daughter, and you, obviously, just mentioned Akira,

1    that's who you're referring to?

2          A      Yes.

3          Q      And when you say go downstairs, where downstairs?

4          A      Into the garage.

5          Q      So, down that stairs, that landing, and then through the door into

6    the garage area?

7          A      Yes.

8          Q      Okay.  So, again, if you could just kind of slowly, what is really the

9    nature of the discussion that's going on?

10         A      Akira going out the night before, and Patrick seen a video of her

11   the night before and discussing with her about lying to him.

12         Q      What did he think she was lying about?

13         A      About having a young man in his vehicle when he asked her not to.

14         Q      So he, Patrick, and Akira were addressing that --

15         A      Exactly.

16         Q      -- in the garage?

17         A      Yes.  And was me and Patrick really addressing it.

18         Q      And so you joined in on this discussion, right?

19         A      Yes.

20         Q      Would you describe it as a talk, an argument?  I mean what was

21   sort of the tone of that?

22         A      It was an argument, it was a loud argument.  It was a lot of

23   shouting and that's primarily why we went to the garage.  There was a lot of

24   handclapping, you know, when you talk with your hands.  But other than that,

25   no, it was a typical argument that we were having.

-48-

1    Q     So, while this is going on, does anyone else come down to the

2  garage while you're having this argument?

3    A     Yes.  Shawn came down to the garage, and he had the house

4  phone in his hand.  It was a phone.  I don't know if it was the house phone or

5  cell phone.  I knew he had a phone.  And he said that Angela's on the phone.

6  And I said yes?  And she -- I was talking to Angela on the phone, and she said

7  mommy, are you okay?

8          MR. BASHOR:  Objection, Your Honor, hearsay.

9          THE COURT:  Okay.  Counsel --

10         MR. FLINN:  It's not offered for the truth, Your Honor.  She's --

11         THE COURT:  Okay.  Then it's not relevant, so it's sustained.

12  BY MR. FLINN:

13   Q     So, he -- the Defendant, told you someone's on the phone and

14  handed you the phone?

15   A     Yes.  And I told Angela I was okay, everything was fine.  And he left

16  back out.

17   Q     So, at that point the Defendant leaves the garage?

18   A     Right.

19   Q     Did he go outside or through the door to the stairway?

20   A     He went back up into the townhouse.

21   Q     So, what did you, Patrick, and Akira do at that point?

22   A     Nothing.  We were still standing there discussing everything and

23  actually calming down.  It wasn't a big discussion after all - after, you know, so

24  long.  It was like everything had gotten out, everybody had said what they had

25  to say.  And Shawn came back downstairs.

1    Q    So, everybody had said what they said, but the Defendant came

2  back down to the garage?

3    A    Yes.

4    Q    What happened when the Defendant came back to the garage?

5    A    He asked me if he could speak with me upstairs.

6    Q    Did you agree to do that?

7    A    Yes.

8    Q    So, you and the Defendant walked back upstairs?

9    A    Yes.

10    Q    Was it just you two or was --

11    A    It was just me and him.

12    Q    So, Patrick --

13    A    And Akira were still in the garage.

14    Q    Okay.  So, when you got upstairs, where did you -- where did you

15  go to talk to the Defendant?

16    A    Into Angela's room.  He went towards Angela's room.

17    Q    What did you two talk about?

18    A    He came in there, and he asked me, do you want me to handle this,

19  do you want me to take care of it?  And I said take care of what, handle what?

20  And he said well, he's down there fighting you guys.  I said no, he's not.  I said

21  we're down there, and there's a lot of handclapping, but everything is okay.

22  Trust me, I got this, there's no problem.

23    Q    When the Defendant said do you want me to take care of this, what

24  were you thinking he meant by that?  What was your state of mind on that?

25        MR. BASHOR:  Objection, Your Honor.  It calls for speculation.

1           THE COURT:  Her state of mind?

2           MR. BASHOR:  As to what he might mean by something.

3           THE COURT:  He asked her what she believed him to be saying.

4           MR. BASHOR:  Very good, Your Honor.

5           THE COURT:  Not what he was saying.  With that understanding

6  that's what the question is being asked, it's overruled.

7  BY MR. FLINN:

8       Q    You can answer.

9       A    Repeat it, please.

10      Q    Sure.  You said that the Defendant told you -- you know, asked you,

11  do you want me to handle this?

12      A    Yes.

13      Q    And then you responded to him that you got this, but what made

14  you respond in that way?

15      A    Yes.  I thought, that he thought, that we were fighting down there,

16  Patrick was fighting us.  And I said no, that's not the case, we're down there

17  doing a lot of shouting.  And as that right there was said, Patrick and Akira was

18  coming back up the steps.  And he could see them --

19      Q    Let me stop you right there.  So, you had this conversation.  You

20  said I got this.  And by now Patrick and Akira are coming up from the garage?

21      A    Yes.

22      Q    Do they come to the same place that you and the Defendant are

23  talking?

24      A    They're coming up to where we are.  I'm coming out of the

25  bedroom, and they're coming up the stairs.  And they're smiling, talking, and

1  everything is okay.

2      Q      When they get up there, what happens next?

3      A      It's like a whole different vibe.  Patrick asked Shawn what does he

4  want to talk to his wife about.  And Shawn said well, you're down there

5  tripping with them and fighting them.  And Patrick said, no, I'm not.  And

6  Patrick went to touch Shawn on his shoulders to say man, no, I'm not.  And

7  Shawn did some move like this, like man, get off  me, you're too close to me.

8          MR. FLINN:  And, for the record, Your Honor, she kind of put her

9  hands out, palms up, away from her body.

10          THE COURT:  The record shall so reflect.

11          THE WITNESS:  And that's when Patrick looked at Shawn and said,

12  do we have a problem, do we need to talk?  He said well let's -- let's go down

13  here, let's go -- we talk.

14  BY MR. FLINN:

15      Q      You said he said let's go down there.  Who's he?

16      A      Patrick looked at Shawn and said, let's go downstairs so we can

17  talk.

18      Q      So, now when he says that, you and Akira are still standing up

19  there toward the top of the stairs, correct?

20      A      Yes.

21      Q      What happens after Patrick says let's go downstairs?

22      A      Patrick looked right at me, and I said no, you don't need to talk to

23  him.  And Patrick pushed me to the side and went right on downstairs first.

24      Q      So, you see Patrick start walking down the stairs?

25      A      Yes.

1    Q      Where is the Defendant at that point?

2    A      Coming right behind him.

3    Q      So, when you say coming behind him, is he also going

4   downstairs?

5    A      Yes, he's going downstairs also.

6    Q      As they start walking down the stairs, what do you do?

7    A      I'm going back up toward Angela's room to get the stuff for the

8   baby, and I hear the shots.

9    Q      You say you hear the shots.  Can you just -- just back up.  You're -

10  going toward Angela's room.  What do you hear?

11   A      Three loud shots.

12   Q      When you heard those three shots, can you say how long had it

13  been since you saw the Defendant and Patrick start walking down the stairs?

14   A      It couldn't have been a couple seconds.  Patrick is tall.  He went

15  downstairs first.  Shawn came right after him.  I had already turned around to

16  go to the bedroom and I heard -- before I even got in the bedroom, I heard the

17  shots.

18   Q      When you heard the shots, what did you do next?

19   A      Looked straight at Akira to make sure, because I know I don't have

20  hearing problems that bad, I said did you hear that?  And we ran to the stairs.

21   Q      So, you and Akira ran toward the stairs?

22   A      Yes.  The stairs, the way the stairs are, there's -- when you come

23  off of the -- from upstairs there's a little landing.  There's a little stairwell, a

24  little staircase, and then there's a landing.  And then there's another set of

25  staircases down below that that goes all the way to the front door.

1       Q     So, you came over to the stairs?

2       A     Yes.  And we were like on the top -- on the top of the -- of the

3  landing.  I was looking straight down at him and Akira was right behind me.

4       Q     So, just so I have this clear, you're on that couple steps down, then

5  a landing?

6       A     Yes.

7       Q     And you're looking down the rest of the stairs?

8       A     Yes.

9       Q     What do you see as you look down those stairs?

10      A     I see Patrick laying on the floor, and I see Shawn standing over

11  him.

12      Q     How did -- how did Patrick look to you at that point laying there?

13  Was he moving, was he saying anything?

14      A     No, not at all.  Not at all.  He looked like he was slumped over on

15  his side.  And I could see Shawn standing down there with the gun, and I could

16  see him standing over Patrick, and he's standing there looking at me with the

17  gun in his hand.  When I looked down, I could see he looks up at me with the

18  gun in his hand.

19      Q     So, as you're looking down the Defendant lifts the gun and points

20  it in your direction?

21      A     Yes.

22      Q     Did you or the Defendant say anything at that point?

23      A     I raised my hands,  and he said don't tell on me.  He said

24  something like don't tell on me, don't say anything.  And all I could do was

25  raise my hands and say okay.  I really thought that I was going to be shot next.

1    Q    When he said that and that's what you're thinking, what did you do
2    next?

3    A    I panicked.  All I could do was stand there.  He was trying to get out
4    of the garage door trying to move Patrick's body with the door to get out of the
5    garage door.  That's the only way you could get out of the door because
6    Patrick's body was in front of the garage door and the front door.

7    Q    Did you see whether the Defendant made it out one of those doors
8    at that point?

9    A    You could hear the garage door going up.  You could -- you knew
10   that he was - all I know is that I was trying to get to Patrick.  By then Akira had
11   called 911 and I was on the -- the phone, and she asked me to try and do CPR.

12   Q    So, as you were coming down the stairs, and saw all of this, and
13   the Defendant pointed the gun at you, where was Akira; if you know?

14   A    I -- I knew she was behind me and then when I raised my arms, I
15   don't know what -- you know, all I could say was okay to her.

16   Q    You said that Akira called 911, but you talked to them?

17   A    Yeah.  She had to call 911.  I know that I had the phone somehow
18   because I had to do -- try to do CPR.

19   Q    So, at some point you're listening to the phone and being told to
20   try to do CPR?

21   A    Yes.

22   Q    So, did you go down the stairs to where Patrick was laying and try
23   to do that?

24   A    Yes.  Shawn had already went down to Patrick.  I don't know where
25   the phone came from, but I knew that I was doing the CPR on him.  I had to

1    pull him toward me because he was face down when I got to him.  I had to pull

2    him toward me over so that I could do the CPR on him.

3         Q      So, did you turn him more so that then his -- he would be more

4    facing up?

5         A      Yes.  To see his face to try and do the CPR.

6         Q      Did -- when you went up to him to try to do that, was -- did he have

7    anything obvious to you in terms of just being hurt?

8         A      Yes.

9         Q      What was that?

10        A      Obviously, when he was down, I could see the back of his head.  It

11   was engorged, it was big right here.  When I turned him over, you know, I

12   knew right then and there that he had - -it was -- it was in his head.

13        Q      So, you tried to do CPR at that point?

14        A      Yes.

15        Q      Did Patrick respond at all to you trying to do CPR?

16        A      No.

17        Q      At what point did you stop?  There are some tissues just to the

18   right of you.

19        A      Thank you.  I didn't stop until the officers came in.  And they had to

20   come through the garage, because they couldn't come through the front door.

21        Q      So, at some point police officers arrive and make their way in?

22        A      Yes.

23        Q      That's when you stopped?

24        A      Yes.   And they took over.

25        Q      Where did you go after the officers arrived and took over the

1  situation?

2      A      They told us to go back upstairs, and we were upstairs.

3      Q      Was Akira upstairs when you went up there?

4      A      Yes, Akira was up there.

5      Q      You previously said that there were I think it was a total of five

6  smaller children, not adult children, that were living in the house?

7      A      Yes, there were.  Yes.

8      Q      Where, if you know, were those children while all of this was going

9  on?

10      A      They were -- when we went downstairs in the beginning, they were

11  all like in the living room, in the bedroom, playing games, you know, video

12  games.

13      Q      So, after the Defendant and Patrick went downstairs, and Patrick

14  was shot, and you went back up, where were the children?

15      A      They were in the room with the door closed.

16      Q      Had you closed that door?

17      A      No.  The door was open when we went downstairs.  The kids told

18  me that Shawn put them in a room.  That he took the clothes off the door, that

19  he put them in a room and closed the door and told them to stay in the room.

20          MR. FLINN:  May we approach the Clerk, Your Honor?

21          THE COURT:  Yes.

22                      [Clerk and State counsel confer]

23          MR. FLINN:  Your Honor, for the record I'm showing Defense

24  counsel State's proposed Exhibits 4, 5, 6, 7, 10, and 11.

25          MR. BASHOR:  Judge, may we approach?

1     THE COURT:  Yes.  Can I see you in the hallway for a minute?  I'm

2  going to step outside in the hallway.  If you can remain seated and not talk to

3  anyone, I'm going to be right back.

4         [Court and counsel exit courtroom at 10:43 a.m., not recorded]

5           [Court and counsel return to courtroom at 10:44 a.m.]

6         THE COURT:  Okay.  So, State you had a motion?

7         MR. FLINN:  Yes, Your Honor.  The State moves to admit State's

8  proposed Exhibits 4, 5, 6, 7, 10, and 11 by stipulation of the parties.

9         THE COURT:  Okay.  So, any time the lawyers enter a stipulation,

10  whether it's to admit something or they admit -- they stipulate to the existence

11  of a particular fact, that means they've agreed, and you have to regard that fact

12  as proved.  And the stipulation to admit these means that the Defense and the

13  State have agreed to their admission.  4, 5, 6, 7,10, and 11 are admitted.

14         [STATE'S EXHIBITS 4, 5, 6, 7, 10, AND 11 RECEIVED]

15         MR. FLINN:  Thank you, Your Honor.

16  BY MR. FLINN:

17     Q     So, Miranda, I'm going to show you some photographs of the

18  house on Smokey Fog and ask you to explain to the jury what they're looking

19  at, okay?

20     A     Okay.

21     Q     I'm going to show you State's Exhibit 4, and I'm going to put that

22  up on the screen.  Can you see that picture on the screen in front of you,

23  Miranda?

24     A     Yes.

25     Q     Okay.  So, as we're looking at that building there, what is the jury

1    looking at?

2         A    You're looking at the front of the townhouse.

3         Q    So, there --

4         A    Right there where it says 102 is where the garage is.  And right

5    there where the white truck is, is the front entrance.  If you go down that

6    sidewalk, it's the front entrance.

7         Q    Now, just so -- to make sure we're talking about the same thing,

8    the white truck that you're referring to, is that what -- the vehicle we're looking

9    at on the left-hand side of the picture?

10        A    Yes, that's --

11        Q    And there's a sidewalk next to it?

12             A    Right.

13             Q    So, the garage door -- it looks like there's three garage doors.

14   The one that's open went to your townhouse?

15             A    Yes.

16             Q    And that sidewalk, does that go toward the front door?

17             A    Yes.

18             Q    I'm going to show you State's Exhibit 5.

19             A    That's down the sidewalk.  That's the apartment 201.

20             Q    So, the sidewalk you were just talking about comes around the

21   building where those numbers are?

22        A    To the front door right there, to 201.

23             Q    That's the front door?

24             A    Yes.

25             Q    I'll show you Exhibit 6.

1    A  That's the garage.  Right there is the door.  Right in front of that

2  door is where Patrick was laying at.  And this is the door that Shawn exited out

3  of, the garage door.  That's the garage door.  It opens up.

4    Q  When you say the door, we're obviously -- we're looking inside

5  the garage?

6    A  Yes.

7    Q  And would it be fair to say toward the top right section of that

8  picture is the door you're talking about?

9    A  Yes.

10    Q  Just past what looks like a mattress?

11    A  Yes.

12    Q  And Patrick's body is on the other side of that door?

13    A  Of that door, yes.

14    Q  I'm showing you State's Exhibit 7.  Is that just a little bit closer

15  up of that door?

16    A  Yes.

17    Q  That's the same door?

18    A  Yes.

19    Q  I'll show you Exhibit 10.

20    A  That's the -- that's the stairwell.

21    Q  I'm going to zoom out real quick before you -- okay.  What are

22  we looking at there?

23    A  That's the stairwell.  At the bottom -- down here, at the bottom is

24  where Patrick was laying at.  The steps that go up -- and then up where you

25  see the plant at, there's a landing right there.  So, it's like a little -- you could

1  peek around the corner to see down into the stairwell.

2          Q So that landing, if you walk up the stairs to where you described

3  that plant, the rest of the stairs, the couple more stairs you talked about, that's

4  to the right?

5          A Yes.  And it goes straight up into the townhouse.

6          Q So, when you came down and saw Patrick's body and the

7  Defendant pointed the gun at you, where were you standing in the picture?

8          A I was standing right up here at the top where you see there's

9  another little banister that's hanging out, right there.  All you had to do is look

10  around the corner to just look down.  That's as far as I went.  When I looked

11  down, I look around that corner.

12          Q So, you looked around the corner toward the bottom of the

13  stairs?

14          A Yes.

15          Q I'm going to show you exhibit -- State's Exhibit 11.

16      A     Yes.  That's the top of the stairs.  That leads into the townhouse.

17  This is the landing that I was telling you about, the second -- the first landing

18  right here that leads down.

19          Q In the lower right corner?  I'm sorry.  In the lower right corner of

20  the screen is the landing?

21          A Yes.   That's the landing right there.  There's a set of stairs about

22  three or four steps that goes down.  And then that's the landing, the first

23  landing.  And then it goes down into the stairwell and there's a second landing

24  at the bottom of the steps.

25          Q So, when -- as you described Patrick started to walk down the

1    stairs --

2              A  Yes.

3              Q  -- and then the Defendant started to walk behind him, are you

4    standing near this area?

5              A  No.

6              Q  So, where are you in relation to this part?

7              A  I'm all the way over here by Angela's room when they start to go

8    downstairs.

9              Q  So, you saw them start to go down and that's when you're

10   walking away from this spot?

11             A  Yes.  I was over here near the stairs.  I was blocking Patrick's

12   way.  That's why he pushed me to the side.

13             Q  Okay.

14             A  And as soon as he walked downstairs, I started walking toward

15   the bedroom because I figured he had it.  You know, he's just going to go

16   down there and talk to him like he talked to us.

17        Q        So, as we're looking at this picture, you -- they start going down

18   the stairs, and you turn just as we're looking at it to the left?

19             A  Uh-huh.

20             Q  Okay.

21             THE COURT:  Is that a yes?

22             THE WITNESS:  Yes.

23             THE COURT:  Thank you.

24   BY MR. FLINN:

25        Q        When you testified that the Defendant pointed a gun at you and

1   spoke to you --

2          A Yes.

3          Q -- do you recall, at the moment, the precise words that the

4   Defendant said to you?

5          A All I know is he said something like don't snitch on me, don't tell.

6   I seen his mouth moving. All I could do was put my hands up and say okay. I

7   knew that I -- I could see my husband laying right there on the ground. I just

8   felt like all he -- all he had to do was just -- I don't even know why I'm sitting

9   here right now.

10         Q The day after this happened you talked to the police. And do

11  you recall telling them the precise words that the Defendant said to you at that

12  point?

13         A It was fresher then, yes.

14         Q Would reviewing a transcript just of that statement refresh your

15  memory about what the Defendant said to you?

16         A Yes, it could.

17         MR. FLINN: May I approach, Your Honor?

18         THE COURT: Yes.

19  BY MR. FLINN:

20      Q     I'm going to show you a page of that and if you could just read this

21  paragraph to yourself and then tell me when you're done.

