AARON D. FORD
  Attorney General
LESLIE A. HEALER (Bar No. 16710)
  Deputy Attorney General
State of Nevada
Office of the Attorney General
100 N. Carson St.
Carson City, NV 89701
(775) 684-1203 (phone)
(775) 684-1108 (fax)
lhealer@ag.nv.gov
*Attorneys for Respondent*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

SHAWN GLOVER, JR.,

      Petitioner,

vs.

WARDEN REUBART, *et al.*,

      Respondents.

Case No. 3:22-cv-00207-LRH-CSD

**ANSWER TO CLAIMS IN FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS (ECF NO. 23)**

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................................1

BACKGROUND FACTS AND PROCEDURE.................................................................................1

   I.   FACTUAL HISTORY ...................................................................................................1

   II.   TRIAL AND APPELLATE COURTS .........................................................................4

      A.   A Clark County Jury Convicted Glover...................................................4

      B.   The Nevada Supreme Court Affirmed Glover's Convictions. ...................4

      C.   Glover Unsuccessfully Challenged His Convictions During Post-Conviction Proceedings......5

   III.   FEDERAL HABEAS CORPUS PROCEEDINGS.........................................................5

ARGUMENT ....................................................................................................................................6

   I.   APPLICABLE LAW. .....................................................................................................6

      A.   AEDPA Standard of Review...................................................................6

      B.   Ineffective Assistance of Counsel Standard of Review. ..........................8

   II.   GROUND ONE: Glover Fails to Demonstrate That the Nevada Supreme Court's Holding that Sufficient Evidence Supported the First-Degree Murder Conviction was Contrary to or Involved an Unreasonable Application of Clearly Established Federal Law or an Unreasonable Determination of the Facts. ..........................10

      A.   Legal Standard....................................................................................10

      B.   The Nevada Supreme Court Reasonably Denied Relief and Glover Fails to Meet His Burden Under AEDPA.........................................................11

   III.   GROUND TWO: Glover Fails to Demonstrate That the Nevada Supreme Court's Holding that the Prosecutor Did Not Commit Misconduct In the Closing Argument was Contrary to or Involved an Unreasonable Application of Clearly Established Federal Law or Unreasonable Determination of the Facts. ..........................15

      A.   Legal Standard....................................................................................15

      B.   The State Court's Rejection of Ground Two was Not Objectively Unreasonable, and Glover Fails to Meet His AEDPA Burden As Any Misconduct Was Harmless. ................................16

IV.    GROUND THREE: Glover Fails to Demonstrate That the Nevada Court of Appeal's Holding that Trial Counsel Was Not Ineffective Regarding Testimonial Hearsay was Contrary to or Involved an Unreasonable Application of Clearly Established Federal Law or Unreasonable Determination of the Facts. ................................................. 17

A.    Legal Standards. ................................................................................. 18

B.    Trial Counsel was Not Ineffective for Failing to Object to Alleged Testimonial Hearsay ..... 18

C.    The Nevada Court of Appeals' Rejected Glover's Claim. ..................................... 20

V.    GROUND FOUR: Glover Fails to Demonstrate That the Nevada Court of Appeal's Holding that There Was No Conflict of Interest was Contrary to or Involved an Unreasonable Application of Clearly Established Federal Law or Unreasonable Determination of the Facts. ....................................................................................... 21

A.    Legal Standard. ................................................................................. 21

B.    There Was No Conflict In The PDO's Representation. ........................................ 22

C.    The Nevada Court of Appeals Rejected Glover's Claim. ...................................... 23

VI.    GROUND FIVE: Glover Fails To Demonstrate That Trial Counsel Was Ineffective for Failing to Impeach a Witness As The Claim Is Procedural Defaulted, or in the Alternative, is Without Merit ................................................................................. 24

A.    Procedural Default and Review for Cause Under *Martinez* .................................. 24

B.    Gound Five Is Not Substantial and Lacks Merit. ........................................... 25

    1.    Trial Counsel Provided Effective Assistance Related To Sutton's Inconsistent Statements. ................................................................................. 25

    2.    There Was No Prejudice. ................................................................... 30

C.    Glover Fails to Demonstrate Post-Conviction Counsel Was Ineffective in Declining to Raise Ground Five. ................................................................................. 31

D.    Conclusion. ................................................................................. 32

CONCLUSION ................................................................................. 32

AARON D. FORD
  Attorney General
LESLIE A. HEALER (Bar No. 16710)
  Deputy Attorney General
State of Nevada
Office of the Attorney General
100 N. Carson St.
Carson City, NV 89701
(775) 684-1203 (phone)
(775) 684-1108 (fax)
lhealer@ag.nv.gov
*Attorneys for Respondent*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| SHAWN GLOVER, JR., | Case No.: 3:22-cv-00207-LRH-CSD |
| Petitioner, | **ANSWER TO CLAIMS IN FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS (ECF NO. 23)** |
| vs. | |
| WARDEN REUBART, *et al.*, | |
| Respondents. | |

Respondents, through legal counsel, Aaron D. Ford, Attorney General of the State of Nevada, and Leslie A. Healer, Deputy Attorney General, hereby submit their answer to the claims in petitioner Shawn Glover's ("Glover") first amended petition for writ of habeas corpus. ECF No. 23. Respondents base this answer upon the following points and authorities, together with all other pleadings, documents, and exhibits on file herein.

### MEMORANDUM OF POINTS AND AUTHORITIES

### BACKGROUND FACTS AND PROCEDURE

**I.    FACTUAL HISTORY.**

Around mid-December 2015, Miranda Sutton ("Sutton"), her husband, Patrick Fleming ("Fleming"), their twin twelve-year-olds, and her 21-year-old daughter, Akira Veasley ("Veasley"), moved in with Sutton's goddaughter, Angela, and her three children. ECF No. 25-45 at 65, 99-100. Angela lived in a two-story two-bedroom townhouse, with a garage and a landing with two entry doors on the first floor and a flight of stairs going up to the dining room, kitchen, and bedrooms. *Id.* at 44-45, 100.

Glover, who has a child in common with Angela, moved into the townhouse on or about Christmas Eve. ECF No. 25-45 at 47, 66, 99. Veasley used Fleming's vehicle to go out on New Year's Eve, and she was not supposed to have her boyfriend in the car. *Id*. at 93.

On New Year's Day, Fleming took Angela to work around 10:00 a.m., stopped to get his paycheck, then returned to the townhouse. ECF No. 25-45 at 47-48. Fleming and Veasley began a heated argument in the garage after he discovered Veasley's boyfriend was in Fleming's car the night before. *Id*. at 48-49, 93, 101-102. Sutton joined the argument in the garage defending her daughter. *Id*. at 49, 75-76, 94, 102.

During the argument, Glover delivered the house phone to Sutton in the garage, stating that Angela was on the phone, and returned upstairs. ECF No. 25-45 at 50, 80, 94. Sutton told Angela everything was fine. *Id*. at 50.

Still in the garage, Fleming, Veasley, and Sutton were still discussing the previous night's events and calming down. ECF No. 25-45 at 50. Glover came into the garage and asked to speak to Sutton upstairs. *Id*. at 51, 94. Sutton and Glover went to Angela's bedroom. *Id*. at 51. Glover asked Sutton, "do you want me to handle this, do you want me to take care of it?" *Id*. Sutton replied, "everything is okay. Trust me, I got this, there's no problem." *Id*.

By then, Fleming and Veasley were coming back up the stairs from the garage. ECF No. 25-45 at 51, 94, 103. Fleming had apologized to Veasley and everything was calm between them. *Id*. at 52-53, 95.

Fleming then asked Glover why he was talking to his wife, Sutton. ECF No. 25-45 at 53. Glover stated that it was his house, and that Fleming was fighting and possibly beating Sutton and Veasley who were crying. *Id*. at 53, 95. Fleming denied beating Sutton and Veasley and said they were just having a normal family argument. *Id*.

Fleming attempted to touch Glover to reassure him. ECF No. 25-45 at 53, 96. Glover got mad and moved away, implying get off me. *Id*. at 53, 95-96. Fleming asked Glover, "Do we have a problem?" *Id*. at 53, 96. Fleming then invited Glover to the garage to discuss the issue. *Id*.

Sutton and Veasley watched Fleming start walking down the stairs towards the garage with Glover behind him on the stairs. ECF No. 25-45 at 53-54, 96. Once Fleming and Glover were on the

stairs, Sutton turned towards Angela's bedroom and Veasley could no longer see the two men. *Id*. at 54, 63, 96.

Within seconds, Sutton and Veasley heard three loud gunshots. ECF No. 25-45 at 54, 97. They ran and looked down the stairs. *Id*. at 54-55, 97. Sutton and Veasley saw Fleming lying on the floor on his side with Glover standing over Fleming's body. *Id*. at 55, 97. Glover looked up at Sutton with the gun in his hand. *Id*. at 55. Glover then pointed the gun at her and threatened Sutton and her children if she told anyone. *Id*. at 55, 64-65.

