1    Rene L. Valladares
     Federal Public Defender
2    Nevada State Bar No. 11479
     *Jonathan M. Kirshbaum
3    Assistant Federal Public Defender
     New York State Bar No. 2857100
4    411 E. Bonneville Ave., Ste. 250
     Las Vegas, Nevada 89101
5    (702) 388-6577
     Jonathan_Kirshbaum@fd.org
6

7
8    *Attorney for Petitioner Shawn Glover, Jr.

9

10                   UNITED STATES DISTRICT COURT
11                         DISTRICT OF NEVADA

12   Shawn Glover, Jr.,

13                    Petitioner,          Case No. 3:22-cv-00207-MMD-CSD

14          v.                             **Reply to Answer (ECF No. 41)**

15   Warden Reubart, *et al.*,

16                    Respondents.

17
18
19
20
21
22
23
24
25
26
27

# TABLE OF CONTENTS

Table of Contents.................................................................................ii

Table of Authorities..........................................................................iv

Points and Authorities ..................................................................... 1

I.     Introduction ............................................................................ 1

II.    Legal Standard ....................................................................... 2

III.   Grounds for Relief................................................................. 5

Ground One: Glover's Right to Due Process under the Fifth and Fourteenth
       Amendments to the United States Constitution Was Violated Because the
       Evidence Was Legally Insufficient to Support the Convictions. ..................... 5

       A.    Factual Background................................................... 5

       B.    Argument.................................................................. 7

Ground Two: Glover's right to due process under the Fifth and Fourteenth
       Amendments to the United States Constitution was violated based upon
       prosecutorial misconduct when the prosecutor attempted to shift the
       burden of proof unto Glover.................................................. 9

       A.    Factual Background................................................... 9

       B.    Analysis ..................................................................... 10

Ground Three: Glover was deprived of his right to the effective assistance of
       counsel under the Sixth and Fourteenth Amendments to the United
       States Constitution when trial counsel failed to object to testimonial
       hearsay ……… ....................................................... 13

       A.    Factual Background................................................... 13

       B.    Argument.................................................................. 14

Ground Four: Glover was deprived of his right to the effective assistance of
       counsel under the Sixth and Fourteenth Amendments to the United
       States Constitution because the public defender's office possessed a
       conflict of interest due to its prior representation of the victim in a
       criminal case ........................................................... 19

       A.    Factual background................................................... 19

B.      Analysis ................................................... 19

Ground Five:  Glover was deprived of his right to the effective assistance of
        counsel under the Sixth and Fourteenth Amendments to the United
        States Constitutional when his attorney failed to impeach a critical
        witness with her inconsistent prior statement in which she told detectives
        a different story about the shooting than the one she gave in her trial
        testimony ............. ..................................................... 22

        A.      Factual Background ......................................... 22

        B.      Glover can establish cause and prejudice to overcome the default;
                he is also entitled to relief on this ground ............................ 27

IV.    Conclusion ................................................... 31

## TABLE OF AUTHORITIES

**Federal Cases**

*Alberni v. McDaniel*, 458 F.3d 860 (9th Cir. 2006) ................................... 20

*Berger v. United States*, 295 U.S. 78 (1935) ................................... 10

*Bullcoming v. New Mexico*, 564 U.S. 647 (2011) ................................... 15, 16

*Crawford v. Washington*, 541 U.S. 36 (2004) ................................... 15

*Cuyler v. Sullivan*, 446 U.S. 335 (1980) ................................... 19

*Darden v. Wainwright*, 477 U.S. 168 (1986) ................................... 10, 11

*Deck v. Jenkins*, 814 F.3d 954 (9th Cir. 2016) ................................... 10

*Dow v. Virga*, 729 F.3d 1041 (9th Cir. 2013) ................................... 3

*Estelle v. Williams*, 425 U.S. 501 (1976) ................................... 11

*Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) ................................... 4

*Gonzalez v. Trevino*, 602 U.S. 653 (2024) ................................... 16, 17

*Harrington v. Richter*, 562 U.S. 86 (2011) ................................... 3

*Hein v. Sullivan*, 601 F.3d 897 (9th Cir. 2010) ................................... 11

*Houston v. Schomig*, 533 F.3d 1076 (9th Cir. 2008) ................................... 19, 20

*In re Winship*, 397 U.S. 358 (1970) ................................... 11

*Jackson v. Virginia*, 443 U.S. 307 (1979) ................................... 7

*Lafler v. Cooper*, 566 U.S. 156 (2012) ................................... 4, 27

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ................................... 15

*Mickens v. Taylor*, 535 U.S. 162 (2002) ................................... 19, 20

*Patterson v. New York*, 432 U.S. 197 (1977) ................................... 11

*Riley v. Payne*, 352 F.3d 1313 (9th Cir. 2003) ................................... 3

*Rodney v. Filson*, 916 F.3d 1254 (9th Cir. 2019) ................................... 27

*Smith v. Arizona*, 602 U.S. 779 (2024) ................................... 17, 19

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................... 14, 19

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004) ........................................... 4

*United States v. Baker*, 256 F.3d 855 (9th Cir. 2001) ............................... 20

*United States v. Blakey*, 14 F.3d 1557 (11th Cir. 1994) ........................... 12

*United States v. Perlaza*, 439 F.3d 1149 (9th Cir. 2006) ......................... 11

*United States v. Segna*, 555 F.2d 226 (9th Cir. 1977) .............................. 11

*Williams v. Illinois*, 567 U.S. 50 (2012) .................................................. 17

*Wood v. Ga.*, 450 U.S. 261 (1981) ............................................................ 19

*Woodford v. Ngo*, 548 U.S. 81 (2006) ...................................................... 27

*Woods v. Sinclair*, 764 F.3d 1109 (9th Cir. 2014) .................................. 27

**Federal Statutes**

28 U.S.C. § 2254 .................................................................................... 3, 4

**State Statutes**

Mass. Gen. Laws ch. 1, § 2016 ....................................................... *Passim*

Nev. Rev. Stat. § 33.018 ................................................................ 20, 22

Nev. Rev. Stat. § 51.035 ................................................................ 28, 29

Nev. Rev. Stat. § 200.481 ................................................................... 20

**Other**

U.S. Const. amend. VI ...................................................................... 14, 15

U.S. Const. amends. V, XIV ................................................................ 5, 9

U.S. Const. amends. VI, XIV ................................................................ 13

**POINTS AND AUTHORITIES**

**I.    Introduction**

Shawn Glover was convicted of murdering Patrick Fleming. However, the conviction was based on wholly unreliable evidence. The prosecution's case against Glover relied solely on the testimony from Sutton and Veasley. However, their testimony was fundamentally flawed. These two witnesses told a completely different story at trial than the one they told to the police immediately after the shooting. One of the witnesses, Miranda Sutton, told the police she did not know who shot Fleming. The other witness told the police that someone named "Hatch" shot Fleming. Neither witness could provide credible explanations as to why their trial testimony was so drastically different from what they originally told the police, when the incident was so fresh in their memories. When this unreliable evidence is looked at in conjunction with the lack of any physical evidence tying Glover to the crime, it is clear that the conviction violates due process as legally insufficient and the state court's decision to the contrary was unreasonable.

