UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| SHAWN GLOVER, JR., | Case No. 3:22-cv-00207-MMD-CSD |
| Petitioner, | ORDER |
| v. | |
| WARDEN REUBART[1], *et al.*, | |
| Respondents. | |

## I.    SUMMARY

Petitioner Shawn Glover, Jr., a Nevada state prisoner, filed an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (ECF No. 23 ("First Amended Petition").) The First Amended Petition is before the Court for adjudication on the merits. As further explained below, the Court denies the First Amended Petition and grants a Certificate of Appealability ("COA") only as to Count 3.

## II.    BACKGROUND

### A.    Facts Underlying Conviction

In December 2015, Patrick Fleming, his wife, Miranda Sutton, their twelve-year-old twins, and Sutton's 21-year-old-daughter, Akira Veasley moved into a townhouse with Sutton's goddaughter, Angela, and Angela's three children. (ECF No. 25-45 at 65, 99-100.) Around Christmas Eve, Glover moved into the townhouse. (*Id.* at 66, 99.) He shares a daughter with Angela. (*Id.* at 47.)

On New Year's Eve, Veasley used Fleming's car, though she was not allowed to have her boyfriend in the car. (*Id.* at 93.) On New Year's Day, Fleming took Angela to

---

[1]According to the state corrections department's inmate locator page, Glover is currently incarcerated at High Desert State Prison. Jeremy Bean is the warden of that facility. The Court directs the Clerk of the Court to substitute Jeremy Bean for Respondent William Reubart under Fed. R. Civ. P. 25(d).

work in the morning, stopped to pick up his paycheck, and returned to the townhouse. (*Id*. at 47-48.) Fleming and Veasley entered into a heated argument in the garage after he discovered that Veasley's boyfriend was in Fleming's car the night before. Sutton joined the argument defending her daughter. (*Id*. at 47-49.)

While arguing, Glover brought a phone to Sutton in the garage because Angela was on the phone. (*Id.* at 50.) Glover returned upstairs. (*Id.*) Sutton told Angela that everything was fine. (*Id*. at 50-51.) As the argument in the garage was calming down, Glover returned to the garage and Glover asked Sutton to speak to him upstairs. While in Angela's bedroom, Glover asked Sutton, "do you want me to handle this, do you want me to take care of it?" Sutton replied that everything was okay. (*Id*.)

Shortly after Fleming and Veasley resolved their argument, they went upstairs. Fleming asked Glover why he was talking to Sutton, his wife. (*Id.* at 53.) Glover indicated that he was concerned about the heated argument in the garage, that it was his house, and that Fleming was possibly fighting Sutton and Veasley, who were crying. (*Id*.) Fleming denied fighting with Sutton and Veasley and said they were simply having a family argument. (*Id.*) Fleming touched Glover on the shoulder and Glover indicated to Fleming that he was too close to him. Fleming asked if they had a problem and if they needed to talk. Fleming suggested that they go downstairs to talk. (*Id*.)

Sutton and Veasley observed Fleming walk down the stairs towards the garage with Glover behind him. (*Id*. at 53-54, 96.) While the men were on the stairs, Sutton and Veasley could no longer see them. (*Id*. at 54-55, 96.) Within seconds, Sutton and Veasley heard three loud gunshots. They ran downstairs and saw Fleming lying on the floor on his side with Glover standing over his body. Sutton testified that Glover threatened her and her children if she told anyone. Glover left the townhouse and Veasley called 911. (*Id*. at 55, 64-65.)

### B.    Procedural Background

Following a jury trial, the state court entered a judgment of conviction for first degree murder with use of a deadly weapon, assault with a deadly weapon, and discharge

1   of a firearm from or within structure or vehicle and sentenced Glover to a term of life

2   without the possibility of parole. (ECF No. 25-55.) The Nevada Supreme Court affirmed

3   the judgment of conviction. (ECF No. 26-21.)

4          Glover filed a state habeas petition seeking post-conviction relief and the state

5   district court denied the state habeas petition. (ECF Nos. 26-28, 26-35.) The Nevada

6   Court of Appeals affirmed the denial of relief. (ECF No. 26-54.) Glover initiated this federal

7   habeas action. (ECF No. 1-1.) Following the appointment of counsel, he filed his First

8   Amended Petition raising five grounds for relief. (ECF No. 23.) Respondents moved to

9   dismiss Ground 5 as unexhausted. (ECF No. 29 at 3-5.) The Court deferred consideration

10  of whether Glover can demonstrate cause and prejudice under *Martinez v. Ryan*, 566

11  U.S. 1 (2012), to overcome the procedural default of Ground 5. (ECF No. 36.)

12  **III.   LEGAL STANDARD**

13         **A.  Review Under the Antiterrorism and Effective Death Penalty Act**

14         28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in

15  *habeas corpus* cases under the Antiterrorism and Effective Death Penalty Act

16  ("AEDPA"):

17         An application for a writ of habeas corpus on behalf of a person in custody
           pursuant to the judgment of a State court shall not be granted with respect
18         to any claim that was adjudicated on the merits in State court proceedings
           unless the adjudication of the claim—
19
           (1) resulted in a decision that was contrary to, or involved an unreasonable
20         application of, clearly established Federal law, as determined by the
           Supreme Court of the United States; or
21
           (2) resulted in a decision that was based on an unreasonable determination
22         of the facts in light of the evidence presented in the State court proceeding.