22                          [Witness reviews document]

23         A Yes.

24      Q     Does that refresh your memory?

25      A     Yes.

1    Q      Would you please tell the jury --

2    A      To the --

3    Q      -- specifically what he said?

4    A      He said, if you and your kids want to live, you'll shut the fuck up.

5           MR. FLINN:  No further questions, Your Honor.

6           THE COURT:  Cross-examination.

7           MR. BASHOR:  Thank you, Your Honor.

8                          <u>CROSS-EXAMINATION</u>

9    BY MR. BASHOR:

10   Q      Good morning.

11   A      Good morning.

12   Q      I'd like to talk to you a little bit about some events leading up to

13   this day.  It's my understanding that you, and your husband, and your

14   daughter, Akira, were living at a different location, and then moved in with

15   Angela; is that correct?

16   A      Yes.

17   Q      And that was about two weeks before this occurred?

18   A      Yes, about two weeks.

19   Q      So, it would be fair to say you were kind of transitioning from one

20   residence --

21   A      To another.

22   Q      -- to another?

23   A      Yes.

24   Q      Okay.  And by happenstance it was the holiday season, so you got

25   to spend it together?

1      A      Yes.

2      Q      Now, Mr. Glover wasn't there -- and I don't know why I'm making

3  that noise, so I'm going to stand back.  But Mr. Glover wasn't there when you

4  moved in, right?

5      A      Right.

6      Q      Mr. Glover moved in on Christmas Eve?

7      A      Right.  About that, yes.

8      Q      And between Christmas Eve and New Year's Day, roughly seven to

9  eight days, he had been in and out of the townhouse, right?

10     A      Yes.

11     Q      Staying away from Angela?

12     A      He had been -- yes.  At first, it was like he was in and out and then

13  he came and stayed.

14     Q      And then he stayed?

15     A      Yeah.

16     Q      Okay.  And obviously we've heard about this townhome, and I

17  don't think it's -- you would agree it's not designed for I don't know how many

18  people in that apartment, 11 or 12 of you, right?

19     A      Actually, him and Angela had her bedroom.

20     Q      Right.

21     A      Me and my husband, we had blowup beds.  So, we had a blowup

22  bed that was very comfortable.  And all the kids were on the video games all

23  night, so they were --

24     Q      I don't mean to criticize the mode of living.  I'm just saying it's

25  close quarters for 11 people?

1        A        It was close, yes.  Yes.

2        Q        Okay.  And so, by that nature it would be -- you would agree

3    that Shawn and Patrick would have interactions with one another over those

4    seven to eight days?

5        A        Daily, yes.

6        Q        And, in fact, on New Year's Eve Patrick had driven Shawn to work?

7        A        Yes.

8        Q        Now, I want to direct your attention to that day.  You called -- well,

9    Akira called 911, right?

10        A        I believe so, yes.

11        Q        And handed you the phone?

12        A        Yes.

13        Q        And you're on the phone with the operator, correct?

14        A        Yes.

15        Q        And you -- the call is made right after the suspect leaves, right?

16        A        Right.

17        Q        There's no delay, right?

18        A        No, I don't know.  I -- I was standing down there, and he was trying

19    to get out the door.  I knew I felt Akira behind me, but I don't know -- I don't

20    even know when she called 911.

21        Q        It would be fair to say it was in a matter of seconds after the

22    suspect --

23        A        It wasn't that long after that, no, it wasn't.

24        Q        Right.  You weren't waiting 20, 30, 40 minutes --

25        A        No.

1    Q    -- to call 911?

2    A    No.

3    Q    You wanted to get your husband some help?

4    A    Right.

5    Q    As soon as possible?

6    A    Exactly.

7    Q    And I would think it would be safe to assume Akira would want the

8    same thing?

9    A    Yes.

10   Q    When you're on the 911 call -- would it be fair to say that call

11   occurred around 12:05?

12   A    It could, yes, about that time.

13   Q    Okay.  And you're in shock?

14   A    Yes.

15   Q    And you're hysterical?

16   A    Yes.

17   Q    You're crying?

18   A    Yes.

19   Q    You want to do whatever you can to help your husband?

20   A    Yes.

21   Q    And the 911 operator wants to know what kind of services are

22   needed, right?

23   A    Yes.

24   Q    And you indicate that someone had shot your husband?

25   A    Yes.

1     Q    And you had stated that your husband had answered the door and

2 he had been shot, correct?

3     A    Yes, I think I did state that.

4     Q    And when asked if you knew who shot your husband, you stated I

5 don't know, I don't know?

6     A    I did say that.

7     Q    When asked if you saw anything at all, you indicated that no,

8 correct?

9     A    That I had just been threatened, and I see my husband laying there.

10 Yes, I did say that.

11     Q    Okay.  And that you stated all you knew he was on the phone, and

12 someone was supposed to come over, I don't know who it was?

13     A    Yes, I did say that.  Now --

14     MR. BASHOR:  I have no idea why -- my cell phone is in the bag.

15                [Court recorder and counsel confer]

16 MR. BASHOR:

17     Q    Let's talk about -- obviously, the first responders come in, right?

18     A    Yes.

19     Q    They secure the scene, right?

20     A    Yes.

21     Q    You are -- because of where Patrick's located, you're upstairs?

22     A    Yes.

23     Q    And eventually detectives come?

24     A    Yes.

25     Q    And the first responders and the detectives -- the first responders

1  are in their uniforms, right?

2          A     Yes.

3          Q     And they have their guns, and their tasers, and that sort of thing,

4  right?

5          A     Yes, they do.

6          Q     And the detectives are there.  They're armed with different things,

7  right?  They're usually in civilian clothes, correct?

8          A     Right.  Right.

9          Q     And they're armed with like a recording device?

10         A     Yes.

11         Q     That's kind of like their weapon, right?

12         A     Yes.

13         Q     And at this point you have a discussion with the detectives,

14  correct?

15         A     Yes.

16         Q     And at some point, a recorder is put in front of you, right?

17         A     I believe so.  I know that they asked me to write a statement out or

18  they wanted to record what was going on, yes.

19         Q     Okay.  And so as far as you knew, the conversation was going to

20  be recorded?

21         A     I -- I really don't - don't even remember that part.

22                Q     Okay.  Now, you had stated that you were obviously in fear for

23  your life, right?

24         A     Yeah.

25         Q     The suspect had pointed a weapon at you, right?

1    A    Yes.

2    Q    And so you have, you would agree, three options at this point,

3    right?

4    A    Uh-huh.

5    Q    You can tell them exactly what happened, right?

6    A    Yeah.

7    Q    You can tell them nothing?

8    A    Right.

9    Q    Or you can tell them something that wasn't the truth?

10    A    Right.

11    Q    And when they asked what happened that day, you begin to

12    describe that your husband, Patrick Fleming, sold marijuana?

13    A    I do say -- they said something like that, and I do recall something

14    to that effect.

15    Q    I'm not talking about they said it.  I'm saying you said that your

16    husband was --

17    A    You know, I really could not tell you word for word -- verbatim

18    what I said, because I was sitting there in tears --

19    Q    That's okay.  I understand.

20    A    -- crying that whole time.  I do recall them saying something about

21    a recording and asking me -- but I do remember telling them also that -- that

22    he couldn't have gotten that far.  There's only desert around us and that he

23    had just shot my husband, and I know of him having a 50- round gun, that he

24    couldn't have been that far.  He had to be in that - in that same townhouses.

25    Q    Okay.  And we'll get to that, okay?

1    A    Okay.

2    Q    What I'm asking you is at the beginning of the interview you had

3    told the officers that your husband, Patrick, was looking for a re-up?

4    A    I may have said that.

5    Q    Would looking at your statement to the police on September 1st

6    refresh your recollection?

7    A    No, it wouldn't, really.

8    Q    It would not?

9    A    No, because I was so out of it that day that it happened that I

10   never, ever, made a statement to -- well, I never signed a statement or did a

11   written statement because I was still in fear.  And I asked the officers that day if

12   they could stay with me and my kids, and they said that they did not have

13   enough manpower to do that.

14        MR. BASHOR:  The Court's indulgence.

15                              [Pause]

16   BY MR. BASHOR:

17   Q    You don't recall telling the detectives that the deal didn't go

18   through, I know this morning he kept saying he had to recop or get some

19   weed?

20   A    I do believe I said that after they stated that no, they could not stay

21   there with me and provide safety for me and my -- my kids.  I do believe that

22   that was said after that.

23   Q    The answer to my question, ma'am --

24   A    At the beginning, I did not know what to say to the officers or the

25   policemen there because I felt like I was still in danger.

1    Q    The answer is yes?

2    A    And I did not -- I'm sorry.

3    Q    The answer is yes, correct?

4    A    Say it again.  What was the question?

5    Q    Do you -- you don't recall?

6    A    I don't recall.

7    Q    You don't recall --

8    A    I don't.

9    Q    -- saying to the police that the deal didn't go through --

10   A    I could have said that, yes.

11   Q    Ma'am, I'm not done with my question.

12   A    I'm sorry.

13   Q    That the deal didn't go through, and I know this morning he kept

14   saying that he had to recop or get some weed; you don't recall saying that?

15   A    I could have said that to the police officers.  I'm not sure what I said

16   after that.  I was still distraught, I was still shaking, and I was still asking for

17   services that they could not provide.  So, I'm not exactly sure.  I didn't even

18   want to give out his name because I was so scared.

19   Q    Okay.  Maybe because it's a lie, right?

20   A    No, it couldn't have been a lie.

21        MR. FLINN:  Objection.  Argumentative.

22        THE COURT:  Sustained.

23   BY MR. BASHOR:

24   Q    Now --

25   A    I stayed there, Shawn did not.  I'm sorry, sir.

THE COURT:  It's okay.  I'm sorry, one second.  If I sustain the

objection, that means that the question is not proper, I'm not allowing it --

THE WITNESS:  Oh, I'm sorry.

THE COURT:  -- and he has to move on, so don't answer, okay?

THE WITNESS:  Okay.

THE COURT:  Thank you.

MR. BASHOR:  The Court's indulgence.

[Pause]

BY MR. BASHOR:

Q      Do you recall telling the detectives that your husband had to make

a run, and it was something to do with weed, and he kept talking about it the

night before?

A      You keep asking me these questions, but I'm not familiar with

them.  I'm not exactly sure what I told them.  I do know that I said can you

guys stay here with us.  And when they told us there was no additional

protection, I'm not sure what I said because the police couldn't help me at that

time, and I knew that he was still in the vicinity.  There was nothing that no

one could do.  The only thing that I wanted to do was get my kids and get out

of there.

Q      Okay.  Let's talk about the argument.

A      Okay.

Q      Do you have a recollection of that?

A      Yes, I do.

Q      Okay.  Do you recall telling -- so, as I understand it, Patrick was

arguing with Akira, right?

1    A    Yes.  He was --

2    Q    And the argument with --

3    A    -- actually, he was arguing with me and Akira.

4    Q    Okay, good.  We'll get to that.

5    A    Okay.

6    Q    The argument started with Akira, correct?

7    A    Yes.

8    Q    Okay.  And that was because Patrick had her followed the night

9    before?

10   A    Yes.  Yes.

11   Q    Because he didn't want a boy in his car, right?

12   A    Something to that.  We -- I never exactly knew exactly what it was.

13   All I knew we were arguing about her age and her being responsible and not

14   the typical average 21-year-old.

15   Q    Patrick had someone following her and spying on her, right?

16   A    One of his friends.  One of his so-called friends had videotaped or

17   something of the -- the event from that night before.

18   Q    So, Patrick had his friend videotape his daughter on a date?

19   A    Yes.

20   Q    That was upsetting to Akira?

21   A    It was upsetting to us all.  That's why we were discussing it and

22   there was an argument.  And it turned from a simple hold on, she's 21 years

23   old, you know, and she's being responsible.  You told her you wanted her back

24   by 11:30, and it was a decent time because of his traditions of New Year's Eve,

25   and she did that.  So, he had her followed to say that no, she wasn't with a boy

1    in her -- in his vehicle.

2          Q      It would be fair to say that Akira was screaming, right?

3          A      It was safe to say we were all screaming.

4          Q      Was Akira screaming?

5          A      Yes.

6          Q      Were you screaming?

7          A      I was screaming.

8          Q      Was Patrick screaming?

9          A      He was talking loud.  Patrick -- Patrick's voice carries loudly.

10         Q      At about 11:35 you go downstairs and let him know that

11   you want to get going, right?

12         A      To tell him that -- we had previous things to do.  We had --

13         Q      That you wanted to go look for an apartment?

14         A      Well, we had an apartment.  We had to go put the money down on

15   the apartment and get going that day to transfer all of our things over there to

16   that apartment.

17         Q      And that's what you -- you took note of the time that it was 11:35,

18   right?

19         A      Well, I said it was 11:35, because I looked at the time.  Instead of

20   you arguing with Akira, we have things to do.

21         Q      Okay.  So, that part of your statement to the police on January 1

22   you have a perfect recollection of, right?

23         A      I'm not exactly sure if that was the exact time.  It could have been

24   around that time because I know that it -- about the time that she got off, and I

25   thought I was looking at the time because of the situation that we were in

1    going to get started with our day.

2        Q    In your statement to police on January 1st, you indicated to them

3    that you didn't get a good look at the suspect; is that correct?

4        A    I'm not exactly sure.

5        Q    All right.

6        A    Like I told you previously, we just -- and I just stated that, that

7    when the officers told me that there was no one that could stay there with me

8    and my kids, that I feared -- I was in fear.  All I could see was the gun pointed

9    up at me.  And I'm not sure why he didn't shoot me that day myself.

10        Q    And, again, there'd be no point to show you the transcript?

11        A    No.

12        Q    All right.  Now, do you remember telling the police that your

13    memory was off since your last surgery?

14        A    No.  I told them that I had a lot of things going on since my last

15    surgery, but my memory wasn't off that -- not to know what had had

16    happened to my husband.  Me and my husband had been together for all

17    these years.  I would know exactly what happened to him.

18        Q    And that's why you told the police you didn't know who shot your

19    husband on January 1st?

20        A    No.  I told the police that when they told me that they could not

21    stay there with me and my kids in the house that my husband was laying on

22    the floor of that had just been shot and murdered.

23        Q    Okay.

24            THE COURT:  Ms. Sutton, because the recording equipment  can't

25    get two people talking at once, I need you to let him finish his question before

1   you start your answer, okay?

2            THE WITNESS:  Okay.

3            THE COURT:  Thank you.

4   BY MR. BASHOR:

5        Q      So when asked if you could describe the individual on that day,

6   you don't recall telling the police no, my memory is kind of off since my last

7   surgery?

8        A      I can tell you this right here.  I could describe him pointing that gun

9   up at me.  That's the only thing I could see.  When the officers was talking to

10  me, that's the only thing I could see.  That since they could not stay with me,

11  that he was going to run back up, and he'll shoot us all up.

12       Q      Okay.  So, it's fair you're really adamant today, right?

13       A      I'm sorry?

14       Q      You're really adamant about what happened today, right?

15       A      Yes.

16       Q      Yeah.  You can't answer a yes or no question.  So when -- you

17  want the killer of your husband brought to justice, right?

18       A      Yes.

19       Q      And so then you decide on January 1st, to lie to the police?

20       A      No.  What I did was on January 1st, not tell the exact same story

21  that they wanted to know and hear, because I was in fear of my -- my life and

22  then my kids were still there, and my husband's body had not even gotten up

23  off the floor yet.  But he had been killed and murdered.  That's the only thing I

24  was thinking of that day.  Now, when my family got to me that night and took

25  me out of that, like the surrounding that it had happened in, I calmed down,

1    and we went to the police station the next morning to tell them exactly who it

2    was, what had happened, everything.

3         Q      Do you recall stating that the individual came into the front door on

4    January 1st?

5         A       I'm not sure.  What I -- that -- that's my whole point to you.  I'm not

6    exactly sure what I said to the officers January 1st, because I was scared and

7    alone with my husband still laying down there and my kids in a room

8    somewhere that I don't even know about.

9         Q      You were alone, yes?

10        A      Alone in that situation, yes.

11        Q      Right.  And there were how many responding officers with

12   handguns?

13        A      But how many stayed with me and my kids is the question.

14        Q      Okay.  I'm asking you a question, ma'am.  How many responding

15   officers were in the apartment when you were home alone?

16        A      I'm not exactly sure.  All I know is they were there.  I'm not -- I'm

17   not even sure if I looked up at them that day.

18        Q      How many detectives?  How many detectives?

19        A      There could have -- there was quite a few detectives that day, but

20   then they didn't threaten me with their gun that day, either.

21        Q      You'd agree that their guns were protecting you?

22        A      They was protecting me, yes, as long as they were there in

23   that -- in that townhouse with us --

24        Q      And when you were in the --

25        A      -- but when they told me that they could not stay with us, there

1    was nothing that they could do.

2        Q    When you were talking to them, they were in the townhouse, right?

3        A    Yes.

4        Q    Protecting you, right?

5        A    Yes.

6        Q    And then you lied to?

7        A    I'm not sure if I lied to them.  I didn't write out a statement that

8    day.

9        Q    And the statement --

10       A    And as I -- I'm sorry.

11       Q    -- that the police recorded, you have no recollection of, right?

12       A    I'm sorry?

13       Q    And the statement the police recorded you have no recollection of?

14       A    No, not today because I never signed anything that day.  And like I

15   told the investigator, give me time to get me and my kids together, and you

16   will know everything that you need to know.  Get us out of this right here place

17   where my husband is dead at, please.  I begged them that day to stay with us.

18       Q    Going back to the argument, you testified on direct examination

19   that Shawn had come down at one point and returned back upstairs, correct?

20       A    Yes.  He came downstairs with the phone and said that Angela was

21   on the phone and returned back upstairs.

22       Q    And then came down a second time and asked if he could speak

23   with you?

24       A    Yes.

25       Q    While that was happening, the argument between Akira and Patrick

1    ends?

2    A       No.  They were finishing up.  It was -- it wasn't -- the argument in

3    the ending was not between Patrick and Akira.  He looked at her and said

4    something -- it was directed to me and him.  Me and him was arguing,

5    because I was telling him of her age and as I was doing it, I was like this and as

6    you see, I have had surgeries on my ears, so I'm louder than what I really think

7    I am.  I think I'm loud -- not loud now, but I'm louder than what I really think I

8    am.  So, downstairs in the garage it was amplified and we're down there

9    screaming, and my voice is getting loud, and I'm clapping, this is nothing

10   unusual.  This is a conversation I'm having with my husband.

11   Q       Okay.

12   A       This is an argument conversation that we all -- that, you know, that

13   I'm having with my husband concerning my daughter just standing right there.

14   Q       You testified on direct examination that when Akira and Patrick

15   came out from the garage and started heading upstairs, the argument between

16   the two of them seemed to be over; is that fair?

17   A       Yes.

18   Q       And that they were smiling?

19   A       Yes.

20   Q       And talking?

21   A       I think that Patrick's whole thing that day was to scare Akira

22   and -- and that was it.  Her being her age, just turning 21 almost, you know,

23   and being with a new boyfriend and everything, it was a scare tactic for her.  It

24   wasn't for anyone else.  And I was trying to tell him to calm down.  And that's

25   all it was.  It wasn't anything serious that, you know --

1    Q    So the argument wasn't all that serious?

2    A    No, not to --

3    Q    It was normal?

4    A    It wasn't -- it was not normal, but it wasn't anything to, you know,

5    get your feathers ruffled about.