Veasley was behind her mother and heard Glover yelling threats, and then saw Glover leave the townhouse through the door leading to the garage. ECF No. 25-45 at 97-98. Veasley thought Fleming was already dead because he was not moving. *Id*. at 98. She called 911 then handed the phone to Sutton. *Id*. at 103. Sutton was performing CPR on Fleming but stopped once police officers arrived. *Id*. at 56-57. Sutton then went back upstairs to where the minor children were. *Id*. at 58.

Sutton and Veasley did not tell the police who shot Fleming during their interview. ECF No. 25-45 at 68-74, 104-110. Veasley told police that it was Fleming's drug customer, Hatch, that shot him, and that she did not know Hatch. *Id*. at 104-06. Veasley admitted that she told the police the next day a different story. *Id*. at 107-10. During that second interview, Veasley again told the police that the shooter was Hatch but explained that Glover was known as Hatch and that she lied when she said she did not know Hatch. *Id*. at 107-08. Veasley testified that she did not tell the police about Glover the first day because she was scared and believed that Glover had been violent toward other people in the past. *Id*. at 107, 110.

Sutton admitted that, on the day of the murder, she told the police that she did not know who shot her husband after the police told her that no officer could stay and protect her and her children. ECF No. 25-45 at 69, 77-80. She was scared, and her dead husband was still lying on the floor. *Id* at 79. Sutton testified that she was unsure of the exact story she told the police that first day, but she "went to the police station the next morning to tell them exactly who it was, what had happened, everything" once she felt she was out of danger. *Id*.

The forensic pathologist testified that Fleming died as a result of a gunshot wound to the head. ECF No. 25-45 at 132. The bullet entered the back of the head on the left side at a downward trajectory,

travelled through the brain, and came to rest in the oral cavity fracturing the jaw. *Id*. at 124, 127. The wound was instantly fatal. *Id*. at 128. A second, non-fatal gunshot wound entered Fleming's inner right upper arm and exited the outer right upper arm. *Id*. at 130-131. A third shot that was not fatal was to the right groin area. *Id*. at 131.

## II.    TRIAL AND APPELLATE COURTS.

### A.    A Clark County Jury Convicted Glover.

In February 2016, the Clark County District Attorney filed an indictment charging Glover with Count 1 - Murder with Use of a Deadly Weapon; Count 2 - Assault with a Deadly Weapon; Count 3 - Ownership or Possession of a Firearm by Prohibited Person; and Count 4 - Discharge of a Firearm From or Within a Structure or Vehicle. ECF No. 25-7. In May 2018, Glover filed a motion to bifurcate Count 3 from the remaining counts, and another motion to strike an expert witness. ECF Nos. 25-32, 25-33. The district court granted the motion to bifurcate and reserved ruling on the motion to strike until the witness testified. ECF No. 25-35 at 6-7. In an amended indictment, the prosecution flipped the last two charges so that the discharge charge became Count 3 and the ownership charge became Count 4. ECF No. 25-42.

Glover's jury trial began on July 30, 2018. ECF No. 25-41. After a total of five days of trial and deliberations, the jury found Glover guilty of Counts 2 and 3, and of First-Degree Murder with Use of a Deadly Weapon in Count 1. ECF No. 25-50 at 49-51. The court sentenced Glover on Count 1 to life without the possibility of parole, plus a consecutive term of 48-180 months for the weapon enhancement; on Count 2 to 28-72 months concurrent with Count 1; and on Count 3 to 60-180 months concurrent with Counts 1 and 2. ECF Nos. 25-41 to 25-46, 25-50, 25-55. The court dismissed Count 4. ECF No. 25-55.

### B.    The Nevada Supreme Court Affirmed Glover's Convictions.

Glover appealed. ECF Nos. 26-2, 26-13. Glover asserted the following claims in his opening brief:

1.    There was insufficient evidence presented at trial to overcome the presumption of innocence and thereby sustain the convictions against Shawn Glover.

2.    Mr. Glover was denied his constitutionally guaranteed right to a fair trial when the state attempted to shift the burden of proof to him.

-4-

1

2

      3.     Mr. Glover was denied his constitutionally guaranteed right to a fair trial when the Court allowed the state to solicit from M. Sutton and A. Veasley improper character evidence.

3 ECF No. 26-18 at 14-21. The Nevada Supreme Court affirmed on October 24, 2019. ECF No. 26-21.

4 The Court found that the district court did not abuse its discretion in admitting testimony of Sutton and

5 Veasley that Glover had a history of violence; the evidence was sufficient to support the three

6 convictions; and while the prosecutor improperly shifted the burden of proof during closing argument

7 by stating that the defense had to prove Glover was not at the residence, any error was harmless due to

8 the overwhelming evidence that Glover was at the scene and committed the crimes. *Id.* at 2-6.

9 Remittitur issued on November 18, 2019. ECF No. 26-22.

10       **C.**     **Glover Unsuccessfully Challenged His Convictions During Post-Conviction Proceedings.**

11

12      Glover then filed a state habeas petition. ECF No. 26-28. The trial court denied the petition on

13 the merits. ECF No. 26-35.

14      On appeal, the Nevada Court of Appeals affirmed. ECF No. 26-54. The court rejected Glover's

15 claims that trial counsel was ineffective for failing to object to hearsay from by forensic pathologist and

16 a conflict of interest. Remittitur issued on February 28, 2022. ECF No. 26-55.

17 **III.   FEDERAL HABEAS CORPUS PROCEEDINGS.**

18      Glover initiated his federal habeas proceeding on May 6, 2022. ECF No. 1-1. He filed his

19 counseled first amended petition on August 3, 2023. ECF No. 23. Glover now asserts the following

20 grounds for relief:

21       Ground One:  Glover's Right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution Was Violated Because the Evidence was Legally Insufficient to Support the Convictions.

22

23

24       Ground Two:  Glover's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution was violated based upon prosecutorial misconduct when the prosecutor attempted to shift the burden of proof unto Glover.

25

26       Ground Three:Glover was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution when trial counsel failed to object to testimonial hearsay.

27

28

1

2

3

Ground Four:   Glover was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution because the public defender's office possessed a conflict of interest due to its prior representation of the victim in a criminal case.

4

5

6

7

Ground Five:   Glover was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution when his attorney failed to impeach a critical witness with her inconsistent prior statement in which she told detectives a different story about the shooting than the one she gave in her trial testimony.

8   ECF No. 23 at 5-22.

9   Respondents moved to dismiss the first amended petition, arguing Ground Five was

10   unexhausted. ECF No. 29. This Court found Ground Five technically exhausted but procedurally barred,

11   and deferred ruling on whether Glover could demonstrate cause and prejudice under *Martinez v. Ryan*,

12   566 U.S. 1 (2012), to overcome the procedural default. ECF No. 36 at 4-5.

13   Respondents now submit their answer to the claims in Glover's petition.

14   **ARGUMENT**

15   **I.   APPLICABLE LAW.**

16   Respondents deny every factual allegation in Glover's first amended federal petition, except for

17   those facts expressly found to exist by a Nevada court of competent jurisdiction. Respondents assert all

18   relevant defenses including defenses this Court can raise *sua sponte*. Respondents do not waive

19   exhaustion.

20   **A.   AEDPA Standard of Review.**

21   This action is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996

22   (AEDPA), 28 U.S.C. § 2254. Pursuant to AEDPA:

23

24

25

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings, unless the adjudication of the claim—

26

27

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or,

28

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). AEDPA imposes a "highly deferential standard" for evaluating claims adjudicated on the merits in state court. *See id.*; *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Early v. Packer*, 537 U.S. 3, 7-8 (2000); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

The clearly established Supreme Court precedent must offer a holding, not merely dictum, that "squarely addresses" the issue raised by the petitioner in his federal habeas action and provides a "clear answer to the question presented." *Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (*per curiam*). If no Supreme Court case squarely addressed, and provided a clear answer to, the petitioner's claim when the state court adjudicated the claim, then the state court's decision cannot contradict or unreasonably apply "clearly established federal law." *Id.* at 126. In such cases, § 2254(d)(1) bars habeas corpus relief on the petitioner's claim.

Under the "unreasonable application" clause, a federal court may grant a writ "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 365 (2000). The state court's "unreasonable application" of Supreme Court precedent must be more than merely incorrect or erroneous. *Id.* at 410. Rather, it must be so unreasonable no fair-minded jurist would agree with it. *Harrington v. Richter*, 562 U.S. 86 at 101-102 (2011). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

The Supreme Court has cautioned lower courts against "framing our precedents at such a high level of generality" regarding clearly established Supreme Court precedent. *Nevada* v. *Jackson*, 569 U.S. 505, 512 (2013). A circuit court may not consult its own precedents, rather than those of the Supreme Court, in assessing a habeas claim brought pursuant to 28 U.S.C. § 2254. *White v. Woodall*, 572 U.S. 415, 420 n.2 (2014). If there are any other reasonable inferences that can be drawn from the relevant precedent, the principle is not clearly established under 28 U.S.C. § 2254(d). *See id*. at 1702–05.