Making matters worse, Glover received ineffective assistance of counsel based on counsel's failure to properly impeach Sutton with her prior inconsistent statements. Counsel's failure to perform this critical task deprived the jury of the ability to fully assess Sutton's credibility. This clearly prejudiced Glover as her credibility was a central component of the case. Glover can overcome the procedural default on this claim because his postconviction attorney was ineffective for failing to raise this claim and the claim clearly has "some merit." He is also entitled to relief on the merits of this claim.

Glover's rights were violated in additional ways. First, the prosecution committed clear misconduct during closing arguments, which the state appellate court acknowledged. In a clear attempt to direct the jury's attention away from the weaknesses in the prosecution's case, the prosecutor shifted the burden of proof unto

1

the defense, asking why they did not produce evidence in court. These comments were not just improper, but they clearly undermined the fairness of the proceedings, violating Glover's right to due process. The state court's decision finding that these improper comments did not rise to the level of a due process violation was patently unreasonable.

Further, Glover's counsel was ineffective for failing to argue that the Confrontation Clause barred the State from introducing the medical examiner's autopsy results through a different examiner. This deficient performance prejudiced Glover as the State relied upon those conclusions to support its theory of what occurred. The state court's decision rejecting this claim is not entitled to deference as it was based on unreasonable factual determinations.

Finally, Glover was deprived of his Sixth Amendment right to conflict-free counsel when his attorney did not disclose that his office had previously represented the victim on two domestic violence cases. This conflict affected counsel's performance as it would have prevented counsel from pursuing a potential self-defense theory that relied upon Glover's knowledge of those prior acts of violence. The state court's decision rejecting this claim was unreasonable as a matter of fact and law.

Accordingly, for the reasons discussed below, the writ should be granted on each ground, the judgment of conviction vacated, and a new trial ordered.

## II.    Legal Standard

Because Glover is a prisoner in state custody, his amended petition falls under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). That statute creates a unique standard of review for constitutional claims that a state court has already adjudicated on the merits. The state courts adjudicated Grounds One through Four on the merits, so the AEDPA standard of review may apply to those claims. With respect to those claims, the Court may grant habeas relief only if the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Essentially, when the state court has rejected a claim on the merits, § 2254(d) creates two opportunities for relief: (1) when the state court's legal analysis is sufficiently flawed, and (2) when the state court's factual findings are sufficiently flawed.

As for the former, a state court's legal analysis isn't entitled to deference if the decision is "contrary to" clearly established federal law, or if it involves an "unreasonable application" of clearly established federal law. A decision is "contrary to" clearly established federal law if the decision "'applies a rule that contradicts the governing law'" as set forth by the United States Supreme Court. *See Riley v. Payne*, 352 F.3d 1313, 1317 (9th Cir. 2003). A decision is also "contrary to" federal law if the relevant facts are "'materially indistinguishable'" from the facts in a prior Supreme Court case, but the state court reached a different result. *Id*.

In addition, Section 2254(d) doesn't mandate deference to a state court's decision if its legal analysis involves an "unreasonable application" of clearly established federal law. That situation occurs when the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). When a federal court concludes deference is not warranted under this clause and grants relief, it is in effect saying the federal court's legal conclusion is "objectively the . . . one that a fairminded jurist should reach." *Dow v. Virga*, 729 F.3d 1041, 1051 n.8 (9th Cir. 2013).

Even if a state court's decision doesn't rest on such legal errors, a federal court may still grant relief if the state court's resolution of a constitutional claim turns on

an "unreasonable determination of the facts" as they were presented in the state court proceedings. That situation may arise, for example, when the state court's factual findings are "unsupported by sufficient evidence," when the fact-finding "process employed by the state court [was] defective," or when "no finding was made by the state court at all." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014).

When the state court explains the reasons why it rejected a claim, the question of deference under Section 2254(d) depends on the state court's actual analysis. In other words, the federal court shouldn't ask whether the state court could've rejected the claim by way of a hypothetical alternative rationale that would've qualified for deference—instead, the federal court simply evaluates the state court's actual reasoning. *See, e.g., Frantz v. Hazey*, 533 F.3d 724, 738 (9th Cir. 2008) (en banc) ("Indeed, if we were to defer to some hypothetical alternative rationale when the state court's actual reasoning evidences a [Section 2254(d)] error, we would distort the purpose of AEDPA."). In short, if the state court's actual reasoning is defective under Section 2254(d), then the court's decision doesn't warrant deference—even if the court could've used other reasoning that would've been entitled to deference.

If the federal court determines the state court's decision isn't entitled to deference under Section 2254(d), it reviews the merits of the claim de novo in order to decide whether relief is warranted. *See Lafler v. Cooper*, 566 U.S. 156, 173 (2012) (citing *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)).

III.    **Grounds for Relief**

**Ground One:**    **Glover's Right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution Was Violated Because the Evidence Was Legally Insufficient to Support the Convictions.**

A.    **Factual Background**

In December 2015, Patrick Fleming, his wife Miranda Sutton, their 21-year-old daughter Akira Veasley, and their 12-year-old twins, moved into a townhouse in North Las Vegas with their goddaughter Angela. (ECF No. 25-45 at 43-45, 92.) Shortly after that, around Christmas Eve, Shawn Glover moved into the townhouse. Glover and Angela have a daughter in common. (*Id.* at 46-47.)

Sutton and Veasley testified at trial that, on the morning of January 1, 2016, Glover shot and killed Fleming. However, in their initial statements to the police given on the day of the shooting, neither Sutton nor Veasley stated that Glover had committed the shooting. Rather Sutton indicated that she did not know who shot Fleming and Veasley indicated the shooter was a man named Hatch, who had come over to the house to buy marijuana from Fleming.

In contrast to their initial statements to the police, Sutton and Veasley testified at trial that on the morning January 1, 2016, Glover shot Fleming after a confrontation between them in the townhouse. The incident began when Fleming had returned from taking Angela to work. (ECF No. 25-45 at 47-49.) Fleming got into an argument with Veasley over her behavior the night before. (*Id.* at 47-49, 93.) The argument was loud and took place in the downstairs garage. Sutton was present in the garage during the argument. (*Id.*)

According to Sutton, at some point during the argument, Glover came downstairs with the phone and told Sutton that Angela was on the phone and wanted to speak to her. (*Id.* at 50-51.) After Miranda told Angela that everything was okay, Glover went back upstairs. (*Id.*) Later, as the argument in the garage was winding

5

down, Glover returned to the garage. Sutton testified that Glover asked her to come upstairs with him, which she did. She claimed that Glover asked her if she wanted him to handle the situation. She told him that everything was fine and not to worry. (*Id.*)

Sutton testified that shortly after Fleming and Veasley had come back upstairs Fleming confronted Glover about wanting to talk to his wife. (*Id.* at 53.) Glover indicated he was concerned because of the heated argument in the garage. (*Id.*) According to Sutton, when Fleming attempted to touch Glover on his shoulder, Glover pulled away "like man, get off me, you're too close to me." (*Id.*) Fleming then looked at Glover and said "do we have a problem, do we need to talk?" Fleming suggested he and Glover go downstairs to talk. (*Id.*)

Sutton told Fleming that he did not need to talk to Glover, but Fleming pushed Sutton to the side and walked downstairs. (*Id.*) Glover followed Fleming down the stairs. Sutton then went towards Angela's bedroom when she heard three gunshots. (*Id.* at 54-55.) Sutton and Veasley ran to the landing at the top of the stairs and saw Fleming lying on the floor and Glover standing over him holding a gun. (*Id.* at 54-55, 97.) Sutton testified that Glover pointed the gun at her and said something to the effect of "don't tell on me." Sutton later testified that Glover threatened her, saying "if you and your kids want to live, you'll shut the fuck up." (*Id.* at 55.) Glover left and Veasley called 911. (*Id.* at 56-57.)