23  28 U.S.C. § 2254(d). A state court decision is contrary to established Supreme Court

24  precedent, within the meaning of § 2254(d)(1), "if the state court applies a rule that

25  contradicts the governing law set forth in [Supreme Court] cases" or "if the state court

26  confronts a set of facts that are materially indistinguishable from a decision of [the

27  Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*,

28  529 U.S. 362, 405-06 (2000), and *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court

3

decision is an unreasonable application of established Supreme Court precedent under § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (internal citation omitted) (quoting *Williams*, 529 U.S. at 409-10).

The Supreme Court has instructed that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Court has stated that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted) (describing the standard as "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt").

### B. Standard for Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for claims of ineffective assistance of counsel requiring Petitioner to demonstrate that: (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced Petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). Courts considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. It is Petitioner's burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

1    Additionally, to establish prejudice under *Strickland*, it is not enough for Petitioner "to

2    show that the errors had some conceivable effect on the outcome of the proceeding." *Id.*

3    at 693. Rather, the errors must be "so serious as to deprive the [petitioner] of a fair trial,

4    a trial whose result is reliable." *Id*. at 687.

5            Where a state district court previously adjudicated the claim of ineffective

6    assistance of counsel under *Strickland*, establishing the decision was unreasonable is

7    especially difficult. *See Richter*, 562 U.S. at 104-05. In *Richter*, the Supreme Court

8    clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply

9    in tandem, review is doubly so. *See id.* at 105; *see also Cheney v. Washington*, 614 F.3d

10   987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews

11   a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s

12   deferential standards apply; hence, the Supreme Court's description of the standard as

13   doubly deferential."). The Court further clarified, "[w]hen § 2254(d) applies, the question

14   is not whether counsel's actions were reasonable. The question is whether there is any

15   reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*,

16   562 U.S. at 105.

17           **C.  Standard for Procedurally Defaulted Claims**

18           "A federal habeas court generally may consider a state prisoner's federal claim

19   only if he has first presented that claim to the state court in accordance with state

20   procedures." *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022). Where a petitioner fails to do

21   so and therefore "has defaulted his federal claims in state court pursuant to an

22   independent and adequate state procedural rule," federal habeas review "is barred unless

23   the prisoner can demonstrate cause for the default and actual prejudice as a result of the

24   alleged violation of federal law, or demonstrate that failure to consider the claims will

25   result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750

26   (1991).

27           For claims of ineffective assistance of trial counsel, petitioners may overcome

28   cause for procedural default of the claim where (1) the claim of ineffective assistance of

1   trial counsel is a "substantial" claim; (2) the "cause" consists of there being "no counsel"

2   or only "ineffective" counsel during the state collateral review proceeding; (3) the state

3   collateral review proceeding was the "initial" review proceeding in respect to the

4   ineffective assistance of trial counsel claim; and (4) state law requires that an "ineffective

5   assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."[2]

6   *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 14, 18; citing

7   *Coleman*, 501 U.S. 722). An ineffective assistance of trial counsel claim "is insubstantial"

8   if it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14-16.

9       "[T]he standard for evaluating the underlying trial counsel IAC claim during the

10  *Martinez* prejudice analysis is not as stringent as that required when considering the

11  merits of the underlying [*Strickland*] claim." *Leeds v. Russell*, 75 F.4th 1009, 1017-18 (9th

12  Cir. 2023) (citing *Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022) ("[A] conclusion on

13  the merits of [a trial counsel IAC] claim under *Strickland* holds a petitioner to a higher

14  burden than required in the *Martinez* procedural default context, which only requires a

15  showing that the [trial counsel IAC] claim is 'substantial.' ")). While review of trial counsel's

16  actions in a *Martinez* prejudice analysis is conducted under a more relaxed standard, the

17  *Strickland* standard is applied with full force when considering the actions of initial

18  postconviction review counsel for a *Martinez* cause analysis. *See Leeds*, 75 F.4th at

19  1022. The requirements of cause and prejudice are distinct but, "[t]he analysis of whether

20  both cause and prejudice are established under *Martinez* will necessarily overlap," as

21  "each considers the strength and validity of the underlying ineffective assistance claim.'"

22  *Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019). On all such issues, if reached, the

23  court's review is *de novo*. *See, e.g.*, *Detrich v. Ryan*, 740 F.3d 1237, 1246-48 (9th Cir.

24  2013); *Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017).

25

26

27  _____

    [2]Nevada prisoners are required to raise IAC claims involving trial counsel in an
28  initial state-postconviction petition, which is the initial collateral review proceeding for
    purposes of applying *Martinez*. *See Rodney v. Filson*, 916 F.3d 1254, 1259-60 (9th Cir.
    2019).