6    Q    Uh-huh.  Nothing to kill over, right?

7    A    I'm sorry?

8    Q    Nothing to kill over?

9    A    Not that my -- no, not that I could see.

10    MR. BASHOR:  The Court's indulgence.

11    [Defense counsel confer]

12    BY MR. BASHOR:

13    Q    Towards the end of the interview you don't remember -- do you

14    recall telling the police that they should go and check the facility for cameras?

15    A    The facility for cameras, yes.

16    Q    You remember that part?

17    A    That they should have cameras outside of the townhouses.

18    Q    And that you give them an approximate time, 11:45, for them to go

19    and look at the cameras?

20    A    It had not happened that long before that.  An approximate time,

21    yes.

22    Q    Okay.  An approximate time, you recall that part?

23    A    No.  I recall me telling them that he did -- I know of him having a 50

24    round drum, that my husband was there on the ground, and that he could not

25    have gotten out of the townhouses not by foot, and he did not have a vehicle.

1    So, where is he?  He has to still be here in the vicinity.

2        Q    Okay.

3        MR. BASHOR:  Your Honor, may I approach?  First of all, I have no

4    further questions, and can I approach?

5        THE COURT:  Sure.  Can I see counsel in the hallway?  Can you

6    remain seated and not talk to anyone again?

7        THE WITNESS:  Yes.

8        THE COURT:  Thank you.

9        [Court and Counsel exit the courtroom at 11:17 a.m., not recorded]

10           [Court and Counsel return to courtroom at 11:21 a.m.]

11        THE COURT:  Okay.  Ladies and gentlemen of the jury, we're going

12   to take a short restroom break.  During this recess you are -- and you're going

13   to follow my Marshal.  During this recess you are admonished not to talk or

14   converse among yourselves or with anyone else on any subject connected

15   with the trial, not to read, watch, or listen to any report of, or commentary on

16   the trial by any person connected with this case or any medium of information

17   including, without limitation, newspaper, television, the internet, or radio.  Do

18   not to form or express any opinion on any subject connected with this trial

19   until the case is finally submitted to you.  No social media, no tweeting, no

20   Facebooking, no twitting, no snapchatting, none of that.  See you in a few.

21        THE MARSHAL:  All rise.  Jury exiting.

22           [Outside the presence of the jury.]

23        THE COURT:  The record should reflect we're outside the presence

24   of the jury.  In the back hallway there I discussed with you a scheduling

25   problem that the Court has that has nothing to do with this case, but that

1  Justice Hardesty would like my attendance tomorrow at the meeting that we

2  talked about at the calendar call.  I told you about the email I sent to him.  I

3  think I can get out of the meeting early, but I can't take a pass on the whole

4  meeting.  I mean he wants me to attend, it's his commission, I committed to it,

5  so we're going to rediscuss the schedule for tomorrow.  And so, I just want to

6  put you on notice to the extent you have to make plans or whatever, you can

7  do that.

8         Okay.  You wished -- the witness needed to use the restroom, so it

9  seemed like a good time to give the jury a break, and we can make a record of

10 whatever you want to make.  You can sit down.  Thank you.  Whatever you

11 want to make a record of.  I would note that no one asked me to give any

12 admonishment and --

13         MR. BASHOR:  Well, I don't think it would have been appropriate at

14 that time anyway because the logical -- excuse me -- the logical progression

15 would be yes, I lied.  And then on redirect examination it would be let's

16 explore those reasons.

17         THE COURT:  Right.  Which they haven't done.

18         MR. BASHOR:  Right.  And my point is, since she won't admit or

19 doesn't recall lying, then there's no need to explain under the statute.

20         THE COURT:  Well, here's the thing.  There's two witnesses, right?

21         MR. BASHOR:  Right.

22         THE COURT:  And so, so far there's this witness who's very clear

23 about everything, and I don't know that it needs to be redirected.  I don't quite

24 frankly -- well, I think she's very clear on her feelings.  And so, for this witness I

25 don't necessarily disagree, but I'll hear from the State.

MR. STANTON:  Well, first of all, she doesn't -- first of all, the way counsel phrased her testimony the State will disagree.  Number one, that she -- her statement is that she doesn't remember lying.  No.  She remembers the statement, she remembers that she gave it, she remembers that she didn't give complete accurate details.  Whether or not you want to say it's a lie, I don't think she's going to concede it is or at least to the extent that it's a conditional lie.  She just doesn't remember -- because counsel's asking the question, do you remember telling the detectives this?

THE COURT:  Right.

MR. STANTON:  So, she's not denying that the statement was made and that the statement has things that are different from her current testimony or version the next day.  So, is it --

THE COURT:  Yeah, but she already testified why didn't you tell -- why didn't you tell.  I mean that's already been covered, and she answered the question with all kinds of things that didn't have anything to do with past violent history.  And so, I don't know that there's something to go back on in redirect.  I don't -- I mean I get from the Defense perspective you want to call it a lie.  She's explained her statement.  And so, I guess I don't know what we're pre-arguing about.

MR. BASHOR:  Okay.  That's fair.

THE COURT:  She couldn't be any more clearer like, you know.

MR. STANTON:  But that answer is not -- is in response to, do you remember saying this to the detectives.  It's, I believe, a substantively and qualitative different concept to ask her what -- and as we planned to do, in a leading fashion, were you also concerned about information that you knew

1    that the Defendant had committed other acts of violence.  In a leading question

2    specifically within the framework of the instruction and that would be the sole

3    question to her to explain what occurred.

4          And just so the record is abundantly clear, that the strategy of the

5    State as it relates to this issue is, as I stated before, we were not going to touch

6    the inconsistent statements.  So, that it is abundantly clear that that is a

7    strategic choice by the Defense to do that under the law in the State of Nevada

8    at the cost to the State's case of not eliciting obviously an inconsistent

9    statement, which I think there is a cost for us to bear in that regard, but

10   pursuant to the Court's directive, and I believe consistent with what the law

11   permits, she is entitled to explain the differences in her inconsistent

12   statements, and I believe within the parameters of the Court's ruling she's

13   entitled to fully explain.

14          THE COURT:  Which I just listened to for 20 minutes, but.  So, I

15   understand the nature of your objection.  I heard her testimony prior to the

16   hearing.  I'm relying on that testimony, I'm standing by my previous ruling, but

17   I'm not allowing gang membership, I'm not allowing any specifics, and that's

18   it.  Anything else?

19          MR. BASHOR:  No, Your Honor.

20          MR. STANTON:  No, Your Honor.

21          THE COURT:  Okay.  So, is she out there?  Can we -- can we --

22                  [Plaintiff and Defense counsel confer]

23          MR. BASHOR:  Your Honor, how do I go about ordering a JAVS of

24   her testimony?

25          THE COURT:  Ask her, and she'll give it to you.  You don't have to

1   order it.

2           MR. BASHOR:  Okay.

3           THE COURT:  She'll burn a copy of it.

4           MR. BASHOR:  Thank you.

5           THE COURT:  By lunch or like right before you leave, can you,

6   please?

7           MR. BASHOR:  Thank you.

8                           [Court and Marshal confer]

9           THE COURT:  Okay.  Are they ready?

10          THE MARSHAL:  In about one minute they'll be ready.

11          THE COURT:  Okay.  I don't know -- hey, State, can you go look for

12  your witness?  She just went to the bathroom and --

13          MR. STANTON:  Yeah, she came back and went back in the side

14  room, I believe.

15          THE COURT:  Okay.

16          MR. STANTON:  She came back.

17          THE COURT:  Okay.  Will you bring them in when they're ready?

18          THE MARSHAL:  Yes.

19          MR. STANTON:  And just a reminder to the Court and counsel, I

20  have Dr. Corneal coming here as the first witness in the afternoon session.

21          THE COURT:  Okay.

22          MR. STANTON:  I told her to be here at 1.

23          THE COURT:  Okay.

24          MR. STANTON:  I could use a couple minutes for her to review the

25  specific autopsy photographs.

1          THE COURT:  I'm going to have the jury come at 1:15.

2          MR. STANTON:  Okay.

3          THE COURT:  Because I might not be able to take a break until

4   12:15, depending on how you guys go.

5          MR. STANTON:  And then my guess is, is that once we're done

6   with this witness, it might be better -- because the next witness is Ms. Veasley,

7   and we wouldn't be able to complete her testimony, so we'd have to either

8   stop hers or just break and then come back to a witness out of order.

9          THE COURT:  Okay.

10                         [Court and Clerk confer]

11          THE COURT:  Do you want to get the witness, so we can bring the

12   jury in when she's already sitting in the seat?

13          THE BAILIFF:  Sure.

14          THE COURT:  Thank you.

15          THE MARSHAL:  Watch your step.  All rise.  The jury is entering.

16   The jury's all present, ma'am.

17                         [In the presence of the jury.]

18          THE COURT:  Counsel, will you stipulate to the presence of the

19   jury?

20          COUNSEL:  Yes, Your Honor.

21          THE COURT:  Okay.  Ma'am, before we continue with your

22   examination, do you understand you're still under oath?

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  All right.  Redirect.

25          MR. FLINN:  Thank you, Your Honor.

1

<u>REDIRECT EXAMINATION</u>

2    BY MR. FLINN:

3        Q      Miranda, when you talked to the police on January 1st, 2016, right

4    after Patrick had been shot --

5        A      Uh-huh.

6        Q      -- and you told them what happened --

7            THE COURT:  One second.  All I can hear is around you talking.

8    One second.

9            MR. BASHOR:  And just while we're doing that, I apologize.   Can

10    we approach really quickly?

11            THE COURT:  Yes.

12                        [Sidebar begins at 11:34 a.m.]

13            THE COURT:  I'm sorry, but everybody is like just full on talking on

14    the way in here.  The people, I can't even blame the people.  It's my staff, as

15    well.

16            MR. BASHOR:  I don't think this has been a problem so far, but I

17    neglected to invoke the exclusionary rule at the beginning of the witnesses

18    being called.  Like I said, I don't think it's been a problem.  And I think the other

19    witnesses have been outside, it's just --

20            THE COURT:  But they cannot be for (indiscernible).

21            MR. BASHOR:  And I don't know who these people are, either, and

22    that's the reason why --

23            THE COURT:  Can you tell Mr. Stanton, please?

24            MR. FLINN:  I can tell you none of these people are witnesses.  The

25    only other lay witness we are calling at this point is Akira, who's already been

1  in the courtroom, so the Court knows.

2          THE COURT:  Okay.  I can accept that.

3          MR. FLINN:  And anybody else --

4          THE COURT:  Will you accept that?  I'll make a record that you

5  invoked it up here at the bench.

6          MR. BASHOR:  And I've already been in the courtroom.  She was in

7  the courtroom earlier.  She's not in the courtroom.

8          MR. FLINN:  Correct.  For the evidentiary.

9          MR. BASHOR:  Right.

10          THE COURT:  Okay.

11          MR. BASHOR:  Thank you.

12          THE COURT:  Okay.

13                  [Sidebar ending at 11:35 a.m.]

14          THE COURT:  Okay.  Now that we can hear you, State, go ahead.

15          MR. FLINN:  Thank you, Your Honor.

16  BY MR. FLINN:

17      Q      Okay.  I'm just going to repeat that.  Miranda, when you, on

18  January 1st, after -- right after Patrick had been shot, and you told police what

19  was going on and left out that it was the Defendant who shot Patrick, did you

20  believe -- did you believe that the Defendant had committed other acts of

21  violence against other people in the past?

22      A      I know he had, yes.

23          MR. FLINN:  Nothing further, Your Honor.

24          THE COURT:  Anything else?  Ladies and gentlemen, I'm going to

25  caution you now, ladies and gentlemen of the jury, that the testimony that the

1  witness believed the Defendant had a history of violence against persons is

2  being offered and may only be considered by you solely for the purpose of

3  explaining the state of mind of the witness at the time she made her statement

4  to police on January 1st, 2016.  This testimony, if believed, is not to be

5  considered as substantive evidence that the Defendant has a history of

6  violence against persons or that he is a person of bad character.

7            Now, do any of the ladies and gentlemen of the jury have any

8  questions you wish the Court to ask the witness?  There being no questions,

9  thank you very much, ma'am, for your testimony.  You're excused.  State, call

10  your next witness.

11            MR. FLINN:  The State calls Akira Veasley, Your Honor.

12            THE MARSHAL:  Watch your step.

13            THE COURT:  If you could when you're ready, face the Clerk, raise

14  your right hand and be sworn.

15                  AKIRA VEASLEY, STATE'S WITNESS, SWORN

16            THE CLERK:  Please be seated.  State and spell your name for the

17  record.

18            THE WITNESS:  It's Akira Veasley, A-K-I-R-A V, as in Victor,

19  E-A-S-L-E-Y.

20            MR. FLINN:  Thank you, Your Honor.

21            THE COURT:  Yes.

22                          DIRECT EXAMINATION

23  BY MR. FLINN:

24      Q     Ms. Veasley, is it okay if I call you Akira?

25      A     Uh-huh.

1    Q    So, I want to talk to you about January 1st, 2016 specifically, okay?

2  At that time where were you living?

3    A    We were living with Angela in the townhouse.  We were staying

4  with them.

5    Q    Do you remember the street the house was on, the townhouse?

6    A    It was Lamb, and I think it was Tropical or Centennial.

7    Q    In North Las Vegas, right?

8    A    Yeah, in North Las Vegas.

9    Q    And you said Angela; who is Angela to you?

10    A    Godsister.

11    Q    Who else did you live with at that time at that house?

12    A    It was me, my mom, my brother and sister, Angela and her three

13  kids, and Patrick.

14    Q    And your mom is Miranda?

15    A    Yes.

16    Q    And Patrick is your dad or stepdad?

17    A    Yes.

18    Q    Were there -- when it came to January 1st, were there any other

19  adults staying at the house?

20    A    Yeah.  Shawn.

21    Q    When you say Shawn, do you know Shawn's last name?

22    A    Glover.

23    Q    And is that person that you know as Shawn Glover present in

24  Court today?

25    A    Yes.

1    Q    Could you please tell the jury where that person is sitting and the

2  clothing he's wearing?

3    A    A suit, sitting right there.  He has a tie on with a white shirt, the

4  long dreads.

5         MR. FLINN:  Would the record reflect she identified the Defendant,

6  Your Honor?

7         THE COURT:  The record shall so reflect.

8  BY MR. FLINN:

9    Q    So, the Defendant was also staying there at the time, right?

10    A    Correct.

11    Q    So, on the morning of January 1st, what were you doing?

12    A    We had got up.  Everything was okay.  And that's when Patrick, he

13  was talking on the phone with, I don't know, I think one of his friends or

14  something, and he started getting mad at me because I went out the prior

15  night, and I wasn't supposed to have my boyfriend in the car.  So, he was

16  saying like he was mad at me over that.  And he was mad at my mom's friend

17  over gift presents.  So, we started to argue in the garage, like we went

18  downstairs to the garage area and started to argue.

19    Q    Just you and Patrick?

20    A    Just me and Patrick.

21    Q    Was anyone else in there at the time?

22    A    Not at the time.

23    Q    And those were the primary things you were arguing about?

24    A    Yeah.

25    Q    While you were arguing about that did anyone else come to the

1  garage?

2     A     Yeah.  So, my mom came to the garage.  She came to the garage

3  first, and she joined the argument, and then that's when Shawn came down

4  there and gave my mom the phone.

5     Q     So while you, your mom, and Patrick are arguing, at some point

6  the Defendant comes in and hands your mom the phone?

7     A     That's correct.

8     Q     Did the Defendant stay for the rest of the argument or did he leave

9  the room?

10    A     No.  He gave my mom the phone real quick.  She talked on the

11 phone for about like a minute or two, and then he left.  And then we continued

12 to argue, and then he came back down.

13    Q     What happened when the Defendant came back down to the

14 garage?

15    A     So, that's when he told my mom that he wanted to talk to her, and

16 they went out of the garage up the stairs.

17    Q     So, at that point it's just you and Patrick in the garage?

18    A     Correct.

19    Q     Miranda, your mom, and the Defendant are now --

20    A     Gone upstairs.

21    Q     -- have gone in towards the stairway?

22    A     Uh-huh.  Uh-huh.

23          THE COURT:  Is that a yes?

24          THE WITNESS:  Yes.  Sorry.

25          THE COURT:  Thank you.

BY MR. FLINN:

Q      At some point, do you and Patrick stop arguing?

A      Yeah.  So, shortly after Shawn and my mom go upstairs, we stop arguing.  He was like I'm sorry, you know, you're grown, blah, blah, blah.  And we exited out the garage and started going upstairs.

Q      So, you said he said he was sorry --

A      Yeah.

Q      -- you're grown.  So, would it be fair to describe the argument at that point as it's now calm?

A      Yeah.  So, everything -- it was okay.  Everything was done.  Everything is fine at this point.

Q      So, you two started to walk up the stairs.  Where did you go when you got up the stairs?

A      I went and sat on the couch.  And Shawn and Patrick they were standing up arguing.  And then my mom, she was like kind of close to the -- the -- to Angela's door -- to Angela's bedroom door.

Q      So, when you're sitting on the couch --

A      Uh-huh.

Q      -- can you hear this argument between Patrick and the Defendant?

A      Yes.  They're right there in front of me.

Q      What did you hear them arguing about?

A      Basically, Shawn was saying something like Patrick was trying to beat on me and my mom.  He heard us crying.  And this is his house.  And Patrick was like I'm not beating on them, you know, I'm just having a conversation.  And I think that's when it was like Shawn got even more mad,

1   and then Patrick like grabbed him by his elbows, and he was like, you know,

2   it's not like that, I'm just trying to have a conversation, you know.  And then

3   Shawn's like no, get off me.  So, at that point,  I'm not sure -- I don't recall who

4   said, you know, let's go downstairs, but someone said let's go downstairs and

5   let's talk.  So, at that point, Patrick starts going down the stairs, and then

6   Shawn, and then that's when I heard the -- the gunshots.

7        Q     So, from -- just sort of backing up.  From where you're sitting on

8   the couch you heard all this happen.  And then did you personally see Patrick

9   start going toward the stairs?

10       A     Yes.

11       Q     And you saw him walking down the stairs?

12       A     Yeah.  I seen him going down the stairs first.

13       Q     You say first, meaning ahead of the Defendant?

14       A     Correct.

15       Q     So, the Defendant is behind Patrick.  And does he also go down the

16  stairs?

17       A     Yes.

18       Q     Based on where you're sitting at some point they now are out of

19  your line of sight?

20       A     Yeah.  So, where I'm sitting, as soon as they start going down the

21  stairs, they are out of sight.

22       Q     Approximately how -- you said you heard -- well, after they started

23  going down the stairs, what exactly did you hear?

24       A     So, I heard the footsteps at first because there's stairs right here

25  and then there's some more stairs going this way.  So, you can hear them

1  going down these stairs, but once they're turning, you hear about like one or

2  two more steps, and then you hear the three gunshots.

3      Q      So, you heard three gunshots?

4      A      Yes.

5      Q      Could you describe hearing those three gunshots?  You know,

6  were they -- was it, you know, one right after the other, was there any timing

7  lapse?  Can you just describe that?