The state trial and appellate courts' factual findings are presumed to be correct unless rebutted by the petitioner by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007). "[R]eview under § 2254(d)(1) is limited to the record that was before the state

court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). In *Pinholster*, the Court reasoned that the "backward-looking language" present in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made," and, therefore, the record under review must be "limited to the record in existence at that same time, *i.e.*, the record before the state court." *Id.* at 182.

State courts are presumed to know and follow the law. *Visciotti*, 537 U.S. at 24. The "highly deferential standard for evaluating state-court rulings" adopted by § 2254(d) demands state court decisions "be given the benefit of the doubt." *Id.* (internal citation omitted). A state court need not cite Supreme Court cases nor even be aware of Supreme Court cases. *Early*, 537 U.S. at 8. Accordingly, a state court's decision will stand "so long as neither the reasoning nor the result of the state-court decision contradicts" clearly established Supreme Court precedent. *Id.*

General standards, such as *Strickland*, prosecutorial misconduct, or sufficiency of the evidence, give state courts more leeway in applying United States Supreme Court precedents in a manner that is not objectively unreasonable. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Appellant courts cannot apply circuit law to "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that (the United States Supreme Court) has not announced." *Lopez v. Smith*, 135 S. Ct. at 4, citing *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam).

**B.      Ineffective Assistance of Counsel Standard of Review.**

To prevail on an ineffective assistance of counsel claim, a petitioner must establish both that counsel's performance was deficient and that he was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The test for deficiency is "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. "Because of all the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks and citation omitted).

Review of an attorney's performance must adopt counsel's perspective at the time of the challenged conduct to avoid the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689. The

1  reviewing court is required to "reconstruct the circumstances of counsel's challenged conduct" and to

2  "evaluate the conduct from counsel's perspective at the time." *Id*. Surmounting *Strickland's* high bar is

3  never an easy task. *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

4        The petitioner bears the burden of demonstrating there is no reasonable argument he received

5  effective assistance of counsel under *Strickland's* deferential standard. *Richter*, 562 U.S. at 105. There

6  are countless ways to provide effective assistance in any given case. "Even the best criminal defense

7  attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. As a result,

8  "[t]he question is whether an attorney's representation amounted to incompetence under prevailing

9  professional norms, not whether it deviated from best practices or most common custom." *Richter*, 562

10  U.S. at 105 (internal quotations and citation omitted). "Just as there is no expectation that competent

11  counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable

12  miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."

13  *Richter*, 562 U.S. at 110.

14        When addressing prejudice or reviewing application of the prejudice prong, the question is not

15  whether the Court believes the petitioner suffered prejudice and the Nevada appellate courts were

16  incorrect in finding none; rather, the Court must ask whether the Nevada appellate courts'

17  determinations of no prejudice were unreasonable, which is a substantially higher threshold. *Avena v.*

18  *Chappell*, 932 F.3d 1237, 1250-51 (9th Cir. 2019) (citations and internal quotation marks omitted).

19        The existence of "overwhelming" evidence is an appropriate basis to conclude no prejudice

20  exists under *Strickland* because it supports the conclusion that there would be no "reasonable

21  probability" of a different result absent counsel's error. *See Strickland*, 466 U.S. at 700 ("Given the

22  overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would

23  have changed the conclusion . . ."); *see also id*. at 696 ("[A] verdict or conclusion only weakly

24  supported by the record is more likely to have been affected by errors than one with overwhelming

25  record support."). Under AEDPA, the petitioner must show that the state court "applied *Strickland* to

26  the facts of his case in an objectively reasonable manner." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).

27  / / /

28  / / /

Furthermore, when a state court adjudicated a claim of ineffective assistance under *Strickland*, it will be especially difficult for a defendant to demonstrate that the decision was unreasonable under AEDPA. In fact, the Supreme Court described this burden as "doubly" difficult to overcome:

> The standards created by *Strickland* and § 2254(d) are both highly deferential…and when the two apply in tandem, review is "doubly" so…The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105 (internal citations omitted).

## II.    GROUND ONE: Glover Fails to Demonstrate That the Nevada Supreme Court's Holding that Sufficient Evidence Supported the First-Degree Murder Conviction was Contrary to or Involved an Unreasonable Application of Clearly Established Federal Law or an Unreasonable Determination of the Facts.

Glover is not entitled to relief on this claim as he fails to show that the Nevada Supreme Court's rejection of sufficiency of the evidence claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Richter*, 562 U.S. at 103. Glover argues that "his murder conviction was based on legally insufficient evidence. The State presented no physical evidence tying Glover to the crime. There was no fingerprint evidence that linked Glover to the crime. There was no DNA evidence collected from inside the townhouse or from any of the ballistics evidence . . ." ECF No. 29 at 7.

### A.    Legal Standard.

In addressing the sufficiency of the evidence, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming the standard).

The first step of the inquiry is to consider the evidence presented at trial in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 319. When "faced with a record of historical facts that supports conflicting inferences," a reviewing court "must presume—even if it does not

affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326; *see also Brown*, 558 U.S. at 132 (explaining that "a reviewing court must consider all the evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously") (internal quotation marks omitted). Because the government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence, or "rule out every hypothesis except that of guilt beyond a reasonable doubt" in the first step of *Jackson*, "a reviewing court may not ask whether a finder of fact could have construed the evidence produced at trial to support acquittal." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010).

At this second step, a reviewing court may not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt," only whether "*any*" rational trier of fact could have made that finding. *Jackson*, 443 U.S. at 318-19 (emphasis in original) (internal quotation omitted).

The trier of fact is responsible for resolving "conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. States are free to define the elements of a crime and determine the penalty for an offense. *Id*. at 324 n.16.

 "When we assess a sufficiency of evidence challenge in the case of a state prisoner seeking federal habeas corpus relief subject to the strictures of AEDPA, there is a double dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011).

**B.    The Nevada Supreme Court Reasonably Denied Relief and Glover Fails to Meet His Burden Under AEDPA.**

Glover only challenges the sufficiency of the evidence supporting his first-degree murder conviction. ECF No. 23 at 7. The Nevada Supreme Court, as detailed below, correctly determined that sufficient evidence supported the conviction.

A court applies the *Jackson* standards to the substantive elements of the criminal offenses under state law. *Jackson*, 443 U.S. at 324. Under Nevada law, "[m]urder is the unlawful killing of a human being . . . [w]ith malice aforethought, whether express or implied." Nev. Rev. Stat. 200.010(1); ECF No. 25-48 at 6 (Jury Instruction 4). "The unlawful killing may be effected by any of the various means by which death may be occasioned." *Collman v. State*, 7 P.3d 426, 442 (Nev. 2000); ECF No. 25-48 at 6.

"Murder of the first degree is murder which is . . . [p]erpetrated by means of . . . willful, deliberate and premeditated killing." Nev. Rev. Stat. 200.030(1)(1); ECF No. 25-48 at 9 (Jury Instruction 7). Murder is a specific-intent crime. *Mitchell v. State*, 149 P.3d 333, 36-37 (Nev. 2006); ECF No. 25-48 at 7 (Jury Instruction 5). The intent to kill may be inferred from the circumstances characterizing the act, including "the manner of the defendant's use of a deadly weapon." *Valdez v. State*, 196 P.3d 465, 481 (Nev. 2008); *see Washington v. State*, 376 P.3d 802, 808 (Nev. 2016) (determining that the intent to kill can be inferred from the defendant firing multiple shots in a residential building during the afternoon in a populated area of town).

For the deadly weapon enhancement, the prosecution is not required to produce the actual weapon at trial to prove a deadly weapon enhancement. *Harrison v. State*, 608 P.2d 1107, 1109-1110 (Nev. 1980); ECF No. 25-48 at 24 (Jury Instruction 22).

"The prosecution is not required to present direct evidence of a defendant's state of mind as it existed during the commission of a crime." *Miranda v. State*, 707 P.2d 1121, 1125 (Nev. 1985), *overruled on other grounds by Bejarano v. State*, 146 P.3d 265 (Nev. 2006); ECF No. 25-48 at 21 (Jury Instruction 19). Rather, "the jury may infer the existence of a particular state of mind from the circumstance disclosed by the evidence." *Miranda*, 707 P.2d at 1125; ECF No. 25-48 at 21; *see also* ECF No. 25-48 at 27 (Jury Instruction 25) ("The intent with which an act is done is shown by the facts and circumstances surrounding the case."). Intent may be proven by direct or circumstantial evidence. *Grant v. State*, 24 P.3d 761, 766 (Nev. 2001); ECF No. 25-48 at 29 (Jury Instruction 27).

The credibility of the witnesses is a question for the jury to determine. *See United States v. Bailey*, 444 U.S. 394, 414 (1980); *Washington v. Texas*, 388 U.S. 14, 19 (1967). *See* ECF No. 25-48 at 31 (Jury Instruction 29) ("The credibility or believability of a witness should be determined by his manner upon the stand, his relationship to the parties, his fears, motives, interests or feelings, his opportunity to have observed the matter to which he testified, the reasonableness of his statements and the strength or weakness of his recollections.").