On cross examination, both Sutton and Veasley acknowledged that they told the police a different story immediately after the shooting. Sutton admitted that, in the 911 call, she originally told the police that she did not know who had shot her husband. (*Id.* at 69.) Sutton struggled to provide a coherent explanation for why she told a different story to the police. Her explanations varied: "I was afraid, so I initially liked to the police"; "I really don't – don't even remember that part"; "I'm not sure if I lied to them"; "I believe I said that"; "I might have said that"; "I don't know." (*Id.* at

69-80.) She also was unable to answer simple and direct questions on cross examination, particularly with respect to questions about her original statement to the police. (*Id.*)

For her part, Veasley admitted on cross examination that she initially told the police that someone named Hatch, who had come over to buy marijuana from Fleming, had shot Fleming. She also indicated that Hatch had been waiting upstairs during the argument, but at some point had come downstairs to talk to Sutton. She further stated that Fleming was upset about Hatch sticking his nose into family business. (*Id.* at 104-06.)

### B.   Argument

Due process requires that a conviction be supported by legally sufficient evidence. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). A petitioner is entitled to habeas relief if he can establish that, upon the record evidence adduced at the trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Id.* at 324.

Glover's right to due process was violated because his murder conviction was based on legally insufficient evidence. The State presented no physical evidence tying Glover to the crime. There was no fingerprint evidence that linked Glover to the crime. There was no DNA evidence collected from inside the townhouse or from any of the ballistics evidence, like the .40 caliber shells found at the crime scene.

Instead, the case against Glover relied solely on the testimony from Sutton and Veasley. However, their testimony was fundamentally flawed. These two witnesses told a completely different story at trial than the one they told to the police immediately after the shooting. In contrast to her trial testimony implicating Glover, Sutton stated in the 911 call when she was still under the stress of the incident that she did not know who had shot Fleming. She could not credibly explain why, in a moment devoid of reflection, she told the 911 operator that she did not know who had

shot Fleming. She provided various reasons for her inconsistency: she was afraid, she did not remember, she did know, she was not sure what she said. She repeatedly refused to give answers to simple and direct questions. Her inconsistency in her accounts of what happened rendered her testimony entirely untrustworthy.

The same can be said about Veasley. She told multiple versions of what happened that day. While she pointed the finger at Glover at trial, she told the police a man named Hatch shot Fleming. Hatch was a customer of Fleming and was at the house to buy marijuana. Although Veasely later stated Hatch was Glover, her description of Hatch as a customer over to buy marijuana was a different person than Glover, who was living in the house at the time. This core inconsistency in her story severely undermines the credibility of her testimony.

Because the only evidence against Glover cannot be considered reliable, the convictions were not based on legally sufficient evidence. Glover's right to due process was violated.

The Nevada Supreme Court's decision rejecting this argument was unreasonable. The court reasoned:

> The record shows that after asking Sutton if she wanted him to "handle the victim (Patrick Fleming), Glover followed Fleming downstairs to talk. Within seconds, Veasley and Sutton heard three gunshots, and Sutton observed Glover standing over Fleming's body holding a gun. Glover pointed the gun at Sutton and threatened her not to report what she saw. The medical examiner testified that the bullets entered Fleming at a downward trajectory. Testimony also established that Glover fled the scene after the shooting. Viewing this evidence in the light most favorable to the State, a rational trier of fact could conclude beyond a reasonable doubt that Glover committed the charged crimes.

(ECF No. 26-21 at 4-5.) This decision was unreasonable. The only evidence the court cites that tied Glover to the murder comes from the two unreliable witnesses: Sutton and Veasley. The remaining evidence may be consistent with the fact that Fleming

was murdered, but not that it was Glover who committed the shooting. Thus, the evidence remains insufficient for the same reasons discussed above, namely that it was based on completely unreliable testimony and there was otherwise no evidence connecting Glover to the scene of the shooting. Accordingly, the state court's decision is not entitled to any deference.

Accordingly, the writ should be granted, the judgment of conviction vacated, and the charges dismissed.

**Ground Two:    Glover's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution was violated based upon prosecutorial misconduct when the prosecutor attempted to shift the burden of proof unto Glover.**

### A.    Factual Background

As discussed under Ground One, the evidence against Glover was insufficient. The two main witnesses gave highly unreliable evidence. The unreliability of their testimony formed a central core of the defense.

In closing argument, defense counsel argued that the prosecution had not proven beyond a reasonable doubt that Glover was the one who committed the crime. (ECF No. 25-50 at 27.) He pointed out that there was no physical evidence connecting Glover to the crime. (*Id.* at 33-35.) He argued that the only evidence against Glover were the unreliable and "suspect" testimony from Sutton and Veasley. (*Id.* at 34-35.) He argued there was no corroboration for their testimony. (*Id.*) He also pointed out there was no real evidence establishing intent or motive. (*Id.* at 37.)

In rebuttal, the prosecutor then attempted to shift the burden of proof on to the defense. First, the prosecutor stated, "And I'm waiting for Mr. Bashor to answer the question, well where was his client?" (*Id.* at 38-39.) Counsel's objection was sustained and the court asked counsel to rephrase the comment. (*Id.* at 39.) The prosecutor then stated, "He [defense counsel] said – Mr. Bashor said, as he was

9

making his comment about this Defendant, is the Defendant was not even there. Where is the evidence about that?" (*Id.*) The jury was never told to disregard this comment.

The jury then convicted Glover on all counts, including murder in the first degree with use of a deadly weapon. (ECF No. 25-49.)

### B.    Analysis

Since the time of *Berger v. United States*, 295 U.S. 78, 88 (1934), the Supreme Court clearly established that prosecutors are legally and ethically bound to refrain from improper argument. "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger*, 295 U.S. at 88. "The prosecutor's job isn't to win, but to win fairly, staying within the rules." *Id*.