## IV.    DISCUSSION

### A.    Ground 1—Insufficient Evidence

In Ground 1, Glover alleges that he was denied his due process rights because there was insufficient evidence to support the convictions. (ECF No. 23 at 5-8.) He asserts that his murder conviction was based on legally insufficient evidence because there was no physical evidence tying him to the crime. (*Id*. at 7.) He contends that the State relied solely on fundamentally flawed testimony from Sutton and Veasley that was inconsistent with their statements to the police. (*Id*. at 7-8.)

#### 1.    Additional Background

When Sutton originally called 911, she stated that she did not know who shot her husband (ECF No. 25-45 at 69) and Veasley originally told the police that an individual named Hatch, who had come over to buy marijuana from Fleming, was the person who shot Fleming. (*Id*. at 104-06.) She had told the police that Hatch had been upstairs during the argument, but had come downstairs at one point to speak to Sutton, and that Fleming was upset that Hatch was inserting himself into family business. (*Id*.) The following day, during their second interviews with the police, both Sutton and Veasley identified Glover as the person who shot Fleming. (*Id*. at 107-08, 79.)

Sutton and Veasley both testified regarding the shooting. (ECF No. 25-45.) As discussed above, Fleming and Veasley were arguing in the garage and Sutton joined the argument defending her daughter. (*Id.* at 50.) Glover observed the interaction when he brought the house phone to Sutton and he returned upstairs.

Sutton and Veasley subsequently observed Fleming walk down the stairs towards the garage with Glover behind him. While the men were on the stairs, Sutton and Veasley could no longer see them. Within seconds, Sutton and Veasley heard three loud gunshots. They ran downstairs and saw Fleming lying on the floor on his side with Glover standing over his body. Sutton testified that Glover threatened her, saying "if you and your kids want to live, you'll shut the fuck up." (*Id*. at 55.)

On cross-examination, both Sutton and Veasley admitted that they did not identify

1    Glover as the shooter to the police immediately following the shooting. (*Id*. at 68-74, 104-

2    110.) Sutton testified that she was afraid because her husband was just killed and the

3    police could not stay at her home to protect her or her family. (*Id*. at 29.) Both Sutton and

4    Veasley testified that they were fearful because they believed that Glover had a violent

5    past. (*Id*. at 29, 37.)

6        A forensic pathologist testified at trial that Fleming died as a result of a gunshot

7    wound to the head. (*Id*. at 132.) The forensic pathologist testified that the bullet's trajectory

8    entered Fleming's head from the left to right and downward. (*Id*. at 127.) The bullet went

9    through Fleming's brain and went down into his oral cavity fracturing his jaw. (*Id*.) The

10   second and third non-fatal shots were in his right upper arm and his groin area. (*Id*.)

11       The Nevada Supreme Court held:

12       The record shows that after asking Sutton if she wanted him to "handle" the
         victim (Patrick Fleming), Glover followed Fleming downstairs to talk. Within
13       seconds, Veasley and Sutton heard three gunshots, and Sutton observed
         Glover standing over Fleming's body holding a gun. Glover pointed the gun
14       at Sutton and threatened her not to report what she saw. The medical
         examiner testified that the bullets entered Fleming at a downward trajectory.
15       Testimony also established that Glover fled the scene after the shooting.
         Viewing this evidence in the light most favorable to the State, a rational trier
16       of fact could conclude beyond a reasonable doubt that Glover committed
         the charged crimes. *See Walker v. State*, 91 Nev. 724, 726, 542 P.2d 438,
17       438-39 (1975) (recognizing that "it is the function of the jury, not the
         appellate court, to weigh the evidence and pass upon the credibility of the
18       witness"); *see also* 193.165 (deadly weapon enhancement); NRS 200.010
19
20       (defining murder); NRS 200.030 (delineating the differing degrees of
         murder); NRS 200.471 (defining assault); NRS 202.287 (defining
21       discharging a firearm within a structure). That the State did not present
         physical evidence connecting Glover to the shooting does not change this
22       conclusion. *See Hernandez v. State*, 118 Nev. 513, 531, 50 P.3d 1100,
         1112 (2002) (concluding that circumstantial evidence alone may support a
23       criminal conviction).

24

25   ECF No. 26-21 at 4-5.

26

27

28

2.    **Analysis**

The Due Process Clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When a habeas petitioner challenges the sufficiency of evidence to support his conviction, the court reviews the record to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Jones v. Wood*, 207 F.3d 557, 563 (9th Cir. 2000).

Sufficiency claims are limited to a review of the record evidence submitted at trial. *Herrera v. Collins*, 506 U.S. 390, 402 (1993). Such claims are judged by the elements defined by state law. *Jackson*, 443 U.S. at 324, n.16). The reviewing court must respect the exclusive province of the fact-finder to determine the credibility of witnesses, to resolve evidentiary conflicts, and to draw reasonable inferences from proven facts. *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996). The district court must assume the trier of fact resolved any evidentiary conflicts in favor of the prosecution, even if the determination does not appear on the record, and must defer to that resolution. *Jackson*, 443 U.S. at 326; *see also McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (reaffirming *Jackson* standard).