8      A      So, the first one went, and then there was a pause, and then the

9  other two let off.  So, it was like the first one, pause, boom, boom.

10     Q      When you heard those gunshots, approximately how much time

11 had gone by since you -- since you had -- since you watched the Defendant

12 follow Patrick down the stairs; if you could estimate?

13     A      About like ten to 15 seconds.  It was real -- it was really quick.

14     Q      When you heard those gunshots, what did you do?

15     A      I looked up at my mom, and then we ran to the stairs.

16     Q      When you got to the stairs, did you start going down the stairs?

17     A      No.  So, my mom started to go down the stairs first, and then I was

18 right behind her.

19     Q      So, you stayed behind your mom?

20     A      Uh-huh.

21     Q      What did you hear or see as the two of you went down the stairs?

22     A      So, I seen Patrick laying on the floor, and I seen Shawn there.  And

23 he was just yelling out threats.  And my mom's just like why did you do this,

24 why did you do this?  And I was just behind her, you know, just scared.  And

25 then at that point I started to run back up the stairs.

1     Q    What, specifically, do you recall the Defendant saying at that time?

2     A    I know he stated something about us not telling on him and that

3 we -- he told us that he wasn't a joke. He's like I'm not a joke, I told you guys I

4 wasn't a joke. And something about not snitching on him. And that's all I

5 could remember. And then that's when he started to leave.

6     Q    When he started to leave, did you see -- did you see where he

7 went?

8     A    Yes. He went outside of the garage door.

9     Q    Through the door of the landing to the garage?

10     A    Yeah.

11     Q    That direction? Can you describe what Patrick looked like at the

12 bottom of the stairs? I mean was he talking, moving? Any -- something of that

13 nature?

14     A    No. I think at that point he was -- he was gone, because he was

15 just laying there.

16     MR. FLINN: No further questions, Your Honor.

17     THE COURT: Cross-examination.

18                         <u>CROSS-EXAMINATION</u>

19 BY MR. BASHOR:

20     Q    Are you okay? Do you need a break?

21     A    No, I'm good. I'm good.

22     Q    There's tissues right there.

23     A    Okay.

24     Q    It's still morning barely, so I'm going to say good morning.

25     A    Good morning.

1    Q    All right.  I'm going to talk to you about the couple weeks leading

2    up to when this happened, okay.  It's my understanding that you, Patrick, and

3    Miranda were kind of in between houses, right?

4    A    Correct.

5    Q    And you were in the townhouse that your sister owned or leased?

6    A    Yes.

7    Q    And your sister being Angela?

8    A    Yes.

9    Q    And so -- and when you moved in, Shawn wasn't there already,

10    right?

11    A    Correct.

12    Q    He moved in approximately Christmas Eve?

13    A    Yeah, about like two days before Christmas.

14    Q    Okay.  And so, over those seven or eight days you were able to

15    observe Shawn's interactions with Patrick, right?

16    A    Yeah.  He -- he didn't come over.  He only came over one time

17    before he actually came the two days prior.  So, I seen him one time,  he came

18    over for about ten minutes, and then he left.

19    Q    So, during that eight days was Shawn in that townhouse or not?

20    A    No.  So, during -- during the time that we first moved in, he was

21    not there.

22    Q    Okay.  Exactly.  And I apologize if I -- I don't mean to be confusing.

23    So, you move in --

24    A    Uh-huh.

25    Q    -- you're there for a little while, ten days, a couple weeks, right?

1    A    Exactly.

2    Q    And then Shawn moves in approximately two days before

3  Christmas, right?

4    A    Yes.

5    Q    And so during that seven or eight days between Christmas

6  Eve-ish and New Year's Day, Shawn's around a lot?

7    A    Yes, that's correct.  Yeah.

8    Q    Okay.  All right.  And so, you, during that period of time, obviously,

9  given it's a two bedroom townhouse and there are 11 or 12 of you, you're

10  going to interact with one another, right?

11    A    Yeah.  Yeah.

12    Q    And in your observations of Patrick and Shawn, they seemed to be

13  getting along?

14    A    Exactly.

15    Q    Okay.  And, you know, during that time it happened to be -- the

16  family got to be together around the holidays, right?

17    A    Yes.

18    Q    Is that fair?  Yes?

19    A    Yes.

20    Q    Because in addition to Angela, one of the children in the home was

21  the daughter of Shawn and Angela?

22    A    Correct.

23    Q    Now, I'm going to draw your attention to the argument in the

24  garage, okay?

25    A    Uh-huh.

1    Q    Is that a yes?

2    A    Yes.

3    Q    Okay.  You were arguing with Patrick about what he perceived that

4    you lied to him, right?

5    A    Yes.

6    Q    And that you were instructed not to have a boy in his car, right?

7    A    Yes.

8    Q    And in fact, at least at some point, there was a boy in his car?

9    A    Yes.

10    Q    And he knew this because he had you followed?

11    A    Yes.

12    Q    And so he -- this was upsetting to him?

13    A    Uh-huh.

14    Q    Yes?

15    A    Yes.

16    Q    And he wanted to confront you with that, right?

17    A    Yes.

18    Q    So, you're in the garage, and it would be fair to describe the

19    argument as pretty loud, right?

20    A    Yes.

21    Q    You're -- you're yelling and shouting, right?

22    A    Yes.

23    Q    He's yelling and shouting, right?

24    A    Yes.

25    Q    You're 21 years old, right?

1      A     Yes.

2      Q     You're an adult?

3      A     Yes.

4      Q     You don't want to be followed?

5      A     Yes.

6      Q     Right.  You want to be able to interact with your friend -- your

7 boyfriend, however you wish?

8      A     Yes.

9      Q     It's not like you're 14, right?

10     A     Yes.

11     Q     Okay.  And because the argument is so loud, Miranda comes down

12 and enters into the argument, as well, right?

13     A     Yes.

14     Q     And she kind of comes to your defense, right?

15     A     Yes.

16     Q     For that very reason we just discussed, that -- that you're a woman,

17 right?

18     A     Yes.

19     Q     And at age 21 you should be able to do whatever you want without

20 being followed?

21     A     Yes.

22     Q     But at the end of the -- the time -- at some point Miranda goes

23 upstairs, right?

24     A     Correct.

25     Q     And you and Patrick are left alone in the garage?

1      A     Uh-huh.  Yes.

2      Q     Yes?  And you wrap up the argument, right?

3      A     Yes.

4      Q     And as you exit the garage and enter the residence, again, as

5 you're heading up the stairs, the argument is over?

6      A     Yes, that's correct.

7      Q     Okay.  You had -- I think you stated on direct examination that

8 Patrick had apologized where he kind of came to your senses like you're right,

9 you're 21 years old?

10     A     Yes.

11     Q     Now, I'm going to ask you questions specifically about the

12 statement you gave to police on January 1st, 2016, okay?

13     A     Okay.

14     Q     And you would agree that that's the day of the incident, correct?

15     A     Yes.

16     Q     And that your statement to police occurred a couple hours after

17 this had happened?

18     A     Yes.

19     Q     Just to set the scene, obviously, you had called 911, right?

20     A     No.

21     Q     You didn't call and then hand the phone to your mother?

22     A     Yes, I dialed.  Sorry.  Yes.

23     Q     Yeah, sorry.  If I'm confusing, please correct me if it's confusing,

24 okay?  All right.  So, you actually physically dialed 911, yes?

25     A     Yes.

1    Q    And you hand the phone to your mom, right?

2    A    Yes.

3    Q    And you do that right away?

4    A    Yes.

5    Q    As soon as it's -- as soon as the suspect has left the residence, you

6    called?

7    A    Yeah.  So, he left, we locked the garage door, and we ran back

8    upstairs.  And that's when we -- I'm sorry.  My mom ran back upstairs and

9    that's when we had called 911.

10    Q    So, about a matter of seconds after the suspect had fled?

11    A    Yeah.  About like ten, 30 seconds.

12    Q    Right.  Because you want to get medical attention to your dad as

13    soon as possible?

14    A    Yes.

15    Q    All right.  Now, just talking about your statement to police on

16    January 1st, 2016, they ask you what happened that day, right?

17    A    Yes.

18    Q    And you tell them that there was a man named Hatch in the house?

19    A    Yes.

20    Q    And that Hatch was a customer of your father, Patrick?

21    A    Yes.

22    Q    And that Patrick would average two to three customers a day

23    selling marijuana?

24    A    Yes.

25    Q    That Hatch was one of those customers?

1    A    Yes.

2    Q    You weren't sure how Hatch had arrived?

3    A    Yes.

4    Q    You knew that during the argument Hatch was waiting upstairs?

5    A    Yes.

6    Q    At some point during the argument Hatch comes down the stairs,

7    interrupts, and asks to speak with your mom?

8    A    Yes.

9    Q    And so, your mom follows?

10    A    Uh-huh.

11    Q    Is that a yes?

12    A    Yes.

13    Q    And then that's -- Patrick and you leave the garage a few moments

14    later?

15    A    Yes.

16    Q    And Patrick is upset with Hatch for talking to Miranda?

17    A    Yes.

18    Q    Okay.  And that Hatch shouldn't be being nosey into what was a

19    family argument?

20    A    Exactly.

21    Q    Now, in that statement you told the police you'd never seen Hatch

22    before, right?

23    A    Yes.

24    Q    And that you told the police as far as you knew, your mom didn't

25    know Hatch?

1      A      Yes.

2      Q      You were asked if Hatch went by any other names.  You said you

3 didn't think so?

4      A      Right.  Correct.

5      Q      That you didn't know whether or not Hatch had any tattoos?

6      A      No.

7      Q      And towards the end of the statement with police on January 1st,

8 2016, the subject of your dad's car comes up, right?

9      A      Yes.

10     Q      The Dodge Durango?

11     A      Yes.

12     Q      And the people that are allowed to drive the Dodge Durango, are

13 you?

14     A      Yes.

15     Q      Miranda?

16     A      Yes.

17     Q      Patrick?

18     A      Yes.

19     Q      And probably Angela, right?

20     A      Yeah.

21     Q      Okay.  And Patrick had a habit of leaving the keys to that car on the

22 countertop?

23     A      Correct.

24     Q      And you had noticed sometime between after 911 was called and

25 when you spoke to the police that the keys were missing?

1    A    Yes.

2    Q    And because you noticed this, you told the police?

3    A    Yes.

4    Q    Okay.  Now, I'm going to ask you questions about your second

5    statement, okay, the next day; do you understand?

6    A    Yes.

7    Q    All right.  At that point you tell the police Hatch --

8    A    Yes.

9    Q    -- is Shawn Glover?

10    A    Yes.

11    Q    Now, on the day in question this was very shocking, right?

12    A    Yes.

13    Q    It was very emotional I would assume?

14    A    Yes.

15    Q    That you were scared?

16    A    Yes.

17    Q    Based on what you said on direct examination you were afraid?

18    A    Yes.

19    Q    Okay.  And for those reasons you told the police that the individual

20    was Hatch?

21    A    Yes.

22    Q    And it was your statement the next day and your testimony today

23    that Hatch is Shawn Glover?

24    A    Yes, that's correct.

25    Q    So, before on January 1, when you told the police you had never

1    seen Hatch before, that wasn't true, correct?

2         A       Yeah, that was not true.

3         Q       And because he was living with you?

4         A       Yes.

5         Q       And you had obviously interacted with him in the past?

6         A       Yes.

7         Q       That again when you told the police that your mom doesn't know

8    Hatch, or at least as far as you knew she didn't know Hatch, that wasn't true?

9         A       Correct.

10        Q       And that you're not sure -- you told the police you weren't sure that

11   even if Patrick had seen Hatch before?

12        A       Correct.

13        Q       You told the police that you did not know whether Hatch went by

14   any other name as we've covered, right?

15        A       Correct.

16        Q       And the next day and today you're saying the other name is Shawn

17   Glover?

18        A       Yes.

19        Q       You described at the top of the stairs that during the argument

20   with Hatch and Patrick that Patrick had reached out his hands to tell Hatch it's

21   not like that?

22        A       Yes, correct.

23        Q       It wasn't a violent lunge or anything like that, right?

24        A       No.  It was just like, you know, like hey.

25        Q       Hey, listen to me?

1      A      Yeah, exactly.

2      Q      You've got it all wrong?

3      A      Exactly.

4      Q      All right.  Now, when you called 911, would it be fair to say that the

5   police arrived fairly quickly?

6      A      Yes.

7      Q      It probably felt like an eternity, right?

8      A      Yeah.

9      Q      But upon reflection you would agree it was only a matter of a

10  couple of minutes?

11     A      Yeah.

12            MR. BASHOR:  The Court's indulgence.

13                          [Defense counsel confer]

14  BY MR. BASHOR:

15     Q      My co-counsel reminded me about the Dodge Durango.  In

16  addition to noticing the keys weren't there --

17     A      Uh-huh.

18     Q      -- where Patrick had routinely parked the vehicle, the vehicle wasn't

19  there, right?

20     A      Correct.

21     Q      We'll hear later that the vehicle was recovered, but as far as you

22  knew, the regular spot where Patrick, you, and Miranda would park, the Dodge

23  Durango was missing?

24     A      Exactly.

25     Q      Along with the keys?

1    A    Yes.

2        MR. BASHOR:  Nothing further.

3        THE COURT:  Redirect?

4                    REDIRECT EXAMINATION

5    BY MR. FLINN:

6    Q    Akira, when you told the police that it was -- that it was Hatch and

7    didn't use the Defendant's real name at that time, did you personally believe

8    that the Defendant had been violent toward other people in the past?

9    A    Yes.

10       MR. FLINN:  Nothing further, Your Honor.

11       THE COURT:  Okay.  Again, Ladies and Gentlemen of the jury, the

12   testimony that the witness believed the Defendant has a history of violence

13   against persons is being offered and may only be considered by you solely for

14   the purpose of explaining the state of mind of the witness at the time she

15   made her statement to police on January 1st, 2016.  The testimony, if believed,

16   is not to be considered as substantive evidence that the Defendant has a

17   history of violence against persons or that he is a person of bad character.

18   With that, thank you very much.

19       I'm sorry, do any of the ladies and gentlemen of the jury have any

20   questions you wish the Court to ask the witness?  There being no questions,

21   thank you very much for your testimony.  You're excused.  Can I see counsel

22   about scheduling?

23              [Sidebar begins at 12:02 a.m.]

24       THE COURT:  So, we break now, and I tell them 1:15?

25       MR. FLINN:  Yeah.

1          THE COURT:  Okay.  Ramsey?

2          THE MARSHAL:  Yes, Your Honor?

3          THE COURT:  When you're done can you come up here?

4          THE MARSHAL:  Okay.

5          THE COURT:  Okay.

6          MR. STANTON:  If I could just have Ramsey or someone here at 1.

7          THE COURT:  Yeah.

8          MR. STANTON:  So, I can get the doctor in here, and then we

9    could --

10          THE COURT:  How about 1:05, so I can give them at least an hour?

11          MR. STANTON:  Yeah, sure.

12          THE COURT:  You know we had an entire lawsuit with the

13    Marshals.

14          MR. STANTON:  Really?

15          THE COURT:  Yes.  So, I wanted to take them out the back, and

16    then take them either down the back door just to the ground floor in the back

17    elevator.

18          THE MARSHAL:  Okay.

19          THE COURT:  Okay.  Cool.

20          MR. STANTON:  Thanks.

21                    [Sidebar ends at 12:03 p.m.]

22          THE COURT:  Okay.  Ladies and gentlemen, we are going to recess.

23    It's 12:03.  We're going to recess until 1:15 for lunch.  My Marshal is going to

24    give you a meeting location to meet with him where he'll bring you back

25    upstairs after lunch.

1    So, during this recess you're admonished not to talk or converse

2  among yourselves or with anyone else on any subject connected with the trial.

3  Do not to read, watch, or listen to an report of, or commentary on, the trial by

4  any person connected with this case or any medium of information, including

5  without limitation, newspaper, television, the internet or radio.  You're not to

6  form or express any opinion on any subject connected with this trial until the

7  case is finally submitted to you.  You've got about an hour and 12 minutes.

8    THE MARSHAL:  All rise.  The jury is exiting.

9    [Outside the presence of the jury.]

10    THE COURT:  Is that door shut?  I can't see.  Is that door shut?

11    UNIDENTIFIED SPEAKER:  Yes.

12    THE COURT:  Okay.  The record -- thank you.  The record should

13  reflect we're outside the presence of the jury.  So, I just wanted to make a

14  record that there was one time when the Defense asked to approach.  In the

15  record it was at 11:35 a.m.  And we had a bench conference where the Defense

16  brought to the Court's attention that while the exclusionary rule had not been

17  previously invoked that the Defense wished to invoke it at that time.  The State

18  made it clear that other than the two female witnesses who just testified today,

19  there have been no witnesses present in the courtroom for today's

20  proceedings whatsoever and that besides these two ladies, everyone else is a

21  non-related witness, correct?

22    MR. STANTON:  Correct, Your Honor.  Yes.

23    THE COURT:  So even though it hadn't been invoked before, it was

24  of no import because no one was here.

25    MR. STANTON:  I assumed that they -- it had been invoked.  I don't

-111-

1  recall that it was, but I assume in every case it has, so that's where the State

2  rolls.

3      THE COURT:  Okay.  So, the way the State rolls.  Good to know.

4  So, anything else on that exclusionary rule being invoked at 11:35 a.m.?

5      MR. BASHOR:  No, Your Honor.

6      THE COURT:  Okay.  So, Defendant gets his lunch break.  You all

7  get your lunch break.  Can you tell Ramsey that -- to ask him to meet the D.A.

8  here at 1:05?

9      UNIDENTIFIED MALE:  I will.

10     THE COURT:  Okay.  You don't have to tell him right now, just, you

11 know, when he's done with those people.

12     UNIDENTIFIED SPEAKER:  Okay.

13     THE COURT:  Okay, thanks.  Okay.

14     MR. STANTON:  Thank you, Your Honor.

15     MR. BASHOR:  Thank you.

16         [Recess at 12:06 p.m., recommencing at 1:15 p.m.]

17     THE COURT:  We're back on the record in State v. Shawn Glover.

18 Outside the presence of the jury.  All attorneys and the Defendant are present.

19             [Outside the presence of the jury.]

20     MR. STANTON:  Your Honor, the next witness is Dr. Corneal.  Mr.

21 Bashor informed me that -- there are two areas of concern from the State.  Mr.

22 Bashor informed me that he is going to seek to inquire as to one of those areas

23 of concern.  So ,the first area is at autopsy, a projectile was removed from Mr.

24 Fleming that was unrelated to this case.  It was from an obvious and apparent

25 older injury.  It was noted both in photograph form and in Dr. Dutra's autopsy

report.  Both Dr. Dutra and Dr. Corneal would, I believe, testify that that

implement, and the injury, and artifact had nothing to do with the cause and

manner of death.  And as such I believe the inquiry in that is wholly irrelevant.

THE COURT:  Okay.  Is that it?

MR. STANTON:  Yes.

THE COURT:  What's the relevance?

MR. BASHOR:  Judge, I would just submit that the old projectile

could go to prior enemies, alternate suspects.  I don't plan to harp too terribly

into it, it's just that the fact that it exists.  And I think that that's --

THE COURT:  Prior enemies and alternate suspects.

MR. BASHOR:  Correct.