Here, the victim, Fleming, his wife Sutton and her daughter Veasley were in a verbal argument in the garage of the townhouse they shared with Glover. ECF No. 25-45 at 11, 50. During the argument, Glover briefly entered the garage to hand the house phone to Sutton as she had a call then left. *Id*. at 50,

80, 94. As the three continued to discuss the issue but had started to calm down, Glover again entered the garage and asked to speak to Sutton upstairs. *Id*. at 50-51, 94.

In an upstairs bedroom, Glover offered to "handle this" and "to take care of it." ECF No. 24-45 at 51. Sutton replied that everything was okay and there was no problem. *Id*. Fleming and Veasley then joined them, noting Fleming apologized to Veasley for starting the argument and that everything was okay between them. *Id*. at 51-53, 94-95, 103.

In the bedroom, Fleming asked why Glover was speaking to Sutton. ECF No. 25-45 at 53. Glover accused Fleming of fighting and beating on Sutton and Veasley, which Fleming denied; Fleming explained it was just a normal family argument. *Id*.

Fleming attempted to touch Glover to reassure him but Glover got mad and moved away. ECF No. 25-45 at 53, 95-96. Fleming asked Glover if they had a problem and invited Glover to discuss the issue in the garage. *Id*. at 53, 96. Sutton and Veasley watched Glover follow Fleming down the stairs then turned away. *Id*. at 53-54, 63, 96.

However, Sutton and Veasley heard three loud gunshots within seconds of turning away. ECF No. 25-45 at 54, 97. When they looked down the stairs, they saw Fleming lying on the ground and Glover standing over him holding a gun.  *Id*. at 54-55, 97. Glover pointed the gun at Sutton and threatened her and her children if she told anyone what happened. *Id*. at 55, 64-65. Veasley heard Glover's verbal threats to her mother. *Id*. at 97-98.

Both women admitted they did not tell the police the full truth, and did not identify Glover as the shooter, during their initial interviews with the policy the day of the murder. ECF No. 25-45 at 68-74, 104-110. However, both identified Glover during their second interviews with police the following day. *Id*. at 107-08, 79. Veasley testified that she did not tell the police about Glover the first time because she was scared of Glover and believed he had a violent history. *Id*. at 107-110. Sutton testified that she was scared as her husband was just killed and the police told her no officers could stay and protect her and her children. *Id*. at 69, 77-80. Once she was sure they were out of danger, she went with Veasley to the station to tell them the full truth. *Id*. at 79.

/ / /

/ / /

1        Glover does not cite any Supreme Court authority that requires the prosecution to prove a

2  murder with only physical evidence, fingerprints, DNA or ballistics evidence. Rather, as noted in the

3  jury instructions and under Nevada law, a jury may rely upon both direct and circumstantial evidence.

4        Here, both eyewitnesses testified to the events leading to and immediately after the murder,

5  admitted they lied to police because they were terrified, and immediately told the police the full truth

6  once they were out of danger. Their testimony was also corroborated by the findings of the forensic

7  pathologist, who testified that the trajectory of the bullet into the back of Fleming's head was at a

8  downward angle, consistent with Glover walking down the steps behind Fleming as described by the

9  two women. ECF No. 25-45 at 124, 127.

10        It was for the jury to evaluate the credibility of the two women following their admissions. The

11  jury clearly believed the two women as demonstrated by the verdict of guilt to first-degree murder.

12        Sufficient evidence existed to support Glover's conviction for willful, deliberate and

13  premediated killing of Fleming.

14        The evidence also supports the Nevada Supreme Court determination:

15              The record shows that after asking Sutton if she wanted him to "handle"
        the victim (Patrick Fleming), Glover followed Fleming downstairs to talk.
16       Within seconds, Veasley and Sutton heard three gunshots, and Sutton
        observed Glover standing over Fleming's body holding a gun. Glover
17       pointed the gun at Sutton and threatened her not to report what she saw.
        The medical examiner testified that the bullets entered Fleming at a
18       downward trajectory. Testimony also established that Glover fled the scene
        after the shooting. Viewing this evidence in the light most favorable to the
19       State, a rational trier of fact could conclude beyond a reasonable doubt that
        Glover committed the charged crimes. *See Walker v. State,* 91 Nev. 724,
20       726, 542 P.2d 438, 438-39 (1975) (recognizing that "it is the function of
        the jury, not the appellate court, to weigh the evidence and pass upon the
21       credibility of the witness"); *see also* 193.165 (deadly weapon
        enhancement); NRS 200.010 (defining murder); NRS 200.030 (delineating
22       the differing degrees of murder); NRS 200.471 (defining assault); NRS
        202.287 (defining discharging a firearm within a structure). That the State
23       did not present physical evidence connecting Glover to the shooting does
        not change this conclusion. *See Hernandez v. State,* 118 Nev. 513, 531, 50
24       P.3d 1100, 1112 (2002) (concluding that circumstantial evidence alone
        may support a criminal conviction).

25

26  ECF No. 26-21 at 4-5.

27        Applying the deferential standard of AEDPA, the Nevada Supreme Court's adjudication of

28  Glover's claim did not result in a decision that was contrary to, or involved an unreasonable application

-14-

of, clearly established federal law, as determined by the United States Supreme Court, or result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The prosecution presented sufficient evidence for "*any* rational trier of fact" to find the essential elements of Glover's crimes beyond a reasonable doubt. *Jackson*, 443 U.S. at 319 (emphasis in original). Therefore, this Court should deny Ground One.

**III.    GROUND TWO: Glover Fails to Demonstrate That the Nevada Supreme Court's Holding that the Prosecutor Did Not Commit Misconduct In the Closing Argument was Contrary to or Involved an Unreasonable Application of Clearly Established Federal Law or Unreasonable Determination of the Facts.**

Since the Nevada Supreme Court adjudicated this claim of alleged burden shifting on the merits, 28 U.S.C. § 2254(d) forecloses relief as the court's adjudication was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

**A.    Legal Standard.**

On federal habeas review, the appropriate standard of review for prosecutorial misconduct is whether the alleged misconduct violated due process, not whether there was misconduct under the court's "broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal citations omitted). It is not enough for prosecutorial remarks to be improper, undesirable, or even universally condemned. *Id.* Rather, "a prosecutor's improper comments will be held to violate the Constitution only if they so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (internal quotation marks omitted)). The Supreme Court measures the fairness of a petitioner's trial by considering (1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused. *Darden*, 477 U.S. at 181-82. The Court must distinguish ordinary trial error of a prosecutor from that sort of egregious misconduct which amounts to a constitutional denial of due process. *Smith v. Phillips*, 455 U.S. 209, 221 (1982).

/ / /

1

**B.    The State Court's Rejection of Ground Two was Not Objectively Unreasonable, and Glover Fails to Meet His AEDPA Burden as Any Misconduct Was Harmless.**

2

3    The Nevada Supreme Court rejected this claim, stating:

4           Glover contends that the State committed prosecutorial misconduct by
             improperly shifting the burden of proof during closing argument. "When
5           considering claims of prosecutorial misconduct, this court engages in a
             two-step analysis. First, we must determine whether the prosecutor's
6           conduct was improper. Second, if the conduct was improper, we must
             determine whether the improper conduct warrants reversal." *Valdez v.*
7           *State,* 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008).

8           Glover's closing argument attacked the State's lack of physical evidence
             and proffered that the State had not even proven that Glover was at the
9           crime scene at the time of the shooting. In rebuttal, the prosecutor argued
             the evidence in support of the State's case and then said, "And I'm waiting
10          for [defense counsel] to answer the question, well, where was his client."
             Glover objected and the court sustained the objection, but allowed the
11          prosecutor to rephrase. The prosecutor then pointed out again that Glover
             had not provided evidence that he was not present at time of the shooting.
12          We agree with Glover that the prosecutor's argument improperly shifted
             the burden of proof to the defense. *Whitney v. State,* 112 Nev. 499, 502,
13          915 P.2d 881, 883 (1996) (reiterating that comments on a defendant's
             failure to produce evidence or call witnesses impermissibly shifts the
14          burden of proof to the defense). Nevertheless, we conclude that this
             prosecutorial misconduct was harmless given the overwhelming evidence
15          both that Glover was at the scene and committed the crimes. *See King v.*
             *State,* 116 Nev. 349, 356, 998 P.2d 1172, 1176 (2000) (concluding that
16          even aggravated prosecutorial misconduct may constitute harmless error
             where there is overwhelming evidence of guilt).

17

18    ECF No. 26-21 at 5-6.

19           Moreover, the prosecution presented overwhelming evidence of Glover's guilt at trial. *See*

20    Section II, *supra*. The Nevada Supreme Court likewise found the evidence overwhelming. ECF No. 26-

21    21 at 6. Thus, to the extent the prosecution crossed the line, any error would undoubtedly be harmless as

22    the error had no "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson,*

23    507 U.S. 619, 623 (1993).