Prosecutorial misconduct during closing argument violates the constitution if the improper statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Ninth Circuit has explained that the question of prejudice mergers with the substantive analysis and a separate harmless error analysis is not required:

> As explained, under clearly established Supreme Court law, the constitutional dimension of the prosecutor's misstatements turns entirely on the issue of prejudice: the error rises to the level of *Darden* error only if there is a reasonable probability that it rendered the trial fundamentally unfair. Our analysis of prejudice therefore overlaps completely with our analysis of the [state court's] constitutional determination.

*Deck v. Jenkins*, 814 F.3d 954, 985 (9th Cir. 2016).

In determining whether a comment rendered a trial constitutionally unfair, courts may consider: (1) whether the prosecutor's comments manipulated or misstated the evidence; (2) the prominence of the comment in the context of the entire

trial; (3) whether the judge admonished the jury to disregard the comment; (4) whether the comment was invited by defense counsel in its summation; (5) whether defense counsel had an adequate opportunity to rebut the comment; and (6) the weight of the evidence. *See Hein v. Sullivan*, 601 F.3d 897, 912-13 (9th Cir. 2010) (citing *Darden*, 477 U.S. at 168, 181-82).

Improper prosecutorial comments that "implicate specific rights of the accused" will violate due process. *See Darden*, 477 U.S. at 181–82. The State must prove all elements of a charged offense beyond a reasonable doubt. *In Re Winship*, 397 U.S. 358, 364 (1970) ("The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged"). The right to the presumption of innocence is a specific constitutional right of the accused which flows directly from the State's burden to prove guilt beyond a reasonable doubt. *See Estelle v. Williams*, 425 U.S. 501, 503 (1976) ("The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice"); *see also Patterson v. New York*, 432 U.S. 197, 215 (1977) (explicitly stating that the State must prove every element of an offense beyond a reasonable doubt, and it may not shift this burden of proof to the defendant); *United States v. Perlaza*, 439 F.3d 1149, 1171 (9th Cir. 2006) ("Criminal defendants have a constitutional right to the presumption of innocence and to have the government prove guilt beyond a reasonable doubt."). Thus, a prosecutor may not shift the State's burden of proof to the defendant. *See United States v. Segna*, 555 F.2d 226, 230 (9th Cir. 1977) (finding that the government's statements, which had the effect of shifting the burden of proof to the defendant and depriving him of the benefits of the reasonable doubt standard, amounted to plain error and required reversal).

Here, the prosecutor's comments so infected the trial with unfairness as to violate Glover's right to due process. The State's question to the jury—"Where is the

evidence about that?"—clearly shifted the burden of proof from the State to the defendant. The question told the jurors that for them to consider the defense's argument challenging the State's evidence against him, the defense needed to present to them some evidence. This comment violated a fundamental notion of our criminal justice system—the State has the burden to prove the defendant guilty beyond a reasonable doubt. When the prosecutor tells the jury, through argument, that the defense needs to produce evidence, the prosecutor shifts the burden upon the defendant in violation of due process under the Fifth and Fourteenth Amendments. *See United States v. Blakey*, 14 F.3d 1557, 1559–60 (11th Cir. 1994) (finding that the prosecutor engaged in impermissible burden shifting by arguing that the defendant presented insufficient exculpatory evidence to warrant the continued presumption of innocence). Critically, this comment was not responsive to any argument from the defense. The defense limited its argument exclusively to the prosecution's failure to prove its case beyond a reasonable doubt. There was no justification for this comment. Yet, the jury was not told to disregard it.

These comments were highly prejudicial. As discussed in Ground One, the prosecution's evidence was weak as there was no physical evidence tying Glover to the crime and the remaining evidence was highly unreliable. This comment was clearly tailored to draw the jury's attention away from the weaknesses in the prosecution's case—which was the main crux of the defense—and focus instead on an improper matter. Counsel never had an opportunity to respond to this comment as it was made in rebuttal, and the jury was given permission to consider it. Accordingly, when the prosecution shifted the burden of proof onto Glover, Glover's right to due process was violated.

The Nevada Supreme Court's rejection of this claim was unreasonable as a matter of law and fact. The court agreed that these comments were improper. However, it concluded that "this prosecutorial misconduct was harmless given the

overwhelming evidence both that Glover was at the scene and committed the crimes." (ECF No. 26-21 at 5-6.) This was an unreasonable conclusion. As discussed above, the evidence was far from overwhelming. The two main witnesses originally told the police that someone else had committed the crime. It is unreasonable to describe their unreliable evidence as overwhelming. This was precisely the harm from the misconduct. It drew the jury's attention away from the weaknesses in the prosecution's evidence, which was Glover's main defense at trial. Put simply, the misconduct struck at the heart of the defense and clearly caused serious damage to Glover. The Nevada Supreme Court's failure to consider the impact of these comments was unreasonable. As a result, the court's decision should not be given any deference.

Consequently, because Glover's right to due process was violated, the petition should be granted, the judgment of conviction vacated, and a new trial ordered.

**Ground Three:  Glover was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution when trial counsel failed to object to testimonial hearsay**

### A.    Factual Background

Prior to trial, Dr. Timothy Dutra—a medical doctor employed by the Clark County Coroner Medical Examiner—performed an autopsy on the victim, Patrick Fleming. Dr. Dutra produced an autopsy report that contained his findings and conclusions regarding the cause and manner of death. At trial, the State called Dr. Jennifer Corneal, rather than Dr. Dutra, to present information contained in the autopsy report, as well as information contained in an investigative file presumably produced by the Clark County Coroner's Office.

At trial, Dr. Corneal testified that Dr. Dutra performed the autopsy of Fleming. (ECF No. 25-45 at 122.). Dr. Corneal had merely reviewed the autopsy report and

investigative files, including photographs, as it related to the autopsy performed on Fleming on January 2, 2016. (*Id.*)

Dr. Corneal testified that Fleming was shot in the back of his head on the left side. (*Id.* at 124.) The entrance wound was located in the back of Fleming's head. (*Id.* at 124-25.) The trajectory of the projectile was left to right, and downward.(*Id.* at 126.) The projectile passed through Fleming's brain, which transected his brain stem and immediately incapacitated him. (*Id.* at 128.) Dr. Corneal testified that she did not observe any soot or stippling that would indicate the gun was fired at close range. (*Id.* at 129.) She further testified she could not determine the range at which the gun was fired possibly due to Fleming's thick hair, which may have absorbed the soot— the gray material deposited around the wound edges—and/or the stippling—the unburnt gun powder that strikes the skin during a shooting at close range. (*Id.*)

Patrick was also shot in his inner, right upper arm, and in the right groin area. (*Id.* at 130-31.) The trajectory of the projectile in the groin area was right to left, front to back and downward. (*Id.* at 132.) Dr. Corneal testified that the gunshot wound to the head was the cause of Patrick's death, and the manner of death was homicide. (*Id.*)

Counsel did not object to Dr. Corneal's testimony under the Confrontation Clause.

## B.    Argument

The Sixth Amendment to the United States Constitution guarantees criminal defendants the effective assistance of counsel at trial. The standard for evaluating an ineffectiveness claim for trial counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a showing that counsel's performance fell below an objective standard of professional care and that there was a reasonable probability the outcome would have been different absent the deficient performance.