The Supreme Court has emphasized that claims of insufficiency of the evidence "face a high bar in federal habeas proceedings . . . ." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam). When the deferential standards of AEDPA and *Jackson* are applied together, the question for decision on federal habeas review is whether the state court's decision unreasonably applied the *Jackson* standard to the evidence at trial. *See, e.g., Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005) (citations omitted).

The Nevada Supreme Court's ruling was neither contrary to nor an objectively unreasonable application of clearly established law as determined by the United States

Supreme Court. Although the prosecution did not present physical evidence, such as DNA evidence demonstrating that Glover was the shooter, ample evidence supported the verdict. Both Sutton and Veasley testified that Fleming was shot seconds after they observed him going down the stairs with Glover behind him. The forensic pathologist's testimony regarding the downward trajectory of the fatal bullet corroborated Sutton and Veasley's testimony. Sutton and Veasley also testified that they did not identify Glover as the shooter during their initial interviews with police because they were fearful. "A jury's credibility determinations are therefore entitled near-total deference under *Jackson*." *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 326). Based on the evidence in the record, and viewing the evidence in the light most favorable to the prosecution, the Court concludes that a rational jury could have found the essential elements of the crimes beyond a reasonable doubt. Accordingly, the Court denies federal habeas relief for Ground 1.

### B.    Ground 2—Prosecutorial Misconduct

In Ground 2, Glover alleges that the State committed prosecutorial misconduct and violated his due process rights by attempting to shift the burden of proof to Glover. (ECF No. 23 at 8-10.)

#### 1.    Additional Background

During closing argument, Glover argued that there was no physical evidence connecting him to the crimes, that the only evidence presented by the State was unreliable, and that there was a lack of evidence establishing intent or motive. (ECF No. 25-50 at 33-35.) During rebuttal, the State provided that they were "waiting for [defense counsel] to answer the question, well where was his client?" (*Id*. at 38-39.) The state district court sustained the defense's objection and instructed the State to rephrase. The State then provided, "[defense counsel] said . . . the Defendant was not even there. Where is the evidence about that?" (*Id*.)

Glover asserts that the State clearly shifted the burden of proof to Glover by telling the jurors that the defense needed to present evidence to challenge the State's case and

1    lack of physical evidence. The state district court did not instruct the jury to disregard the

2    State's comment. Glover further argues that the Nevada Supreme Court's rejection of this

3    claim was unreasonable and should not be considered harmless. (ECF No. 44 at 17-18.)

4         The Nevada Supreme Court held:

5         Glover contends that the State committed prosecutorial misconduct by
          improperly shifting the burden of proof during closing argument. "When
6         considering claims of prosecutorial misconduct, this court engages in a two-
          step analysis. First, we must determine whether the prosecutor's conduct
7         was improper. Second, if the conduct was improper, we must determine
          whether the improper conduct warrants reversal." *Valdez v. State*, 124 Nev.
8         1172, 1188, 196 P.3d 465, 476 (2008).

9
          Glover's closing argument attacked the State's lack of physical evidence
10        and proffered that the State had not even proven that Glover was at the
          crime scene at the time of the shooting. In rebuttal, the prosecutor argued
11        the evidence in support of the State's case and then said, "And I'm waiting
          for [defense counsel] to answer the question, well, where was his client."
12        Glover objected and the court sustained the objection, but allowed the
          prosecutor to rephrase. The prosecutor then pointed out again that Glover
13        had not provided evidence that he was not present at time of the shooting.
          We agree with Glover that the prosecutor's argument improperly shifted the
14        burden of proof to the defense. *Whitney v. State*, 112 Nev. 499, 502, 915
          P.2d 881, 883 (1996) (reiterating that comments on a defendant's failure to
15        produce evidence or call witnesses impermissibly shifts the burden of proof
          to the defense). Nevertheless, we conclude that this prosecutorial
16        misconduct was harmless given the overwhelming evidence both that
          Glover was at the scene and committed the crimes. *See King v. State*, 116
17        Nev. 349, 356, 998 P.2d 1172, 1176 (2000) (concluding that even
          aggravated prosecutorial misconduct may constitute harmless error where
18        there is overwhelming evidence of guilt).

19

20

21    ECF No. 26-21 at 5-6.

22              **2.    Analysis**

23         Prosecutorial misconduct warrants federal habeas relief if the prosecutor's actions

24    "so infected the trial with unfairness as to make the resulting conviction a denial of due

25    process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation and internal quotation

26    marks omitted). A defendant's constitutional right to due process of law is violated if

27    the prosecutor's misconduct renders a trial "fundamentally unfair." *Id.* at 181-83; *see*

28    *also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process

analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Claims of prosecutorial misconduct are reviewed "on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation and internal quotation marks omitted); *see also Greer v. Miller*, 483 U.S. 756, 765 (1987); *Turner v. Calderon*, 281 F.3d 851, 868 (9th Cir. 2002). If there is constitutional error, a harmless error analysis is applied; the error warrants relief if it "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (citation and internal quotation marks omitted); *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012).