THE COURT:  Okay.  So, what, if any, additional information do you

have about the time or evidence would you be able to -- because if this

becomes an issue, even though you might not have noticed witnesses, I might

allow you to get into it if I allow it.  I'm not saying I'm allowing it, I'm just

curious.  Do you have a witness that says that was 30 years ago, two years

ago, six minutes ago; how -- what do you know?

MR. STANTON:  For me?

THE COURT:  Yes.

MR. STANTON:  I have -- other than it is a completely healed injury

with no evidence of its tracking and no signs of that it be of recent vintage.  As

far as --

THE COURT:  So, have you asked his family, hey -- I mean usually

when someone gets shot, someone besides that person knows or has an idea

of when that happened.

1    MR. STANTON:  I personally did not.  I'm not aware of anything in

2  the investigative file that would answer that question.

3    THE COURT:  I'm sure you have a high -- I'm going to go with two

4  rows of potential witnesses behind you.  So, do you want to talk to one of

5  them, since one of them is raising their hand?

6    MR. STANTON:  1993.

7    THE COURT:  Thank you.  So, if he -- could you call that witness

8  forward, please?

9    MR. STANTON:  Certainly.

10    THE COURT:  We're going to have a little hearing.

11    MR. STANTON:  Okay.  Can you come forward?

12    MR. GIVENS:  I'm his dad.

13    MR. STANTON:  Okay.  Come on up.

14    THE COURT:  Sir, if you could approach the witness stand, please.

15    MR. BASHOR:  I think you're fine, Doctor.

16    DR. CORNEAL:  Okay.

17    THE COURT:  Sorry.  Real quick.

18    DR. CORNEAL:  No, I just wanted to make sure I didn't need to

19  leave the room.

20    THE COURT:  Sir, could you face my Clerk while you're still

21  standing, raise your right hand, and be sworn.

22    MELVIN A. GIVENS, III, PLAINTIFF'S WITNESS, SWORN

23    THE CLERK:  Please be seated.  please state and spell your name

24  for the record.

25    THE WITNESS:  Melvin A. Givens, III.  G-I-V-E-N-S.

1      THE COURT:  And can you move your chair up a little?  Okay.  The

2  District Attorney is going to ask you about your relationship with the named

3  victim in this case and some other questions about the topic that we've been

4  discussing, okay?

5      THE WITNESS:  Yes.

6                          <u>DIRECT EXAMINATION</u>

7  BY MR. STANTON:

8      Q      Sir, how are you related to Patrick Fleming?

9      A      I'm his father.

10     Q      And do you have personal knowledge of when Patrick suffered the

11  injury that you heard raised in court that is some sort of a projectile, some part

12  or portion of a bullet that was inside his body?

13     A      Yes, I do.

14     Q      And when did that event occur?

15     A      November 11, 1993, right after his birthday.

16     Q      And was that here in Las Vegas or some other location?

17     A      Yes.  Yes.

18     Q      Okay.  And did it have anything to do with either the Defendant or

19  the case that we're here on trial this week for?

20     A      No.

21     Q      Do you know anything about who the author of the injury to your

22  son was?

23     A      Well, he was walking down the street off of McWilliams [phonetic],

24  and he was over in the project area off of Washington.  And he was walking

25  with another guy and some guy came around the corner and asked him a

1   question.  It was like a drive-by shooting.  And they asked him a question, do

2   he know such and such and such, and he said, no.  So, he turned to walk away,

3   and they shot him in the back three times.

4        Q    Okay.

5        A    And they shot his friend, also.

6        Q    Thank you very much.  I have no further questions.

7             MR. BASHOR:  I don't have any questions, Your Honor.

8             THE COURT:  Okay.  Thank you very much, sir, for your testimony.

9             THE WITNESS:  All right.

10            THE COURT:  Okay.  Is there anything else?

11            MR. BASHOR:  No, Your Honor.

12            THE COURT:  Anything else?

13            MR. STANTON:  Not any other evidence or argument from me on

14   this issue.

15            THE COURT:  All right.  Based upon the only reliable evidence,

16   which is testimony under oath of the named victim's father that this projectile

17   was at or around 25 years ago, I won't allow the inquiry.  It is significantly

18   more prejudicial than probative to somehow paint him as I don't know what

19   and the idea that somehow retribution is happening 25 hour -- 25 years later is

20   a stretch, at best.  Anything else?

21            MR. STANTON:  And, Your Honor, the other -- just for the record,

22   the other matter was the toxicology report of Mr. Fleming, as well.

23            THE COURT:  One second, one second.

24                      [Court and Marshal confer]

25            THE COURT:  Okay.

1          MR. STANTON:  Mr. Bashor indicated to me that they are not going

2   to go into that area of inquiry.  I would have had the same objection for the

3   same reasons, but since he's not going into it, I appreciate that, so that's not

4   an issue, but I just wanted to put it on the record that that issue was discussed

5   between me and Defense counsel prior to this.

6          MR. BASHOR:  And, Judge, if we were pursuing a different line of

7   defense, obviously, I would have a different position, but I don't think that a

8   small amount of marijuana in Mr. Fleming's system has anything to do with

9   this case.

10          THE COURT:  Okay.  Thank you.

11          MR. STANTON:  That's it.  Nothing further on behalf of the State.

12          THE COURT:  Okay.  Bring in the jury.  Doctor?  By the way, do you

13   have any objection to the named victim's father remaining in the courtroom?

14          MR. BASHOR:  No.

15          THE COURT:  Okay.

16          MR. BASHOR:  He's not on our witness list.

17          THE COURT:  No.  Okay.

18          MR. BASHOR:  That's fine.

19          THE COURT:  But technically he testified.

20          MR. BASHOR:  Oh, I understand, but, no, that's fine, Your Honor.

21          THE COURT:  Okay.

22                [State counsel and Court Recorder confer]

23          THE MARSHAL:  All rise.  The jury is entering.  The jury is all

24   present, ma'am.

25                [In the presence of the jury.]

1          THE COURT:  Counsel, will you stipulate to the presence of the

2    jury?

3          MR. STANTON:  Yes, Your Honor.

4          MR. BASHOR:  Yes, Your Honor.

5          THE COURT:  Doctor, if you could please face my Clerk, raise your

6    right hand, and be sworn.

7              DR. JENNIFER CORNEAL, PLAINTIFF'S WITNESS, SWORN

8          THE CLERK:  Please be seated.  Would you state and spell your

9    name for the record?

10          THE WITNESS:  Jennifer Corneal, J-E-N-N-I-F-E-R C-O-R-N-E-A-L.

11          MR. STANTON:  May I proceed, Your Honor?

12          THE COURT:  Yes.  Thank you.

13                            DIRECT EXAMINATION

14    BY MR. STANTON:

15          Q     Ma'am, how are you employed?

16          A     I'm a medical examiner at the Clark County Office of the Coroner

17    Medical Examiner.

18          Q     And I'd like to talk to you about, in kind of general terms, your

19    background both from an educational perspective, as well as your professional

20    experience.  Do you have an educational background that allows you and

21    assists you in performing your functions at the Coroner's office?

22          A     I do.

23          Q     And what is your educational background?

24          A     I'm a doctor.  I completed medical school.  I then completed four

25    years of a pathology residency.  I'm a board certified anatomic pathologist.  I

1  then completed a year of subspecialty training in forensic pathology, and I'm a

2  board certified forensic pathologist.

3      Q    And the -- I'll get into the area of pathology and the subcategories

4  that you just mentioned, but you are a licensed physician here in the State of

5  Nevada?

6      A    I am.

7      Q    And you perform functions to include a medical procedure as part

8  of your duties called an autopsy?

9      A    Correct.

10     Q    How many autopsies have you been involved in as -- either as the

11 primary physician or an assisting capacity in your career?

12     A    Over 1,000.

13     Q    And does that also include injuries involving gunshot wounds?

14     A    Yes.

15     Q    Is there a significant number of those thousands that gunshot

16 wounds are part of your examination?

17     A    Yes.

18     Q    Doctor, let me ask you some questions about the area of

19 pathology.  And once again in general terms can you explain what pathology

20 means?

21     A    Pathology is a study of disease processes.  They consider the

22 pathologist the doctor's doctor.  So, if you have a biopsy or specimens taken

23 from you, the pathologist looks at that and gives a diagnosis.

24     Q    So, that could be say skin tissue involving some sort of suspected

25 disease, and they're looking for a specialized assessment from a physician

1  focused in that field?

2      A    Yes.

3      Q    And then you mentioned there's something called anatomical

4  pathology; what is that?

5      A    Pathology is divided into anatomical pathology and clinical

6  pathology.  Anatomical pathology includes forensic pathology, which is what I

7  do.  Surgical pathology, which is what I was talking about when you get a

8  biopsy, or an organ taken out, and they look at it and give a diagnosis to the

9  doctor.   Clinical pathology, on the other hand, has to do with microbiology,

10  chemistry.  Pathologists are the ones who run the labs in the hospitals, so

11  clinical pathologists tend to do that.

12      Q    And the final field is forensic pathology.  Can you explain what that

13  sub-specialization is in?

14      A    Forensic pathology is the subspecialty of anatomic pathology that

15  looks at medical legal death.  And my job, as part of that, is to perform

16  autopsies and determine cause and manner of death.

17      Q    And could you describe what cause of death means to you in the

18  medical legal context?

19      A    Cause of death is the immediate reason somebody has died.

20      Q    And how many categorizations are used in your field as coroners

21  both here and across the country?

22      A    For manner of death?

23      Q    Well, cause of death can be a wide range.  Manner of death.

24      A    For manner of death, there are five categories; there's natural,

25  accident, suicide, homicide, and then when the death doesn't fit into either of

1   those categories there's an undetermined category, as well.

2       Q     And, Doctor, did I ask you to review an autopsy report and the

3   investigative file to include photographs contained within the Clark County

4   Coroner's Office as it relates to an ultimate autopsy report of Patrick Fleming,

5   dated January 2nd, 2016?

6       A     You did.

7       Q     And based upon your review, you were asked by me and your

8   office to come in and testify to the cause, and manner, and findings as a result

9   of that autopsy, correct?

10      A     Yes.

11      Q     Now, let me just begin.  You were not the attending physician on

12  January 2nd, 2016 here; is that correct?

13      A     That's correct.

14      Q     It would have been Dr. Dutra?

15      A     Yes.

16      Q     And he is retired from the Coroner's office?

17      A     Yes.

18      Q     Doctor, were you able to review a series of photographs about the

19  findings and the conclusions in the autopsy report?

20      A     I was.

21          MR. STANTON:  Your Honor, prior to Dr. Corneal's testimony this

22  afternoon, she has reviewed what has been marked by your Clerk as State's

23  Exhibits 36 through 48.  I'd move for their admission at this time.

24          MR. BASHOR:  Your Honor, we have a stipulation.  No objection.

25          THE COURT:  36 through 48 are admitted by stipulation.

1    [STATE'S EXHIBITS 36 THROUGH 48 RECEIVED]

2  BY MR. STANTON:

3    Q    In addition, Dr. Corneal, I asked you prior to your testimony to

4  select via file numbers out of a large number of photographs, photographs

5  that you believe might assist the jury in understanding your testimony and the

6  findings in this case; is that accurate?

7    A    Yes.

8    Q    And they are depicted in the photographs that I just mentioned?

9    A    Yes.

10    Q    Doctor, let me first ask some background questions about the

11  autopsy proceeding and that medical procedure.  Could you explain kind of

12  what the examination entails, in particular, the external and internal exam?

13    A    Yes.  The autopsy, as he stated, consists of an external

14  examination, which is just looking at the outside of the body, documenting

15  hair color, eye color, tattoos, scars, and any injuries that might be seen.  And

16  then we open the body, we examine the organs, we examine the inside tissues

17  to look for again more injuries and also any natural disease processes which

18  might contribute or cause death.

19    Q    And during that process there are a number of items of evidence

20  that are memorialized, both by the physician, as well as a photographer?

21    A    Yes.

22    Q    So, let me begin now in addressing your assessment of the injuries

23  that were noted on Mr. Fleming.  And if -- I plan on going through the order

24  that they're listed in the autopsy report.  Are you comfortable with that order?

25    A    Yes.

1    Q    Okay.  So, how many gunshot wounds were observed and

2    documented on Mr. Fleming?

3    A    Three.

4    Q    And I'd like to begin with gunshot number one.  Could you tell us

5    anatomically where that gunshot wound was located?

6    A    The gunshot wound was on the back of the head on the left side.

7    Q    And could you tell whether or not that wound was an entrance or

8    exit gunshot wound?

9    A    It was an entrance gunshot wound.

10    Q    I'd like to show Exhibit 39 to you.  Let me ask you a couple

11    questions first.  Obviously, anatomically, we're looking at Mr. Fleming's back

12    of his head?

13    A    Yes.

14    Q    And the condition around the wound in his hair, is that something

15    that's done as part of the autopsy procedure?

16    A    It is.

17    Q    And why is that?

18    A    Prior to shaving the head we photograph the wound as it is.  But

19    then in order to better visualize the wound, we shave around it, so we can see

20    the wound edges, determine if there's abrasions, determine if there's soot in

21    that area.

22    Q    Okay.  And we'll get into a little bit of each one of those, but I want

23    to go to Exhibit 40.  Is that a close-up photograph of the same anatomical area

24    and wound that we saw in the previous photograph?

25    A    It is.

1    Q    Dr. Corneal, how do you determine that that is an entrance

2  gunshot wound?

3    A    Entrance wounds seem to be punched out.  In other words, you

4  cannot re-approximate them.  They also tend to have a rim of abrasion.  And --

5              THE COURT:  I'm sorry, what?

6              THE WITNESS:  I was trying to like show them the rim of abrasion

7  on this one.

8              THE COURT:  And what's the problem?

9              MR. STANTON:  We're no longer on the touch screen.  So, I think --

10              THE WITNESS:  Oh, I'm sorry.  I'm used to --

11              THE COURT:  Yeah.  Well, hold on.

12              THE WITNESS:  -- the touch screen.

13              MR. STANTON:  We've graduated to a mouse, so if you could

14  just wait one second.  Oh, there you go.

15              THE WITNESS:  Okay.

16              THE COURT:  Wait.

17              MR. STANTON:  If you click on the pencil.

18              THE WITNESS:  Then I just point?

19              MR. STANTON:  Yes.

20              THE WITNESS:  Technology.  Okay.  So, this area here is a rim of

21  abrasion.  That just occurs when the projectile enters the skin; it rubs this area

22  off.

23              THE COURT:  We solved it.

24              UNIDENTIFIED MALE:  Okay.

25  BY MR. STANTON:

1   Q    And could you kind of contrast what an exit wound would look like

2   versus what we see here?

3   A    Sure.  So, an exit wound on the other hand is more of a tearing of

4   the skin.  It actually can be pushed back together.  We call it a laceration.  And

5   there can be abrasion, but usually there's not abrasion and there's no soot or

6   stippling around the wound.

7   Q    So, now what I'd like to do, Doctor, is go back to the previous

8   photograph and ask you some questions about the internal assessment of the

9   injuries of that wound.  Is it -- what do you do or what is normal about

10  determining, from an internal examination, where --

11          MR. STANTON:  -- that's still frozen on the previous photograph.

12  Oh, I think you have to --

13              THE WITNESS:  What did I do?

14          THE COURT:  Wait.  Just go ahead and say it.

15          THE CLERK:  You click the other arrow down.

16          MR. STANTON:  I  think if she  -- oh, no, there you go.  You got it.

17  Sorry.

18  BY MR. STANTON:

19  Q    So, let me go back to Exhibit 39.  Doctor, what is done to determine

20  the path or trajectory of that bullet?

21  A    The scalp is reflected, and a portion of the skull was removed.  The

22  brain is also removed and dissected.  And as we radiograph everyone, we

23  knew the projectile was in his right jaw area, so that was dissected out from

24  below.

25  Q    And could you tell me what path, anatomically, to your frame of

1   reference that you use in all wounds that this bullet -- gunshot injury, took

2   inside his head?

3       A    Sure.  First, just to explain anatomic paths, when we're talking

4   about the body, front is the front of your body with your hands, with your

5   palms, facing forward.  The tops of your feet would be forward.  The soles

6   would be back.  Top, bottom, just like you would think.  So, this went back to

7   front, left to right, and downward.

8       Q    So, the trajectory as we see it is left to right and downward?

9       A    Yes.

10      Q    You indicated that through x-rays you determined that there was a

11  bullet still in Mr. Fleming associated with this entrance gunshot wound?

12      A    Yes.

13      Q    Before we get to where the bullet came to rest, where did it go

14  through anatomically before it came to rest?

15      A    It went through his brain.  It transected his brain stem.  And then it

16  went down into his oral cavity fracturing his jaw.

17      Q    So, the skull is fractured?

18      A    Yes.

19      Q    And then you said it dissected the brain stem.  Is that an important

20  organ when you're examining injuries in that region of the body to note?

21      A    Yes.

22      Q    We'll get back to that in just a second, but let me go to the

23  mandible; what was the condition of the mandible?

24      A    The mandible was fractured.

25      Q    As a result of the bullet striking that bone?

1       A       Yes.

2       Q       And so for those not familiar, the mandible is part of the jaw area

3   of our bodies?

4       A       Yes.  It's your jaw on the bottom here.

5       Q       The lower jaw?

6       A       The lower jaw.

7       Q       So, let me talk to you about your assessment from a medical

8   perspective, Dr. Corneal, as to whether or not this wound, number one, was

9   instantaneously incapacitating in your opinion?

10      A       Yes.

11      Q       Does that have something to do with the transection of the brain

12  stem?

13      A       Yes.

14      Q       Can you explain that?

15      A       Within your brain stem and the mid-brain is an area that controls

16  respiration.  So, if you transect the brain stem, you no longer can cause your

17  lungs and diaphragm to work, and you instantaneously die.

18      Q       Now, there is another part of gunshot wounds that you look at

19  from a forensic pathology perspective and that is whether or not you can tell

20  or see signs of evidence of the range that the weapon was from the person or

21  the injury at the time it was inflicted?

22      A       Yes.

23      Q       Are you familiar with that process?

24      A       Yes.

25      Q       And that process leaves physical evidence that you see on a

1    regular basis with some -- certain gunshot wounds?

2        A    Correct.

3        Q    What is that that you're looking for?

4        A    What we're looking for is either soot or stippling around the wound

5    and in the wound edges.  So, soot is the gray material that will be deposited

6    around the wound edges.  Stippling, on the other hand, is an injury that is

7    caused by unburnt gun powder striking the skin.

8        Q    And so you can have, based upon what you observe, a range of

9    distances approximately based upon your visual observation of the wound?

10       A    Yes.

11       Q    And in this particular case there -- were there any signs?

12       A    No.

13       Q    Are there factors that affect, especially in this region and with what

14   you see with Mr. Fleming's hair, that affect your ability to see that?

15       A    Yes.

16       Q    Can you explain that?

17       A    Anything in between the gun when it's fired and the decedent, the

18   body, can cause the stippling or soot not to appear; in this case his thick hair.

19       Q    And since there's no evidence, what is the determination if you're

20   not certain of the distance?

21       A    Indeterminate.

22       Q    And is that the conclusion that you draw to the gunshot wound

23   we've just been discussing?

24       A    Yes.

25       Q    Doctor, let me ask you now about wound number two.  Can you

1    describe the general area where wound number two was involved?

2        A      Wound number two it was in the right upper arm.

3        Q      And I'm going to show you State's Exhibit 38.  And could, number

4    one, you orient us anatomically on Mr. Fleming where we're looking at now?