24           Further, jury instructions cured any potential misconduct that occurred. Arguments of counsel

25    carry less weight than instructions from the court. *Boyde v. California*, 494 U.S. 370, 384 (1990)

26    (finding that arguments are the work of advocates, while the court's instructions are "definitive and

27    binding statements of the law"). The jury instructions also specified that the prosecutor's "statements,

28    arguments, and opinions" were not evidence in the case and that "whatever counsel may say, you will

bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it." ECF No. 25-48 at 29, 40.

Further, the jury instructions also explicitly delineated it was the prosecution, not Glover, that carried the burden of proof. ECF No. 25-48 at 28. The instructions further specified that Glover "is presumed innocent until the contrary is proven. This presumption places upon the [prosecution] the burden of proving beyond a reasonable doubt every element of the crime charged and that [Glover] is the person who committed the offense." *Id.* The trial judge also verbally reiterated the instructions to the jury. ECF No. 25-50 at 4-17. The jury is presumed to have followed their instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

The Nevada Supreme Court's factual findings are entitled to a presumption of correctness. 28 U.S.C. §2254(e)(1). The Nevada Supreme Court applied the correct federal constitutional standard and reasonably rejected Glover's prosecutorial misconduct claim. Glover may not obtain federal habeas relief as he fails to show the Nevada Supreme Court's rejection of his prosecutorial misconduct claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Richter*, 562 U.S. at 103. Applying the deferential standard of AEDPA, the Nevada Supreme Court's adjudication of Glover's claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Any error in the prosecutor's comments during closing argument was harmless given the overwhelming evidence against Glover. Therefore, this Court should deny Ground Two.

## IV.    GROUND THREE: Glover Fails to Demonstrate That the Nevada Court of Appeal's Holding that Trial Counsel Was Not Ineffective Regarding Testimonial Hearsay was Contrary to or Involved an Unreasonable Application of Clearly Established Federal Law or Unreasonable Determination of the Facts.

Glover argues that trial counsel failed to object to "testimonial hearsay" when the forensic pathologist, Dr. Corneal, testified about findings regarding Fleming's autopsy that were created by a different medical examiner who performed the autopsy, Dr. Dutra. ECF No. 23 at 10-13.

1    **A.    Legal Standards.**

2    Under clearly established federal law, the Confrontation Clause bars "admission of testimonial

3    statements of a witness who did not appear at trial unless he was unavailable to testify, and the

4    defendant . . . had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36,

5    53–54 (2004); *Davis v. Washington*, 547 U.S. 813, 821 (2006). The Confrontation Clause applies only

6    to "'witnesses against the accused, i.e., those who 'bear testimony.'" *Crawford*, 541 U.S. at 51 (citation

7    omitted); *Davis*, 547 U.S. at 823–24. Thus, nontestimonial statements do not implicate the

8    Confrontation Clause.

9    The determination that a statement is testimonial turns on whether the declarant "made [the

10    statement] under circumstances which would lead an objective witness reasonably to believe that the

11    statement would be available for use at a later trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305,

12    310 (2009). The United States Supreme Court has never found an autopsy report to be "testimonial"

13    within the confines of the Confrontation Clause. *See, e.g.*, *id.* at 335 (Kennedy, J., dissenting); *Williams*

14    *v. Illinois*, 567 U.S. 50, 98 (2012) (Breyer, J., concurring).

15    **B.    Trial Counsel was Not Ineffective for Failing to Object to Alleged Testimonial**
16        **Hearsay.**

17    Glover fails to establish how counsel's failure to object to the testimony of a medical doctor

18    employed by the Clark County Office of the Coroner Medical Examiner affected the outcome of his

19    jury trial. ECF No. 23 at 10.

20    Here, Dr. Corneal testified that she reviewed the autopsy report prepared by Dr. Dutra, the

21    pathologist who performed the autopsy. ECF No. 25-45 at 122. The report included photographs of

22    Fleming's injuries. *Id*. at 123-24. In reviewing the report and the photographs, Dr. Corneal testified

23    regarding her expert opinion about the path or trajectory of a bullet inside of a body. She denoted her

24    extensive training in conducting autopsies involving gunshot wounds and determining the manner of

25    death. *Id*. at 119-21. Dr. Corneal further testified that in her opinion, based on her training, extensive

26    autopsy experience, and review of the autopsy report, that Fleming was shot in the back of the head, and

27    it was that shot that caused his death. *Id*. at 132.

28    / / /

-18-

Dr. Corneal's testimony demonstrated that she conducted her own thorough analysis of the autopsy report and associated evidence obtained during the autopsy, including the photographs, to form her own independent opinion. That included her own opinion as to the cause of death and trajectory of the bullets. Glover's counsel had ample opportunity to cross-examine Dr. Corneal regarding her analysis and opinion. ECF No. 25-45 at 132-34. This eviscerated any potential issue under the Confrontation Clause.

Dr. Corneal's testimony was simply her assessment of the autopsy report. Neither *Crawford* nor its progeny hold that autopsy reports are "testimonial" in nature; therefore, the Supreme Court's caselaw does not require a forensic pathologist who testifies at trial to have first-hand knowledge. Rather, the *Crawford* Court stated, "[w]e leave for another day any effort to spell out a comprehensive definition of 'testimonial.'" 541 U.S. at 68.

Indeed, as denoted above, the Supreme Court still has not explicitly ruled as to whether autopsy reports are testimonial statements. In *Williams*, the Supreme Court's most recent Confrontation Clause case, a four-Justice plurality opinion agreed that the admission of expert testimony referring to an out-of-court DNA profile did not violate the Confrontation Clause, but no single majority commanded a majority of the Court. 567 U.S. at 65. Therefore, there exists substantial ambiguity as to whether admission of challenged evidence violates clearly established federal law. *See id*. at 65 (noting the lack of clarity regarding what hearsay violates the Confrontation Clause "has resulted in a steady stream of new cases" from the Supreme Court) (plurality opinion), *id*. at 58 (casting reasonable doubt on defendant's claim that noting out-of-state statements offered by an expert "solely for the purpose of explaining the assumptions on which that [expert's] opinion rests" "falls outside the scope of the Confrontation Clause"), *id*. at 84 (casting reasonable doubt on defendant's claim where Field Identification Cards at issue arguably were "not prepared for the primary purpose of accusing" defendant of wrongdoing); *see also id*. at 141 ("What comes out [of *Williams*] . . . is—to be frank—who knows what.") (Kagan, J., dissenting).

Importantly, the plurality also noted that while the Court previously held that certain forensic reports fell under the category of testimonial statements, it did not hold that ***all*** forensic reports fell into that same category. *Williams*, 567 U.S. at 84 (emphasis added). It concluded that the reports in those

cases violated the Confrontation Clause because "they were equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial." *Id.*

The plurality's opinion demonstrates that the Supreme Court has not clearly established a rule on this issue. It explicitly stated that the Court had not made a determination on all forensic reports, only particular types of reports. Therefore, there is still no clearly established Supreme Court rule on whether an autopsy report admitted into evidence by a doctor who did not prepare the report runs afoul of the Confrontation Clause. Given the fractured decision in *Williams* and the lack of clarity in the Supreme Court's Confrontation Clause jurisprudence, this Court cannot conclude that the Nevada Supreme Court's conclusion was contrary to or an unreasonable application of clearly established Supreme Court authority.

Finally, Glover fails to demonstrate prejudice. Glover fails to demonstrate that had he objected during trial, the court would not have continued the trial to allow the original pathologist to testify in Dr. Corneal's place. Further, as demonstrated in section II, *supra*, even if the court struck the testimony of Dr. Corneal, more than sufficient evidence adduced at trial proved Glover's culpability. ECF No 25-45, 25-46, 25-50.

## C.     The Nevada Court of Appeals' Rejected Glover's Claim.

In addressing this issue, the Nevada Court of Appeals held:

> The Nevada Supreme Court has previously held that expert testimony regarding the content of a testimonial statement in a written report may function as the equivalent of a testimonial statement, *see Vega v. State,* 126 Nev. 332, 340, 236 P.3d 632, 638 (2010), and that another analyst's testimony as to the testimonial statements of a nontestifying analyst violates the Confrontation Clause, *see Polk v. State,* 126 Nev. 180, 183-84, 233 P.3d 357, 359 (2010). However, an expert witness may testify concerning an independent opinion reached as a result of reliance upon reports generated by others without violating the Confrontation Clause. *Vega,* 126 Nev. at 340, 236 P.3d at 638; *see also Flowers v. State,* 136 Nev. 1, 9, 456 P.3d 1037, 1046 (2020) ("To the extent [the expert witness] offered his independent opinions and only conveyed to the jury that he generally relied on the autopsy photographs and reports in reaching his opinions, he did not communicate hearsay to the jury.).

> The medical examiner that conducted the autopsy of the victim was not available to testify at trial. However, a second medical examiner testified that she reviewed the autopsy reports and photographs that were created by the first examiner. The second medical examiner testified that she utilized the reports and photographs to reach her own independent conclusions as to the cause of the victim's death. The second medical examiner ultimately

testified that she concluded that the victim died due to a gunshot wound to the head and the manner of death was homicide. The second medical examiner did not testify as to the conclusions reached by the first medical examiner.