14

Here, counsel was ineffective for failing to object to the admission of testimonial hearsay. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In *Crawford*, the United States Supreme Court held that guarantee includes a defendant's right to confront those "who 'bear testimony'" against him. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009), *quoting Crawford*, 541 U.S. at 51. A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. *Melendez-Diaz*, 557 U.S. at 309.

In *Melendez-Diaz*, the United States Supreme Court held that a "certificate of analysis" detailing the results of a forensic drug analysis was a testimonial statement covered by the Sixth Amendment's confrontation clause. 557 U.S. at 308–311. "Absent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to 'be confronted with the analysts at trial.'" *Id.* at 311, *citing Crawford*, 541 U.S. at 54.

In *Bullcoming v. New Mexico*, the Supreme Court held the introduction of a blood-alcohol analysis report through the surrogate testimony of a second analyst, who had not certified the report or performed or observed the testing, violated the Confrontation Clause. 564 U.S. 647 (2011). The Court further reiterated the principle that a document created solely for an evidentiary purpose, made in aid of a police investigation, ranks as testimonial. *Bullcoming,* 564 U.S. at 664, *citing Melendez-Diaz,* 557 U.S. at 311 (forensic reports available for use at trial are testimonial statements and certifying analyst is a witness for purposes of the Sixth Amendment)).

The Supreme Court has recently confirmed the clearly established law from these cases: "As earlier described, those two decisions applied *Crawford* in 'straightforward' fashion to forensic evidence. *Melendez-Diaz*, 557 U.S., at 312 [;] *see*

15

1    *Bullcoming*, 564 U.S., at 659–661[.] The first prevented the introduction of a lab

2    analyst's testimonial report sans lab analyst. The second refused to accede to the idea

3    that any old analyst—i.e., a substitute who had not taken part in the lab work—

4    would do." *Smith v. Arizona*, 602 U.S. 679, 698 (2024).

5        Dr. Corneal's testimony clearly violated these principles. Her testimony was

6    simply the means to present Dr. Dutra's testimonial statements. Evidence from

7    Fleming's autopsy, including all of the testimonial conclusions in the autopsy report,

8    was admitted at trial through Dr. Corneal, even though the expert who performed

9    the autopsy, Dr. Dutra, did not testify. Dr. Dutra's findings and conclusions were

10   clearly testimonial as the information in the report would have led an objective

11   witness to reasonably believe that the statements would be available to be used at a

12   later trial. The report contained, among other things, Dr. Dutra's opinion as to the

13   cause and manner of death in a homicide case. This evidence was clearly

14   incriminating as it was used to support the State's theory about the manner in which

15   the shooting occurred. Because it was testimonial, Glover had the right to question

16   Dr. Dutra about his work if the State intended to use it against him.

17       Although the State was allowed to present the evidence to the jury, Glover was

18   not provided the opportunity to question Dr. Dutra about his methodology,

19   competence as an expert, and other factors relevant to the weight and admissibility

20   of the testimony concerning the autopsy provided through Dr. Corneal. Under

21   *Melendez-Diaz* and *Bullcoming*, the Supreme Court has made clear that a forensic

22   expert witness must be subject to confrontation. However, rather being given the

23   opportunity to confront Dr. Dutra, the medical examiner who performed the autopsy

24   and authored the autopsy report, Dr. Dutra's findings were presented through Dr.

25   Corneal. Counsel should have objected to this testimony.

26       Glover was prejudiced by counsel's failure to object to this testimony. There

27   was a reasonable probability that such an objection would have led to the testimony

1   being excluded. This exclusion would have resulted in the omission of a critical

2   element of the homicide charge—cause and manner of death—which would like

3   probably led at least one juror to find reasonable doubt.

4        Here, the Nevada Court Appeals concluded that Dr. Corneal's testimony did

5   not violate *Crawford* (and counsel was not ineffective for objecting) because Dr.

6   Corneal offered her own independent opinion. (ECF No. 26-54 at 4.) The court also

7   concluded that Glover did not suffer any prejudice. (*Id.*)

8        Both of these conclusions were unreasonable. First, with respect to the

9   deficient performance prong, the state court's factual finding was unreasonable.

10  Preliminarily, in *Williams v. Illinois*, 567 U.S. 50, 70-81 (2012), a plurality of the

11  Supreme Court found no confrontation error when the prosecution had an expert

12  testify as to her own conclusions without seeking to admit the underlying information

13  from the forensic report into evidence for its truth. Although the Supreme Court has

14  now entirely abrogated the plurality's decision on the basis that it converted

15  *Melendez-Diaz* and *Bullcoming* to dead-letter opinions, *see Smith*, 602 U.S. at 798-

16  800, *Williams* was still good law at the time of the Court of Appeals decision.

17       Nonetheless, the state court's decision was based on an unreasonable finding

18  of fact. Dr. Corneal's testimony did not offer any independent opinions. Rather, her

19  testimony was based solely upon her review of Dr. Dutra's work. She testified she

20  reviewed the autopsy report authored by Dr. Dutra and an investigative file—

21  presumably produced by the coroner's office—that included photographs taken

22  during the autopsy. Dr. Corneal never indicated that her testimony was based upon

23  her own conclusions and opinions after an independent evaluation of the evidence.

24  For example, Dr. Corneal was asked, "How many gunshot wounds were observed and

25  documented on Mr. Fleming?" (ECF No. 25-45 at 124.) Clearly, she could not have

26  "observed" any of the wounds as she did not conduct the examination. Further, she

27  was directly being ask about what a prior examiner had documented, the prosecution

17

clearly seeking to admit that information for its truth, making it testimonial. Similarly, throughout her testimony, she provided evidence about Fleming's injuries that would appear to come from Dr. Dutra's work on the case. At bottom, it is not clear from her testimony what, if anything, was independent from Dr. Dutra's work. Indeed, the State went so far as describing the autopsy as *her* examination of the body and asked the jury to look at that way. (ECF No. 25-50 at 42 ("So, from Dr. Corneal's perspective, she looks at the body. The body of Mr. Fleming and the incredible amount of evidence, important evidence that is and was derived *in her examination of that slice of the crime scene, his body*.") (emphasis added).) As such, it is unreasonable to find that Dr. Corneal's opinions were independent. Rather, the only reasonable factual finding here is that she was the surrogate for the findings and opinions contained in Dr. Dutra's autopsy report.

The state court's prejudice decision was also unreasonable. As mentioned before, excluding Dr. Corneal's testimony would have had a significant impact on this case. The State clearly relied upon Dr. Corneal's testimony to justify their theory of the case. (ECF No. 25-50 at 23, 25, 42, 43.) Excluding this evidence would have resulted in the omission of a critical element of the homicide charge—cause and manner of death—which would like probably led at least one juror to find reasonable doubt. It was unreasonable to conclude that counsel's error in failing to object would not have had an impact on the outcome of trial. The state court's decision is not entitled to deference.