The Nevada Supreme Court's rejection of Glover's claim was neither contrary to nor an objectively unreasonable application of clearly established law as determined by the United States Supreme Court. The State presented strong evidence that Glover committed the crimes. *See Darden*, 477 U.S. at 181-82 (analyzing a claim that the prosecutor's argument violated due process by considering the strength of the evidence against the defendant). Considering witness testimony that Glover had followed Fleming down the stairs, that he was observed standing over Fleming's body immediately after being shot, the trajectory of the bullet, that Glover threatened Sutton not to tell police, and that Glover fled the scene, the Court cannot conclude that the actions of the prosecutor "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181-82.

In addition, the state district court instructed the jury that statements by the prosecution were not evidence and that the State carried the burden of proof. (ECF No. 25-48 at 28-29, 40.) The United States Supreme Court has long held that "[a] jury is presumed to follow its instructions. *Weeks v. Angelone*, 528 U.S. 225, 235 (2000). The Court finds that the Nevada appellate court reasonably found that the statement made during closing argument by the prosecution was harmless in view of the evidence that

1   established Glover's guilt. Glover is denied federal habeas relief for Ground 2.

2       **C.    Ground 3—Ineffective Assistance as to Testimonial Hearsay**

3       In Ground 3, Glover alleges that trial counsel rendered ineffective assistance of

4   counsel for failure to object to testimonial hearsay. (ECF No. 23 at 10-13.)

5               **1.    Additional Background**

6       A medical doctor employed by the Clark County Coroner Medical Examiner, Dr.

7   Timothy Dutra, performed an autopsy on Fleming and provided an autopsy report of his

8   findings and conclusions. At trial, however, another doctor, Dr. Corneal, testified based

9   on her review of the autopsy report and investigative files, including photographs. (*Id.* at

10  10.)

11      Dr. Corneal testified that Fleming was shot in the back of the head on his left side.

12  (ECF No. 25-45 at 124.) She further testified that she did not observe soot or stippling

13  that would indicate that the gun was fired at close range, possibly due to Fleming's thick

14  hair. (*Id.* at 129.) She testified that the gunshot wound to the head was the cause of

15  Fleming's death and that the manner of death was homicide. (*Id.*)

16      Glover argues that the autopsy report containing Dr. Dutra's testimonial

17  conclusions, including the cause and manner of death, was admitted at trial even though

18  Dr. Dutra did not testify. (ECF No. 23 at 12.) Glover asserts that because it was

19  testimonial, he had the right to question Dr. Dutra about his work, methodology,

20  competence, and any other factors relevant to the weight and admissibility of the

21  testimony concerning the autopsy that was provided through Dr. Corneal. (*Id.*) He

22  contends that trial counsel was ineffective for failing to object to Dr. Corneal's testimony.

23  (*Id.*)

24      The Nevada Court of Appeals held:

25      The Nevada Supreme Court has previously held that expert testimony
        regarding the content of a testimonial statement in a written report may
26      function as the equivalent of a testimonial statement, *see Vega v. State*,
        126 Nev. 332, 340, 236 P.3d 632, 638 (2010), and that another analyst's
27      testimony as to the testimonial statements of a nontestifying analyst violates
        the Confrontation Clause, *see Polk v. State*, 126 Nev. 180, 183-84, 233
28      P.3d 357, 359 (2010). However, an expert witness may testify concerning

                                         13

an independent opinion reached as a result of reliance upon reports generated by others without violating the Confrontation Clause. *Vega*, 126 Nev. at 340, 236 P.3d at 638; *see also Flowers v. State*, 136 Nev. 1, 9, 456 P.3d 1037, 1046 (2020) ("To the extent [the expert witness] offered his independent opinions and only conveyed to the jury that he generally relied on the autopsy photographs and reports in reaching his opinions, he did not communicate hearsay to the jury.).

The medical examiner that conducted the autopsy of the victim was not available to testify at trial. However, a second medical examiner testified that she reviewed the autopsy reports and photographs that were created by the first examiner. The second medical examiner testified that she utilized the reports and photographs to reach her own independent conclusions as to the cause of the victim's death. The second medical examiner ultimately testified that she concluded that the victim died due to a gunshot wound to the head and the manner of death was homicide. The second medical examiner did not testify as to the conclusions reached by the first medical examiner.

Because the second medical examiner testified that she reached her own independent conclusions, her testimony did not violate Glover's right to confrontation. Accordingly, Glover did not demonstrate his Counsel's performance fell below an objective standard of reasonableness by failing to object to the second medical examiner's testimony. Glover also did not demonstrate a reasonable probability of a different outcome at trial had counsel done so. Therefore, we conclude the district court did not err by denying this claim without conducting an evidentiary hearing.

ECF No. 26-54 at 3-4.