5        A      His back is up in the photo.  This is the gunshot entrance wound on

6    his inner right upper arm.

7        Q      And is that an entrance or exit gunshot wound?

8        A      An entrance wound.

9        Q      And let me show you Exhibit Number 43.  Is that a closer up

10   photograph of that same wound?

11       A      It is.

12       Q      Now, let me go to Exhibit 44.  It, I believe, is self-explanatory in that

13   photograph anatomically, but is there a corresponding exit wound depicted in

14   that photograph?

15       A      Yes.  The exit wound on the outer right upper arm.

16       Q      Now, Doctor, let me talk to you about this wound.  Let me ask you

17   about the track that was observed by the internal examination in this area.

18   What were you able to determine?

19       A      The bullet entered the inner upper arm.  It broke his humerus,

20   which is the bone in your upper arm, and then exited the outer upper arm.

21       Q      So this had a corresponding entrance and an exit with no bullet

22   found associated with this gunshot wound?

23       A      There were fragments of a bullet, but the fragments broke off in

24   the broken arm, and then the later exited, yes.

25       Q      Now, Doctor, let me ask you a couple questions about that wound.

1    Was it, in your opinion, from a medical degree of certainty, an incapacitating

2    one?

3         A       No.

4         Q       Was it a fatal one?

5         A       No.

6         Q       And the final wound -- gunshot wound number three,

7    anatomically, where was that wound observed?

8         A       That was in the right groin area.

9         Q       I'm going to show you Exhibit Number 45.  Is this the upper right

10   thigh area?

11        A       Yes.

12        Q       And is that rod there for a reason?

13        A       It's -- yes.

14        Q       And what is that reason?

15        A       It's showing trajectory.

16        Q       So, the same thing about a location or the trajectory path that you

17   previously described from an internal, this wound can be shown by an

18   external demonstration which is depicted in this photograph?

19        A       Yes.

20        Q       Doctor, was this wound incapacitating?

21        A       No.

22        Q       Was this wound in and of itself fatal?

23        A       No.

24        Q       There was no bullet or projectile associated with this wound?

25        A       Correct.

1  Q      And the track pattern was what, anatomically, to the description of

2  Mr. Fleming's body as you describe wounds?

3  A      Right to left, front to back, and downward.

4  Q      Doctor, what was the cause of Mr. Fleming's death?

5  A      Gunshot wound to the head.

6  Q      And what is the manner of death?

7  A      Homicide.

8  Q      At the hands of another?

9  A      Yes.

10  MR. STANTON:  Pass the witness.

11  THE COURT:  Cross-examination.

12  MR. BASHOR:  Thank you, Your Honor.

13  <u>CROSS-EXAMINATION</u>

14  BY MR. BASHOR:

15  Q      Good afternoon, Doctor.

16  A      Good afternoon.

17  Q      I'm going to start where Mr. Stanton left off.  We heard that you

18  have classifications for the manner of death, correct?

19  A      Yes.

20  Q      And part of your responsibility as a forensic pathologist,

21  particularly when you are working for the county, is that you report your data

22  to the Bureau of Vital Statistics?

23  A      Yes.

24  Q      And we do that because we want to know how our populations are

25  passing away, right?

1      A      Correct.

2      Q      So if it's -- you know, there's a -- we could discover that a disease

3 that has an oddly large population in a small area, the powers at be could

4 figure out how to take care of something like that, right?

5      A      Right.

6      Q      Okay.  So, when you use your classifications it's something that

7 you use in your profession, correct?

8      A      Yes.

9      Q      And it's something that the Bureau of Vital Statistics understands

10 and utilizes?

11      A      Correct.

12      Q      So, the way you would use the word homicide doesn't necessarily

13 mean whether something's a murder, a manslaughter, or an involuntary

14 manslaughter, right?

15      A      Correct.  It's not a legal definition.

16      Q      Correct.  Exactly.  So, the definitions that we use are different than

17 the definitions you use?

18      A      Correct.

19      Q      Okay.  Now, we've heard that the ranges of the wounds in all three

20 of the wounds is an intermediate range, correct?

21      A      Indeterminate.

22      Q       I'm sorry, indeterminate range.  Can you describe to the ladies and

23 gentlemen of the jury what a contact wound is?

24      A      A contact wound occurs when the gun is pressed against the skin.

25 There's usually charring, soot, sometime an abrasion ring, sometimes you can

1    see the muzzle imprint.

2        Q      Okay.  And the reason for that is because it's pressed right against

3    the skin, you understand when a firearm ejects or fires a projectile, a flame

4    comes out of the end of the muzzle, right?

5        A      Yes.

6        Q      Causing the end of the muzzle to then heat up dramatically and

7    quickly?

8        A      Yes.

9        Q      And so, if a wound you observed had that kind of characteristic,

10   you would make a determination that it was right up against the skin?

11       A      Yes.

12       Q      And for these three are we able to eliminate contact wound?

13       A      With the hair and the clothing, not completely, but most likely, yes.

14       Q      Okay.  Fair enough.

15              MR. BASHOR:  Thank you, Your Honor.

16              THE COURT:  Redirect?

17              MR. STANTON:  No questions.

18              THE COURT:  Do any of the ladies and gentlemen of the jury have

19   any questions you wish the Court to ask the witness?  There being no

20   questions, thank you very much for your testimony.  You're excused.

21              THE WITNESS:  Thank you.

22              THE COURT:  State, call your next witness.

23              MR. STANTON:  Renee Harder.

24              THE MARSHAL:  Follow me.  Watch your step.

25                  RENEE HARDER, PLAINTIFF'S WITNESS, SWORN

1      THE CLERK:  Please be seated.  Will you state and spell your name

2   for the record.

3      THE WITNESS:  Renee Harder, R-E-N-E-E H-A-R-D-E-R.

4      MR. STANTON:  May I proceed, Your Honor?

5      THE COURT:  Yes.  Thank you.

6                      <u>DIRECT EXAMINATION</u>

7   BY MR. STANTON:

8      Q      Ma'am, how are you employed?

9      A      I am a crime scene analyst for the City of North Las Vegas.

10     Q      Can you tell me about what job responsibilities you have in that

11  capacity?

12     A      Yes.  It is my job to respond to crime scenes and document the

13  crime scene, including all evidence, properly collecting and impounding all

14  evidence located.

15     Q      How long have you been a crime scene analyst?

16     A      Just shy of 14 years.

17     Q      And is there some training and experience that you have with you

18  both educationally and then kind of in the course of your employment?

19     A      Yes.

20     Q      Could you describe that?

21     A      I have an associate's degree in criminal justice.  Once hired I

22  attended the Las Vegas Metropolitan Police Department's Crime Scene

23  Investigations Academy.  After successfully completing the academy, I went

24  through the North Las Vegas Police Department's field training program,

25  which I successfully completed.  Since then, over the last 14 years, I have

1    completed hundreds of hours of different forensic discipline classes.

2        Q    And I know this might be for you a difficult figure to come up with

3    some degree of precision, but I'm looking to an area of what you are

4    comfortable in approximating.  How many crime scenes have you been

5    involved in in a professional capacity either as the principal crime scene

6    analyst assigned to that scene or in an assistant capacity?

7        A    All kinds of crimes?

8        Q    Yes.

9        A    Thousands.

10       Q    And there is a crime scene analyst in your department, as well as

11   the Metropolitan Police Department, kind of a seniority aspect when you have

12   a more serious scene; is that true?

13       A    Yes.

14       Q    And could you describe kind of how that works if you're brand new

15   versus someone with your experience about what type of scenes you would

16   go to?

17       A    Entry level crime scene investigators will not be primary on things

18   like homicides or officer involved shootings.  The senior or level two CSI's

19   would take primary on those kinds of calls.

20       Q    Okay.  There are a group of crime scene analysts that respond to

21   some scenes?

22       A    Yes.

23       Q    Can you describe how -- and my first part of my question is, within

24   crime scene analysts themselves and then I'll get to detectives as a byproduct

25   of your answer, but could you describe to the jury how in a scene such as this,

1  a serious scene, crime scene analysts work together and how those

2  responsibilities are broken down?

3       A     In a scene such as this, usually at least two crime scene analysts

4  would arrive -- would go to the scene.  We would then discuss the scene and

5  we would split up the duties so that one person isn't in charge of the entire

6  investigation.

7       Q     And is there kind of a communication process that exists between

8  the analysts about their jobs and functions as you go through scenes?

9       A     Yes.

10       Q     Can you kind of once again, in a general fashion, kind of explain

11  how that works?

12       A     Usually one CSI will be in charge of photographs and collecting

13  evidence.  Another CSI might handle the diagram portion.  If there are other

14  scenes associated, like search warrants or vehicles, someone -- we would split

15  those up, so that one person doesn't have to handle all aspects of the scene.

16       Q     And now I'd ask you about how that works in the interaction with

17  law enforcement and, in this particular case, at a homicide scene how you

18  interact and what that interaction is with homicide detectives.

19       A     When the detectives arrive on scene, they let us know what they

20  need from us above and beyond what we might already have decided to

21  complete.  And like I said, that would have to do with search warrants and

22  what they might be looking for on warrants and situations like that.

23       Q     And then prior to your testimony today I had you review Exhibits 1

24  through 35 marked for this trial.  Are you familiar with those photographs and

25  crime scene diagram that are marked accordingly?

1      A      Yes.

2      Q      And do they accurately depict the crime scene document diagram

3   prepared in this case, as well as photographs at various different stages at this

4   primary scene as the scene was processed?

5      A      Yes.

6            MR. STANTON:  Your Honor, I move for 1 through 35 into

7   evidence.

8            THE COURT:  Stipulated?

9            MR. BASHOR:  We stipulate.

10           THE COURT:  1 through 35 are admitted by stipulation.

11                   [STATE'S EXHIBIT 1-35 RECEIVED]

12           MR. STANTON:  Thank you, counsel.

13   BY MR. STANTON:

14     Q      So, let me talk to you about kind of when you arrive at a scene

15   after you've been briefed some kind of -- in this case involving a structure;

16   what is kind of the first step in photographing or documenting the location that

17   you're at?

18     A      We would first document the exterior of the residence showing the

19   address, showing the basic condition of the exterior.

20     Q      I'm showing you State's Exhibit 4.  Is this the exterior photograph

21   of the scene that you responded to on January 1st, 2016?

22     A      Yes.

23     Q      Let me go to Exhibit Number 5.  Is that kind of a reference with a

24   number that's important to you; why is that photograph --

25     A      Correct.  This shows the front door of the specific unit involved in

1    this incident.

2        Q       Now, there's been previous testimony that I won't belabor about

3    certain aspects inside the garage, but fair to say that that is a photograph taken

4    by crime scene analysts upon their arrival and processing of the scene?

5        A       Correct.

6        Q       Then let me go to State's Exhibit 1 and what is that?

7        A       This is a diagram of the residence.

8        Q       Commonly referred to as a crime scene diagram?

9        A       Correct.

10        Q       And there's a couple things that I want to talk to you about.

11    Number one here is a staircase?

12        A       Yes.

13        Q       And then a figure of a body here?

14        A       Correct.

15        Q       And that's once again to demonstrate -- kind of to orient us, with

16    some of the pictures that are also used to document these areas?

17        A       Yes.

18        Q       We have a reference of north and the physical address and the

19    apartment number?

20        A       Correct.

21        Q       Now, in the next document I'm going to show you, Grand Jury

22    Exhibit Number 2, or not Grand Jury, Trial Exhibit Number 2, there's a series

23    of numbers that are depicted.  And I'll focus first around the body figure.  Can

24    you tell me what those are designed to depict?

25        A       Yes.  The numbers that you see here all are associated with pieces

1    of evidence that were -- that were collected at the scene.

2    Q    And then is there an index that's associated with that?

3    A    Yes.

4    Q    And let me show you Exhibit Number 3.  Is that the index for the

5    numbers that are depicted on the crime scene?

6    A    Yes.

7    Q    So, the description is by the crime scene analyst of the item that

8    we see here, and those numbers reference the diagram itself?

9    A    Correct.

10   Q    I gotcha.  So, now let me go to Exhibit Number 8.  Can you tell us

11   where inside the home that is and what we're looking at?

12   A    This is at the top of the first set of stairs looking down into the

13   entryway.  The doorway straight in front of you is that front door.  And then

14   the doorway to your left is the garage.

15   Q    Now, Ms. Harder, in this photograph we do not see any yellow

16   evidence tents.  Does that tell you something about when this photograph was

17   taken in comparison to some others?

18   A    This would be taken prior to any investigation, any locating of

19   evidence.  This was our initial photographs.

20   Q    Okay.  Now, let me go with Exhibit 9.  Can you tell us what that is

21   and how it compares and contrasts with the previous photo?

22   A    Right.  This is the same view, except in this photo you can see

23   evidence tents in the middle under his arm showing where some evidence had

24   been located.

25   Q    And so if I could, going back to Exhibit Number 1, this is the raw

1 | diagram without any evidence depicted on it, and this Exhibit 2 is the same

2 | diagram, but with it processed and memorialized as to specific evidentiary

3 | items?

4 |     A    Correct.

5 |     Q    I want to now ask you about Grand Jury Exhibit Number 12.  And

6 | can you tell us where we are in this photograph?

7 |     A    This is at the bottom of that same stairway, a closer photo of the

8 | deceased in that entryway.

9 |     Q    And the doors that are around his person, is one of those the

10 | garage door?

11 |     A    Correct.  The door near his right hand would be the door to the

12 | garage.  The door near his head is the door to -- that's the front door.

13 |     Q    Now, I want to draw your attention to a couple of items here.

14 | Number one is this area under Mr. Fleming's head, this carpeting I'm pointing

15 | to.  Do you recall that in some subsequent photos we have closer up

16 | photographs of that area?

17 |     A    Yes.

18 |     Q    Can you describe kind of how the processing works from the

19 | overall photographs here to when evidence tents are applied and then when

20 | Mr. Fleming is removed from the scene?  Can you explain how that process

21 | works?

22 |     A    When we arrive on the scene, we take overall photos before

23 | anything is disturbed, or touched, or moved.  It's just to show the condition

24 | when we first arrived.  We will then locate any evidence, photograph it.  We

25 | will then place those evidence markers down and re-photograph the scene

1    again showing all those evidence markers.  Once the victim was removed, we

2    then continue to look for evidence under where his body was.  And in this

3    case, we did locate additional evidence on and under that carpet.

4        Q      And there is a particular agency within Clark County that has a very

5    prominent role when it comes to a deceased person at the scene; is that

6    correct?

7        A      Yes.

8        Q      Who is that?

9        A      The Clark County Coroner's Office.

10       Q      And is there a kind of a mandated procedure about how the

11   processing of the body and areas around the body work in conjunction with

12   the Coroner's office?

13       A      Yes.  The Coroner's office has jurisdiction over the body.  We are

14   not to touch it or move it until they are on scene, and they are able to do their

15   concurrent investigation.

16       Q      And there's actually an investigator from the Coroner's office that

17   comes to the scene working with you and the detectives?

18       A      Correct.

19       Q      So, I want to go to Exhibit 13.  Do you recognize that as you got a

20   closer picture of Mr. Fleming?

21       A      Yes.

22       Q      I want to point in kind of an orientation fashion in this broader

23   photograph to a couple items that aren't as well seen in it.  For the record,

24   above Mr. Fleming's left arm against the wall, do you see the item that I'm

25   pointing to there?

1    A    Yes, sir.

2    Q    Is that item something that is photographed, tagged, and

3    impounded in the closer set of photographs in this case?

4    A    Yes, it is.

5    Q    And what was that item?

6    A    That's a .40 caliber cartridge case.

7    Q    And let me direct your attention to Mr. Fleming's right elbow here,

8    almost in the middle bottom third of the photograph; are there a number of

9    evidentiary items located against, near, and underneath his body in that area?

10    A    Yes.

11    Q    And, finally, in the waistband area that I'm pointing to now on Mr.

12    Fleming's front stomach area, do you recognize that item?

13    A    Yes.

14    Q    And what was it?

15    A    Later to be determined a nine millimeter Glock, Model 19 handgun.

16    Q    Going to Exhibit 16, is that something we've seen before in the

17    photographs that I presented to you?

18    A    Yes.  That's the .40 caliber cartridge case.

19    Q    And that's now a closer picture?

20    A    Correct.

21    Q    And this is prior to the processing from tagging and identifying

22    evidentiary items by number?

23    A    Correct.

24    Q    Okay.  Now, let me go to Exhibit 17.  What has happened from a

25    crime scene analyst's processing perspective that you now clearly see in this

1  photograph?

2       A       This is that second round of photos that I described where we now

3  go through and mark our items of evidence and then re-photograph

4  everything with its numerical marker.

5       Q       So, let me go to the index, Exhibit Number 3, and if I go to this

6  index and go to number one, let me zoom in.  What is the description of item

7  number one?

8       A       One Winchester Smith & Wesson 40 cartridge casing.

9       Q       So, the item numbers once again here correspond to the visual

10  yellow tags we would see in any photograph?

11       A       Correct.

12       Q       Let me go to Exhibit 18.  What is that a photograph of?

13       A       This is that same cartridge case, now numerically marked and a

14  close-up of it.

15       Q       Why is that particular type of evidence tag put next to this item, the

16  ruler aspects of it?

17       A       To show size.

18       Q       So, there's kind of an identification, as well as a scale, that's

19  inserted for size?

20       A       Correct.

21       Q       Exhibit 20, what are we looking at there?

22       A       This is the deceased's midsection showing again item number two

23  and three and then the firearm in his waistband.

24       Q       Exhibit 19?

25       A       This shows item number two and three closer, item number two

1  being a bullet and item number three being a red Bic lighter.

2      Q      Exhibit 22.  I'd like you to focus on item number eight at the open

3  area in the middle -- or at the bottom of the door to the top of the photograph.

4      A      That's an additional cartridge case, .40 caliber, that was located,

5  and marked, and re-photographed.

6      Q      And Exhibit 21?

7      A      And that's a close-up of that same cartridge case.

8      Q      I'd like to go to Exhibit 26 and now ask you about evidence tag

9  number nine; what is that?

10      A      Evidence tag number nine I believe is a defect that's found in the

11  carpet.  It's bullet fragments in the carpet.

12      Q      And let me show you a close-up in 23.

13      A      Oh, it's a cartridge.

14      Q      Was there something close to the defect in the carpet also at or

15  near tag number nine?

16      A      Yes.  Number nine's actually the cartridge case.  It's another .40

17  caliber cartridge case.

18      Q      Exhibit 24.  Obviously, Mr. Fleming is no longer there.

19      A      Correct.

20      Q      There's now item number ten.  Can you tell me what item number

21  ten is?

22      A      Item ten should be the defect in the bullet fragments.

23      Q      And Exhibit 25?

24      A      That's a close-up photo of those fragments.

25      Q      Now, was there a process in which this area, the area I've just

1  shown depicted by tag number ten and that matte type carpeting adjacent to

2  the garage door that it's processed further.  Can you explain what you do and

3  how it was done in this case?

4        A      In this case, these fragments were collected after being

5  photographed.  The carpet is then removed and we're photographing the

6  underside of the carpet, as well as the tile floor underneath.

7        Q      I'm showing you Exhibit Number 28.  Is that kind of the process

8  that you just described in the photograph as we're going through them.