Because the second medical examiner testified that she reached her own independent conclusions, her testimony did not violate Glover's right to confrontation. Accordingly, Glover did not demonstrate his Counsel's performance fell below an objective standard of reasonableness by failing to object to the second medical examiner's testimony. Glover also did not demonstrate a reasonable probability of a different outcome at trial had counsel done so. Therefore, we conclude the district court did not err by denying this claim without conducting an evidentiary hearing.

ECF No. 26-54 at 3-4.

The Nevada courts' factual findings are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). The state's highest court applied the correct federal constitutional standard. The state's highest court's adjudication did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

Hence, Glover fails to demonstrate the state's highest court's rejection of the petitioner's claim was lacking justification, and this Court should likewise reject Ground Three.

**V.    GROUND FOUR: Glover Fails to Demonstrate That the Nevada Court of Appeal's Holding that There Was No Conflict of Interest was Contrary to or Involved an Unreasonable Application of Clearly Established Federal Law or Unreasonable Determination of the Facts.**

Glover argues the trial counsel had a conflict of interest because the Clark County Public Defender's Office (PDO) previously represented the victim in a criminal case. ECF No. 23 at 13-14.

**A.    Legal Standard.**

The Sixth Amendment right to effective assistance of counsel includes the right to representation free from conflicts of interest. *Mickens v. Taylor,* 535 U.S. 162, 166 (2002); *Cuyler v. Sullivan,* 446 U.S. 335, 349-50 (1980). It is insufficient to show a mere "possibility of conflict." *Cuyler,* 446 U.S. at 351. Rather, to demonstrate a conflict of interest for Sixth Amendment purposes, a petitioner must show his counsel operated under an "actual conflict" that "adversely affect[ed]" counsel's performance." *Mickens,* 535 U.S. at 172. Potentially divided allegiances do not constitute

active representation of conflicting interests. *Paradis v. Arave,* 130 F.3d 385, 391 (9th Cir. 1997). Speculation will not substitute for evidence. *Morris v. California,* 966 F.2d 448, 456 (9th Cir. 1992).

When a potential conflict is brought to the attention of the trial court, the court must inquire about the potential conflict. *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978). The Sixth Amendment does not guarantee a petitioner a conflict-free relationship with his counsel, but it does protect him if the conflict between the petitioner and his attorney prevented effective assistance of counsel. *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983).

**B.     There Was No Conflict In The PDO's Representation.**

Glover alleges that the PDO could not adequately represent him in a self-defense strategy due to their knowledge of Fleming's alleged violent behavior arising from their prior representation of Fleming in a separate criminal case. ECF No. 23 at 14.

The PDO during closing argument argued that the testimony of the two witnesses—Sutton and Veasley—did not make sense. ECF No. 25-50 at 27-37. He argued that Fleming drove Glover to work the previous day and that the family argument did not involve Glover. *Id*. at 28, 36. Further, that Glover may or may not have been at the residence during the murder. *Id*. at 37.

Glover must present "an actual conflict of interest" existed, not the mere possibility of one. *Culver,* 446 at 349-50. Glover cites two former cases in which the PDO represented Fleming involving domestic violence and disorderly conduct. ECF No. 23 at 13-14. Glover further alleges that he was aware of the charges because of his connection to "Fleming's family through Angela." ECF No. 23 at 14. Again, Glover suggests that this may have changed the outcome of the trial. *Id*.

This claim is speculative and baseless. Glover's claim for relief is without any evidence to support it. He did not provide any evidence to support either an actual conflict or that Fleming disclosed any relevant information to the PDO that supported a conflict of interest. Glover does not assert that any actual conflict existed. Instead, he relies on a theoretical division of loyalties that the United States Supreme Court previously rejected in *Mickens*. 535 U.S. at 170-71.

Glover fails to explain what evidence regarding the victim's prior alleged violent criminal actions resulted in an actual conflict of interest. He presents no claim as to what questions counsel failed to ask as a result of the alleged conflict.

As to the allegation that counsel could not address a potential self-defense strategy, the defense strategy at trial undermines this argument. Glover's theory at trial was that he was not the shooter *or* that he was not even at the residence, not that he shot the victim in self-defense. ECF Nos. 26-50 at 27-37, 25-44 at 111. Had counsel attempted to argue a self-defense theory, it would have completely contradicted the theories counsel did rely upon at trial.

And the facts of the case did not support a theory of self-defense. First, the two witnesses watched Glover follow Fleming down the stairs and turned away for only few second before they heard the gunshots—three gunshots—in quick succession. And the forensic pathologist's testimony supported that testimony as Glover shot the victim in the back of the head at a downward angle.

Finally, to date the United States Supreme Court found an actual conflict for dual representations, where defense counsel actively represents co-defendants with potentially competing defenses. *Cuyler*, 446 U.S. at 348, 350. Glover does not claim any such conflict here.

Glover fails to show an actual conflict of interest. He never suggested counsel was deficient for failing to present a self-defense theory. Glover does not claim the defense theory presented at trial was deficient or prejudicial. Glover now, through the lens of hindsight, claims pursuing a different defense theory would have been beneficial. However, even if there was an actual conflict, the Nevada Court of Appeals still properly denied the claim.

## C.     The Nevada Court of Appeals Rejected Glover's Claim.

In addressing this alleged conflict of interest, the Nevada Court of Appeals held:

> "Conflict of interest and divided loyalty situations can take many forms, and whether an actual conflict exists must be evaluated on the specific facts of each case. In general, a conflict exists when an attorney is placed in a situation conducive to divided loyalties." *Clark v. State,* 108 Nev. 324, 326, 831 P.2d 1374, 1376 (1992) (quoting *Smith v. Lockhart,* 923 F.2d 1314, 1320 (8th Cir. 1991)). A conflict of interest exists if "counsel 'actively represented conflicting interests'" and the "conflict of interestadversely affected [the defendant's] lawyer's performance." *Strickland,* 466 U.S. at 692 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350, 348 (1980)).

> Glover did not allege that his trial counsel was placed in a situation that was conducive to divided loyalties. Glover also did not allege that his trial counsel actively represented conflicting interests or that counsel's performance was adversely affected by the public defender's office's previous representation of the deceased victim. Glover's allegations were thus insufficient *to* show that his counsel had an actual conflict of interest.

1

> Therefore, we conclude the district court did not err in denying this claim without conducting an evidentiary hearing.

2

ECF No. 26-54 at 4-5.

3

The Nevada courts' factual findings are entitled to a presumption of correctness. 28 U.S.C. §

4

2254(e)(1). The state's highest court applied the correct federal constitutional standard. The state's

5

highest court's adjudication did not result in a decision that was contrary to, or involved an

6

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

7

United States; or result in a decision that was based on an unreasonable determination of the facts in

8

light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). Glover is not entitled

9

to relief on Ground Four.

10

**VI.    GROUND FIVE: Glover Fails To Demonstrate That Trial Counsel Was Ineffective for Failing to Impeach a Witness As The Claim Is Procedural Defaulted, or in the Alternative, is Without Merit.**

11

12

In Ground Five, Glover alleges trial counsel was ineffective with regard to the impeachment of

13

Sutton with her prior inconsistent statements to the police. ECF No. 23 at 15-22. Glover alleges that

14

trial counsel should have sought to admit Sutton's inconsistent statement into evidence. *Id*. at 21. This

15

Court previously found Ground Five technically exhausted but procedurally barred, but deferred ruling

16

on whether Glover could rely upon *Martinez* to overcome the procedural bars. ECF No. 36 at 4.

17

**A.    Procedural Default and Review for Cause Under *Martinez*.**

18

The procedural default of a claim by the state courts will ordinarily bar federal review, absent a

19

showing of cause for the default and prejudice flowing therefrom. *Coleman v. Thompson*, 501 U.S. 722,

20

751 (1991). In *Martinez*, the Supreme Court created a narrow equitable remedy for petitioners that

21

procedurally default ineffective assistance of trial counsel claims in state court where (1) the ineffective

22

assistance of trial counsel claim is substantial; (2) the "cause" is no counsel or constitutionally

23

ineffective counsel during the state postconviction review; and (3) state law requires an ineffective

24

assistance claim be raised in the initial review collateral proceeding. 566 U.S. at 17. A substantial claim

25

is a claim that has some merit. Although the cause and prejudice requirements are distinct, "[t]here is

26

considerable overlap between these requirements, since each considers the strength and validity of the

27

underlying ineffective assistance claim." *Djerf v. Ryan*, 931 F.3d 870, 880 (9th Cir. 2019).