Accordingly, because Glover's right to the effective assistance of counsel was violated, the writ should be granted, the judgment of conviction vacated, and a new trial ordered.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**Ground Four:    Glover was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution because the public defender's office possessed a conflict of interest due to its prior representation of the victim in a criminal case**

### A.    Factual background

Glover was represented by an attorney with the Clark County Public Defender's Office. However, trial counsel failed to disclose the Public Defender's former representation of the victim, Patrick Fleming, in two criminal cases. The Public Defender represented Fleming in Las Vegas Justice Court case number 01M20858X. In that case the court convicted Fleming of Battery Domestic Violence following a bench trial. (ECF No. 26-31 at 29-30.) The Public Defender also represented Fleming in Las Vegas Justice Court in case number 10F15357X, where Fleming pleaded Nolo Contendre to a charge of Disorderly Conduct. (*Id.* at 31-32.)

### B.    Analysis

Defendants have a "right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981) (citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980); and *Holloway v. Arkansas*, 435 U.S. 475, 481 (1978)). In order to establish that counsel was ineffective due to a conflict of interest, a defendant must show that a conflict of interest existed and that it had an adverse effect on counsel's performance. *Cuyler*, 446 U.S. at 348; *see also Mickens v. Taylor*, 535 U.S. 162, 171-74 (2002). If an actual conflict of interest is established, the defendant does not need to prove *Strickland* prejudice. *Cuyler*, 446 U.S. at 349-50. This is so because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland v. Washington*, 466 U.S. 668, 692 (1984).

The Supreme Court defines an actual conflict "by the effect a potential conflict had on counsel's performance." *Houston v. Schomig*, 533 F.3d 1076, 1081 (9th Cir. 2008) (citing *Mickens,* 535 U.S. at 171). The Sixth Amendment does not protect

against a "mere theoretical division of loyalties," *Mickens*, 535 U.S. at 171; rather, it protects against conflicts of interest that adversely affect counsel's performance. *Alberni v. McDaniel*, 458 F.3d 860, 870 (9th Cir. 2007). The Ninth Circuit has provided that an attorney has an actual conflict of interest when during the course of the representation, the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action. *United States v. Baker*, 256 F.3d 855, 860 (9th Cir. 2001). While the Supreme Court cases on conflict of interest concern multiple representation, courts have applied the *Cuyler* standard to other types of conflicts of interest, including when the attorney has previously represented the victim. *See Houston*, 533 F.3d at 1081-82; *Alberni*, 458 F.3d at 869-73.

Glover was deprived of his right to the effective assistance of counsel based on the conflict of interest due to his counsel's prior representation of the victim. The Public Defender's Office represented Fleming on a case in which he was convicted of battery domestic violence. That establishes an actual conflict sufficient to trigger constitutional protection. *See Houston*, 533 F.3d at 1081-82; *Alberni*, 458 F.3d at 869-73. Further, that conflict affected counsel's performance. Fleming's prior conviction generally includes acts that are considered violent in nature towards someone who had a familial or romantic relationship with Fleming.[1] Glover was connected to Fleming's family through Angela, who was Fleming's goddaughter. Glover was dating Angela. It is reasonable to believe that, through this connection, Glover would have been aware of this prior behavior. That information may have been used to support a self-defense claim during Glover's trial. Such a defense would have been bolstered by trial testimony revealing: (1) Fleming initiated a confrontation with Glover following

---

[1] Under NRS 200.481(1)(a) a "battery" means any willful and unlawful use of force or violence upon the person of another. A battery domestic violence occurs when a battery is committed against someone who has a familial or romantic relationship with the defendant. NRS 33.018.

a heated confrontation with Sutton and Veasley; (2) Fleming pushed Sutton to the side when she attempted to deescalate the confrontation between Fleming and Glover; and (3) Fleming was in physical possession of a firearm at the time of his death. (ECF No. 25-45 at 53; ECF No. 25-46 at 16.) However, the Public Defender's Office would have had an ethical obligation to refrain from using any information from the prior case to assist Glover establish a self-defense argument. Thus, there was a significant risk that the representation of Fleming materially affected trial counsel's ability to represent Glover. As such, an actual conflict of interest existed.

The Nevada Court of Appeals' decision on this claim was unreasonable both as a matter of law and fact. The court rejected this claim, concluding "Glover did not allege that his trial counsel was placed in a situation that was conducive to divided loyalties. Glover also did not allege that his trial counsel actively represented conflicting interests or that counsel's performance was adversely affected by the public defender's office's previous representation of the deceased victim. Glover's allegations were thus insufficient to show that his counsel had an actual conflict of interest." (ECF No. 26-54 at 5.) This analysis was unreasonably incorrect. In the first instance, Glover clearly alleged sufficient allegations to establish a conflict of interest. Indeed, they were the same allegations made here: his attorney had previously represented the victim on a violent crime and that prior representation would have impacted his attorney's ability to use the prior conviction to benefit Glover in his case. (ECF No. 26-31 at 24-25.) As explained above, there is a clear connection between the prior representation and the manner in which it would have adversely affected counsel's performance in Glover's case. The Court of Appeals' failure to acknowledge that connection was unreasonable. The state court's decision is not entitled to any deference.

Accordingly, Glover's right to the effective assistance was violated. The writ should be granted, the judgment vacated, and a new trial ordered.

**Ground Five:** **Glover was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitutional when his attorney failed to impeach a critical witness with her inconsistent prior statement in which she told detectives a different story about the shooting than the one she gave in her trial testimony**

This claim is technically exhausted and procedurally defaulted. This Court previously deferred decision to the merits stage on whether Glover can overcome the default on this claim.

**A.    Factual Background**

In December 2015, Patrick Fleming, his wife Miranda Sutton, their 21-year-old daughter Akira Veasley, and their 12-year-old twins, moved into a townhouse in North Las Vegas with their goddaughter Angela. (ECF No. 25-45 at 43-45, 92.) Shortly after that, around Christmas Eve, Shawn Glover moved into the townhouse. Glover and Angela have a daughter in common. (*Id.* at 46-47.)

Sutton and Veasley testified at trial that, on the morning of January 1, 2016, Glover shot and killed Fleming. However, in their initial statements to the police given on the day of the shooting, neither Sutton nor Veasley stated that Glover had committed the shooting. Rather Sutton indicated that she did not know who shot Fleming and Veasley indicated the shooter was a man named Hatch, who had come over to the house to buy marijuana from Fleming.