## 2. Analysis

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418 (1965); *see also Maryland v. Craig*, 497 U.S. 836, 845 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."); *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) ("[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose . . . infirmities through cross-examination, thereby calling

to the attention of the factfinder the reasons for giving scant weight to the witness' testimony."); *Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.").

The United States Supreme Court has determined that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). The United States Supreme Court has also held that "analysts' affidavits [are] testimonial statements," so "[a]bsent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to be confronted with the analysts at trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009) (emphasis in original) (internal quotation marks omitted). Thereafter, the Court held that the Confrontation Clause does not allow the government "to introduce a forensic laboratory report containing a testimonial certification . . . through the in-court testimony of a scientist who did not . . . perform or observe the test reported in the certification . . . unless the analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine the particular scientist." *Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011) (holding that a blood alcohol analysis report was testimonial). The *Bullcoming* Court determined that "surrogate testimony" contravenes the Confrontation Clause. *Id*. at 661. Surrogate testimony could not convey what the original analyst knew or observed about the events stated in the certificate, nor "could it expose any lapses or lies on the certifying analyst's part." *Id*. The *Bullcoming* Court concluded: "The accused's right is to be confronted with the analyst who made the certification." *Id*. at 652.

Later, in *Williams v. Illinois*, five Justices agreed that the admission of expert testimony referring to an out-of-court DNA profile did not violate the Confrontation Clause. 567 U.S. 50 (2012). The Court came to no clear consensus as to what constituted a testimonial statement, however, issuing a plurality opinion, two concurrences, and a

dissent. The plurality noted that in *Bullcoming* and *Melendez-Diaz*, "there is no question" but that the test results were offered for their truth, whereas in *Williams*, the report was offered "only for the distinctive and limited purpose of seeing whether it matched something else." *Id*. at 69. As Justice Breyer acknowledged in his concurrence, the Court did not settle how "Confrontation Clause 'testimonial statement' requirements apply to crime laboratory reports." *Id*. at 92 (Breyer, J., concurring).

In *Smith v. Arizona*, 602 U.S. 779 (2024), a more recent Confrontation Clause case that cannot be considered here,[3] the Supreme Court addressed whether testimony by an expert witness would violate the Confrontation Clause if that testimony were based on an absent witness's report. 602 U.S. at 783. *Smith* holds that "when an expert conveys an absent analyst's statements in support of [the expert's] opinion, and the statements provide that support only if true, then the statements come into evidence for their truth." *Id*. The Supreme Court accordingly found that the protections of the Confrontation Clause apply when a substituted analyst offers independent conclusions while conveying the substance of an underlying report. *Id*. at 803 ("Neither may the state introduce those statements through a surrogate analyst who did not participate in their creation. And nothing changes if the surrogate … presents the out-of-court statements as the basis of his expert opinion." (citation omitted)). The Court left the question of whether such out of court statements are "testimonial" open for trial courts to decide. *Id*. at 801-02.

Based on the unsettled nature of the law on what is testimonial, the Court cannot conclude that the Nevada appellate court's ruling was an objectively unreasonable application of clearly established law as determined by the United States Supreme Court. A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's

---

[3]Under Supreme Court precedent, a new rule of criminal procedure ordinarily "does not apply retroactively to overturn final convictions on federal collateral review." *Edwards v. Vannoy*, 593 U.S. 255, 263 (2021). There are only two exceptions and the opinion in *Smith* does not fall into either category. Glover acknowledges that *Williams* "was still good law at the time of the Court of Appeals decision." (ECF No. 44 at 22.) The holding in *Smith* is inapplicable to Glover's collateral attack on his conviction.

1  application of the United State Supreme Court precedent must be objectively

2  unreasonable to warrant relief. *Lockyer*, 538 U.S. at 75. "The prisoner must show that the

3  state court's decision is so obviously wrong that its error lies 'beyond any possibility for

4  fairminded disagreement" *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (citing *Richter*, 562

5  U.S. at 103). As such, if any fairminded jurist could take a different view from the way the

6  state appellate court resolved the claim, habeas corpus relief is not warranted. *Richter*,

7  562 U.S. at 102. If all fairminded jurists would agree that the resolution of the claim was

8  "an error well understood and comprehended in existing law," then relief under §

9  2254(d)(2) is warranted. *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (citation omitted).

10  The Court emphasized that "even a strong case for relief does not mean the state court's

11  contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102.

12      As the Nevada Court of Appeals noted, Dr. Corneal used the autopsy report and

13  investigative files to reach her own independent conclusions as to the cause of death and

14  did not testify as to the conclusions of the first medical examiner. Glover makes a good

15  argument that Dr. Corneal "was the surrogate for the findings and opinions contained in

16  Dr. Dutra's autopsy report." (ECF No. 44 at 23.) The testimonial nature of an autopsy

17  report has not been specifically evaluated by the Supreme Court. *See Meras v. Sisto*, 676

18  F.3d 1184 (9th Cir. 2012) (explaining that *Crawford* did not clearly establish that forensic

19  lab reports reports are testimonial).