9        A      Yes.

10       Q      And Exhibit 29, what are we looking at there?

11       A      That's the underside of that mat, showing the defect on the

12  underside of the mat.

13       Q      And on the top side of that would have been the bullet fragment

14  that was impounded?

15       A      Correct.

16       Q      And let me go to Exhibit 30 and tag 11.  What are we looking at

17  there?

18       A      This is additional bullet fragments and the broken tile underneath

19  that defect in the carpet.

20       Q      Exhibit 32, what is that?

21       A      That's a photograph, stepped back just a little bit so you can see

22  the entire defect in the tile.

23       Q      And once again, 31, is that a sequential photograph now up close

24  of the previous?

25       A      Correct.

1     Q     That was tile underneath the carpeting?

2     A     Yes.

3     Q     Now, I want to show you Exhibit 33.  Can you tell us what we're

4  looking at there and where is that in the scene?

5     A     This is the handgun in a leather holster that is in the waistband of

6  the victim.

7     Q     Now, is there a procedure, kind of a strict line about how handguns

8  such as this found in a scene is processed?

9     A     Yes.

10     Q     Can you describe that for me?

11     A     The handgun was removed from the holster, then you drop the

12  magazine out and lock the slide back to make it safe, noting whether or not

13  any live ammunition or cartridge cases come out of the slide when we rack it

14  back.  We then count all the live ammunition that's in the magazine,

15  photograph the gun and all of its make, model, serial number, all of its

16  designators.

17     Q     And this particular gun was processed in that fashion?

18     A     Yes.

19     Q     I would like to show you next in order State's Exhibit 34.  What are

20  we looking at there and where in the process are, we seeing this weapon?

21     A     This would be the first photograph taken after removing it off of

22  this person.  It's still in the holster.

23     Q     And Exhibit 35?

24     A     This would be after it's removed from the holster, the magazine

25  has been dropped and the slide has been locked back.  The ammunition is still

1    in the magazine.

2        Q      What was the condition of this weapon at the time that it was

3    processed, as you just described?

4        A      There are 15 live 9 millimeter cartridges in the magazine and there

5    was nothing in the chamber.

6        Q      Are you familiar with semi-automatic handguns?

7        A      Yes.

8        Q      Do you also qualify, in your capacity as a Crime Scene Analyst, to

9    carry a firearm with the North Las Vegas Police Department?

10       A      Yes, I do.

11       Q      How often do you qualify with a weapon?

12       A      Four times a year.

13       Q      And that's every year since you've been employed in that capacity?

14       A      Correct.

15       Q      What kind of weapon, revolver or semi-automatic do you carry?

16       A      I carry a 9 millimeter Glock Model 26.

17       Q      Semi-automatic handgun?

18       A      Correct.

19       Q      So, would it be fair to say that you're familiar with how to load it,

20   operate, and fire that weapon?

21       A      Yes.

22       Q      So, let me ask you this question, in the condition that the gun was

23   in, that is, as you testified, the magazine had live rounds in it, but none in the

24   pipe or in the barrel end.  If I pulled out that Glock and squeezed the trigger

25   would the gun go off?

1    A    No.

2    Q    What would be required in order to make this Glock operational so

3    that if I pulled the trigger the gun would fire?

4    A    The slide would have had to have been racked back to put a round

5    into the chamber.

6    Q    Thank you.

7         MR. STANTON:  Your Honor, I don't believe I have any further

8    questions.  I pass the witness.

9                        CROSS-EXAMINATION

10   BY MR. O'BRIEN:

11   Q    Good afternoon, Ms. Harder.

12   A    Good afternoon.

13   Q    I want to start with a few general questions.  I know you talked a

14   little bit about your background and your training to become a CSA.

15   A    Uh-huh.

16   Q    Let's talk a little bit about the responsibilities of a CSA.  You just

17   basically respond to crime scenes to document the crime?

18   A    Document and collect evidence, yes.

19   Q    And by collecting evidence, recovering physical evidence and

20   fingerprints?

21   A    Correct.

22   Q    And also performing a variety of investigative tasks, potentially?

23   A    Yes.

24   Q    Okay.  And to accomplish that, you carry test kits and evidence

25   collection materials with you?

1    A    Yes.

2    Q    Okay.  Obviously, you're in North Las Vegas official uniform right

3  now?

4    A    Yes.

5    Q    You're not driving around in your personal vehicle?

6    A    No.

7    Q    Okay.  When you're on the job, you're on the job?

8    A    Correct.

9    Q    Okay.  So, you're using a North Las Vegas police vehicle?

10    A    Yes.

11    Q    And I assume the vehicle is stocked with those kits?

12    A    Yes.

13    Q    Okay.  Do you personally stock the vehicle when you begin your

14  shift?

15    A    Yes.

16    Q    Okay.  And the test kits, just some of the materials that you could

17  collect include DNA?

18    A    Yes.

19    Q    Fingerprints?

20    A    Yes.

21    Q    Gunshot residue?

22    A    Yes.

23    Q    Blood?

24    A    Yes.

25    Q    And there's a kit to actually test if something is blood?

1      A      Presumptively, yes.

2      Q      Okay.  And, also, a collection of firearms, as in this case, you did?

3      A      Yes.

4      Q      Okay.  And then part of your job -- an important part of your job is

5    also protecting the integrity of the evidence?

6      A      Yes.

7      Q      Specifically, part of your training, I imagine, with the Metro

8    Academy, was making sure there's no pollution?

9      A      Yes.

10     Q      And by -- or by pollution, I guess, a better phrase might be

11   contamination?

12     A      Yes.

13     Q      Okay.  And that, in part, that's why you wear gloves?

14     A      Yes.

15     Q      When you're on the scene?

16     A      Correct.

17     Q      Okay.  So -- and you talked a little bit about when you arrive on the

18   scene talking to detectives about what they might want investigated?

19     A      Correct.

20     Q      All right.  And when we say detectives, essentially the lead officer

21   on the case; is that correct?

22     A      In this case, it's -- I mean the detectives.  There are patrol officers

23   there, but when detectives and CSI are called out, they become the lead

24   investigators.

25     Q      Okay.  And I think you also said you would ask the detective what

1  he or she might want investigated, but that's on top of what you, in your

2  training, see should be investigated, correct?

3       A     Correct.

4       Q     All right.  And then once evidence is collected, you send the

5  evidence to the lab for testing?

6       A     No.

7       Q     Okay.  How does -- the detective chooses what goes to the lab for

8  testing?

9       A     Correct.

10      Q     Okay.  And does the detective have your office send --

11      A     No.

12      Q     -- that for testing, or the detective handles that themselves?

13      A     The detectives handle those requests themselves.

14      Q     Okay.  So, you're more on the collection side, and then once, after

15  that point, the detectives are making the calls?

16      A     Correct.

17      Q     Okay.  Ask you a few questions about -- did you have a chance to

18  review the reports from -- for this case?

19      A     Yes.

20      Q     Okay.  Specifically, you authored a report in this case?

21      A     I did.

22      Q     And there was a second CSA on the scene; is that correct?

23      A     Yes, the CSI official was actually primary on this case.

24      Q     Okay.  So, the CSI official also collected some evidence?

25      A     The CSI official collected all scene evidence at the residence.

1    Q    And by the residence, we're referring to the townhome at ████

2    ██████████

3    A    Yes.

4    Q    Okay.  ████████████████  in North Las Vegas?

5    A    Yes.

6    Q    Okay.  Just to give a sense to the jury of what we're talking about,

7    you're familiar with this area of North Las Vegas?

8    A    Yes.

9    Q    Okay.  I'm showing you what's been marked as Defendant's

10   Proposed Exhibit I.  And --

11   MR. STANTON:  Well, Judge, just for the record, counsel showed

12   me Defense A through K.  I have no objection to them being admitted.  I think

13   that needs to be on the record before they publish it.

14   THE COURT:  Okay.

15   MR. STANTON:  Thank you.

16   THE COURT:  I didn't pay attention to that part.  Sorry about that.

17   MR. O'BRIEN:  My apologies.  Thank you, counsel.

18   THE COURT:  So, do you move to admit by stipulation?

19   MR. STANTON:  Yes.

20   THE COURT:  A through K?

21   MR. STANTON:  Those are the ones I've reviewed, Your Honor.

22   MR. O'BRIEN:  I believe that's all I have.

23   THE COURT:  Okay.  A through K are admitted by stipulation.

24            [DEFENDANT'S EXHIBIT A-K RECEIVED]

25   MR. O'BRIEN:  Thank you again, counsel.

1    BY MR. O'BRIEN:

2       Q      We're looking at Defense Exhibit I.  Do you recognize the area

3    depicted in this?

4       A      Yes.

5       Q      And, specifically, what are we looking at?

6       A      We're looking at a bird's eye view of the northern area of North Las

7    Vegas, the Lamb and Centennial area.

8       Q      And down towards the bottom right, is that Interstate 15 crossing

9    through the photo?

10      A      Yes, it is.

11      Q      Okay.  And along the top edge is the northern edge of the

12   Woodbury Beltway of 215?

13      A      215, correct.

14      Q      Okay.  I'm showing you what's been marked as Defense Exhibit J.

15   Do you recognize this area?

16      A      Yes.  This is the neighborhood that the incident took place.

17      Q      Okay.  Specifically, the area around Smokey Fog Avenue?

18      A      Correct.

19      Q      And Smokey Fog is pictured on the -- say the top --

20      A      Top right.

21      Q      -- the upper part of the photo?

22      A      The top right, yeah.

23      Q      Thank you.  I'll come back to that photo, but to give a sense of

24   where -- let me show you Defense Exhibit K.  What are we looking at in

25   Defense Exhibit K?

1      A      This is a closer look of Smokey Fog Avenue and showing the

2   specific townhome that we're talking about.

3      Q      And that's the address again, █████████████████████

4      A      I believe so.  I would have to doublecheck.  I didn't respond to the

5   actual house, so.

6      Q      But that is the address marked on the photo of this?

7      A      That is, yes, ████.

8      Q      Okay.

9      A      Yeah.

10      Q      Going back to Exhibit J.  We talked a little bit about CSI Fischer

11   being primary when --

12      A      Yes.

13      Q      -- the two of you were at the scene?

14      A      Yes.

15      Q      I would like to talk to you a little bit about fingerprint collection.

16      A      Okay.

17      Q      Okay.  Part of your job is -- and your expertise, is processing

18   evidence for fingerprints?

19      A      Yes.

20      Q      And obtaining both suspect and elimination prints?

21      A      If requested, yes, we will collect suspect and elimination prints.

22      Q      So, if the detective essentially asked you for that, that's something

23   that you could take care of?

24      A      Yes.

25      Q      All right.  And in taking fingerprints, you use various methods, very

1    different scientific methods of collecting those, correct?

2        A    Yes.

3        Q    Sometimes powder, sometimes chemicals?

4        A    Correct.

5        Q    All right.  And in this case, I believe -- and there's one method that

6    is magnetic powder and a magnetic wand?

7        A    Yes.

8        Q    You're familiar with that -- with that technique?

9        A    Yes.

10       Q    Specifically, just explain it to the jury.  Essentially, it non-

11   scientifically is a stick with a plunger in it, and you depress the plunger, which

12   brings up a magnet towards a collection of iron dust, essentially?

13       A    The fingerprint powder has a magnetic component to it so that it

14   adheres to the wand.

15       Q    Okay.  And then you then brush that wand lightly against the

16   surface?

17       A    Correct.

18       Q    To determine if there are any fingerprints?

19       A    Right.

20       Q    Okay.  And then once that's done -- let me ask you a few questions

21   about what's often called lifting a print.  Once -- if a print is uncovered by that

22   powder, do you then use tape to collect that fingerprint?

23       A    Correct.

24       Q    Okay.  Putting the tape over the magnetic powder image of the

25   fingerprint --

1    A    Uh-huh.

2    Q    -- and the tape then is removed to collect the fingerprint?

3    A    Correct.

4    Q    So that it can later be tested?

5    A    It can later be compared, yes.

6    Q    Okay.  And in this case, there were some fingerprints taken from

7    ███████████████ is that correct?

8    A    By CSI Fischer, yes.

9    Q    Yes.  In fact, there were two lifts that CSI Fischer did?

10   A    Yes.

11   Q    The first one --

12        MR. O'BRIEN:  The Court's indulgence.

13   BY MR. O'BRIEN:

14   Q    The first lift CSI Fischer took for was from the front door of the

15   property?

16   A    I believe both of them were from the exterior of the front door.

17   Q    Okay.  Exterior, essentially outside, the outside section?

18   A    Yes.

19   Q    Okay.  And Lift 1, CSI Fischer refers to as good comparable quality?

20   A    Yes.

21   Q    And to explain that a little bit to the jury, there's a comparison

22   phase once a fingerprint's collected?

23   A    Yes.

24   Q    And if it's of comparison quality, essentially the fingerprint can be

25   compared to an elimination print?

1    A    Yes, it can be compared to other fingerprints.  No known prints of

2   either suspects, or victims, or whomever.

3    Q    Thank you.  Much more eloquently worded.  And that comparison

4   is, in part, to determine the existence of any similarities between the two

5   prints?

6    A    Yes.

7    Q    And, of course, dissimilarities between the two prints?

8    A    Correct.

9    Q    But it's worth noting that CSI Fischer noted that this is not AFIS

10   quality print?

11    A    Correct.

12    Q    Can you explain AFIS quality to the jury?

13    A    Correct.  If a fingerprint is of AFIS quality that means that it's clear

14   enough to put into the computer, where the computer can then run it against

15   the Western Identification Network first to see if it matches anyone who's ever

16   been put in the system before, but it has to be of a sufficient quality to do so.

17    Q    And from your knowledge of the investigation, was Lift Number 1

18   ever compared with the Defendant, Shawn Glover?

19    A    I don't believe so.

20    Q    Okay.  There was a second lift we talked about from the front door,

21   correct?

22    A    Yes.

23    Q    And this one, in particular, was a poor candidate for comparison?

24    A    Correct.

25    Q    Which also means automatically it's also not of AFIS quality?

1    A    Correct.

2    Q    Okay.  And from your review of CSI Fischer's work, do you have

3  any knowledge of fingerprints taken from a counter inside ███████████

4    A    I do not have knowledge of that, no.

5    Q    Okay.  Do you have any knowledge of fingerprints taken from car

6  keys?

7    A    Car keys?

8    Q    Car keys.

9    A    No.

10   Q    Do you have any knowledge of fingerprints taken from the railing

11 leading down the stairs at ████?

12   A    No.

13   Q    And none were taken -- as far as you know, none were taken from

14 the wall leading down the stairs?

15   A    No.

16   Q    And no fingerprints were taken near the couch on the second

17 floor?

18   A    Not to my knowledge.

19   Q    Okay.  And none were taken from the .40 caliber shells that were

20 found; is that correct?

21   A    Correct.

22   Q    And we talked a little bit about CSI Fischer's investigation.  Before I

23 move on, when you responded to the property, you were not asked to work

24 inside the residence, correct?

25   A    Correct.

1    Q    The detective asked you to go to a vehicle that was located on the

2    property?

3    A    Yes.

4    Q    Okay.  And do you recall where the vehicle was located?

5    A    It was in the parking lot, and it was off of Pepper Thorn, but  I -- I'm

6    sorry, I don't remember the cross street.

7    Q    If I show you Defense Exhibit B, is this a photo that you took?

8    A    Yes, sir.  Thank you.

9    Q    And did you take this photo probably just for this reason?

10   A    Yes, sir.

11   Q    Okay.  And it looks like it's the intersection of Pepper Thorn and

12   Beige Bluff; is that correct?

13   A    Yes.

14   Q    All right.  And that is where the vehicle was located?

15   A    Correct.

16   Q    All right.  On the map, do you see the intersection of Pepper Thorn

17   and Beige Bluff?

18   A    Yes.

19   Q    Would you please mark that for the jury?  It looks like now we have

20   to use the mouse rather than the touch screen.

21   A    Oh, sorry.

22   Q    The little red crayon, and if you could circle it, please?  Thank you

23   very much.  I'm showing you what's been marked as Defense Exhibit A.  Do

24   you see a vehicle that you investigated in this photo?

25   A    I don't see a picture.  I'm sorry.  Do I have to --

1     MR. STANTON:  You have to get rid of the --

2     MR. O'BRIEN:  Oh, I apologize.

3    BY MR. O'BRIEN:

4     Q  If you could use the mouse again and go to the arrow, click on

5 the arrow.  Thank you so much.  Again, sorry, this is Defense Exhibit A.  Do

6 you see a vehicle that you investigated on January 1st, 2016?

7    A  Yes.

8    Q  That's specifically the Dodge Durango towards the left side of the

9 photo?

10    A  Yes, sir.

11    Q  All right.  And showing you Defense Exhibit C, this is a closer view

12 of the Dodge Durango?

13    A  Yes.

14    Q  And you did -- you did some investigation inside of the vehicle, as

15 well?

16    A  Correct.

17    Q  When you arrived at the scene, detectives were already there?

18    A  Yes.

19    Q  And specifically, Detective Wilson was present?

20    A  Yes.

21    Q  And did Detective -- you noted in your report Detective Wilson had

22 the keys to the vehicle at that time?

23    A  Correct.

24    Q  This was around -- do you recall what time you left?

25    A  Around 3:30.

1    Q    3:30 p.m.?

2    A    Yes.

3    Q    Okay.  I'm showing you Defense Exhibit D.  This is a photo that you

4  took?

5    A    Yes.

6    Q    And it's essentially just the interior, front interior of the Durango?

7    A    Correct.

8    Q    Okay.  Going back to Defense Exhibit C.  When you arrived at the

9  scene, does the detective -- does the detective tell you the importance of the

10  vehicle?

11    A    I usually get a small briefing, yes.

12    Q    Okay.  And in this case, there was concern that the suspect had

13  stolen this vehicle?

14         MR. STANTON:  Object to any answer that deals with Detective

15  Wilson or any other person's opinion.  That's hearsay.

16         THE COURT:  Counsel, you want to rephrase?

17         MR. O'BRIEN:  Yes, Your Honor.

18  BY MR. O'BRIEN:

19    Q    In this instance, you were asked to investigate this vehicle -- well,

20  let's just leave it there.  You were asked to investigate the vehicle, correct?

21    A    Yes.

22    Q    Okay.  The detective did not ask you to take fingerprints of the

23  vehicle?

24    A    No.

25    Q    Okay.  And you ultimately did not take fingerprints of the vehicle?

1    A    No.

2    Q    Okay.  Did not take fingerprints of the door exterior?

3    A    No.

4    Q    Okay.  And obviously going along with that, there were no

5  fingerprints in the interior of the vehicle, as well?

6    A    No, sir.

7    Q    Okay.  I would like to take a step back from fingerprints for a

8  second and talk to you a little bit about gunshot residue.

9    A    Okay.

10    Q    One of the kits that your -- that you carry with you when you're

11  working is a gunshot residue test?

12    A    Yes.

13    Q    Essentially, it's a kit?

14    A    Yes.

15    Q    Okay.  And the testing involves, in this particular gunshot residue

16  testing is testing for lead, barium, and antimony, always difficult to say?

17    A    Yes.

18    Q    And the reason, the reason those particles in particular are being

19  tested is that those are in the residue produced from the firing of a weapon?

20    A    Correct.

21    Q    A handgun, essentially.  Once a handgun is fired, that -- those

22  particles are in the residue produced?