28

/ / /

-24-

A petitioner establishes deficient performance under *Strickland*, and therefore *Martinez*, not by simply alleging that post-conviction counsel failed to present what the petitioner believes to be a "substantial" claim of ineffective assistance of counsel. *Strickland* requires more; it requires this Court to presume that counsel exercised reasoned professional judgment in litigating petitioner's first state post-conviction petition. 466 U.S. at 687-91. It is petitioner's burden to overcome that presumption. *Id.*

Applying *Strickland*, to prove the first prong, a petitioner must show that post-conviction counsel's errors were so serious that he failed to function as the "counsel" guaranteed by the Sixth Amendment. *Id.* This Court must presume that post-conviction counsel exercised reasoned professional judgment in litigating the case "to maximize the likelihood of success" on post-conviction review. *Cf. Smith v. Robbins*, 528 U.S. 259, 288 (2000). ("In *Jones v. Barnes*, 463 U.S. 745 (1983), we held that appellate counsel who files a merits brief need not (*and should not*) raise every nonfrivolous claim, but rather may select from them in order to maximize the likelihood of success on appeal.") (emphasis added).

Since *Strickland* deference regarding an attorney's performance is based upon counsel's perspective at the time of his actions, post-conviction counsel's performance must be evaluated from the view that trial counsel is also presumed to have exercised reasonable judgment in deciding how to litigate a case. *Strickland*, 466 U.S. at 689.

To demonstrate prejudice, the likelihood of a different result in the post-conviction proceedings must be substantial, not just conceivable. *See Strickland.*, 466 U.S. at 693.

**B.    Gound Five Is Not Substantial and Lacks Merit.**

Under *Martinez*, Glover must show his defaulted claim is substantial. *Martinez*, 566 U.S. at 14. He fails to do so.

### 1.    Trial Counsel Provided Effective Assistance Related To Sutton's Inconsistent Statements.

Trial counsel made every effort to exclude any prior bad acts or damaging testimony by Sutton. *See* ECF No. 25-44, 25-45. Prior to the opening statements, the court held a hearing wherein counsel discussed the statements by Sutton and Veasley. ECF No. 25-44 at 89-119. The parties previously discussed the existence of the inconsistent statements to the police. *Id.* at 89. The parties referred to

1    Sutton's first statement to the police on January 1, 2016, the day of the murder, as "Statement 1.0." *Id*.

2    at 90. The next day, Sutton made a different statement to the police, referred to as "Statement 2.0." *Id*.

3          The prosecution argued that Statement 1.0 was vague and included reference to narcotics

4    activity by the victim but also contained definite omissions by Sutton and aspects that contradicted

5    Statement 2.0. ECF No. 25-44 at 91-92. Despite some inconsistency, the prosecution believed it was

6    important to elicit the reasons for the inconsistency. The court and counsel discussed the reasons that

7    Sutton and Veasley changed their stories. *Id*.

8          The prosecutor stated that Sutton and Veasley's reasons included their knowledge of Glover's

9    prior conviction, prior murders, multiple acts of violence towards others, and involvement in the

10   Gerson Park gang. ECF No. 25-44 at 95-96. This information "becomes as probative as you could

11   possibly get in a case like this as to why there would be a distinction between a witness' statement 1.0

12   versus 2.0." *Id*.

13         Defense counsel objected to any testimony regarding Glover's past. ECF No. 25-44 at 102.

14   Counsel argued that the difference between Statements 1.0 and 2.0 was more than vague. Statement 1.0

15   was misleading, and 1.0 was given closer to the time of the murder. *Id*.

16         "Sutton provides information to the police that she saw nothing, didn't hear from anyone,

17   someone knocked at the door and shot her husband." ECF No. 25-44 at 102. Sutton's Statement 2.0 is

18   more detailed, but it is still lacking. *Id*. Sutton stated that she had previously met the man, he attempted

19   to speak to her that day, and that it was probably a drug deal gone wrong. *Id*. at 103. Defense counsel

20   argued:

21                 [O]nce we get to that balancing test of probative value versus prejudicial
                   nature of the testimony, I think prejudicial nature of saying there is a
22                 person that has previously been killed by Shawn Glover tips prejudicial
                   nature. The scales are essentially way out of balance . . . .
23

24   ECF No. 25-44 at 106. The prosecutor responded:

25                 MR. STANTON: . . . The State's not moving to admit it under those
                   grounds. And, thus, the pretrial raising this issue is, look, you're at your
26                 peril if you're seeking to admit an inconsistent statement knowing what
                   the law permits that witness to say as an explanation for the
27                 inconsistencies. It also goes without, I think any reasonable dispute, that
                   the defense knows what the underlying facts that these witnesses are going
28                 to say about the threats and how that impugns their client's credibility and
                   the potential that that evidence might be admissible.

-26-

*Id*. at 108-09. Defense counsel presented one final response:

> MR. O'BRIEN: [I]f your ruling is under a whodunnit that the prior statement of witnesses would be open to these women's discussion of their hearsay or their hearing of rumors about Shawn Glover, Your Honor, we would ask that you keep out any information about any prior conviction and anything we would characterize as a prior bad act. Thank you.

ECF No. 25-44 at 112.

The court determined that a hearing outside the presence of the jury prior to Sutton and Veasley's testimony was appropriate to determine the probative value of Sutton and Veasley's knowledge of Glover. ECF No. 25-44 at 114.

At the beginning of the third day of trial, and outside the presence of the jury, the court and counsel questioned Sutton regarding her knowledge of Glover's prior bad acts and her anticipated testimony. ECF No. 25-45 at 27-31. Afterwards, Glover's counsel renewed objections made the previous day. *Id*. The court instructed Sutton and Veasley that they could not say anything about Glover's alleged gang membership, prior murder, or that he was previously in prison. *Id*. at 40-41.

The prosecution called Sutton on direct. ECF No. 25-45 at 42-65. On cross-examination, Sutton admitted that she made more than one statement; she did not remember what she said during Statement 1.0 but would not admit that she lied. *Id*. at 65-83. Sutton admitted that she told the police in Statement 1.0 that her husband had answered the door and was shot. *Id*. at 69. She admitted that Fleming had spoken to someone on the phone and that person was coming over to the house. *Id*. Sutton claimed that she did not remember that she told the police that Fleming was selling marijuana, and he was looking for a "re-up," "recop," or get more weed. *Id*. at 71-73.

Trial counsel asked Sutton about the argument between Fleming, Veasley, and herself. ECF No. 25-45 at 74-76. Sutton stated that she remembered she went into the garage at 11:35. *Id*. at 76. Trial counsel then states, "So, that part of your statement to the police on January 1 you have a perfect recollection of, right?" *Id*. Counsel asked about her lack of memory, and that she did not clearly see the suspect. *Id*. at 77-78. Trial counsel then returned to asking questions about the argument, which Sutton clearly answered. *Id*. at 82. Then Sutton recalled that she told the police that the townhouses had cameras to find the suspect that should still be in the vicinity. *Id*. Trial counsel was thorough in his questions to Sutton regarding Statement 1.0. *Id*. at 65-83.

-27-

1    The court asked the jury to leave to discuss a scheduling issue with counsel. ECF No. 25-45 at

2    83-84. The court allowed counsel to make a record of his renewed objections. *Id*. at 84-88. Outside the

3    presence of the jury, the defense explained their objection to Sutton's testimony:

4    MR. BASHOR [second trial counsel]: . . . And my point is, since she won't
     admit or doesn't recall lying, then there's no need to explain [why the

5    statements are inconsistent] under the statute.

6    THE COURT: Well, here's the thing. There's two witnesses, right?

7    MR. BASHOR: Right.

8    THE COURT: And so, so far there's this witness who's very clear about
     everything, and I don't know that it needs to be redirected. I don't quite

9    frankly -- well, I think she's very clear on her feelings. And so, for this
     witness I don't necessarily disagree [that the limiting instruction is not

10   necessary], but I'll hear from the State.

11   MR. STANTON: . . . She remembers the statement, she remembers that
     she gave it, she remembers that she didn't give complete accurate details.

12   Whether or not you want to say it's a lie, I don't think she's going to
     concede it is or at least to the extent that it's a conditional lie. She just

13   doesn't remember . . . So, she's not denying that the statement was made
     and that the statement has things that are different from her current

14   testimony or version the next day. So, is it –

15   THE COURT: Yeah, but she already testified why didn't you tell -- why
     didn't you tell. I mean that's already been covered, and she answered the

16   question with all kinds of things that didn't have anything to do with past
     violent history. And so, I don't know that there's something to go back on

17   in redirect. I don't -- I mean I get from the Defense perspective you want to
     call it a lie. She's explained her statement.

18

19   MR. STANTON: . . . And just so the record is abundantly clear, that the
     strategy of the State as it relates to this issue is, as I stated before, we were

20   not going to touch the inconsistent statements. So, that it is abundantly
     clear that that is a strategic choice by the Defense to do that under the law

21   in the State of Nevada at the cost to the State's case of not eliciting
     obviously an inconsistent statement, which I think there is a cost for us to

22   bear in that regard, but pursuant to the Court's directive, and I believe
     consistent with what the law permits, she is entitled to explain the

23   differences in her inconsistent statements, and I believe within the
     parameters of the Court's ruling she's entitled to fully explain.

24   THE COURT: Which I just listened to for 20 minutes, but. So, I
     understand the nature of your objection. I heard her testimony prior to the

25   hearing. I'm relying on that testimony, I'm standing by my previous ruling,
     but I'm not allowing gang membership, I'm not allowing any specifics, and

26   that's it.