In contrast to their initial statements to the police, Sutton and Veasley testified at trial that on the morning January 1, 2016, Glover shot Fleming after a confrontation between them in the townhouse. The incident began when Fleming had returned from taking Angela to work. (ECF No. 25-45 at 47-49.) Fleming got into an argument with Veasley over her behavior the night before. (*Id.* at 47-49, 93.) The argument was loud and took place in the downstairs garage. Sutton was present in the garage during the argument. (*Id.*)

22

According to Sutton, at some point during the argument, Glover came downstairs with the phone and told Sutton that Angela was on the phone and wanted to speak to her. (*Id.* at 50-51.) After Miranda told Angela that everything was okay, Glover went back upstairs. (*Id.*) Later, as the argument in the garage was winding down, Glover returned to the garage. Sutton testified that Glover asked her to come upstairs with him, which she did. She claimed that Glover asked her if she wanted him to handle the situation. She told him that everything was fine and not to worry. (*Id.*)

Sutton testified that shortly after Fleming and Veasley had come back upstairs Fleming confronted Glover about wanting to talk to his wife. (*Id.* at 54.) Glover indicated he was concerned because of the heated argument in the garage. (*Id.*) According to Sutton, when Fleming attempted to touch Glover on his shoulder, Glover pulled away "like man, get off me, you're too close to me." (*Id.*) Fleming then looked at Glover and said "do we have a problem, do we need to talk?" Fleming suggested he and Glover go downstairs to talk. (*Id.*)

Sutton told Fleming that he did not need to talk to Glover, but Fleming pushed Sutton to the side and walked downstairs. (*Id.*) Glover followed Fleming down the stairs. Sutton then went towards Angela's bedroom when she heard three gunshots. (*Id.* at 54-55.) Sutton and Veasley ran to the landing at the top of the stairs and saw Fleming lying on the floor and Glover standing over him holding a gun. (*Id.* at 54-55, 97.) Sutton testified that Glover pointed the gun at her and said something to the effect of "don't tell on me." Sutton later testified that Glover threatened her, saying "if you and your kids want to live, you'll shut the fuck up." (*Id.* at 55.) Glover left and Veasley called 911. (*Id.* at 56-57.)

On cross examination, defense counsel attempted to impeach Sutton with her prior inconsistent statements. Sutton admitted that, in the 911 call, she stated that her husband had answered the door and he had been shot. (ECF No. 45-25 at 69.) She

acknowledged that someone was supposed to come over, but she did not know who it was. (*Id*.) She further admitted that she told the 911 operator that she did not know who had shot her husband. (*Id*.) She believed that she also told the 911 operator that she had been threatened. (*Id*.)

However, defense counsel failed to impeach Sutton with her statements to the detectives on the day of the shooting. Sutton acknowledged that the detectives had a recording device and they wanted to record the conversation. (ECF No. 45-25 at 70.) She could not remember if it had been recorded. (*Id*.)

Counsel then sought to question her about the substance of her prior statement to the detectives. However, counsel failed to actually impeach her with the statement. Counsel began by asking her whether she informed the detectives that Fleming was looking for a re-up. (ECF No. 45-25 at 71-72.) In response, Sutton became evasive. At first, she changed the subject and began discussing other aspects of her prior statement. Counsel asked her again and Sutton replied, "I may have said that." (*Id*. at 72.) Rather than impeach her with the actual language of the statement, counsel asked her, "Would looking at your statement to the police on September 1st refresh your recollection?"[2] Sutton said no. Counsel asked why. Sutton said that she did not sign a written statement or write a statement because she was in fear. She explained that she asked the officers to stay and protect them, but they would not. (*Id*.)

Counsel continued to frame the impeachment question as whether Sutton "recalled" telling the detective her inconsistent statements. Counsel asked, "**You don't recall** telling the detectives that the deal didn't go through, I know this morning he kept saying he had to recop or get some weed?" (*Id*. (emphasis added).) Sutton, once again, redirected her answer away from the question and stated that

---

[2] It is not clear why counsel said September 1. The statement he was referencing was clearly January 1, 2016, the day the crime occurred.

she believed she and her kids were in danger. (*Id.*) Defense counsel followed up by attempting to get her to confirm she had said this. Sutton refused to do that. After her refusal, counsel then asked whether she recalled making the statement. Sutton said no. (*Id.* at 72-73.) Counsel again asked whether she recalled saying it. Sutton answered that she could have said it, but she was "not sure what I said after that. I was distraught, I was still shaking, and I was still asking for services that they could not provide. So I'm not exactly sure. I didn't even want to give out his name because I was so scared." (*Id.* at 73.) Counsel then asked, "Okay. Maybe because it's a lie, right?" The prosecutor's objection to the question as argumentative was sustained. (*Id.*)

Counsel then asked, "Do you recall telling the detectives that your husband had to make a run, and it was something to do with weed, and he kept talking about it the night before?" Sutton responded, "You keep asking me these questions, but I'm not familiar with them. I'm not exactly sure what I told them." (*Id.* at 74.) Once again, Sutton stated that the police refused to protect her and her family. (*Id.*) Counsel moved on to other subjects.

After questioning her about the argument between Fleming and Veasley occurred, counsel asked Sutton, "Okay. So, that part of your statement to the police on January 1 you have a perfect recollection of, right?" Sutton responded that she was not sure. (*Id.* at 76.)

Counsel returned to the January 1 statement to the police and asked her, "In your statement to police on January 1st, you indicated to them that you didn't get a good look at the suspect, is that correct?" Sutton replied, "I'm not exactly sure." (*Id.* at 77.) Sutton explained that she was afraid when the officers would not stay with them. (*Id.*) Counsel asked, "And, again, there'd be no point to show you the transcript?" Sutton answered, "No." (*Id.*)

Counsel then asked whether she remembered telling the police that her memory was off since her last surgery. Sutton said, "No. I told them that I had a lot of things going on since my last surgery, but my memory wasn't off that—not to know what had had happened to my husband." (*Id.* at 77.) Counsel followed up, "And that's why you told the police you didn't know who shot your husband on January 1st?" Sutton denied that. She said, "I told the police that when they told me that they could not stay there with me and my kids in the house. . . ." (*Id.*) Counsel then asked her whether she recalled telling the officers she couldn't describe the individual because her memory was kind of off since my last surgery." Sutton, once again, changed the subject and said what she could remember about what happened. (*Id.* at 78.)

Later, counsel asked whether she recalled stating that the individual came in through the front door on January 1. Sutton said she wasn't sure. She added, "[T]hat's my whole point to you. I'm not exactly sure what I said to the officers January 1st, because I was scared and alone with my husband still laying down there and my kids in a room somewhere that I don't even know about." (*Id.* at 79.)

After asking Sutton whether she lied to the police, Sutton said she was not sure if she lied to them since she did not write out a statement. Counsel then asked her whether she had any recollection of the police recording a statement. Sutton said, "No, not today because I never signed anything that day." She added, once again, she was scared. (*Id.* at 80.)

On redirect, the prosecutor asked Sutton whether, when she spoke to the detectives on January 1, she believed that Glover had committed other acts of violence at the time she spoke to the police. Sutton said yes, she knew about his history. (*Id.* at 90.) Afterwards, the court instructed the jury that this testimony could be considered by the jury solely for the purpose of explaining the state of mind of the witness at the time she made her statement to police on January 1, 2016. (*Id.* at 90-91.)

26

Counsel never sought to admit into evidence Sutton's prior inconsistent statements to the police detectives.

For her part, Veasley admitted on cross examination that she initially told the police that someone named Hatch, who had come over to buy marijuana from Fleming, had shot Fleming. She also indicated that Hatch had been waiting upstairs during the argument, but at some point had come downstairs to talk to Sutton. She further stated that Fleming was upset about Hatch sticking his nose into family business. (*Id.* at 104-06.)