20      Based on the unsettled nature of the law on what is testimonial, the Court cannot

21  conclude that the Nevada Court of Appeals' decision was objectively unreasonable to the

22  extent that the decision is so obviously wrong that its error lies beyond any possibility for

23  fairminded disagreement. Fairminded jurists could, and do, differ from the Nevada

24  appellate court in the resolution of this issue. Thus, the Court denies federal habeas relief

25  for Ground 3. Because reasonable jurists could debate the resolution of this claim, the

26  Court grants a certificate of appealability on Ground 3.

27      **D.    Ground 4—Conflict of Interest**

28      In Ground 4, Glover alleges that trial counsel rendered ineffective assistance

17

because the public defender's office had a conflict of interest due to its prior representation of Fleming. (ECF No. 23 at 13-14.)

### 1.    Additional Background

Trial counsel failed to disclose that the public defender's office had represented Fleming in two criminal cases. Fleming was represented by the public defender's office in a case where he was convicted of battery domestic violence. Glover argues that "there is reason to believe that, because Glover was connected to Fleming's family through Angela, he would have been aware of this prior behavior." (*Id.* at 14.) Glover asserts that such information may have been used to support a self-defense claim, but that the public defender's office would have had an ethical obligation to refrain from using any information from Fleming's prior case. (*Id.*)

The Nevada Court of Appeals held:

"Conflict of interest and divided loyalty situations can take many forms, and whether an actual conflict exists must be evaluated on the specific facts of each case. In general, a conflict exists when an attorney is placed in a situation conducive to divided loyalties." *Clark v. State*, 108 Nev. 324, 326, 831 P.2d 1374, 1376 (1992) (quoting *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991)). A conflict of interest exists if "counsel 'actively represented conflicting interests'" and the "conflict of interest adversely affected [the defendant's] lawyer's performance." *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 348 (1980)).

Glover did not allege that his trial counsel was placed in a situation that was conducive to divided loyalties. Glover also did not allege that his trial counsel actively represented conflicting interests or that counsel's performance was adversely affected by the public defender's office's previous representation of the deceased victim. Glover's allegations were thus insufficient to show that his counsel had an actual conflict of interest. Therefore, we conclude the district court did not err in denying this claim without conducting an evidentiary hearing.

(ECF No. 26-54 at 4-5.)

### 2.    Analysis

Effective assistance of counsel "includes a right to conflict-free counsel." *United States v. Mett*, 65 F.3d 1531, 1534 (9th Cir. 1995). In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an

actual conflict of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). However, until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. *Id.* If counsel actively represents multiple defendants with conflicting interests, such that an actual conflict adversely affects counsel's performance, prejudice is presumed. *See Cuyler*, 446 U.S. at 349-50. However, the Supreme Court has instructed that *Cuyler* "does not clearly establish, or indeed even support . . . expansive application" of that rule to cases outside the context of multiple concurrent representation. *Mickens v. Taylor*, 535 U.S. 162, 175 (2002). The presumption of prejudice only applies in the context of representation of multiple clients because of the "high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice." *Id.* The Nevada appellate court's rejection of Glover's claim was neither contrary to nor an objectively unreasonable application of clearly established law as determined by the United States Supreme Court. Glover fails to demonstrate that trial counsel actively represented conflicting interests and that this adversely affected his trial counsel's performance. Even if Glover could show that trial counsel actively represented conflicting interests, his ineffective assistance claim still could not be successful absent a showing that such conflict adversely affected his counsel's performance. Glover contends that he could have presented a self-defense theory at trial. Glover's theory of defense at trial, however, was that he was not the shooter and that the State solely relied on Sutton and Veasley's testimony which was unreliable. Glover can show no more than a theoretical division of loyalties. *See Mickens*, 535 U.S. at 171 (2002) ("[O]ur role is not to speculate about counsel's motives or about the plausibility of other litigation strategies."). Accordingly, the Court denies federal habeas relief for Ground 4.

### E.    GROUND 5—Ineffective Assistance for Failure to Impeach Witness

In Ground 5, Glover alleges that trial counsel rendered ineffective assistance for failure to impeach a critical witness with her inconsistent prior statement in which she told a different story about the shooting than her trial testimony. (ECF No. 23 at 15-22.)

### 1.    Additional Background

At trial, on cross-examination, Sutton admitted that in a 911 call she had stated that her husband had answered the door and he had been shot. (ECF No. 25-45 at 69.) She acknowledged that an individual was supposed to come over, but she did not know who it was. (*Id*.) She further admitted that she told the 911 operator that she did not know who shot her husband and that she believed she told the 911 operator that she had been threatened. (*Id*.) Glover asserts that trial counsel, however, failed to impeach Sutton with her statements made to the detectives on the day of the shooting.