23    A    Yes.

24    Q    And part of the reason for that is that they are present in the primer

25  of a cartridge?

1     A     Yes.

2     Q     So, the primer of essentially the bullet or the cartridge inside the

3    gun contains these particles?

4     A     Yes.

5     Q     And then when fired, that's why they are present?

6     A     Yes.

7     Q     All right.  To -- and this -- part of the science behind it is that these

8    particles are ejected from the barrel of the gun when fired?

9     A     Yes.

10     Q     And it leaves a residue in the area around the gun at the time of

11   the firing?

12     A     Correct.

13     Q     And that residue can be tested?

14     A     Yes.

15     Q     If requested, a person's hands can be swabbed?

16     A     Yes.

17     Q     And a gun residue test run off of that swab?

18     A     Correct.

19     Q     And part of the reason we might test hands, or we might be

20   requested to test hands is the residue -- if a gun was in someone's hand and

21   that gun was fired, the residue would fall onto that hand?

22     A     Correct.

23     Q     All right.  You could also swab clothing, correct?

24     A     Yes.

25     Q     And in this case, while you did not go to the property, are you

1  aware of any gunshot residue testing that was done?

2      A    I did respond to the property, I just wasn't dispatched there.  So, I

3  wanted to correct myself on that one.  I did later respond to the property, I was

4  dispatched to the vehicle.  Sorry.

5      Q    Okay.

6      A    But not to my knowledge, no.

7      Q    And I want to talk to you a little bit about DNA collection and

8  testing.  I'm showing you Defense Exhibit E.  I know we're bouncing back and

9  forth, but what is pictured in Defense Exhibit E?

10     A    This is the driver's side of the Durango, where I've marked with

11 evidence markers the areas that I want to swab for DNA.

12     Q    Okay.  And we talked a little bit -- the Prosecution talked to you a

13 little bit about markers.  Essentially, it is marking the, as you just said, the

14 spots in a photo where you're going to test?

15     A    Correct.

16     Q    I'm showing Defense Exhibit F.  Are we looking at your hand in the

17 bottom left corner?

18     A    Yes, sir.

19     Q    Okay.  And that is you swabbing an area for DNA?

20     A    Yes.

21     Q    All right.  And I'm showing you Defense Exhibit G.  Similarly, this is

22 your hand swabbing the steering wheel for DNA?

23     A    Correct.

24     Q    And Defense Exhibit H, you're hand swabbing the, I assume the

25 gear shift?

1      A      Yes.

2      Q      Okay.  I want to talk to you a little bit about DNA and why you

3  would swab an area.

4      A      Okay.

5      Q      Touch DNA, in particular, it's a forensic method for analyzing DNA

6  that might be left at the scene of a crime?

7      A      Correct.

8      Q      And it's called, specifically, touch DNA because the testing requires

9  very small samples in order to be tested?

10     A      Yes, it's an area where someone has touched and left epithelial

11 DNA.

12     Q      Okay.  And when you're swabbing these areas, you're looking for

13 touch DNA?

14     A      Yes.

15     Q      Okay.  In this instance, the detectives did not ask you to test this

16 DNA?

17     A      I don't test DNA.

18     Q      Okay.  I thought that.  As far as you know, the detective did not

19 send the DNA to be tested?

20     A      I wouldn't know.

21     Q      Okay.  All right.  So, as we said earlier, you did your job of

22 collecting?

23     A      Correct.

24     Q      At that point, it's the lead investigator's job to decide what to do?

25     A      Yes, sir.

1     Q     Thank you.

2          MR. O'BRIEN:  The Court's indulgence.

3  BY MR. O'BRIEN:

4     Q     And Ms. Harder, just -- you mentioned epithelial DNA, just so the

5  jury knows, epithelial DNA is essentially skin cells?

6     A     Skin cells, yes.

7     Q     Okay.  And that was part of when we were discussing touch DNA

8  and what might be collected and ultimately tested?

9     A     Correct.

10     Q     Okay.  A few more questions about the investigation inside of the --

11  inside of the property at ███████████  We talked a little bit about

12  fingerprints, and to the best of your knowledge, there was no DNA taken inside

13  of ████████

14     A     Not to my knowledge.

15     Q     Okay.  And by taken, essentially collected with the swab method as

16  we saw in the photos?

17     A     Right.

18     Q     All right.  But -- actually, let me be more particular.  There was a

19  swab taken of Mr. Fleming's mouth, a buccal swab?

20     A     That was probably done at the autopsy.

21     Q     Okay.  Okay.  So not done inside the house, as far as you know?

22     A     I wouldn't assume so.

23     Q     Okay.  So, in that vein, there was no DNA taken from the -- any

24  counter in the property?

25     A     Not to my knowledge, no.

1    Q    Okay.  And no DNA taken from the couch?

2        MR. STANTON:  Objection, asked and answered.  The bannister

3    going down the stairs, the couch, the counter, all have been asked and

4    answered.

5        THE COURT:  Is this the last area?

6        MR. O'BRIEN:  This is the last area and, Your Honor, I did ask about

7    fingerprints, but not about DNA.  This is the very last area.

8        THE COURT:  Okay.

9    BY MR. O'BRIEN:

10    Q    So, no DNA was collected from the couch, as far as you know?

11    A    Not to my knowledge.

12    Q    And no DNA was collected from the railing on the way down the

13    stairs?

14    A    Not to my knowledge.

15    Q    Or from the wall along the way down the stairs?

16    A    Not to my knowledge.

17    Q    And no DNA was collected from the .40 caliber shells that were

18    found?

19    A    Not to my knowledge, no.

20    Q    Okay.  Thank you very much.

21        THE COURT:  Redirect?

22        MR. STANTON:  Thank you, Your Honor.

23                    REDIRECT EXAMINATION

24    BY MR. STANTON:

25    Q    And counsel just asked you about three areas of forensic items that

1    you are certified and trained to collect, gunshot residue, fingerprints, and DNA

2    as well I want to focus on.  You're familiar with all those?

3          A     Yes.

4          Q     Okay.  So, let me ask you this question.  Let me give you a good

5    surface for prints to be left, start off with fingerprints.  Glass, non-porous

6    surface, and I'm not moving when I grab -- grasp it, and I'm a secretor, and I

7    have oils coming out of my hands.  Probably a pretty good candidate that a

8    latent of comparison quality will be left under those circumstances?

9          A     Yes.

10         Q     All things being.  Will it tell you when I left that print?

11         A     No.

12         Q     It won't tell you the date, times, circumstances of when I put that

13   print on there?

14         A     No.

15         Q     What happens if I move it when I touch that glass?

16         A     It will most likely be smudged.

17         Q     And in smudged prints, it greatly affects the quality of the print for

18   comparison purposes?

19         A     Yes.

20         Q     Let me shift to DNA.  I'm walking down the stairwell and I put my

21   hand on the railing inside this home.  Would I leave DNA, generally speaking?

22         A     Probably.

23         Q     Possibly.  Will it tell you when I left the DNA?

24         A     No.

25         Q     Will it tell you what circumstances I left the DNA, at least touch

1    DNA as opposed to blood or some other DNA rich fluid?

2        A    No.

3        Q    Let me talk about gunshot residue.  You, on several questions

4    asked by Defense counsel, asked about the collection of gunshot residue.  Are

5    you familiar with the limitations on gunshot residue as far as what it will tell

6    you?

7        A    It will basically tell you whether someone was around a gun being

8    fired.

9        Q    Okay.  Will it tell you whether or not I held a gun in my hand and

10   fired it?

11       A    No.

12       Q    So, if we had four people in a room and let's assume this is a

13   normal size bedroom, 10 by 13, or thereabouts, and a gun is fired.  Would you

14   expect, if you were to take a gunshot residue test soon in time without

15   anybody putting their hands in clothing, washing their hands, or an

16   appreciable lapse of time, would you expect all four people to test positive?

17       A    It's very possible, yes.

18       Q    And there's no gradiation of the testing of gunshot reside.  In other

19   words, you can't tell by the results of it that you're the shooter, you're three

20   feet, you're closer than person number two or three, or anybody else in the

21   room.  Is that accurate?

22       A    I don't know exactly how it measures.  From what I understand, it's

23   just it's either present or it's not.

24       Q    Okay.  Are you --

25            THE COURT:  And you said -- I'm sorry to interrupt.  You said

1  gradiation.

2         MR. STANTON:  I did.

3         THE COURT:  Spell that for the record.

4         MR. STANTON:  Okay.  Thank you, Your Honor.

5         THE COURT:  G-R-A --

6  BY MR. STANTON:

7    Q    Do you know where --

8         THE COURT:  It's the first time I ever heard it, so I wanted to make

9  sure I got it right.

10  BY MR. STANTON:

11   Q    Are you familiar where gunshot residue testing is performed?

12   A    It's sent off to a lab somewhere back east, I believe.

13   Q    How about Bear County, Texas?  Does that sound familiar?

14   A    East of here.

15   Q    Okay, but it's not by the way -- right, it's not by the crime lab?

16   A    No, sir.

17   Q    And, in fact, North Las Vegas, getting back to DNA and

18  fingerprints, doesn't have their own crime lab, you ship it to Metro.  Is that --

19   A    We do our own fingerprints.

20   Q    But the DNA --

21   A    But we -- DNA, we do not, it gets sent to Metro, the County Lab.

22   Q    Okay.  Thank you, ma'am.

23         MR. STANTON:  Nothing further.

24         THE COURT:  Re-cross?

25         MR. O'BRIEN:  No, thank you.

1      THE COURT:  Do any of the ladies and gentlemen of the jury have

2  any questions you wish the Court to ask the witness?  There being no

3  questions, thank you very much for your testimony.  You are excused.  We're

4  going to take a restroom break after --

5      MR. O'BRIEN:  Your Honor, may we approach?

6      THE COURT:  Sure.

7                  [Sidebar at 2:36 p.m.)

8      MR. STANTON:  We're done for the day.

9      THE COURT:  Really?

10      MR. STANTON:  Yeah.

11      THE COURT:  All right.

12      MR. STANTON:  I only have one more witness.

13      THE COURT:  Who is it?

14      MR. STANTON:  Detective Wilson, who's unavailable today.  She's

15  out of State on another case, and then we have the --

16      THE COURT:  I could do the claims admonishment.

17      MR. O'BRIEN:  Uh-huh.

18      THE COURT:  Right.

19      MR. O'BRIEN:  Sure.

20      MR. STANTON:  And we have to settle the jury instructions.  That

21  won't be too long according to our brief discussion outside your presence.

22      THE COURT:  Okay.  So, you're going to close this Friday, is that

23  what you're thinking?

24      MR. O'BRIEN:  That's be plan, because Thursday being tomorrow, I

25  would expect the detective to be a couple hours, and my person would be five

1    minutes, from my perspective.

2    THE COURT:  Okay.  So, if I went ahead (indiscernible) it would be

3    2:20, I was asking to be excused.

4    MR. O'BRIEN:  Okay.

5    THE COURT:  We had a full discussion of whether he's the boss,

6    but I feel like he's possibly self-fulfilling.

7    MR. STANTON:  So, whenever you want to, to tomorrow, and then

8    we'll argue your thing Friday morning.

9    MR. O'BRIEN:  That seems to be the plan.

10    THE COURT:  I have a hearing on an in capita without probability,

11    blah, blah, blah.  I might just move it so that we can finish this on time.

12    MR. O'BRIEN:  That would be great, Your Honor.

13    THE COURT:  Okay.  I have to move it.  I have to move it.  Thanks.

14    So, I'm going to give them this thrill about being done a little early today.

15    MR. STANTON:  Right.  And then I'll send -- I have two specials on

16    the other murder counts that I'll send over.

17    THE COURT:  Okay.

18    MR. STANTON:  Okay?

19    [Sidebar ends at 2:38 p.m.]

20    THE COURT:  Well, ladies and gentlemen, the testimony that we

21    had anticipated would take the rest of the day is done, and so we're done a

22    little early.  And so, we do our best to plan and schedule.  We have some

23    witnesses that are out of State that are not available until tomorrow.  So, you

24    are done for today.

25    So, we're going to break now.  I have a Nevada Supreme Court

1   Commission that I am appointed to, with a particular Justice who would like

2   my attendance tomorrow.  I'm being excused early from the Commission, but

3   we're not -- and the lawyers knew this in advance and there's at least one of

4   you that understands that when the Supreme Court speaks, those of us in the

5   business listen, including me.  So, I have to do that, and we're not going to

6   start this trial until 2:30.  So, we're just going to compress, 2:30 to 5.  Okay?

7   And so, we'll take a break in there and we're going to -- the way things are

8   going along, we are still on time, no problem.

9           So, during this overnight recess until 2:30, you can work tomorrow,

10  you can go about your business as long as you're at the meeting place that my

11  Marshall designates to you at 2:30 tomorrow afternoon, okay?  As long as you

12  don't talk about the case and you follow my admonishment.  Okay.  Just put it

13  out of your mind and come back at 2:30 tomorrow.

14          So, during this recess, you're admonished not to talk or converse

15  among yourselves or anyone else on any subject connected with the trial.  You

16  are not to read, watch or listen to any report of or commentary on the trial by

17  any person connected with this case, or any media of information, including,

18  without limitation, newspaper, television, the internet or radio.  You're not to

19  form or express any opinion on any subject connected with the trial until the

20  case is finally submitted to you.  Tomorrow at 2:30.

21          THE MARSHAL:  All rise.  The jury is exiting.

22          [Outside the presence of the jury.]

23          THE COURT:  The record shall reflect we're outside the presence of

24  the jury.  I would like to take a short restroom break, come back and admonish

25  your client, because I have to do that when the State rests, and I hear that

-173-

1    you're resting soon tomorrow, right?

2              MR. STANTON:  Correct.

3              THE COURT:  Shortly after we, you know, we have what, one more

4    witness?

5              MR. STANTON:  One witness.

6              THE COURT:  Okay.  So, I'm going to do the client admonishment,

7    and I would like to look at the jury instructions, and at least have you flag for

8    me what you're objecting to.  Are you prepared to do that or --

9              MR. STANTON:  I think if we -- if you give us a little bit of time

10   through tonight, we can focus that to be more efficient.

11             THE COURT:  Okay.  And do you have any proposed that  I --

12             MR. O'BRIEN:  I emailed an entire packet.  I think that Mr. Stanton

13   anticipated the possibility of self-defense, and so there's -- when he first put

14   his packet together, and so --

15             THE COURT:  All right.  Do this, do me a favor, send me a new one.

16             MR. STANTON:  Okay.

17             THE COURT:  Otherwise, I have everything woven in and I won't

18   have to pull it out and be in a different order.  Just send me a new one unless

19   you accept their version of yours and theirs.

20             MR. STANTON:  I think we can send you a new one, and also

21   highlight the ones that are contested.

22             MR. O'BRIEN:  Correct.  That's my plan for this evening, Your

23   Honor.

24             THE COURT:  Okay, then that's fine.  Give me just two minutes and

25   then I'll admonish your client, and you can all be about your day.  Okay?  Two

1    minutes.

2            MR. O'BRIEN:  Very good.

3                [Recess at 2:42 p.m., recommencing at 2:45 p.m.]

4            THE COURT:  Are you ready?

5            MR. O'BRIEN:  We're ready, Your Honor.  I believe Mr. Stanton has

6    left responsibility to Mr. Flinn.

7                    [Outside the presence of the jury.]

8            THE COURT:  Okay.  We're back on the record in State v. Shawn

9    Glover outside the presence of the jury.  Both Defense counsel are present, Mr.

10   Flinn for the State.

11           Mr. Glover, in every criminal trial, the Judge has to read an

12   admonishment that is important, and I read it verbatim to make sure I don't,

13   you know, screw it up.   So, I'm going to read it to you verbatim here.  If you

14   have any -- I usually read it at or around when the District Attorney is going to

15   rest, but since you're going to, at some point, start a case tomorrow, I'll read it

16   to you tonight so that you have been admonished, and you can certainly

17   discuss it to the extent you need to with your attorneys.

18           THE DEFENDANT:  Okay.

19           THE COURT:  So, under the Constitution of the United States and

20   under the Constitution of the State of Nevada, you cannot be compelled to

21   testify in this case.  Do you understand that?

22           THE DEFENDANT:  Yes, ma'am.

23           THE COURT:  You may, at your own request, give up this right and

24   take the witness stand and testify.  If you do, you will be the subject to cross-

25   examination by one of the Deputy District Attorneys, and anything that you

1  may say, be it on direct or cross-examination, will be the subject of fair

2  comment when the Deputy District Attorneys speak to the jury in their final

3  arguments.  Do you understand that?

4      THE DEFENDANT:  Yes, ma'am.

5      THE COURT:  If you choose not to testify, the Court will not permit

6  the Deputy District Attorneys, either of them, to make any comments to the

7  jury because you have not testified.  Do you understand that?

8      THE DEFENDANT:  Yes, ma'am.

9      THE COURT:  If you elect not to testify, the Court will instruct the

10  jury, but only if your attorney requests, specifically as follows:

11      The law does not compel a Defendant in a criminal case to take the

12  stand and testify, and no presumption may be raised, and no inference of any

13  kind may be drawn from the failure of a Defendant to testify.  Do you have any

14  questions about these rights?

15      THE DEFENDANT:  No, ma'am.

16      THE COURT:  You are further advised if you have a felony

17  conviction more than ten years that has not elapsed from the date that you

18  have been convicted or discharged from prison, parole, or probation,

19  whichever is later, and the Defense has not sought to preclude that coming

20  before the jury, and you take the stand and testify, the Deputy District

21  Attorneys, one of them, in the presence of the jury, would be permitted to ask

22  you the following:  One, have you been convicted of a felony; two, what was

23  the felony; and, three, when did it happen?  However, no other details could be

24  gone into.  You discussed these rights with your client?

25      THE DEFENDANT:  Yes, ma'am.

1      MR. O'BRIEN:  Yes, ma'am.

2      THE COURT:  And did you answer any questions he had, if he had

3  any?

4      MR. O'BRIEN:  Absolutely.

5      THE COURT:  Okay.  And so, if there's nothing else, I'll see you

6  tomorrow at, what time did we say?  I'm going to say 2:20, and then, you

7  know, sit in the back.

8      MR. O'BRIEN:  If I have those instructions to you, say 9 or 9:30 in

9  the morning, that's plenty of time?

10      THE COURT:  Yeah.

11      MR. O'BRIEN:  Okay.

12      THE COURT:  Well, I'm going to be sitting at that meeting with

13  time.

14      MR. O'BRIEN:  Okay.  So, I'll make sure you have them to fill your

15  time.

16      THE COURT:  Thank you.  You may understand that I'm -- my -- it's

17  not formal, but my ADHD requires me to do more than one thing.  I can't do

18  one thing.

19      MR. O'BRIEN:  I'm not very good at idle either, Your Honor.

20      THE COURT:  So, I would be happy to be looking at the

21  instructions.

22      MR. O'BRIEN:  I'll make sure you have them.

23  /////

24  /////

25  /////

1      THE COURT:  Thanks.

2      MR. O'BRIEN:  Yep.

3          [Proceedings concluded at 2:49 p.m.]

16  ATTEST:  I do hereby certify that I have truly and correctly transcribed the
17  audio/visual proceedings in the above-entitled case to the
    best of my ability.

_____

Maukele Transcribers, LLC
Jessica B. Cahill, Transcriber, CER/CET-708