27   ECF No. 25-45 at 84-86.

28   / / /

-28-

1    On redirect, Sutton testified that she knew that Glover committed other acts of violence against

2   other people in the past. ECF No. 25-45 at 90. The court then instructed the jury,

3           THE COURT: Ladies and gentlemen, I'm going to caution you now, ladies
            and gentlemen of the jury, that the testimony that the witness believed the

4           Defendant had a history of violence against persons is being offered and
            may only be considered by you solely for the purpose of explaining the

5           state of mind of the witness at the time she made her statement to police on
            January 1st, 2016. This testimony, if believed, is not to be considered as

6           substantive evidence that the Defendant has a history of violence against
            persons or that he is a person of bad character.

7

8   *Id.* at 90-91.

9    On the record, both trial counsel argued that they were fully aware of the information that could

10  come out regarding Glover's past should they open the door to Sutton's prior inconsistent statements.

11  ECF Nos. 25-44, 25-45 (explaining that ". . . fair trial for both sides so that the scales aren't tipped on

12  one way or the other . . .;" " . . . she won't admit or doesn't recall lying, then there's no need to explain

13  . . ."). Under Nev. Rev. Stat. 50.085(3),[1] the defense could not prove specific instances of conduct of a

14  witness to attack the witness's credibility with extrinsic evidence.

15   Trial counsel made a reasonable strategic choice in how to question Sutton. A reasonable

16  attorney could have concluded that pushing Sutton too far, by seeking to admit the inconsistent

17  statement into evidence if admissible, would lead to the introduction of damaging information

18  regarding Glover. Here, trial counsel did impeach Sutton. Trial counsel went through the information in

19  Statement 1.0 during Sutton's cross-examination. ECF No 25-45 at 65-83. Sutton stated that she did not

20  remember what she said because she wanted protection or out of the place where her dead husband was

21  still at the bottom of the stairs. *Id.* at 70, 72 80, 89-90. Trial counsel elicited testimony that she had

22  previously made a false statement. *Id.* at 69-82.

23  / / /

24          [1] Nev. Rev. Stat. 50.085(3) provides:

25          Specific instances of the conduct of a witness, for the purpose of attacking
            or supporting the witness's credibility, other than conviction of crime, may

26          not be proved by extrinsic evidence. They may, however, if relevant to
            truthfulness, be inquired into on cross-examination of the witness or on

27          cross-examination of a witness who testifies to an opinion of his or her
            character for truthfulness or untruthfulness, subject to the general

28          limitations upon relevant evidence and the limitations upon interrogation
            and subject to the provisions of NRS 50.090.

-29-

That trial counsel chose not to introduce Statement 1.0 into evidence was not deficient performance. *See Doe v. Ayers*, 782 F.3d 425, 431 (9th Cir. 2015) (concluding that the defendant's trial counsel "could have done a much better job of impeaching [the witness], . . . but the failures regarding impeachment of [the witness] are of comparatively little consequence"). Counsel is entitled to formulate a strategy that is reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies. *Richter*, 562 U.S. at 107.

Glover's assertion that Statement 1.0 should have been introduced as evidence is entirely based on his misguided belief that the outcome of the trial would have been different. ECF No. 23 at 21-22. The mere fact that Glover disagrees with trial counsels' decision to not introduce Sutton's inconsistent statement does not make counsels' decision so objectively unreasonable that no other attorney would have made it.

### 2.    There Was No Prejudice.

Even if trial counsel introduced Statement 1.0 into evidence and it was admissible, there is not a reasonable probability of a different outcome at trial because there was overwhelming evidence of Glover's guilt. *See Strickland*, 466 U.S. at 694; section II, *supra*. In order to undermine Sutton's testimony, therefore, counsel would have had to acknowledge that it was his own client who had a past (possibly a conviction for murder, prison time, and gang membership). Even though the court instructed Sutton regarding her testimony, she could have blurted out information about Glover's past to explain why she changed her story to the police. The jury would hear the information if though the court would strike the testimony.

Further, the evidence of the prior inconsistent statement would not have undermined Sutton's testimony. ECF No. 25-45 at 65-83. Sutton's credibility would not have been affected by the introduction of the statement. Sutton stated that Glover had threatened to kill her children and her if she told the police who had just shot and killed her husband.

Moreover, the only testimony that Glover seeks to challenge is that of Sutton. Even if the inconsistent statement had been introduced and it affected Sutton's credibility, she was not the only witness. The facts establish that Veasley also saw the two men walk down the stairs, mere seconds later

/ / /

heard the gunshots, and heard Glover make verbal threats against Sutton for her silence. Veasley testified,

> I seen [Fleming] laying on the floor, and I seen [Glover] there. And [Glover] was just yelling out threats. And my mom's just like why did you do this, why did you do this? And I was just behind her, you know, just scared. And then at that point I started to run back up the stairs.

Glover's verbal threats to harm Sutton, Veasley and the minor children certainly conveyed certainty that Glover not only killed Fleming but did so with premeditation and deliberation. Veasley's testimony alone provided overwhelming evidence to support the first-degree murder conviction.

There was no reasonable probability of a different outcome even if trial counsel successfully admitted Sutton's inconsistent statement into evidence. Counsel is entitled to formulate a strategy that is reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies. *Richter*, 562 U.S. at 107.

### C.    Glover Fails to Demonstrate Post-Conviction Counsel Was Ineffective in Declining to Raise Ground Five.

Glover fails to overcome the presumption that post-conviction counsel exercised reasonable judgment in deciding how to litigate this case. *See Runningeagle v. Ryan*, 825 F.3d 970, 982 (9th Cir. 2016) (explaining the second requirement of *Martinez*). Counsel had no obligation under *Strickland* to raise Ground Five instead of, or in addition to, the claims raised in the state post-conviction petition. Moreover, counsel did not fall below an objective standard of reasonableness for omitting any facts in Ground Five.

Here, post-conviction counsel was not ineffective. *Jones*, 463 U.S. at 751-52 (acknowledging effective appellate advocates narrow the issues on appeal by selecting the strongest claim(s) to raise). Post-conviction counsel received the entire contents of Glover's trial and appellate files. ECF No. 26-26. Glover filed a counseled state habeas petition on September 14, 2020. ECF No. 26-28. After the clerk issued a notice of non-conforming document, Glover then filed an amended petition for writ of habeas corpus that was the same as the one filed in September 2020. ECF Nos. 26-29, 26-31. The court held a hearing on January 8, 2021, wherein counsel argued in support of the petition regarding ineffective assistance of counsel, testimonial hearsay, and conflict of interest. ECF No. 26-27 at 6.

1    Post-conviction counsel was not deficient. He fails to demonstrate that the allegations in Ground

2    Five were plainly stronger than those actually presented to the appellate court. *Davila v. Davis*, 582

3    U.S. 521, 533 (2017) (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)).

4    Glover fails to overcome the presumption that post-conviction counsel exercised reasonable

5    judgment in choosing the claims he raised in the post-conviction petition. Counsel did not fall below an

6    objective standard of reasonableness for omitting the claim in Ground Five. Even if post-conviction

7    counsel did perform deficiently, that performance did not result in prejudice because this claim would

8    fail on the merits.

9    **D.    Conclusion.**

10    Ground Five is not substantial. And Glover fails to demonstrate that post-conviction counsel

11    was ineffective. Therefore, Glover cannot demonstrate he can overcome the procedural defaults under

12    *Martinez* and this Court should dismiss Ground Five. In the alternative, the claim lacks merit and this

13    Court should deny the claim.

14    **CONCLUSION**

15    Glover fails to show the Nevada Supreme Court and the Nevada Court of Appeals' rejection of

16    his claims in Grounds One, Two, Three, and Four was "so lacking in justification that there was an

17    error well understood and comprehended in existing law beyond any possibility for fair minded

18    disagreement." *Richter*, 562 U.S. at 103. Finally, in Ground Five, Glover fails to meet the *Martinez*

19    requirements to overcome procedural default, and he fails to establish that the claim was substantial or

20    ineffective assistance of post-conviction counsel. For the foregoing reasons, Respondents respectfully

21    request this Court deny Glover's first amended petition for writ of habeas corpus with prejudice.

22    RESPECTFULLY SUBMITTED this 4th day of February, 2025.

23                    AARON D. FORD
                      Attorney General
24
                      By: /s/ Leslie A. Healer
25                    LESLIE A. HEALER (Bar No. 16710)
                      Deputy Attorney General
26

27

28

-32-

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the Office of the Attorney General and that on this 4th day of February, 2025, I served a copy of the foregoing **ANSWER TO CLAIMS IN FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS (ECF NO. 23)** by U.S. District Court CM/ECF electronic filing to:

Jonathan M. Kirshbaum
Assistant Federal Public Defenders
411 E. Bonneville Avenue, Suite 250
Las Vegas, NV 89101
Jonathan_Kirshbaum@fd.org

/s/ Carrie L. Crago