### B.   Glover can establish cause and prejudice to overcome the default; he is also entitled to relief on this ground

A petitioner can obtain review of a procedurally defaulted claim only if he can show cause and prejudice to overcome the default. *Cooper v. Neven*, 641, F.3d 322, 327 (9th Cir. 2011); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006); *Woods v. Sinclair*, 764 F.3d 1109, 1129 (9th Cir. 2014).

Under *Martinez*, if a petitioner has defaulted a claim of ineffective assistance of trial counsel in state court, the inadequate assistance of the petitioner's state post-conviction attorney may provide cause to overcome the default in federal court. To show cause under *Martinez*, a petitioner needs to prove his state post-conviction attorney "was ineffective under the standards of *Strickland v. Washington*." *Id.* at 14. That is, the petitioner needs to show deficient performance on the part of the post-conviction attorney, along with prejudice, i.e., a reasonable probability the defaulted *Strickland* claim would have succeeded in state court. *See Rodney v. Filson*, 916 F.3d 1254, 1259-60 (9th Cir. 2019). To establish prejudice under *Martinez*, the petitioner needs to show the underlying *Strickland* claim is "substantial," i.e., that it has "some merit." *Martinez*, 566 U.S. at 14.

Glover can establish cause because his postconviction counsel was ineffective for failing to raise Ground Five, which alleged that counsel was ineffective for failing

27

to impeach a critical witness with her prior inconsistent statement. The State called two main witnesses to testify against Glover, Miranda Sutton and Akira Veasley. In their initial statements to the police, both gave detailed statements indicating that they did not know the person who had shot and killed the victim. Neither of them had identified Glover as the shooter.

However, at trial, both witnesses changed their story and identified Glover as the shooter. Counsel's main task at trial was to challenge the credibility of these two witnesses with their dramatically inconsistent statements. This was particularly true about Sutton, who provided the details about the entire incident at trial, including Glover's alleged motivation. On cross-examination, counsel made insufficient and misguided attempts to impeach Sutton with her prior inconsistent statements, rarely following the proper procedure for impeaching a witness with a prior inconsistent statement and repeatedly veering off course into the procedures for refreshing a witness's recollection. Counsel never sought to admit into evidence Sutton's prior inconsistent statement.

Trial counsel was ineffective for failing to properly impeach Sutton with her prior inconsistent statement to the police. Glover's main defense at trial was that the State's most important witnesses against Glover told an entirely different story at trial than the one they told the police on the day of the shooting. Sutton's prior inconsistent statement to the police was a central component of that defense. However, counsel utterly failed to impeach Sutton with that statement. There is a basic way that a witness can be impeached through the use of a prior inconsistent statement. The attorney confirms the witness's current testimony. The attorney then confirms that the witness made a prior statement. The final step is to then ask the witness about the specific language in the prior inconsistent statement. If the witness refuses to acknowledge the content of the statement, then the attorney can seek to admit the statement. *See* NRS 51.035 (prior inconsistent statements are not hearsay).

28

Counsel simply failed to do that here. Most importantly, counsel failed to get the prior inconsistent statement into evidence. Counsel's approach was misguided from the start. When counsel first began questioning Sutton about her prior inconsistent statement, he did not make clear the exact contents of her prior statement. He paraphrased it and spoke about it in broad terms. However, counsel had the right to use the exact language of the statement in his question. Counsel could have gone so far *as simply reading the transcript of the statement.*

But the more prejudicial mistake was his inadequate and misguided response to Sutton's answers. Sutton refused to confirm the contents of her prior statement. Instead, she kept repeating that she did not remember. In response, counsel had the right to admit the prior statement into evidence. Rather than pursue this important step, counsel instead focused on whether Sutton remembered her prior statement. But her memory of the statement was irrelevant for this type of impeachment. So long as the parties had the opportunity to question her about the statement, which clearly occurred, counsel was allowed to admit the prior inconsistent statement into evidence. *See* NRS 51.035. He did not need to waste time, and cede control of the questioning over to Sutton, by inquiring into her memory of the statement. He just needed to admit the prior inconsistent statements. Based on Sutton's refusal to answer his questions about the contents of her statement to the police, the jury was simply not allowed to consider what Sutton had previously said to the detectives.

At bottom, the goal of this type of impeachment was to get the exact contents of the prior inconsistent statement into evidence so that the jury could use it to assess Sutton's credibility. That was either through Sutton admitting that she said the statements or, if she refused to acknowledge those statements, to then admit them into evidence. Counsel did not do that here. This was a critical mistake. There was no strategic justification for this error.

Respondents argue that counsel had a strategic reason for failing to seek to admit the prior inconsistent statements. They argue that seeking to admit the prior inconsistent statement to the police would have potentially opened the door to the admission of prior bad act evidence against Glover. (ECF No. 41 at 29-30.) This was not a concern here. In the first instance, as Respondents acknowledge, the State was already given permission to ask Sutton about Glover's bad acts. (ECF No. 25-45 at 90-91.) That was a result of counsel already *seeking to impeach Sutton with her prior inconsistent statements*. That is the point here. He raised the prior inconsistent statements before the jury, but did not properly get those inconsistent statements into evidence for the jury to fully consider. In other words, he made the strategic decision to make an issue of these inconsistent statements, but he performed that strategy deficiently.

This deficient performance prejudiced Glover. Sutton's prior inconsistent statements to the police were the central component of the defense. Sutton's testimony, even more than Veasley's, was critically important to the prosecution's case. She provided the details about the entire incident, including Glover's alleged motivation for the shooting. Attacking her credibility was fundamental to the defense. Counsel's inability to properly impeach her with the prior inconsistent statements in which she told an entirely different story about what occurred, resulted in the jury being unable to consider the substance of the prior statement. There can be no doubt that there is a reasonable probability that, but for counsel's error, the outcome of the proceedings would have been different.

Postconviction counsel was ineffective for not raising this claim. As shown above, trial counsel performed deficiently in his cross-examination of Sutton and that deficient performance had an impact on the outcome of the trial. Had postconviction counsel raised this claim, there is a reasonable probability that the outcome of the postconviction proceedings would be different. Glover can thus show cause to

overcome the default on this claim. For the same reasons, Glover can establish prejudice as the underlying ineffective assistance of trial counsel claim is substantial. Similarly, Glover is entitled to relief since counsel's performance was deficient and there is a reasonable probability that the outcome of the trial would have been different had counsel properly conducted the cross-examination of Sutton, giving the jury the opportunity to review her prior inconsistent statements.

Accordingly, Glover can overcome the default on this ground. He is also entitled to relief. The writ should be granted, the judgment of conviction vacated, and a new trial ordered.

## IV.    Conclusion

For the reasons discussed above, the writ should be granted, the judgment of conviction vacated, and a new trial ordered.

Dated June 5, 2025.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Jonathan M. Kirshbaum*

Jonathan M. Kirshbaum
Assistant Federal Public Defender

31