During argument outside the presence of the jury, the State argued that Sutton's statements made to detectives on the day of the shooting ("Statement 1.0") were inconsistent with her other statements made to detectives ("Statement 2.0) because of Sutton's knowledge of Glover's prior convictions, prior murders, multiple acts of violence towards others, and involvement in a gang. (ECF No. 25-44 at 91-92, 95-96.) Following argument, the state district court instructed Sutton and Veasley that they could not mention anything about Glover's alleged gang membership, prior murder, or that he was previously in prison. (ECF No. 25-45 at 40-41.)

During cross-examination, trial counsel questioned Sutton about her prior statement to the detectives. (*Id*. at 65-83.) Sutton admitted that she made more than one statement, but that she did not remember what she said during Statement 1.0. (*Id*.) Sutton would not admit that she lied and did not admit telling detectives that Fleming was looking for a "re-up" or "re-cop" of marijuana and that a deal didn't go through. (*Id*. at 72.) On redirect, the State asked Sutton whether when she spoke to detectives on the day of the shooting if she believed that Glover committed other acts of violence and she responded affirmatively. (*Id*. at 90.) The state district court instructed the jury that this testimony could

1    be considered solely for the purpose of explaining the state of mind of the witness. (*Id*. at

2    90-91.)

3        Glover argues that trial counsel failed to admit the prior inconsistent statement into

4    evidence, and that trial counsel could have simply read the transcript of the statement.

5    (ECF No. 44 at 34.) Respondents argue that trial counsel strategically questioned Sutton

6    to prevent admission of prior bad act evidence against Glover. (ECF No. 41 at 32.)

7                    **2.    Analysis**

8        The Court finds that Ground 5 is not substantial within the meaning of *Martinez*

9    and that Glover fails to excuse procedural default of this claim. Glover fails to demonstrate

10   that his counsel was deficient under *Strickland*. "[S]trategic choices made after thorough

11   investigation of law and facts relevant to plausible options are virtually unchallengeable."

12   *Strickland*, 466 U.S. at 690. As evidenced by the record, although counsel did not admit

13   Sutton's prior inconsistent statement into evidence, trial counsel questioned Sutton

14   regarding the information in Sutton's prior statement to detectives such that the jury would

15   be aware of her prior statement, and elicited testimony on cross-examination that Sutton

16   previously made a false statement. In addition, trial counsel strategically questioned

17   Sutton to avoid presenting evidence regarding Glover's prior murder, incarceration, and

18   gang affiliation. Glover fails to overcome the strong presumption that his counsel's

19   conduct "falls within the wide range of reasonable professional assistance." *Strickland*,

20   466 U.S. 689.

21       Further, in light of the evidence presented against Glover, including Veasley's

22   testimony and Sutton's testimony that Glover had threatened her, Glover fails to

23   demonstrate that had counsel successfully admitted Sutton's prior inconsistent statement

24   into evidence that the outcome of the trial would have been different. Although Sutton's

25   prior statement was not admitted into evidence, trial counsel nonetheless questioned her

26   on the substance of her prior statements to detectives. Sutton admitted on cross-

27   examination that she had made a false statement. Accordingly, Glover fails to

28   demonstrate prejudice under *Strickland*.

1    Because Glover's underlying ineffective assistance of counsel claim fails under

2    *Strickland*, he cannot meet the second prong of the *Martinez* test, which requires a

3    petitioner to show a reasonable probability that the result of the post-conviction

4    proceedings would have been different absent post-conviction counsel's deficient

5    performance. *See Ramirez*, 937 F.3d at 1242. Glover fails to show cause and prejudice

6    to excuse default of this claim. The Court therefore denies habeas relief for Ground 5.

7    **V.    CERTIFICATE OF APPEALABILITY**

8    This is a final order adverse to Glover. Rule 11 of the Rules Governing Section

9    2254 Cases requires the Court to issue or deny a certificate of appealability ("COA").

10   Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability

11   for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851,

12   864-65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the

13   petitioner "has made a substantial showing of the denial of a constitutional right." With

14   respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable

15   jurists would find the district court's assessment of the constitutional claims debatable or

16   wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S.

17   880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists

18   could debate (1) whether the petition states a valid claim of the denial of a constitutional

19   right and (2) whether this Court's procedural ruling was correct. *Id.*

20   Applying these standards, this Court finds that a certificate of appealability is

21   warranted for Ground 3. Reasonable jurists could debate whether Glover has

22   demonstrated that trial counsel rendered ineffective assistance for failure to object to Dr.

23   Corneal's testimony based on the autopsy report containing Dr. Dutra's conclusions as a

24   violation of the Confrontation Clause. The Court finds that a certificate of appealability is

25   not warranted for the remaining grounds.

26   **VI.    CONCLUSION**

27   It is therefore ordered that Petitioner Shawn Glover, Jr.'s First Amended Petition

28   for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 23) is denied.

1    It is further ordered that a certificate of appealability is granted for Ground 3 and

2  denied for the remaining grounds.

3    The Clerk of Court is directed to substitute Jeremy Bean for Respondent William

4  Reubart, enter judgment, and close this case.

5    DATED THIS 17th Day of September 2025.

6

7

8

9  _____

10  MIRANDA M. DU
   UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23